## STATE OF CONNECTICUT *v.* ROBERT COURCHESNE
(SC 17174)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille,
Zarella and Schaller, Js.*

---

*\* The listing of justices reflects their seniority status on this court as of the date of oral argument.*

Argued March 19, 2008—officially released June 15, 2010

*John Holdridge*, assistant public defender, with whom was *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Eva Lenczewski*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. At approximately 11 p.m. on September 15, 1998, the defendant, Robert Courchesne, and an

acquaintance, Demetris Rodgers, were seated in the defendant's car in the parking lot of Webster Bank located on the corner of Chase and Wigwam Avenues in Waterbury, arguing over a drug debt that the defendant owed Rodgers' boyfriend. When Rodgers became upset upon learning that the defendant was unable to pay the debt, the defendant took a serrated kitchen knife that he kept in his car and repeatedly stabbed Rodgers with it in her chest and back. Rodgers, who was approximately eight and one-half months pregnant, managed to escape from the car and to run a short distance before collapsing in the street as a result of her wounds. The defendant fled the scene in his car. About fifteen minutes later, a passerby discovered Rodgers. Shortly thereafter, a police officer arrived at the scene and called for emergency medical personnel, who attempted to revive Rodgers. Rodgers then was transported to Waterbury Hospital (hospital), where she was pronounced dead. An emergency department physician performed an emergency cesarean section on Rodgers and delivered her baby, Antonia Rodgers.[1] After Antonia was delivered, she immediately was subject to further resuscitation efforts and then placed on life support. Antonia remained on life support for forty-two days, at which time life support was removed. Within hours of removal, Antonia was pronounced dead. The cause of death was lack of oxygen to her brain, which she had suffered in utero as a result of the death of her mother.

The defendant was apprehended and charged in connection with the deaths of Rodgers and Antonia. Specifically, the defendant was charged with two counts of murder in violation of General Statutes § 53a-54a (a)[2]

---

[1] We hereinafter refer to Antonia Rodgers as Antonia and Demetris Rodgers as Rodgers throughout this opinion.

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

for the intentional killings of Rodgers and Antonia,[3] one count of capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (8)[4] for the murder of two or more persons in the course of a single transaction, and one count of capital felony in violation of § 53a-54b (9)[5] for the murder of a person under sixteen years of age, namely, Antonia. The trial court, *Damiani, J.*, held a probable cause hearing in accordance with article first, § 8, of the state constitution, as amended by article seventeen of the amendments,[6] and General Statutes § 54-46a (a),[7] following which the court found probable

---

[3] The charge with respect to the alleged murder of Antonia was predicated on a theory of transferred intent, that is, that the defendant, with the intent to kill Rodgers, also killed Antonia. See footnote 2 of this opinion.

[4] General Statutes (Rev. to 1997) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

In *State* v. *Courchesne*, 262 Conn. 537, 539, 816 A.2d 562 (2003), we incorrectly stated that the 1997 revision of § 53a-54b, as amended by Public Acts 1998, No. 98-126, § 1, was the applicable statute for purposes of the defendant's case. Public Act 98-126 did not become effective until October 1, 1998, approximately two weeks after the defendant's commission of the crimes charged in the present case. All references to § 53a-54b in this opinion are to the 1997 revision—the statute in effect on September 15, 1998—unless otherwise indicated.

[5] General Statutes (Rev. to 1997) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (9) murder of a person under sixteen years of age."

[6] Article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ."

Although article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, was amended further by article twenty-nine of the amendments, article twenty-nine of the amendments did not amend the provision in article seventeen of the amendments securing the right to a probable cause hearing in cases involving crimes punishable by life imprisonment or death.

[7] General Statutes § 54-46a (a) provides: "No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause

cause to believe that the defendant had committed the crimes with which he was charged.[8] Thereafter, the defendant waived a jury trial with respect to the guilt phase of the proceedings and elected to be tried by a three judge panel (panel), which consisted of *West, Cofield* and *D'Addabbo, Js.* The panel found the defendant guilty on all counts, and, thereafter, the trial court, *D'Addabbo, J.,*[9] conducted a penalty phase hearing before a jury in accordance with General Statutes (Rev. to 1997) § 53a-46a.[10] At the conclusion of the penalty

to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause."

[8] The trial court specifically found probable cause to believe that the defendant had committed three of the four crimes with which he had been charged, namely, the murder of Antonia and capital felony under both subdivisions (8) and (9) of § 53a-54b; the court made no finding with respect to the charge concerning the murder of Rodgers; see *State* v. *Courchesne*, 46 Conn. Sup. 63, 77, 757 A.2d 699 (1999) ("probable cause is found as to counts two, three and four of the information"); presumably because any conviction on that charge alone could not lead to a sentence of life imprisonment or the death penalty. See Conn. Const., amend. XVII (securing right to probable cause hearing for any crimes punishable by death or life imprisonment). Nevertheless, in determining that there was probable cause to believe that the defendant had committed the crime of capital felony by "murder[ing] . . . two or more persons at the same time or in the course of a single transaction"; General Statutes (Rev. to 1997) § 53a-54b (8); it necessarily determined that there was probable cause to believe that the defendant had murdered Rodgers. See *State* v. *Courchesne*, supra, 76.

[9] Judge D'Addabbo also served as the presiding judge of the three judge panel during the guilt phase of the proceedings.

[10] General Statutes (Rev. to 1997) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's

## phase hearing, the jury returned a special verdict, find-

guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any factor set forth in subsection (h), the existence of any aggravating factor or factors set forth in subsection (i) and whether any aggravating factor or factors outweigh any mitigating factor or factors found to exist pursuant to subsection (d).

"(f) If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by

ing, with respect to the defendant's conviction of capital felony under § 53a-54b (8), the existence of an aggravating factor, namely, that the defendant had committed the offense in an especially heinous, cruel or depraved

one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death.

"(g) If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

"(h) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) he was under the age of eighteen years or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (4) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(i) The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; or (7) the defendant committed the offense with an assault weapon, as defined in section 53-202a."

All references throughout this opinion to § 53a-46a are to the 1997 revision unless otherwise indicated.

manner within the meaning of § 53a-46a (i) (4),[11] and finding beyond a reasonable doubt that the aggravating factor outweighed any potential mitigating factor or factors. In accordance with the panel's finding of guilt and the jury's special verdict, the trial court, *D'Addabbo, J.*, rendered judgment of guilty and sentenced the defendant to death.[12]

On appeal to this court,[13] the defendant challenges the panel's finding of guilt and his death sentence. With respect to the guilt phase of the proceedings, he claims, inter alia, that the trial court improperly (1) denied his motion to suppress his written confessions and other evidence linking him to the murders, (2) denied his motion to dismiss the murder and capital felony charges relating to the death of Antonia because the court improperly invoked the common-law born alive rule[14]

[11] In *State* v. *Courchesne*, 262 Conn. 537, 542, 559, 816 A.2d 562 (2003), we concluded that, when a defendant has been convicted of capital felony for the murder of two persons in the course of a single transaction in violation of § 53a-54b (8), the state, in order to establish the aggravating factor set forth in § 53a-46 (i) (4), must prove only that the defendant committed one, rather than both, of the murders in an especially heinous, cruel or depraved manner.

[12] For sentencing purposes, the court merged the defendant's capital felony and murder convictions, murder being a lesser included offense of capital felony. In addition to the sentence of death that the trial court imposed on the defendant for his capital felony conviction under § 53a-54b (8), the court also sentenced the defendant to life in prison without the possibility of release for his capital felony conviction under § 53a-54b (9).

[13] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[14] Under the born alive rule, "only one who has been born alive can be the victim of homicide." *Commonwealth* v. *Booth*, 564 Pa. 228, 240, 766 A.2d 843 (2001). Thus, at common law, a person who caused the death of a fetus—even a viable fetus—could not be prosecuted for homicide. Id. By contrast, the law considered it a homicide if the fetus was born alive and then died of injuries that were inflicted in utero. Id.

in concluding that Antonia was a "person" for purposes of this state's murder and capital felony statutes, (3) denied his motion to dismiss after concluding that both the murder and capital felony charges relating to the death of Antonia lawfully could be predicated on the doctrine of transferred intent, and (4) permitted the state to proceed under the born alive rule and the doctrine of transferred intent in violation of his rights under the due process and ex post facto clauses of the United States constitution. In addition, the defendant claims that, even if the trial court properly recognized the existence of the born alive rule for purposes of our Penal Code, (1) the evidence was insufficient to establish beyond a reasonable doubt that Antonia was, in fact, born alive and, therefore, a "person" within the meaning of this state's murder and capital felony statutes, and (2) the state's "novel integration" of the born alive rule and the transferred intent principle embodied in § 53a-54a (a)[15] violated his constitutional right to fair notice that his conduct with respect to the death of Antonia fell within the murder and capital felony statutes. With respect to the penalty phase of the proceedings, the defendant claims, inter alia, that (1) the evidence was insufficient to prove beyond a reasonable doubt that he committed the murder of Rodgers in an "especially heinous, cruel or depraved manner" within the meaning of § 53a-46a (i) (4), and (2) the jury reasonably could not have found that the aggravating factor outweighed any mitigating factor or factors.[16]

---

[15] See footnote 2 of this opinion.

[16] The defendant raises numerous additional claims related to the penalty phase of the proceedings. We do not address some of these claims because they are not likely to arise at any subsequent penalty phase hearing. With respect to the remaining claims, although they may arise at a possible subsequent penalty phase hearing, we elect not to consider them unless and until, upon remand, the defendant is found guilty of the underlying capital felony charge and receives a sentence of death. To proceed otherwise would require us to determine that a penalty phase hearing is likely, a conclusion that we could reach only if we also were to presume that the defendant is likely to be found guilty of the underlying capital offense. We

For the reasons that follow, we reject the defendant's guilt phase claims and the penalty phase claims that we address. We nevertheless conclude that the panel applied the wrong evidentiary standard in finding that the state had established beyond a reasonable doubt that Antonia was born alive. Specifically, the panel improperly failed to consider whether, in accordance with *State* v. *Guess*, 244 Conn. 761, 764, 780, 715 A.2d 643 (1998), Antonia was brain dead at the time of her delivery due to the irreversible cessation of brain function even though her circulatory and respiratory systems were maintained by artificial means for forty-two days after her delivery. Accordingly, with respect to the murder charge arising out of the death of Antonia and both capital felony charges, all of which are predicated on the state's contention that, because Antonia was born alive, she was a person within the meaning of our Penal Code, we conclude that the defendant is entitled to a new trial at which the state will be required to prove that Antonia was not brain dead at the time she was born. If, upon retrial, the defendant is found guilty of the capital felony charge concerning the murder of Rodgers and Antonia in the course of the same transaction, the defendant also is entitled to a new penalty phase hearing. Finally, we affirm the defendant's conviction for the murder of Rodgers.

I

## SUPPRESSION CLAIMS

The defendant first claims that the trial court improperly denied his motion to suppress certain statements that he made to the police implicating himself in Rodgers' murder in violation of his rights under the fourth,[17]

are unwilling to engage in any presumption with respect to the result of the guilt phase proceeding.

[17] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirma-

eighth[18] and fourteenth[19] amendments to the United States constitution.[20] The defendant contends that the trial court improperly rejected his claims that he was seized by the police, that the seizure exceeded the bounds of a *Terry*[21] stop and that, following that stop, he did not voluntarily consent to accompany the police to the Waterbury police department for questioning. The defendant further contends, contrary to the conclusion of the trial court, that the fruits of these constitutional improprieties, including his oral and written statements in which he confessed to murdering Rodgers, must be suppressed. We disagree.

The following facts are necessary to our resolution of the defendant's suppression claims. The defendant filed a motion to suppress all oral and written statements that he had made to the police—in which he allegedly confessed to murdering Rodgers—on the ground that those statements had been obtained illegally. Thereafter, the trial court, *O'Keefe, J.*, conducted

tion, and particularly describing the place to be searched, and the persons or things to be seized."

[18] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[19] The fourth and eighth amendments are applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Tuilaepa* v. *California*, 512 U.S. 967, 970, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994) (eighth amendment); *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (fourth amendment).

[20] The defendant also asserts that his rights under article first, §§ 7, 8 and 9, of the Connecticut constitution were violated. Because the defendant has not provided a separate state constitutional analysis, we deem his state constitutional claim abandoned. See, e.g., *State* v. *Simpson*, 286 Conn. 634, 651 n.17, 945 A.2d 449 (2008).

[21] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "Under *Terry* . . . an officer may forcibly stop a suspect and engage in a stop and frisk investigation if the officer has a reasonable and articulable suspicion that the suspect has committed or is about to commit a crime." (Internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 501 n.17, 838 A.2d 981 (2004).

a suppression hearing at which both defense counsel and the state presented evidence. The state called as witnesses Detective John Kennelly and Sergeant Gary Pelosi, both members of the criminal investigations division of the Waterbury police department. The defense witnesses included the defendant's girlfriend in 1998, Jacqueline Wilson, the defendant's neighbors, Tamara Oliver and Sydney Vega, and Paul Ariola, a detective with the Waterbury police department. No two witnesses gave the exact same account of events relating to the defendant's alleged seizure by the police.

The state's first witness, Kennelly, testified that, sometime in the early morning hours of September 16, 1998, Waterbury police received information that the defendant was the last person to be seen with Rodgers before she was found mortally wounded. Acting on this information, Kennelly and Ariola set up a surveillance of the defendant's house on Sumac Street in Waterbury at approximately 8 a.m. that day. The officers, who were not in uniform, positioned their unmarked police car a short distance away from the defendant's house so that they could observe any vehicles coming down the street. At approximately 10:15 a.m., the defendant pulled up to the front of his house in a Ford Escort with a female passenger later identified as Wilson. According to Kennelly, at that point, he and Ariola immediately exited their police vehicle and approached the defendant's vehicle. After identifying himself and Ariola, Kennelly informed the defendant that they were investigating Rodgers' death and asked the defendant if he "would be kind enough" to go with them to the police station to answer some questions. The defendant replied, "sure, no problem," and exited his vehicle without being asked to do so. Kennelly characterized the defendant's demeanor as "calm, cooperative [and] rational," and further observed that the defendant did not appear to be under the influence of drugs or alcohol.

The officers neither handcuffed nor arrested the defendant, and they did not tell him that he was under arrest because, according to Kennelly, there was no probable cause to arrest him at that time.

The defendant then entered Kennelly's vehicle, and Kennelly transported him to the station. Although Kennelly did not tell the defendant that he did not have to go to the station, Kennelly testified that the defendant was, in fact, free to decline to do so. After the defendant had arrived at the station, he was placed in an interview room and read his *Miranda*[22] warnings from a printed card. After the defendant was advised of his rights, he signed and dated the card. The defendant then was asked whether he knew anything about Rodgers' death. The defendant immediately broke into tears and confessed that he had killed Rodgers. He then made a full oral and written confession to the murder, which included the disclosure of the location where he had disposed of the murder weapon.

Pelosi testified for the state that, in the early morning hours of September 16, 1998, Waterbury police learned from Rodgers' mother and Rodgers' boyfriend that Rodgers had been with the defendant immediately prior to her death and that Rodgers knew that the defendant was a narcotics user. Sometime between 9 and 10 a.m. that morning, Pelosi drove his unmarked police car to the defendant's Sumac Street address to participate in the surveillance. Upon his arrival there, Pelosi parked his vehicle at the other end of the street from where Kennelly and Ariola were parked and waited for the defendant. At approximately 10 a.m., Pelosi observed the defendant and Wilson pull into the defendant's driveway. At that time, Kennelly and Ariola exited their vehicle and approached the defendant's vehicle. Kennelly then spoke briefly to the defendant. According to

[22] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Pelosi, Kennelly told the defendant that he wanted to speak to him at the police station about Rodgers' death and asked him if he would be willing to do so. Pelosi further testified that none of the officers was in uniform, no guns were drawn when they approached the defendant's vehicle, the defendant was not told that he was under arrest, and he was not handcuffed or otherwise restrained. Pelosi described the defendant's demeanor as "very quiet, calm . . . . [H]e looked worried, concerned." Pelosi also stated that the defendant did not appear to be under the influence of alcohol or drugs. Kennelly then drove the defendant to the police station for questioning. At some point, Pelosi asked Wilson if she would accompany him to the station for questioning. She replied that she would and got into the front passenger seat of Pelosi's vehicle. The entire encounter, from the time the defendant and Wilson arrived on Sumac Street until they left in separate vehicles for the police station, lasted no more than five minutes.

Wilson testified at the suppression hearing for the defendant. She explained that, at approximately 10 a.m. on the day following Rodgers' murder, she and the defendant, with whom she resided, arrived on Sumac Street in her Ford Escort and noticed that many people in the neighborhood were standing in front of their houses. Before reaching his residence, the defendant pulled over to ask one of his neighbors whether she had seen Rodgers. The neighbor responded, "[N]o, cause you all murdered her." The defendant then proceeded to drive down the street toward his residence. When he arrived there, a police car appeared. According to Wilson, the defendant immediately attempted to turn around and to leave, but the police told him "to stop," and then "blocked him in." Wilson further testified that the police "made" her and the defendant get out of the vehicle. When asked if she had any choice in the matter, she replied, "I didn't know. I just did what they told

me." Wilson also explained, however, that, after exiting the vehicle, she went to the police station voluntarily.

Oliver testified that she was standing outside her house on Sumac Street in the morning hours of September 16, 1998, when she saw the defendant and Wilson drive up the street. The defendant pulled his vehicle over next to Oliver, and Wilson asked Oliver if she had seen Rodgers. Oliver responded that she had not. The defendant then continued driving toward his house, but a police car was parked nearby. When the defendant saw the police car, he tried to back up and to leave. At that point, however, the police car pulled up beside the defendant's car, causing him to stop. Oliver could not hear any conversation but observed the defendant exit his vehicle and subsequently enter the officer's car. Shortly thereafter, Wilson also got out of the vehicle and entered another police car that also had arrived at the scene. Both police cars then departed.

Ariola testified that the only car participating in the surveillance was the car that he and Kennelly were driving and that the officers had parked their car about three houses beyond the defendant's house on the opposite side of the street. After the defendant arrived with Wilson in Wilson's Ford Escort, the defendant pulled in front of his residence, waited "[a] few seconds" and then started to drive away. Before the defendant could drive away, however, Ariola moved his car into the middle of the street and stopped so close to the defendant's car that the defendant could not get by him. The defendant made no further attempts to drive away. Ariola testified that, if the defendant had asked the officers to move, there would have been "no reason" to prevent him from backing up. The officers then exited their car and approached the defendant's vehicle; Kennelly approached along the driver's side and Ariola approached along the passenger's side. After the officers identified themselves, Kennelly told the defendant

that he wanted the defendant to accompany him to the police station to talk about Rodgers. Neither officer had his gun drawn. Ariola further testified that there was no probable cause at that time to arrest the defendant and that the officers merely had wanted to question him because they had information that he was with Rodgers shortly before her death. The officers asked the defendant and Wilson to exit their vehicle, and, shortly thereafter, Pelosi arrived at the scene. The officers then called a tow truck for the defendant's car. Ariola testified that "everybody," including the defendant, was a suspect at the time, and the officers' intention was to question, not to arrest, the defendant. After Kennelly and Pelosi left the scene in separate cars with the defendant and Wilson, respectively, Ariola stayed behind to secure the area and to guard the defendant's vehicle until it could be towed away.

The final defense witness was Vega, the defendant's next-door neighbor. Vega testified that, on the morning of the surveillance, he was standing in his front yard and saw four "marked" police cars block the defendant's vehicle as the defendant approached his home. According to Vega, the police officers opened the defendant's car door, "pointed a gun at [the defendant]," and "pulled him out" of the car. Immediately thereafter, the defendant, who was not handcuffed, was placed in one of the police vehicles. Vega stated that he was approximately 600 feet from the scene when he observed the events that formed the basis of his testimony.

Following this testimony, the trial court, *O'Keefe, J.,* denied the defendant's motion to suppress. In an oral ruling, the court found that the "confrontation or . . . meeting" between the police and the defendant on the morning of September 16, 1998, did not have the "indicia of an arrest." In support of this conclusion, the court observed that the officers did not run up to the defendant or draw their weapons when they approached him.

The court stated that Vega's testimony that the officers had drawn their weapons was not credible, noting that, of all the witnesses, Vega was the only one to testify that the police were brandishing guns when they approached the defendant. The court also found that, although the officers "did stop [the defendant's] car," their actions were reasonable under the circumstances because it might not have been possible for the officers otherwise to have captured the defendant's attention to alert him to the fact that they wanted to speak with him. The court further found that the confrontation between the defendant and the police was not a seizure for constitutional purposes, and, even if it was, it was based on a "reasonable, articulable suspicion" that the defendant was involved in Rodgers' death because her murder had occurred only a few hours earlier and the defendant had been identified as the last person to be seen with Rodgers while she was still alive. The court made no other specific findings with respect to the issue of whether the police had exceeded the permissible limits of a *Terry* stop. The court did note, however, that police officers are paid to speak with people in furtherance of criminal investigations and, therefore, that the officers in the present case had every right to try to speak with the defendant. Finally, the court found that the defendant had gone to the police station voluntarily. In support of this conclusion, the court observed that the defendant may have done so out of feelings of remorse or shame for what he had done because, as soon as he arrived at the station, he immediately began to cry and confessed to stabbing Rodgers. The court concluded, on the basis of the defendant's behavior, that he did not "sound like somebody who is really resistant to the efforts of the police to talk to him." Although the court stated that it would expand on its

oral ruling in a written memorandum of decision to follow, no such memorandum ever was issued.[23]

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance. . . . In the present case, in which we are required to determine whether the defendant was seized by the police, we are presented with a mixed question of law and fact that requires our independent review." (Citations omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843–44, 955 A.2d 43 (2008). "When considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any . . . the encounter between [the police officer] and the defendant constitute[d] an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officers] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citations

---

[23] Although the court stated that it would expand on its oral ruling in a subsequent written memorandum of decision, it did not issue such a decision. Instead, the court signed a transcript of its oral ruling in conformance with Practice Book § 64-1, which provides in relevant part: "(a) The court shall state its decision either orally or in writing . . . (4) in ruling on motions to suppress under Section 41-12 . . . . If oral, the decision shall be recorded by a court reporter and, if there is an appeal, the trial court shall create a memorandum of decision for use in the appeal by ordering a transcript of the portion of the proceedings in which it stated its oral decision. The transcript of the decision shall be signed by the trial judge and filed in the trial court clerk's office. . . ."

omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004).

"Under the fourth amendment to the United States [c]onstitution . . . a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. *Alabama* v. *White*, 496 U.S. 325, 330–31, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990); *Terry* v. *Ohio*, [392 U.S. 1, 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]; *State* v. *Mitchell*, 204 Conn. 187, 194–95, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. *Terry* v. *Ohio*, supra, 392 U.S. 21 . . . . In determining whether a detention is justified in a given case, a court must consider [whether], relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . . *State* v. *Lipscomb*, 258 Conn. 68, 75–76, 779

A.2d 88 (2001); see also *Adams* v. *Williams,* 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ([a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time).

"In addition, [e]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. *Terry* v. *Ohio,* supra, 392 U.S. 22. Therefore, [a]n investigative stop can be appropriate even [when] the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Internal quotation marks omitted.) *State* v. *Colon,* 272 Conn. 106, 149–50, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

This court also has recognized that "[t]he test enunciated by the United States Supreme Court [regarding] whether an investigative stop passes constitutional muster balances the nature of the intrusion [on] personal security against the importance of the governmental interest inducing the intrusion. See *United States* v. *Hensley,* [469 U.S. 221, 228, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)]. A strong law enforcement interest has been particularly recognized in the context of felonies or violent crimes, because 'it is in the public interest that the crime be solved and the suspect detained as promptly as possible.' Id., 229. Furthermore, when the situation in which a suspect has been detained has

afforded him a lesser expectation of privacy . . . fourth amendment protections have been deemed to be correspondingly less stringent." (Citations omitted.) *State* v. *Mitchell*, supra, 204 Conn. 196. Because the intrusion resulting from an investigative stop is minimal, the reasonable suspicion standard is not onerous.

"The determination of whether a reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) *State* v. *Santos*, supra, 267 Conn. 504–505.

The state does not directly address the propriety of the court's finding that the encounter between the defendant and the police officers in the street in front of the defendant's house did not constitute a seizure. The state contends, however, that, even if we assume, arguendo, that the officers' conduct did constitute a seizure, the court properly concluded that the seizure was a lawful *Terry* stop. In particular, the state contends that the stop satisfied the requirements of *Terry* because it was based on the officers' reasonable, articulable suspicion that the defendant was involved in Rodgers' murder and because the stop was limited in scope and duration, lasting no longer than necessary to effectuate its purpose of inquiring whether the defendant would be willing to answer some questions about Rodgers and the circumstances surrounding her death. The defendant does not challenge the court's finding that the facts in existence at the time of the stop gave rise to a reasonable, articulable suspicion on the part of the police officers to justify a *Terry* stop.[24] The defendant

[24] We note that other courts have found reasonable and articulable suspicion when, as in the present case, the murder under investigation recently had occurred, it was committed in the same general vicinity in which the defendant was stopped, and the defendant was the last person to be seen with the victim prior to the murder. See, e.g., *Burgeson* v. *State*, 267 Ga.

claims, rather, that the officers' detention of him "was marked by such intrusiveness, displays of force and coercion that it exceeded the bounds of a stop permitted by *Terry*" and, therefore, constituted a de facto arrest, which required probable cause. In support of his claim that the officers used undue force in detaining him, the defendant asserts that, in addition to blocking his vehicle, two or three armed officers surrounded him and ordered him out of the vehicle, behaved in a "blunt and forceful manner" toward him, and conveyed such urgency when they sought to have the defendant accompany them to the station that he was forced to abandon his vehicle in the middle of the road.

In response, the state maintains that the only aspect of the stop that even arguably could be characterized as involving a degree of compulsion or force was the officers' use of their unmarked police vehicles to prevent the defendant from driving away. The state contends, however, that, when viewed in light of the totality of circumstances, the officers' blocking the defendant's vehicle so that he could not leave before the officers were able to speak to him was a reasonable means of maintaining the status quo so that the officers could complete the purpose of the investigatory stop. In other words, the state asserts that the challenged police action did not transform the stop into an arrest.

102, 105, 475 S.E.2d 580 (1996) (police had reasonable suspicion to make *Terry* stop of vehicle containing defendant and three others when, inter alia, "the authorities were able to positively identify the body of the victim, get a description of the victim's car including the license plate, learn that the victim was last seen with [the defendant] and three others, and that certain of the individuals were hiding out in Tennessee"); *State* v. *Allen*, 682 So. 2d 713, 718 (La. 1996) (police had reasonable suspicion to justify brief *Terry* stop of defendant's car when murder occurred in area, defendant was last person seen with victim and defendant was known to own same type of gun used in murder); *Herrera* v. *State*, 665 S.W.2d 497, 505 (Tex. App. 1983, pet. ref'd) (police had reasonable suspicion to justify *Terry* stop of defendant in black Chevrolet when defendant had been seen with victim in black 1967 Chevrolet about eighteen hours before victim's body was discovered).

For purposes of this appeal, we assume, arguendo, that the police seized or detained the defendant when they approached him and confronted him with the request that he accompany them to the station. We conclude, however, that the trial court properly determined that the seizure of the defendant by the police constituted a lawful *Terry* stop.

"A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. . . . Like the determination of initial justification, this inquiry is fact-bound." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, supra, 204 Conn. 197. Whether the detention of a suspect exceeds the scope of a permissive investigative stop, however, is a question of law. See, e.g., *State* v. *Nash*, 278 Conn. 620, 641, 899 A.2d 1 (2006).

"One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an identification, [as] long as his conduct is strictly tied to and justified by the circumstances [that] rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends on a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Braxton*, 196 Conn. 685, 689, 495 A.2d 273 (1985). "A police officer who has articulable grounds to believe that a crime has been committed and to detain someone who may be implicated in that crime must be permitted to make reason-

able use of the resources at his disposal at the site of the investigatory stop." Id., 690.

The defendant claims that two or three armed officers surrounded him, ordered him out of his vehicle and used undue force in detaining him. The defendant's characterization of what occurred, however, is not fully consistent with the trial court's findings concerning the officers' conduct. As we previously have indicated, although the court made only limited factual findings with respect to the encounter between the police and the defendant, it determined that the confrontation had none of the indicia of an arrest because the officers "didn't have any guns out, [and] they didn't run up to [the defendant]." The court further found that, although the officers "did stop [the defendant's] car" by pulling in front of it, that action was the only way for them to get the defendant's attention so that they could talk to him. At no time did the police ever handcuff the defendant or otherwise inform him that he was not free to leave. Moreover, Kennelly testified that he had asked the defendant if he would be willing to accompany him to the station for questioning. Although one witness, namely, Vega, testified that the officers actually had drawn their guns, the court did not credit his testimony and was not required to do so. None of the other witnesses, including Wilson, the defendant's girlfriend, described any conduct on the part of the officers that could be construed as unduly coercive, threatening or oppressive. Although it is true that Kennelly and Ariola approached the defendant's vehicle from both sides, this was not unreasonable in view of the fact that the defendant was accompanied by Wilson, who was sitting in the front passenger seat. Because the suppression hearing testimony fully supports the trial court's factual findings and its conclusion concerning the propriety of the *Terry* stop, we see no reason to disturb those findings and conclusions.

The defendant nevertheless claims that the officers, by virtue of their actions, exceeded the scope of a permissible investigative stop, as a matter of law, when they approached and communicated with him. "When engaging in a fourth amendment reasonableness inquiry, we ask, would the facts available to the officer at the moment of the seizure or the search warrant a [person] reasonable caution in the belief that the action taken was appropriate? . . . [T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes. . . . At the same time, however, the law recognizes the important need to allow authorities to graduate their responses to the demands of any particular situation." (Citations omitted; internal quotation marks omitted.) *State* v. *Nash*, supra, 278 Conn. 641–42.

Connecticut courts have found the patdown of a suspect, the search of a suspect's vehicle and the approach of officers with their guns drawn to be within the permissible bounds of a *Terry* stop depending on the circumstances. Thus, in *State* v. *Wilkins*, 240 Conn. 489, 692 A.2d 1233 (1997), for example, this court held that an investigatory detention was lawful when a uniformed officer, following a traffic stop of a vehicle during which its two occupants engaged in furtive conduct, approached the vehicle with his gun drawn, ordered the occupants out and, thereafter, conducted a patdown search of the occupants and a limited search of their vehicle for weapons. Id., 493–94, 501–504; see also *State* v. *Casey*, 45 Conn. App. 32, 41–44, 692 A.2d 1312 (actions of police officers did not exceed permissible limits of investigative detention under *Terry*, even though police officers removed defendant and other suspects from vehicle at gunpoint, searched vehicle, defendant and other suspects twice, handcuffed defendant and other

suspects and placed them in back of police cruisers for one hour before making identifications necessary for probable cause to arrest, when police had information that defendant and other occupants of vehicle may have been involved in shooting and officers' actions accounted for safety of public and themselves), cert. denied, 241 Conn. 924, 697 A.2d 360 (1997); *State* v. *Holloman*, 20 Conn. App. 521, 526, 568 A.2d 1052 (permissible in course of *Terry* stop for officers to order occupants out of car at gunpoint when report indicated occupants were involved in local armed robbery in which handgun was stolen), cert. denied, 214 Conn. 805, 573 A.2d 317 (1990); *State* v. *Wylie*, 10 Conn. App. 683, 687–88, 525 A.2d 528 (mere fact that officer ordered defendant to stop with officer's gun drawn does not automatically convert *Terry* stop into arrest), cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987).

Guided by the general principles articulated in the foregoing cases and the policy considerations underlying *Terry*, we reject the defendant's claim that the officers engaged in conduct that was more intrusive or more coercive than necessary to effectuate a legitimate *Terry* stop. In view of the fact that the officers were investigating a murder that had occurred in the area only a few hours earlier and the fact that the defendant was the last person seen with the victim, the officers' conduct in detaining him briefly was not unreasonable. The only police conduct that fairly may be characterized as coercive was the action undertaken by the officers in blocking the defendant's vehicle to ensure that he would not leave the area before they could speak to him. In light of the defendant's attempt to leave almost immediately after he pulled up to his house, we agree with the trial court that blocking the defendant's vehicle likely was the most efficacious way to maintain the status quo so that the police could gain the defendant's attention. Other courts agree that such action ordinarily

is permissible to maintain the status quo when the subject of the investigatory stop is in a vehicle and, therefore, has the capacity to flee from the scene unless physically blocked from doing so. See, e.g., *United States* v. *Tuley*, 161 F.3d 513, 515 (8th Cir. 1998) ("[b]locking a vehicle so its occupant is unable to leave during the course of an investigatory stop is reasonable to maintain the status quo while completing the purpose of the stop"); *Commonwealth* v. *Hall*, 50 Mass. App. 208, 210, 736 N.E.2d 425 ("[b]locking generally will be reasonable [for purposes of a *Terry* stop] when the suspect is in a vehicle because of the chance that the suspect may flee upon the approach of police with resulting danger to the public as well as to the officers involved" [internal quotation marks omitted]), review denied, 432 Mass. 1111, 739 N.E.2d 701 (2000).

Furthermore, as we previously indicated, the officers, who were driving an unmarked car and were not in uniform, approached the defendant's vehicle without drawing their guns and merely requested that the defendant accompany them to the police station for questioning about the murder. Thus, other than Vega, whose testimony the trial court expressly discredited, no witness described the officers as having engaged in any conduct that reasonably may be deemed to be unduly intimidating or coercive under the circumstances with which the police officers were confronted when they stopped the defendant.

The defendant cites several cases for the proposition that the officers used a level of force and coercion that exceeded the limits of a lawful *Terry* stop. The officers in those cases, however, used far more coercive techniques than those that were employed by the officers in the present case. See *Park* v. *Shiflett*, 250 F.3d 843, 851–52 (4th Cir. 2001) (defendant's liberty was curtailed to degree associated with formal arrest because he would not have felt free to leave after being thrown

against wall, kicked, handcuffed and locked in patrol car); *United States* v. *Robinson*, 30 F.3d 774, 785 (7th Cir. 1994) (stop escalated into arrest when defendant was placed in handcuffs and read his *Miranda* rights); *Oliveira* v. *Mayer*, 23 F.3d 642, 645–46 (2d Cir. 1994) (court concluded that police had gone beyond investigatory stop of suspects and had arrested them on basis of facts that suspects had been "boxed-in by six police vehicles and outnumbered two-to-one by officers with guns drawn or at the ready," ordered from vehicle, harshly treated, kept in handcuffs for duration of detention, placed in separate police cruisers and questioned with or without *Miranda* warnings, and extensively searched), cert. denied, 513 U.S. 1076, 115 S. Ct. 721, 130 L. Ed. 2d 627 (1995); *United States* v. *Anderson*, 981 F.2d 1560, 1566 (10th Cir. 1992) (blocking of defendant's egress by two agents in separate cars and approach by agent with drawn gun constituted arrest that required probable cause because suspect was not free to leave); *United States* v. *Codd*, 956 F.2d 1109, 1110–11 (11th Cir. 1992) (detention went beyond bounds of *Terry* stop when officer asked suspect to stop and identify herself, placed her in handcuffs, took her to police station, handcuffed her to chair and searched her purse); *United States* v. *Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990) (investigatory stop transformed into arrest when officers took hold of and isolated unarmed, compliant juvenile by shining high beams of police car in his face, patting him down, gripping his arm, telling him not to run anymore and directing him to back of one of two patrol cars); *State* v. *Edwards*, 214 Conn. 57, 70–73, 570 A.2d 193 (1990) (detention in course of *Terry* stop exceeded permissible limits when officers placed defendant in handcuffs and transported him to police headquarters to be held for investigative purposes for indefinite period of time). In fact, none of the elements associated with the impermissible *Terry* stops in the

foregoing cases is present in this case: the officers who confronted the defendant did not draw their guns, did not place the defendant in handcuffs, did not seize any items in his possession or control, did not tell him or indicate to him that he could not leave, did not lock him in a patrol car and did not use any other type of physical force against him that might have been considered excessive under the circumstances. The defendant therefore cannot prevail on his claim that the conduct of the officers exceeded the permissible bounds of a *Terry* stop as a matter of law.

The defendant also claims that he did not agree voluntarily to go to the police station to be questioned about the murder. He contends that his purported consent to speak to the police was the fruit of his illegal seizure and that, even if it was not, his agreement merely reflected his submission to lawful authority. We reject the defendant's contentions.

We first address the defendant's claim that his consent was invalid because it was the fruit of an illegal seizure. "Courts have frequently held that a purportedly voluntary consent given after an illegal arrest or search is nonetheless a tainted fruit when that consent was given very soon after the illegal police action. See, e.g., *United States* v. *Recalde*, 761 F.2d 1448, 1459 (10th Cir. 1985) (consent given promptly after illegal arrest invalid); *United States* v. *Gooding*, 695 F.2d 78, 84 (4th Cir. 1982) (consent occurring 'within the same brief continuous encounter' as illegal seizure invalid); *State* v. *Raheem*, 464 So. 2d 293, 297–98 (La. 1985) (consent given within forty minutes of arrest invalid). These decisions imply that a consent given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority and not necessarily an act of free will." *State* v. *Cates*, 202 Conn. 615, 621–22, 522 A.2d 788 (1987). In light of our determination that the defendant's detention was lawful under

*Terry*, however, the defendant cannot establish that his answers to questions posed to him by the police at the station constituted the fruit of an illegal seizure.

The defendant next asserts that, even if he was the subject of a lawful investigatory stop, he did not consent voluntarily to go to the police station for questioning because, under the totality of the circumstances, his agreement to do so was the product of police coercion. The defendant also contends that the evidence demonstrates that he merely was submitting to lawful authority. We reject these claims.

It is well established that "[t]he question [of] whether consent . . . has . . . been freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances . . . and, ultimately, requires a determination regarding the putative consenter's state of mind." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 44, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . As a question of fact, it is normally to be decided by the trial court [on] the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 275, 897 A.2d 554 (2006). "We are particularly mindful that all of these factual findings revolve principally around the credibility of the witnesses who appeared before the trial court, the evaluation of which is left to the trial court's sound discretion because of its function to weigh and interpret the evidence before it." Id., 277.

This court recently considered the issue of voluntary consent in *State* v. *Azukas*, supra, 278 Conn. 267. In *Azukas*, several officers were granted entry into a home in which the defendant, Anthony Azukas, a suspect in a murder, was staying with his girlfriend and their infant child.[25] Id., 271. The police located Azukas in an upstairs bedroom and told him that they would like to speak to him about a murder that they were investigating. Id., 273–74. Azukas agreed to accompany the officers to the police station, where he confessed to the murder. Id., 271–72. On appeal, Azukas claimed that the trial court improperly had denied his motion to suppress his inculpatory statements because, inter alia, his consent to accompany the police to the station had not been voluntary. See id., 272, 284–85. In rejecting the claim, we observed that the trial court specifically had credited testimony, adduced by the state, that Azukas willingly had agreed to go to with the officers to the station and that he had not been placed under arrest, handcuffed or otherwise restrained in any way. Id., 284. Furthermore, the evidence adduced by the state indicated that the officers had not engaged in any coercive conduct toward Azukas and that they also did not argue with him or harass him in any way. Id., 284–85. We concluded that the suppression hearing testimony supported the trial court's conclusion that Azukas had consented to accompany the officers voluntarily. Id.

Similarly, in *State* v. *Colon*, supra, 272 Conn. 107, we observed that the defendant, Ivo Colon, voluntarily had accompanied the police to the station, where he confessed to the fatal beating of a two year old child.[26] Id.,

---

[25] The police received permission to enter the residence from the girlfriend's father, who owned the home and also resided there. *State* v. *Azukas*, supra, 278 Conn. 271, 273.

[26] We note that Colon never claimed that he did not voluntarily accompany the police to the station. We discussed that aspect of the investigation merely to explain, after concluding that Colon lawfully had been detained under *Terry*, that his subsequent statements to the police had not been otherwise tainted. See *State* v. *Colon*, supra, 272 Conn. 151–52 n.15.

133, 140–41. We explained that the trial court had found that, after the police confronted Colon in the hallway of his mother's apartment; see id., 131, 137; they briefly detained him under *Terry* and asked him if he would go to the station with them to discuss the child's injuries. Id., 151–52 n.15. When Colon nodded affirmatively, he was transported to the station by the police. Id. We further noted that the trial court had found that "[t]here were no guns drawn, or any evidence of threats, or physical force. The evidence that the court finds credible is that [Colon] was not handcuffed. He was placed in an unmarked police cruiser, without a cage, and taken to police headquarters. [Colon's] demeanor was calm and [he was] under control. Although the police did not tell [Colon that] he could refuse to go to the police station, he did not object or request to go to the . . . station at another time." (Internal quotation marks omitted.) Id. We thus characterized the evidence as indicating that Colon had consented voluntarily to go to the police station for questioning. See id.

Other courts also have concluded that a defendant's consent to accompany the police to the station was voluntary when the defendant appeared willing to do so and there was no evidence of coercion. See, e.g., *United States* v. *Mendenhall*, 446 U.S. 544, 557–58, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (respondent voluntarily agreed to accompany federal agents to airport office after being approached on concourse and asked by agents if she would do so and there was no threat or show of force); *United States* v. *Kimball*, 25 F.3d 1, 8 (1st Cir. 1994) (defendant voluntarily consented to accompany officers to police station because, even though he was not told that he was free to leave or free to refuse further questioning, he expressly agreed to go to station when asked several times, never indicated any unwillingness to do so, and officers did not handcuff, physically restrain, threaten to arrest, coerce or

otherwise intimidate defendant); *State* v. *Navarro*, 201 Ariz. 292, 296–97, 34 P.3d 971 (2001) (defendant voluntarily consented to accompany officer to police station for questioning after defendant arrived voluntarily at scene of investigation, plainclothes officers did not surround him on public street, handcuffs were removed almost immediately after being placed on him, and defendant verbally agreed to accompany officers to station upon being asked to do so); *State* v. *Bragan*, 920 S.W.2d 227, 243 (Tenn. Crim. App. 1995) (defendant voluntarily agreed to accompany police officers to station, there having been no threats, no show of force and no physical compulsion to accompany officers, even though speaking officer's tone of voice indicated that trip to station was mandatory). But cf. *United States* v. *Gonzalez*, 763 F.2d 1127, 1128, 1132 (10th Cir. 1985) (defendant did not voluntarily consent to accompany police officer to station when officer withheld defendant's driver's license, car registration and title and defendant therefore had no reasonable choice other than to accompany officer no matter how polite officer was in phrasing request).

Turning to the present case, we conclude that the trial court properly found that the defendant voluntarily had agreed to go to the police station for questioning. There is no evidence that the officers forced or otherwise pressured the defendant to accompany them to the station. In fact, the testimony indicated that the defendant was cooperative with the police, who were not in uniform and did not display their weapons, and that he got out of his vehicle without being asked to do so. The defendant never was restrained, his demeanor was described as calm, and he did not appear to be under the influence of alcohol or drugs. Finally, and perhaps most importantly, the evidence that the state adduced demonstrated that the police had asked the defendant if he would be willing to accompany them

to the station; at no time was the defendant told that he was obligated to go to the station or that he otherwise was required to speak to the police. Although it may be true that most people would view such an approach by the police with concern or apprehension, we never have held that a *Terry* stop is so inherently coercive as to compel the conclusion that the suspect's agreement to speak to the police could not have been voluntary. On the contrary, the test is fact specific, so that, ultimately, the determination of whether the consent was voluntary rests on a careful consideration of the totality of the relevant circumstances. The record supports the trial court's conclusion that the defendant voluntarily agreed to accompany the police to the station upon being requested to do so.

The defendant nevertheless has identified twenty-five "circumstances," or reasons,[27] that purportedly demon-

---

[27] The reasons that the defendant gave include the following: (1) The police did not inform the defendant that he was free to refuse to accompany them to the police station (station); (2) the clear " 'implication of obligation' " inherent in the request of the police that the defendant accompany them to the station; (3) the defendant never stated that his " 'consent' " was voluntary; (4) the police did not ask the defendant if he was voluntarily consenting to accompany them to the station; (5) the police did not inform the defendant that he was free to leave before telling him that they wanted him to accompany them to the station; (6) the police did not inform the defendant that he could answer their questions somewhere else other than the station; (7) the police did not advise the defendant of his *Miranda* rights before informing him that they wanted him to accompany them to the station; (8) the police did not inform the defendant that he was not under arrest before informing him that they wanted him to accompany them to the station; (9) the presence of two or three armed police officers at the scene; (10) the police blocked the defendant's vehicle before informing him that they wanted him to accompany them to the station; (11) the armed police officers surrounded the defendant's vehicle before informing him that they wanted him to accompany them to the station; (12) his " 'consent' " was obtained immediately after he was detained pursuant to *Terry*; (13) the defendant was ordered out of his vehicle; (14) the police conveyed a strong sense of urgency as demonstrated by the fact that the defendant abandoned his car in the middle of the street; (15) the defendant was not given an opportunity to move his vehicle out of the middle of the street and onto his property before responding to the request of the police that

strate why his consent was not voluntary. Several of these reasons relate to the fact that the officers did not inform the defendant that he was not required to comply with their request that he accompany them to the police station or that they did not specifically ask him whether his consent was voluntary. Indeed, Kennelly acknowledged that he did not inform the defendant that he did not have to go to the station. It was altogether reasonable, however, for the trial court to have concluded that this fact, standing alone, was insufficient to render the defendant's consent involuntary. Indeed, as the United States Supreme Court has stated, "we cannot accept the position . . . that proof of knowledge of the right to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent. Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions . . . ." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 232–33, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); see also *United States* v. *Thompson*, 524 F.3d 1126, 1134 (10th Cir. 2008) ("knowledge of the right to refuse consent is not a necessary prerequi-

he accompany them to the station; (16) the blunt and forceful manner in which the police communicated with the defendant and Wilson; (17) the force and intrusiveness of the *Terry* stop; (18) there was no inclement weather or other conditions that prevented the police from interviewing the defendant in his car, in one of the police cars at the scene, in the defendant's yard or home or anywhere else other than the station; (19) specialized personnel were not required to conduct the defendant's interview, and the defendant was interviewed by the same officers who detained him; (20) the defendant did not drive himself to the station but, rather, was transported to the station in a police car; (21) the defendant was forced to ride in the backseat rather than in the front seat of the police car; (22) the encounter occurred in front of the defendant's residence; (23) the defendant was placed in a small interview room at the station where he was subjected to interrogation for a lengthy period of time; (24) the defendant never was told that he could leave the station prior to his interrogation; and (25) the defendant's understanding was impaired by not having slept the previous night and by his use of crack cocaine.

site" to establishing that consent was voluntary [internal quotation marks omitted]); *United States* v. *Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (same); *Symes* v. *United States*, 633 A.2d 51, 53–54 (D.C. 1993) (same). Under the circumstances of the present case, the mere fact that the police did not inform the defendant of his right to refuse to accompany them to the station does not invalidate the court's finding that his agreement to do so was the product of his voluntary consent and not police coercion.

The defendant also claims that his consent was involuntary because the officers (1) blocked him from leaving the scene, (2) were armed, (3) approached on both sides of his vehicle, (4) did not allow him to move his vehicle from the middle to the side of the road, (5) sought his consent immediately after he was seized, (6) were blunt in their manner, and (7) had him ride to the police station in the backseat of their vehicle instead of having him drive his own vehicle. We disagree with the defendant's contention that these facts required a finding that his consent had not been obtained voluntarily. Although these facts are relevant to the determination of whether the defendant's consent was voluntary, they are not necessarily dispositive of that issue, and the trial court was not bound to treat them as such. Indeed, in light of the other facts that demonstrate the defendant's willingness to accompany the police, the trial court reasonably concluded that the defendant had agreed to do so voluntarily.[28] We therefore reject the

---

[28] We reject as irrelevant or unpersuasive the other "circumstances" that the defendant cites as allegedly demonstrating that his consent to go to the police station was involuntary. These include the fact that the police did not inform him of his *Miranda* rights before they asked him to go to the station, that there was no inclement weather or other conditions that prevented the police from interviewing the defendant in his car or some place other than the station, that the encounter occurred in front of his residence, that he was placed in a small interview room after he arrived at the station, and that he never was told that he could leave the station prior to being interrogated.

defendant's contention that the trial court improperly denied his motion to suppress his inculpatory statements and the fruits thereof.

## II

## BORN ALIVE RULE

The defendant next claims that, in denying his motion to dismiss the murder count and the two capital felony counts predicated on Antonia's death, the trial court, *Damiani, J.*, improperly invoked the born alive rule in connection with its determination that Antonia was a "person" within the meaning of this state's murder and capital felony statutes. The defendant contends that there is no precedent in this state pursuant to which a defendant may be held liable for a homicide that is founded on an injury inflicted on a fetus and, even if such authority existed, the rule is obsolete and should not be followed. The defendant further claims that the born alive rule is inconsistent with, and thus abrogated by, our Penal Code, because, under the Penal Code, "criminal liability [is premised] on attendant circumstances that must exist at the time the [crime was committed]." The defendant maintains that, in light of this principle, he could not have murdered Antonia within the meaning of the Penal Code because of the lack of a temporal nexus between his criminal conduct and her status as a person. In a related vein, the defendant, relying on his contention concerning the inapplicability of the born alive rule, further maintains that his intent to kill Rodgers could not be transferred to Antonia under the transferred intent provisions of § 53a-54a (a) because he engaged in the conduct resulting in Antonia's death when Antonia was not a person. Finally, the defendant claims that the trial court's "novel" application of the "twin legal fictions" of the born alive rule and the doctrine of transferred intent, as a basis for concluding that the state could prosecute him for mur-

der and capital felony, violated his constitutional right to fair warning under the due process clause of the fourteenth amendment and constituted a violation of the ex post facto clause of article one, § 10, of the United States constitution.[29]

The following facts and procedural history are relevant to our resolution of these claims. On February 11, 1999, the trial court, *Damiani, J.*, conducted a probable cause hearing on the two counts of murder and the two counts of capital felony with which the defendant had been charged. Because three of the counts require proof by the state that Antonia was born alive, namely, the counts alleging the murder of Antonia, the murder of a person under the age of sixteen (Antonia) and the murder of two or more persons (Rodgers and Antonia) in a single transaction, the state adduced testimony from Richard S. Palmer, the emergency department physician who delivered Antonia via cesarean section.[30] Due to the circumstances, Palmer had only an extremely limited opportunity to observe Antonia, but he did observe that Antonia was not breathing and was not making any sounds at the time of delivery. He also made no attempt to resuscitate Antonia; instead, imme-

---

[29] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

The defendant also contends that dual application of the born alive rule and the transferred intent provisions of § 53a-54a (a) violates his rights under the analogous provisions of the state constitution. Because he has not engaged in a separate state constitutional analysis, however, we do not address his claim under the state constitution. See, e.g., *State v. Nash*, 278 Conn. 620, 623–24 n.4, 899 A.2d 1 (2006) (this court will not review state constitutional claim unless defendant provides adequate, independent legal analysis of that claim).

[30] As we previously indicated; see text accompanying footnote 1 of this opinion; Palmer first attended to Rodgers, whom he determined to be dead. He delivered Antonia approximately ten minutes after Rodgers' arrival in the emergency department.

diately after delivering Antonia, Palmer transferred her to a physician's assistant, who then rushed her to the pediatric intensive care unit. Approximately one-half hour after the delivery, Palmer went to that unit and treated a laceration that Antonia had suffered during the cesarean section. At that time, Antonia's vital signs, that is, her heart rate and respiration, had been stabilized, and she had been placed on a ventilator. Palmer thereafter completed the appropriate paperwork for the issuance of Antonia's birth certificate, which signified that she had been born alive. Over the next several weeks, Palmer often checked on Antonia, who continued to exhibit stable vital signs until, six weeks later, when she was removed from the ventilator and subsequently pronounced dead.

On the same day as the probable cause hearing, the defendant filed a motion to dismiss the capital felony charges and the charge relating to Antonia's murder, and made a request for a finding of no probable cause. In the motion to dismiss, the defendant asserted that these charges were legally deficient because, inter alia, (1) Antonia was a fetus when the defendant inflicted the injuries that resulted in her death, and, as a matter of law, a fetus is not a person under this state's murder and capital felony statutes, (2) the evidence was insufficient to establish the requisite "concurrence between the [necessary] mens rea and the actus reus of the charged offenses," and (3) prosecuting the defendant under the born alive rule violates his right to notice under the relevant due process and ex post facto provisions of the federal constitution.

On May 19, 1999, the trial court denied the defendant's motion to dismiss and request for a finding of no probable cause. *State* v. *Courchesne*, 46 Conn. Sup. 63, 757 A.2d 699 (1999). In its memorandum of decision, the trial court characterized the fundamental question presented as "whether the defendant can be tried for mur-

der and capital felony for the killing of an infant who succumbs forty-two days following a [cesarean] birth necessitated by the fatal stabbing of her pregnant mother . . . ." Id., 64. The court observed that, to establish that the defendant had committed the crimes of murder and capital felony arising out of the death of Antonia, the state was required to prove that Antonia was a "person" within the meaning of the murder and capital felony statutes. See id., 65. Because General Statutes § 53a-3 (1) defines "person" simply as a "human being," a term that itself is not defined in our statutes, the trial court turned to the Model Penal Code and the New York Penal Law for guidance. Id., 66–67. The court observed that, under the New York Penal Law, "a 'person' is defined as 'a human being who has been born and is alive.' " Id., 67, quoting New York Penal Law § 125.05 (1) (McKinney 1998). The trial court also observed that "[t]he Model Penal Code defines a 'human being' as 'a person who has been born and is alive.' " *State* v. *Courchesne*, supra, 67; see Model Penal Code § 210.0 (1) (1980). On the basis of these definitions and this court's past reliance on the New York Penal Law and Model Penal Code in construing this state's Penal Code, the trial court concluded that "the definition of a 'person' in Connecticut criminal law includes those who are born and are alive." *State* v. *Courchesne*, supra, 67. The court further concluded that this definition did not exclude Antonia because the physician who delivered her, Palmer, had testified at the probable cause hearing that Antonia "was born and remained alive for forty-two days before she succumbed to her injuries." Id.

In reaching its determination, the trial court also relied on the common-law born alive rule. See id., 67–69. The court explained that, under that rule, "the death of a fetus could stand as a basis for murder as long as the fetus was born alive and subsequently died of injuries

inflicted in utero." Id., 68. The court further observed that the born alive rule previously had been recognized in this state in *State* v. *Anonymous (1986-1)*, 40 Conn. Sup. 498, 516 A.2d 156 (1986) (*Anonymous*). See *State* v. *Courchesne*, supra, 46 Conn. Sup. 67. In *Anonymous*, the court relied on the born alive rule in denying the state's application for a warrant to arrest the defendant, who had been accused of murder in connection with the death of "an unborn but viable fetus . . . ." *State* v. *Anonymous (1986-1)*, supra, 498–500, 502–503, 505. The trial court in the present case therefore rejected the defendant's contention that application of the born alive rule violated his due process right to fair notice because Antonia was a fetus when the defendant inflicted her fatal injuries, and, therefore, he had no reason to know that her subsequent death could give rise to a cognizable offense, namely, murder or capital felony. See *State* v. *Courchesne*, supra, 71–72. The court explained that the born alive rule has deep roots in the common law and that the legislature's codification of the criminal law had not altered the rule in any way. Id., 71. For these same reasons, the court rejected the defendant's claim that application of the rule constituted an unconstitutional ex post facto law, concluding that "the rule [that] applies to establish the defendant's liability was not created after he acted. . . . To apply the born alive rule to this defendant, therefore, would not make more burdensome the punishment for a crime, after its commission [in violation of the ex post facto clause] . . . . *Collins* v. *Youngblood*, [497 U.S. 37, 42, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990)]." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, supra, 72. Finally, with respect to the defendant's claim that the state had failed to demonstrate the necessary "concurrence between the mens rea and the actus reus of the charged offenses"; id., 73; the trial court observed that "[t]he intent required by

§ 53a-54a (a) [this state's murder statute] may be sup-
plied under the doctrine of transferred intent. The clear
meaning of the statute leads to the result that, when a
person engages in conduct with the intent to kill some-
one, there can be a separate count of murder for every
person actually killed by the conduct. *State* v. *Hinton*,
[227 Conn. 301, 309, 630 A.2d 593 (1993)]." (Internal
quotation marks omitted.) *State* v. *Courchesne*, supra,
74. The court concluded that there was nothing in our
statutory scheme to prevent the state from relying on
the principle of transferred intent for the purpose of
establishing that the defendant had the mental state
necessary to support a conviction of the murder of
Antonia even though the injuries that caused her death
were inflicted while she was in utero. Id., 74–75.

Thereafter, the defendant waived his right to a jury
trial for purposes of the guilt phase of the case, and
his case was tried before the panel. On September 17,
2001, following that trial, the panel issued a written
decision finding the defendant guilty of all charges. With
respect to the counts of the information relating to
Antonia's murder, the panel found that the definition
of "person" under Connecticut law "includes those who
are born and are alive," and, therefore, for purposes of
§ 53a-3 (1), a human being is "a person who has been
'born alive.' " After observing that "[t]he law of the case
is consistent with this . . . [conclusion]," the panel fur-
ther stated that "the state has proven beyond a reason-
able doubt that Antonia . . . was born alive" and,
consequently, that she is "a person" within the meaning
of this state's murder and capital felony statutes. The
panel further explained that the state had proven that
the defendant, with the intent to cause the death of
Rodgers, had caused the death of Antonia in violation
of the provision of § 53a-54a (a) pursuant to which a
person is guilty of murder "when, with intent to cause

the death of another person, he causes the death . . . *of a third person* . . . ." (Emphasis added.)

The defendant subsequently filed a motion for articulation of several legal conclusions and factual findings made by the panel in its written decision. The panel granted the motion only as to one legal conclusion,[31] namely, "[t]he legal basis for [the] adoption of the born alive rule and what [the panel] meant when it referred to 'the case law' and 'the law of the case.' . . . The defendant requests that [the panel] articulate both the meaning and significance of 'the case law' and 'the law of the case,' and to what extent, if at all, [the panel] adopted [the] . . . analysis and ruling [of the court, *Damiani, J.*] on the [born alive] issue." In its articulation, the panel stated that the term " '[l]aw of the case' refers to prior decisions made during the course of this case" and that, under that doctrine, "when a matter has previously been ruled [on] interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case." The panel then observed that the court, *Damiani, J.*, had resolved the issue of the born alive rule as it applies to murder and

---

[31] The panel denied the motion with respect to the following issues, conclusions and findings: (1) "[t]he legal definition of 'born alive' as applied by the [panel] and its factual basis for finding that Antonia . . . was born alive . . . and was therefore a person"; (2) "[t]he legal authority [on] which the [panel] held the defendant liable for [the three counts of the information relating to the murder of Antonia]"; (3) clarification as to "whether the born alive rule was the law of Connecticut, incorporated into the definition of person, at the time the defendant acted, and to what extent, if at all, [the panel] adopted [the] analysis and ruling [of the court, *Damiani, J.*] on the issue"; (4) "[t]he manner in which the [panel] applied the transferred intent doctrine as defined in *State* v. *Hinton*, [supra, 227 Conn. 301]"; (5) "[Antonia's] legal status at the time the defendant acted"; (6) "[w]hether the [panel] made any finding, aside from applying the doctrine of transferred intent, that the defendant intended to cause the death of Antonia, independent of his intent toward [Rodgers]"; and (7) "[w]hether the [panel] accepted and if so the legal basis for accepting [the] . . . conclusion [of the court, *Damiani, J.*] that the defendant's narrowing death penalty scheme argument applies only to the penalty phase and not to the capital felony conviction."

capital felony "in a well thought out [and] comprehensive opinion," and that the panel had adopted the court's reasoning and analysis in concluding that the defendant was guilty of those offenses insofar as they pertained to the murder of Antonia.

Before turning to the merits of the defendant's claims, we first set forth the applicable standard of review.[32] "A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the [state] cannot as a matter of law and fact state a cause of action that should be heard by the court . . . ." (Internal quotation marks omitted.) *State* v. *Cyr*, 291 Conn. 49, 56, 967 A.2d 32 (2009). "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] . . . the motion to dismiss will be de novo." (Internal quotation marks omitted.) *State* v. *Haight*, 279 Conn. 546, 550, 903 A.2d 217 (2006).

The defendant's claim also raises an issue of statutory interpretation over which our review is plenary. E.g., *Stiffler* v. *Continental Ins. Co.*, 288 Conn. 38, 42, 950 A.2d 1270 (2008). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine the meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of

---

[32] Because the panel adopted the factual findings and legal conclusions of the court, *Damiani, J.*, our consideration of the defendant's claim also requires us to review the merits of the court's decision.

such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 43. "[W]hen the statute being construed is a criminal statute, it must be construed strictly against the state in favor of the accused." *State* v. *Cardwell*, 246 Conn. 721, 739, 718 A.2d 954 (1998). Furthermore, "[w]e are mindful . . . that, [i]n determining whether . . . a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Thus, [n]o statute is to be construed as altering the common law, farther than its words import [and a statute] is not to be construed as making any innovation [on] the common law which it does not fairly express. . . . We recognize only those alterations of the common law that are clearly expressed in the language of the statute because the traditional principles of justice [on] which the common law is founded should be perpetuated." (Citations omitted; internal quotation marks omitted.) *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 532, 839 A.2d 1250 (2004); see also *State* v. *Floyd*, 217 Conn. 73, 94, 584 A.2d 1157 (1991) (recognizing in context of criminal case that "[i]t is a commonplace of statutory construction that statutes in derogation of the common law should not be construed to alter the common law further than their words demand"). Thus, "[i]t is assumed that all legislation is interpreted in light of the common law at the time of its enactment." (Inter-

nal quotation marks omitted.) *Hunte* v. *Blumenthal,* 238 Conn. 146, 153, 680 A.2d 1231 (1996). Accordingly, this court frequently has interpreted our criminal statutes and rules in light of common-law principles. See, e.g., *State* v. *Salamon,* 287 Conn. 509, 536–40, 949 A.2d 1092 (2008) (kidnapping statute); *State* v. *Skakel,* 276 Conn. 633, 691–93, 888 A.2d 985 (2006) (criminal statute of limitations), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); *State* v. *Scott,* 256 Conn. 517, 533–34, 779 A.2d 702 (2001) (sexual assault statutes); *State* v. *Miranda,* 245 Conn. 209, 222–26, 715 A.2d 680 (1998) (assault statute), overruled on other grounds by *State* v. *Miranda,* 274 Conn. 727, 734, 878 A.2d 1118 (2005); *State* v. *Guess,* supra, 244 Conn. 771–76 (murder statute); *Ullmann* v. *State,* 230 Conn. 698, 705–708, 647 A.2d 324 (1994) (criminal contempt statute); *State* v. *Ross,* 230 Conn. 183, 196–200, 646 A.2d 1318 (1994) (territorial jurisdiction of court over capital felony offenses), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Kulmac,* 230 Conn. 43, 52–53, 644 A.2d 887 (1994) (rape shield and risk of injury statutes); *State* v. *Sanchez,* 204 Conn. 472, 477–82, 528 A.2d 373 (1987) (perjury statute). Thus, the issue is "whether the principle should be recognized as a matter of policy under the circumstances of [the particular] case." *State* v. *Miranda,* supra, 245 Conn. 221.

With these principles in mind, we commence our review of the defendant's claim with an examination of the relevant statutory language. General Statutes § 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." "Person" is defined for the purpose of the homicide statutes as a "human being . . . ." General Statutes § 53a-3 (1). The term "human being," however, is not defined statutorily. Moreover, as the trial court correctly observed, the legislative his-

tory of the relevant statutory provisions, including §§ 53a-3 (1) and 53a-54a (a), offers no guidance with respect to the issue raised by the present case, namely, whether a person who murders a pregnant woman also may be found guilty of the murder of the baby if the baby is born alive and later dies from injuries inflicted while the baby is in utero, in the course of the intentional killing of the mother.[33]

When the language and legislative history of a criminal statute do not resolve the question of statutory interpretation presented by a particular case, this court "may turn to the parallel statutory provisions set forth in the Model Penal Code and the [revised] New York . . . Penal Law, effective September 1, 1967, for guidance"; (internal quotation marks omitted) *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990); because "[t]he drafters of [our Penal Code] relied heavily [on] the Model Penal Code and various state criminal codes, especially the [P]enal [Law] of New York. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11." *State* v. *Hill*, 201 Conn. 505, 516–17, 523 A.2d 1252 (1986); see also *State* v. *Henry*, 253 Conn. 354, 363, 752 A.2d 40 (2000) ("[w]e note that our Penal Code is modeled after the New York Penal [Law]"); *State* v. *Desimone*, 241 Conn. 439, 456, 696 A.2d 1235 (1997) (legislature relied on "the interpretations of the American Law Institute's Model Penal Code and the New York [P]enal [Law] . . . when it revised the state [P]enal [C]ode in 1969" [internal quotation marks omitted]); *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 500 ("[t]he murder section of [this state's] [P]enal [C]ode was based partly on the [revised] New York

---

[33] Because there is no dispute that the defendant knew that Rodgers was pregnant with Antonia when he killed Rodgers, we have no occasion to consider whether a defendant who murders a pregnant woman but who is unaware that she was pregnant at the time of that murder also may be liable for the murder of the baby.

. . . Penal Law and partly on the Model Penal Code" [internal quotation marks omitted]). The New York Penal Law defines "person" as "a human being who has been born and is alive." New York Penal Law § 125.05 (1) (McKinney 2009).[34] The Model Penal Code defines "human being" as "a person who has been born and is alive . . . ." Model Penal Code § 210.0 (1) (1980). Thus, even a viable fetus that succumbs to injuries inflicted in utero before being born alive is not a person within the meaning of the New York Penal Law and the Model Penal Code.[35] Notably, moreover, New York

[34] This definition has not been amended since the adoption of the revised New York Penal Law in 1965.

[35] We note that a number of courts have indicated that the Model Penal Code definition of "human being" as a "person who has been born and is alive" represents a codification of the common-law born alive rule. See *State* v. *Lamy*, 158 N.H. 511, 515, 969 A.2d 451 (2009); see also *People* v. *Lage*, Docket No. 08CA0617, 2009 Colo. App. LEXIS 989, *21 (May 28, 2009) (Connelly, J., concurring in part and dissenting in part). Indeed, the commentary to the Model Penal Code provides that "[§] 210.0 (1) defines the term 'human being' to mean a person 'who has been born and is alive.' The effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive." Model Penal Code § 210.1, comment 4 (c) (1980). The commentary goes on to state, however, that "[t]he significance of this definition of 'human being' is that it excludes from criminal homicide the killing of a fetus. This exclusion is warranted in order to avoid entanglement of abortion in the law of homicide." Id. Thus, it is not entirely clear whether the Model Penal Code definition of "human being" is applicable when, as the state alleges in the present case, an infant is born alive but dies from injuries that he or she had suffered in utero. This very issue was discussed by the Texas Court of Appeals in *Cuellar* v. *State*, 957 S.W.2d 134 (Tex. App. 1997, pet. ref'd), which stated the following in interpreting the identical definitional provisions of the Texas Penal Code: "The 'has been born and is alive' definition in the [P]enal [C]ode does not address the precise issue before us. 'Has been born and is alive' does not tell us at what point in time the individual needs to have been born and be alive. The dissent seems certain that the victim's status under the law is frozen at the moment of the alleged misconduct. We do not believe the statute provides a clear mandate of this interpretation." Id., 137. After explaining that the statutory ambiguity made it appropriate to consult extratextual factors, including the common law, for the purpose of ascertaining the meaning of the term "human being," the court in *Cuellar* observed that "[t]he Texas definition 'has been born and is alive' closely resembles the ancient common law 'born alive' doctrine." Id. The court thereafter adopted the common-

courts have concluded that an infant who is born alive and then dies from injuries sustained in utero is a person under that state's homicide statutes. See, e.g., *People v. Hall*, 158 App. Div. 2d 69, 71–76, 557 N.Y.S.2d 879, appeal denied, 76 N.Y.2d 940, 564 N.E.2d 679, 563 N.Y.S.2d 69 (1990).

law born alive rule, stating that it saw "no reason why the criminal law should not . . . afford protection to children who are born and alive for a period of time before dying as a result of prenatal injuries." Id., 140.

In his concurring and dissenting opinion, Justice Schaller, focusing on the fact that our Penal Code contains no definition of the term "human being," asserts, first, that the Model Penal Code definition of that term does, in fact, expressly contemplate the fact pattern in the present case and, second, that the failure of our legislature to adopt the Model Penal Code definition of the term must be viewed as its renunciation of that definition. Contrary to the contention of Justice Schaller, we consider it more likely that the commentary to the Model Penal Code was intended to clarify that the killing of a fetus in utero does not constitute the crime of homicide, and that that definition does not expressly address the more specific issue of whether it is a homicide when an infant, having been injured in utero, is born alive and then dies of his or her injuries. Even if Justice Schaller is correct, however, that the Model Penal Code definition of the term "human being" was intended to encompass the particular factual scenario presented by this case, that fact would not alter or affect our interpretation of this state's murder statute as embodying the born alive rule because the commentary to the Model Penal Code also states: "Several modern statutes follow the Model [Penal] Code in making this limitation [that is, restricting homicide to the killing of one who has been born alive] explicit. *Others are silent on the point, but absent express statement to the contrary, they too may be expected to carry forward the common-law approach.*" (Emphasis added.) Model Penal Code § 210.1, comment 4 (c) (1980). Because our statutory scheme is patterned after the Model Penal Code, we must presume that our legislature was familiar with this commentary and, consequently, that it would have acted in accordance with the commentary by expressly repudiating the Model Penal Code definition of the term "human being" if, in fact, the legislature had intended to adopt a different definition of the term. Indeed, as one prominent commentator has explained, "[s]everal criminal codes define 'person' for purposes of the law of homicide as . . . a human being who has been born and was alive at the time of the homicidal act. . . .

"[*When*] *the term 'person' or 'human being' or like term in the homicide statutes is not defined by statute, the courts have usually applied the common law 'born alive' interpretation.*" (Citations omitted; emphasis added.) 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 14.1 (c), pp. 419–20 n.13. This latter fact, along with the commentary to the Model Penal Code, refutes Justice Schaller's contention that we should not recognize

We also look for interpretive guidance to common-law principles governing the same general subject matter.[36] "At common law it is clear that only a living human being could be the victim of a homicide. To become a human being within the meaning of homicide statutes at common law, a child had to be born alive and have an existence independent of and separate from its mother. . . . The 'born alive' rule dates back to at least the [seventeenth] century when the great common lawyer, Sir Edward Coke, wrote that the killing of an unborn quickened child 'is a great misprision and no murder.' . . . The 'born alive' requirement was reiterated [in the eighteenth century] by [Sir William] Blackstone in [his common-law treatise entitled] Commentaries [on the Laws of England] . . . . As has been elsewhere thoroughly documented, Blackstone had tremendous impact on the development of the common law in the original American colonies and in the early states of

the born alive rule merely because our statutes contain no express reference to it.

[36] As this court previously has observed, "[t]he common law is generally described as those principles, usage, and rules of action applicable to the government and security of persons and property which do not rest for their authority [on] any express and positive declaration of the will of the legislature." (Internal quotation marks omitted.) *Moore* v. *McNamara*, 201 Conn. 16, 24, 513 A.2d 660 (1986); see also *Western Union Telegraph Co.* v. *Call Publishing Co.*, 181 U.S. 92, 102, 21 S. Ct. 561, 45 L. Ed. 765 (1901) ("[a]s distinguished from law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England" [internal quotation marks omitted]); *State* v. *Muolo*, 118 Conn. 373, 378, 172 A. 875 (1934) (defining our common law as "the prevailing sense of the more enlightened members of a particular community, expressed through the instrumentality of the courts, as to those rules of conduct which should be definitely affirmed and given effect under the sanction of organized society, in view of the particular circumstances of the time, but with due regard to the necessity that the law should be reasonably certain and hence that its principles have permanency and its development be by an orderly process").

this . . . country. By 1850, the 'born alive' rule had widespread general acceptance by all jurisdictions in the United States [that] had considered the issue." (Citations omitted.) *State* v. *Soto*, 378 N.W.2d 625, 628 (Minn. 1985); see also C. Forsythe, "Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms," 21 Val. U. L. Rev. 563, 595–96 (1987).

"In its simplest statement, the 'born alive rule' prescribes that only one who has been born alive can be the victim of homicide. Causing the death of a fetus, whether viable or not, was not considered homicide at common law. If, however, the fetus was born and then died of injuries inflicted prior to birth, a prosecution for homicide could be maintained. Requirements for proof of live birth were . . . stringent: 'the fetus must have been totally expelled from the mother and have shown clear signs of independent vitality.' " *Commonwealth* v. *Booth*, 564 Pa. 228, 240, 766 A.2d 843 (2001). "At least two reasons, both deriving from the state of medical knowledge in centuries past, may be discerned for such requirements. First, owing to the high incidence of prenatal mortality and stillbirths, it was exceedingly difficult to determine that a fetal death or stillbirth had resulted from a defendant's act and not from natural causes. Second, because the fetus was considered to be dependent [on], and therefore essentially a part of, its mother, a prosecution for homicide could not be maintained unless it could be shown that the fetus had become a person separate from its mother." Id., 241. As one court in Australia recently explained: "The law presumed that all children were born dead and the fact of live birth had to be established by evidence. . . . Usually such proof was not difficult, but problems arose when a child died soon after birth and there was no, or little, direct evidence of what had happened at or immediately after birth." (Citations

omitted.) *Regina* v. *Iby*, 63 N.S.W.L.R. 278, 283–84, 154 A. Crim. R. 55 (New South Wales Crim. App. 2005).

The commentaries of one of Connecticut's most prominent legal scholars, former Chief Justice Zephaniah Swift, a member of this court from 1808 until 1819, reveal that the born alive rule was a component of the state's homicide laws from its earliest days. See 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 299. In his scholarly and authoritative treatise on Connecticut law, Swift states: "The [s]tatute respecting murder enacts, that if any person shall commit any wilful murder, upon malice, hatred or cruelty, not in a man's just and necessary [defense], nor by casualty against his will, or shall slay or kill another through guile, or by poisoning, or other such atrocious practices, he shall be put to death. The common law definition of murder is when a person of sound memory and discretion, unlawfully killeth any reasonable creature in being, and in the public peace, with malice aforethought, either express or implied. It is evident that the statute is made in affirmance of the common law. . . .

"The person killed, to constitute murder, must be actually in existence. To kill a child in its mother's womb, is not murder, but a great misdemeanor, but if the child be born alive, and then die by reason of the injury it suffered in the womb, it will be murder in him who caused it." Id., pp. 298–99. A similar assertion concerning the vitality of the born alive rule also is contained in a second commentary, namely, A Digest of the Laws of the State of Connecticut, that also was originally authored by Swift. Swift stated therein: "Felonious [h]omicide is of two kinds, [m]urder and [m]anslaughter. Murder is defined to be where a person of sound memory, and discretion, unlawfully kills any reasonable creature, in being, and in the peace, with malice aforethought express or implied. . . .

"To constitute murder the party killed must be a reasonable being, alive and in the peace. Therefore to take a potion in order to procure an abortion or to administer it, to a pregnant female with the same design, or to strike her so that the child is killed, is not murder at common law, because [the child] is not in existence, and the circumstance of its death cannot be ascertained with sufficient precision: but if the child be born alive, and afterwards die[s] by reason of the violence it has received before its birth, it seems to be the better opinion that it will be murder in the party who inflicted it."[37] 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 267. Furthermore, although the issue is one of first impression for this court, trial courts in this state previously have applied the born alive rule, or a rule akin to the born alive rule, in concluding that a fetus that is born alive despite having suffered injuries in utero as a result of the negligence of another person has a cause of action against the wrongdoer; *Simon* v. *Mullin*, 34 Conn. Sup. 139, 147, 380 A.2d 1353 (1977) (any fetus regardless of viability); *Tursi* v. *New England Windsor Co.*, 19 Conn. Sup. 242, 248, 111 A.2d 14 (1955) (viable fetus); and that a viable fetus that is injured in utero but dies before being born is not a person within the meaning of the state's homicide statutes. See *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 499. In addition, in *In re Valerie D.*, 25 Conn. App. 586, 595 A.2d 922 (1991), rev'd on other grounds, 223 Conn. 492, 613 A.2d 748 (1992), the Appellate Court quoted *Anonymous* with approval, noting, inter alia, that the court in *Anonymous* had declined to treat an unborn child as a person for purposes of our Penal Code because, under the code, a person includes only those who have born alive. Id., 591.

---

[37] We note that the same explication and acknowledgment of the born alive rule also is contained in the last version of Swift's Digest. See 2 Z. Swift, A Revision of Swift's Digest of the Laws of Connecticut (1884) p. 294.

In ascertaining the common law, we also look to the decisions of other jurisdictions. E.g., *Rogers* v. *Tennessee*, 532 U.S. 451, 464, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001) ("[c]ommon law courts frequently look to the decisions of other jurisdictions in determining whether to alter or modify a common law rule in light of changed circumstances, increased knowledge, and general logic and experience"); *State* v. *Miranda*, 260 Conn. 93, 107, 794 A.2d 506 (same), cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); see also *Pacific Indemnity Ins. Co.* v. *Aetna Casualty & Surety Co.*, 240 Conn. 26, 30, 688 A.2d 319 (1997) ("[a]lthough this court has not previously addressed [the common-law issue presented], we find guidance in the decisions of other jurisdictions"). As one court has noted, "[c]ourts in other jurisdictions have also consistently concluded that the death of an infant who is born alive from injuries inflicted in utero constitutes homicide. See, e.g., *United States* v. *Spencer*, 839 F.2d 1341, 1343–44 [9th Cir.] (kicking and stabbing of mother resulting in death of infant ten minutes after birth was killing of 'human being') [cert. denied, 487 U.S. 1238, 108 S. Ct. 2908, 101 L. Ed. 2d 939 (1988)]; *Ranger* v. [*State*], 249 Ga. 315, [317, 290 S.E.2d 63] (1982) (death of child, twelve hours after birth, caused by shooting of mother sufficient to sustain conviction for felony murder of child); [*People*] v. *Bolar*, 109 Ill. App. 3d 384, [389–92, 440 N.E.2d 639] (1982) (newborn surviving only long enough to exhibit a few heartbeats 'individual' within meaning of manslaughter and reckless homicide statutes); *Jones* v. [*Commonwealth*], 830 S.W.2d 877, 880 [Ky. 1992] (infant who died from prenatal injuries fourteen hours after birth was 'person' within [meaning of] criminal homicide statutes); *Williams* v. [*State*], 316 Md. 677, [682–83, 561 A.2d 216] (1989) (death of child seventeen hours after birth from arrow wound [to] mother supported manslaughter conviction); [*State*] v. *Anderson*, 135 N.J.

Super. 423, [429, 343 A.2d 505 (1975)] (twins who died within hours of birth 'persons' within meaning of homicide laws); *People* v. *Hall*, [supra, 158 App. Div. 2d 76–78] (infant who died thirty-six hours after birth due to prenatal shooting of mother [was] 'person' within meaning of homicide statutes); *Cuellar* [v. *State*], 957 S.W.2d 134 [140 (Tex. App. 1997, pet. ref'd)] (infant who died forty-three hours after birth from injuries suffered by mother in car crash 'individual' within meaning of manslaughter statute).

"Although some of those decisions were based [on] statutes expressly defining homicide to include the deaths of those who have been born alive, the absence of such language does not dictate a contrary interpretation. In [*State*] v. *Cornelius*, 152 Wis. 2d 272, [448 N.W.2d 434 (App. 1989)], the defendant argued that, notwithstanding the inclusion of the born alive rule in the statutory definition of 'human being,' he could not be prosecuted for homicide for the death of a child resulting from the infliction of prenatal injuries. [Id., 279.] In rejecting the claim, the court noted that Wisconsin (like Arizona [and Connecticut]) had abolished common law crimes in favor of a criminal code. See [id.] Nevertheless, the court observed that common law rules not in conflict with the code were retained . . . and thus concluded that it would have employed the born alive rule in interpreting the homicide statute even absent a statutory reference to the rule. See id." *State* v. *Cotton*, 197 Ariz. 584, 589, 5 P.3d 918 (App. 2000); see also id., 586, 590–91 (infant who died twenty-four hours after birth from injuries sustained in utero when mother was shot in head was "person" within meaning of Arizona homicide statutes). This is true in Connecticut, as well. See, e.g., *Gore* v. *People's Savings Bank*, 235 Conn. 360, 382, 665 A.2d 1341 (1995) (statute shall not be construed as altering common law unless statutory language clearly so requires); *Dart & Bogue Co.*

v. *Slosberg*, 202 Conn. 566, 573, 522 A.2d 763 (1987) (statutory construction "begins with the presumption that statutory and common law should, [whenever] possible, be read in harmony"). As we previously have observed, moreover, "the common law of England . . . was brought here by the first settlers, and became the common law of Connecticut so far as it was not unadapted to the local circumstances of this country." (Citations omitted.) *Graham* v. *Walker*, 78 Conn. 130, 133, 61 A. 98 (1905). Thus, at times, "[this court's] view of the relationship of the common law of England to the law of Connecticut has been conspicuous by its ambivalence"; *Dacey* v. *Connecticut Bar Assn.*, 184 Conn. 21, 25, 441 A.2d 49 (1981); and, consequently, "the common law of England prior to 1776 does not *necessarily* represent the common law of this state . . . ." (Citation omitted; emphasis added.) Id. "As our jurisprudence developed [however], the courts applied the principles of the [English] common law to the decision of causes, so far as they seemed applicable to our social conditions . . . ."[38] *Brown's Appeal from Probate*, 72 Conn. 148, 151, 44 A. 22 (1899). The defendant has offered no reason, and we know of none, why the born alive rule would not have been accepted as the law of this state at the time of its settlement,[39] just as

---

[38] In his concurring and dissenting opinion, Justice Zarella asserts that we "subscribe to the view that all of the English common law has been assimilated into the common law of this state," and that our conclusion in that regard "ignores" and "disregard[s]" our case law to the contrary. Justice Zarella's assertion is incorrect. As we expressly stated, we recognize only that portion of the common law of England that we deem relevant and appropriate for purposes of this state. As we explain, we conclude that the born alive rule was the common law of this state when our Penal Code was adopted and that the rule has not been abrogated by the legislature.

[39] Justice Zarella states that our conclusion "that the born alive rule is well established in the common law of this state lacks any convincing support because Connecticut courts never have acknowledged and applied it in the criminal context" and that, "[c]onsequently, there can be no presumption that they would have done so had the issue been presented." This statement indicates that, in Justice Zarella's view, a doctrine or principle does not represent the common law of this state until it has been expressly

the rule was accepted by virtually every jurisdiction

recognized and applied by one or more courts of the state. Under this view, unless a particular common-law doctrine previously has been recognized expressly by the courts of this state, we may adopt the doctrine prospectively only, as if it did not exist at the time of the conduct at issue. We disagree with this view, which, subject only to the limitations of due process, has no support in our law or, as far as we know, the law of any other jurisdiction. Indeed, contrary to the position that Justice Zarella advocates, this court frequently has applied common-law principles of first impression in the then pending criminal case. See, e.g., *State* v. *Skakel*, supra, 276 Conn. 691–93 (concluding, in exercise of common-law authority, and contrary to prior precedent of this court, that amendment to criminal statute of limitations applies to crime committed prior to enactment of amendment in absence of clear legislative intent to contrary); *State* v. *Guess*, supra, 244 Conn. 780–81 (adopting new definition of death in murder case predicated on court's common-law authority); *State* v. *Walton*, 227 Conn. 32, 45, 630 A.2d 990 (1993) (adopting doctrine of vicarious liability of conspirators under *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 2d 1489 [1946] for first time under court's common-law authority). Thus, even though the born alive rule *had* been recognized as embodied in our homicide statutes prior to 1998—the year of the defendant's crimes—in a published decision of the Superior Court; see *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 498; Justice Zarella's assertion reflects a fundamental misapprehension of the manner in which the common law is identified and applied. Even if no court of this state previously had recognized the existence of the born alive rule, we would be required to determine its existence on the basis of the case law of England, the decisions of courts of other jurisdictions, and the works of common-law scholars. See, e.g., *Barnes* v. *Blumenthal*, 261 Conn. 434, 456, 804 A.2d 152 (2002) (*Zarella, J.*) (citing with approval statement of former Justice Berdon in his dissent in *Moore* v. *Ganim*, 233 Conn. 557, 670, 660 A.2d 742 [1995], that common law of Connecticut includes, inter alia, universally accepted usages and customs in addition to adjudications of courts of justice and rules of practice); J. Root, Introduction, 1 Root (Conn.) ix–xiii (1789–93) (common law derives from, inter alia, usages and customs assented to and adopted in practice by citizens, adjudications of courts of justice and rules of practice); J. Root, supra, 1 Root (Conn.) xii (explaining that, in contrast to statutory law, common law consists of "unwritten customs and regulations which are reasonable and beneficial, and which have the sanction of universal consent and adoption in practice, amongst the citizens at large or particular classes of them, have the force of laws under the authority of the people, and the courts of justice will recognize and declare them to be such, and to be obligatory upon the citizens as necessary rules of construction and justice"); see also *Meadows* v. *State*, 291 Ark. 105, 107, 722 S.W.2d 584 (1987) ("[i]n ascertaining the common law, we look not only to our own cases, but to early English cases, early writers on the common law, and cases from other states"); *Williams* v. *State*, 316 Md. 677,

that had considered it.[40] Put differently, there was no

681, 561 A.2d 216 (1989) ("in ascertaining the common law of [Maryland] in the absence of clear Maryland case law on the subject, we look to early English cases and writers on the common law, as well as cases from other jurisdictions"); *Lake* v. *Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 234 (Minn. 1998) ("[t]o determine the common law, we look to other states as well as to England"); *In re Estate of Conley*, 753 N.W.2d 384, 392 (N.D. 2008) ("In determining the common law of [North Dakota] we are not restricted to the law as it has evolved over the centuries in England. The common law, which is based on reason and public policy, can best be determined by studying the decisions of our federal and state courts and the writings of past and present students of our country's law over all the years of American judicial history." [Internal quotation marks omitted.]). Indeed, numerous other appellate courts have recognized the born alive rule and deemed it applicable to the then pending case solely on the basis of English common-law authority, other state cases, the writings of legal commentators or a combination thereof. See, e.g., *United States* v. *Spencer*, supra, 839 F.2d 1343–44; *People* v. *Greer*, 79 Ill. 2d 103, 110–16, 402 N.E.2d 203 (1980); *Williams* v. *State*, supra, 681–83; *People* v. *Guthrie*, 97 Mich. App. 226, 233–38, 293 N.W.2d 775 (1980), appeal denied, 417 Mich. 1006, 334 N.W.2d 616 (1983); *State* v. *Beale*, 324 N.C. 87, 89–93, 376 S.E.2d 1 (1989); *Cuellar* v. *State*, supra, 957 S.W.2d 137–40. The issue to be decided, therefore, is whether, upon consideration of the pertinent sources, the born alive rule represented the law of this state when the defendant stabbed and killed Rodgers and killed Antonia. We answer that question in the affirmative because the reasons for recognizing the rule are compelling and because there is no persuasive reason for not doing so.

[40] See, e.g., *United States* v. *Spencer*, supra, 839 F.2d 1343 ("[In 1908, when] 18 U.S.C. § 1111 was passed by Congress to enlarge the common law definition of murder . . . it was well-established in common law . . . that an infant born alive that later died as a result of fetal injuries was a human being. . . . States confronting this question prior to 1908 had unanimously considered infants born alive as human beings. . . . No court has ever held otherwise. . . . In view of [Congress'] intent to reflect the state and common-law definition of murder when it passed [18 U.S.C. § 1111], and the state and common-law acceptance of infants who died subsequent to birth due to fetal injuries as human beings, it seems clear that Congress intended fetal infanticide to be included within the statutory definition of murder under 18 U.S.C. § 1111." [Citations omitted; internal quotation marks omitted.]); *State* v. *Cotton*, supra, 197 Ariz. 589 ("[c]ourts in other jurisdictions have also consistently concluded that the death of an infant who is born alive from injuries inflicted in utero constitutes homicide"); *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 627, 470 P.2d 617, 87 Cal. Rptr. 481 (1970) ("[b]y the year 1850 . . . the common law [born alive rule] had long been accepted in the United States"); *State* v. *Hammett*, 192 Ga. App. 224, 225, 384 S.E.2d 220 (1989) ("Under Georgia law, a person who injures a pregnant woman so that her fetus, though born alive, subsequently dies by reason of the

injuries inflicted on it while still in its mother's uterus, can be convicted for the felony murder of the newborn child. . . . This is consistent with the common law status of an unborn child [as espoused by Sir Edward Coke in the seventeenth century]." [Citation omitted.]); *State* v. *Aiwohi*, 109 Haw. 115, 123, 123 P.3d 1210 (2005) ("an overwhelming majority of the jurisdictions confronted with the prosecution of a third party for conduct perpetrated against a pregnant mother, causing the death of the subsequently born child, uphold the convictions of the third parties"); *People* v. *Bolar*, supra, 109 Ill. App. 3d 389 ("[t]he common law, as well as Illinois law, is quite clear; a child cannot be the subject of a homicide unless it is born alive and expires as a result of the injuries previously sustained"); *Commonwealth* v. *Morris*, 142 S.W.3d 654, 657 (Ky. 2004) ("The born alive rule is reported to have first been applied in the United States [in 1791]. . . . Prior to legislative reform, it was almost universally applied." [Citation omitted; internal quotation marks omitted.]); *Williams* v. *State*, 316 Md. 677, 683, 561 A.2d 216 (1989) ("[s]o extensive is the acceptance of [the] common law [born alive] rule that we conclude that it was indeed the law of Maryland in 1776"); *Commonwealth* v. *Cass*, 392 Mass. 799, 806 n.5, 467 N.E.2d 1324 (1984) ("the [born alive] rule has been accepted as law in England and in those American jurisdictions that have decided the question"); *People* v. *Guthrie*, 97 Mich. App. 226, 233, 293 N.W.2d 775 (1980) ("[w]hen the [Michigan] [l]egislature enacted the negligent homicide statute in 1921 and reenacted it in 1931, the born alive rule was a well understood and accepted rule of law" [internal quotation marks omitted]), appeal denied, 417 Mich. 1006, 334 N.W.2d 616 (1983); *State* v. *Soto*, supra, 378 N.W.2d 628–29 ("By 1850, the born alive rule had widespread general acceptance by all jurisdictions in the United States [that] had considered the issue. . . . [I]t is clear that the . . . born alive rule is now well-established in the great majority of jurisdictions." [Internal quotation marks omitted.]); *State* v. *Anderson*, supra, 135 N.J. Super. 427 ("[t]hat a fetus may be the victim of murder if it be born alive has long been a part of [the] common law"); *People* v. *Hall*, supra, 158 App. Div. 2d 77–78 ("[a]ppellate courts in other jurisdictions [that] have reviewed the issue of whether an individual can be convicted of homicide for injuries inflicted on a fetus that lead to the death of the child after it is born alive have, virtually without exception, decided this question in the affirmative"); *State* v. *Beale*, 324 N.C. 87, 90–92, 376 S.E.2d 1 (1989) ("[T]he common law rule [is] that a viable fetus cannot be the subject of murder unless it was born alive and subsequently died of injuries inflicted prior to birth. . . . [T]he overwhelming majority of courts [that] have considered the issue [have] concluded that the killing of a viable but unborn child is not murder under the common law. . . . These courts have adhered to the common law rule that the killing of a fetus is not criminal homicide unless it was born alive and subsequently died of injuries inflicted prior to birth." [Citations omitted.]); *Commonwealth* v. *Booth*, supra, 564 Pa. 239 ("Prior to legislative activity in this area in recent decades, acceptance of the born alive rule was almost universal. . . . Pennsylvania recognized the born alive rule [in 1791] . . . ." [Citations omitted; internal quotation marks omitted.]); *State* v. *Amaro*, 448 A.2d 1257, 1259 (R.I. 1982) ("[t]he born-alive rule was well established at common law and had been indirectly

ambivalence in Connecticut toward the born alive rule. To the contrary, the writings of former Chief Justice Swift indicate that it was, in fact, regarded as a governing legal principle in this state.[41] We, therefore, must

acknowledged by this court by . . . 1950"); *Cuellar* v. *State*, supra, 957 S.W.2d 138 ("[since 1648], the common law would allow a conviction for not just manslaughter but also murder when a child is born alive and then dies as a result of prenatal injuries"); *State* v. *Cornelius*, supra, 152 Wis. 2d 281 ("[w]hile we decide this issue based on Wisconsin's own statutory scheme, it is worth noting that with one exception *every* jurisdiction that has faced this issue has concluded that the death of an infant as a result of fetal injuries constitutes homicide" [emphasis in original]); see also, e.g., C. Forsythe, supra, 21 Val. U. L. Rev. 583 ("The common law authorities who have had the most impact on American law, and who have been accepted by American courts as the authority for the common law, are the [seventeenth] century authority, Sir Edward Coke . . . and the [eighteenth] century authority, Sir William Blackstone. . . . Coke and Blackstone were repeatedly adopted by American courts as authorities for the general legal principles governing the killing of the unborn child and for the born alive rule."); P. Bentley, comment, "Feticide: Murder in Kentucky?," 71 Ky. L.J. 933, 935 (1982–83) ("American courts employed the born alive doctrine as early as 1797 in infanticide cases. By 1850, this rule of English common law had become accepted and well-settled in American case law." [Internal quotation marks omitted.]); D. Curran, note, "Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws," 58 Duke L.J. 1107, 1112, 1115 (2009) ("Historically, feticide was governed entirely by the born-alive standard: a fetus that was never born alive could not have been killed in the legal sense. . . . It is this standard [articulated as early as the seventeenth century by Coke] that [United States] courts and legislatures inherited and that still is upheld in some jurisdictions."); M. Shah, note, "Inconsistencies in the Legal Status of an Unborn Child: Recognition of a Fetus as Potential Life," 29 Hofstra L. Rev. 931, 936 (2001) ("[d]uring the nineteenth century, American courts uniformly adopted the [b]orn [a]live [r]ule in the context of criminal law"). To the extent that the rule protected the class of victims who, having been injured in utero, died from those injuries after being born alive, the rule served a highly salutary purpose, and we are unable to conceive of any reason why it would not have been accepted as the common law of this state.

[41] In his concurring and dissenting opinion, Justice Zarella refuses to credit the views expressed by Zephaniah Swift with respect to the common-law underpinnings of the born alive rule. In doing so, Justice Zarella ignores the fact that "Swift led the development of an American (as distinct from an English) common law. He wrote the first text on American [l]aw in 1795 and 1796, setting forth the *common law of Connecticut* based on the actual practices of local judges." (Emphasis added.) W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 19; see also *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 132, 32 A.2d 547 (1943) (characterizing Swift as

"among the most learned of our legal scholars"); W. Horton, supra, p. 19 (characterizing Swift as one of "the greatest early American jurists"). Indeed, this court repeatedly and consistently has relied on Swift for the purpose of ascertaining this state's common law in a wide variety of contexts. E.g., *State* v. *Griffin*, 251 Conn. 671, 692–94, 741 A.2d 913 (1999) (setting forth common-law rights with respect to jury trials as enumerated by Swift); *Binette* v. *Sabo*, 244 Conn. 23, 78, 710 A.2d 688 (1998) (*Katz, J.*, concurring in part and dissenting in part) (relying on Swift to establish importance of individual rights, including right to be free from abuse of governmental power, during preconstitutional era); *Weidenbacher* v. *Duclos*, 234 Conn. 51, 60–61, 661 A.2d 988 (1995) (relying on Swift in concluding that writ of habeas corpus is proper procedural vehicle with which to challenge custody of child at common law); *State* v. *Morales*, 232 Conn. 707, 718–19, 657 A.2d 585 (1995) (relying on Swift in identifying common-law rights of criminal defendants to challenge state's evidence); *State* v. *Brown*, 232 Conn. 431, 449, 656 A.2d 997 (1995) (explaining that common-law approach to be followed in cases involving alleged juror misconduct emanates from writings of Swift); *State* v. *Joyner*, 225 Conn. 450, 467, 625 A.2d 791 (1993) (explaining that, in accordance with writings of Swift, insanity is common-law defense); *State* v. *Oquendo*, 223 Conn. 635, 650–51, 613 A.2d 1300 (1992) (relying on Swift in ascertaining common-law definition of arrest); *State* v. *Bunkley*, 202 Conn. 629, 637, 522 A.2d 795 (1987) (identifying elements of common-law crime of manslaughter as articulated by Swift); *Gentile* v. *Altermatt*, 169 Conn. 267, 284, 363 A.2d 1 (1975) (setting forth elements of common-law action of trespass on case as identified by Swift), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); *Pavlick* v. *Meriden Trust & Safe Deposit Co.*, 141 Conn. 471, 480, 107 A.2d 262 (1954) (relying on Swift for proposition that foreigners could not purchase or hold land at common law); see also *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 299–300, 664 A.2d 803 (relying on Swift in concluding that common-law cause of action for legal malpractice existed at time state constitution was adopted in 1818), cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995); *State* v. *Scott*, 11 Conn. App. 102, 113–14, 525 A.2d 1364 (relying on Swift in identifying common-law marital exemption for sexual assault), cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987). Justice Zarella also fails to articulate any reason why, consistent with Swift's writings, this state would not have recognized the born alive rule as part of its common law. Justice Zarella has proffered no policy reason, and we can think of none, for declining to hold a person accountable for murder when that person, acting with the intent to kill, inflicts injuries on a fetus that subsequently is born alive and then dies of the injuries that it suffered in utero.

Rather, Justice Zarella contends that our reliance on Swift is misplaced in light of our observation in *Valeriano* v. *Bronson*, 209 Conn. 75, 546 A.2d 1380 (1988), that, because "Swift's Digest not only covered Connecticut law, but encompassed the law 'generally' "; id., 91–92 n.10; unless Swift expressly noted that a particular principle "was determined to be part of Connecticut law as opposed to a part of the English common law in general"; id., 91 n.10; his commentary cannot be considered authoritative with respect to the law of this state. In *Ullmann* v. *State*, supra, 230 Conn. 698, however,

presume that the legislature did not intend to abrogate the rule when it enacted the Penal Code in 1971.[42] Indeed, in the absence of legislation "expressly includ-

this court expressly disavowed this court's narrow reading, in *Valeriano*, of the applicability of Swift's Digest to Connecticut law, explaining that the court in *Valeriano* had overlooked the preface to that commentary, in which Swift explains that he purports to set forth the common law of this state. Id., 707 n.7 (explaining that Swift "states in preface to [the first] volume . . . of his digest that his 'plan [was] to *select from the English authorities, the rules in force here,* and to combine them with our own, in a systematic view, so as to exhibit one complete code' " [emphasis in original]). Moreover, Justice Zarella's efforts to distinguish *Ullmann* from the present case are unavailing because *Ullmann* makes it perfectly clear that, in light of the clarity of the preface to Swift's Digest, the court in *Valeriano* simply was mistaken in asserting that Swift's Digest was not necessarily a reliable source of Connecticut law. Finally, Justice Zarella's argument also overlooks the fact that Swift discussed the born alive rule in his 1796 publication, *A System of the Laws of the State of Connecticut,* which, as its title indicates, deals with the law of this state.

[42] Justice Zarella contends that the language of our murder statute that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person"; General Statutes § 53a-54a (a); bars application of the born alive rule. Specifically, Justice Zarella asserts that "[t]here can be no clearer expression of a temporal nexus between the intent necessary to commit the crime and the act of committing the crime than [under § 53a-54a (a)]. The use of the term 'when' [in § 53a-54a (a)] mandates that the defendant must have the intent to cause the death of a person prior to, or contemporaneously with, the act that is the cause of death." Justice Zarella's novel construction of § 53a-54a is incorrect because the term "when" in § 53a-54a (a) is not used in its temporal sense, as Justice Zarella contends; rather, the term means "if" or "in the event that . . . ." Webster's Third New International Dictionary (defining "when" as, inter alia, "in the event that: on condition that: if"). It is perfectly clear that the term "when" is used to mean "if" or "in the event that" for purposes of § 53a-54a (a) because the drafters of our Penal Code, like the drafters of the Model Penal Code and New York Penal Law, after which our Penal Code is modeled, elected to use the term "when" repeatedly and consistently in this state's criminal statutes, including those that inarguably impose no temporal link between the mens rea and the actus reus. See, e.g., General Statutes § 53a-56 (a) (1) ("[a] person is guilty of manslaughter in the second degree *when* . . . [h]e recklessly causes the death of another person" [emphasis added]); General Statutes § 53a-70 (a) (1) ("[a] person is guilty of sexual assault in the first degree *when* such person . . . compels another person to engage in sexual intercourse by the use of force against such other person or a third person" [emphasis added]); General Statutes § 53a-94 (a) ("[a] person is guilty of kidnapping in the

ing a fetus within the definition of victims of homicide

second degree *when* he abducts another person" [emphasis added]); General Statutes § 53a-172 (a) (1) ("[a] person is guilty of failure to appear in the first degree *when* . . . while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear" [emphasis added]); General Statutes § 53a-217 (a) (1) ("[a] person is guilty of criminal possession of a firearm or electronic defense weapon *when* such person possesses a firearm or electronic defense weapon and . . . has been convicted of a felony" [emphasis added]). The fact that there is no evidence whatsoever to indicate that the legislature intended to use the term "when" differently for purposes of § 53a-54a (a) than it did for all of the other criminal statutes in which that term is used defeats Justice Zarella's assertion that the term is used in its temporal sense in § 53a-54a (a). Indeed, the construction that Justice Zarella urges is so lacking in merit that even the defendant has not advocated it, and we know of no court that has adopted such a construction, even though other states, including New York, have homicide statutes that are materially identical to our homicide statutes. In fact, courts in New York have applied the born alive rule in the context of its homicide statutes. Thus, in *People* v. *Hall*, supra, 158 App. Div. 2d 76, the court applied the born alive rule in affirming the defendant's conviction under N.Y. Penal Law § 125.15 (1), which provides in relevant part that "[a] person is guilty manslaughter in the second degree when . . . [h]e recklessly causes the death of another person . . . ." In *Hall*, the evidence established that the defendant had recklessly killed an infant who died approximately thirty-six hours after a premature cesarean birth necessitated by the defendant's shooting of the infant's pregnant mother. *People* v. *Hall*, supra, 71.

Justice Zarella contends that *Hall* is distinguishable from the present case because, in contrast to this state's murder statute, and New York's virtually identical second degree murder statute; see N.Y. Penal Law § 125.25 (McKinney 2009); New York's second degree manslaughter statute contains no requirement of a temporal nexus between the intent of the perpetrator to kill the victim and the victim's status as a person. See N.Y. Penal Law § 125.15 (1) (McKinney 2009). This assertion also fails. Justice Zarella concedes, as he must, that, under *Hall*, the reckless killing of a fetus that had been injured in utero but that subsequently died after having been born alive is sufficient to sustain a conviction of manslaughter in the second degree under New York Penal Law. Justice Zarella maintains, however, that the *intentional* killing of that *same fetus* would not give rise to the crime of intentional murder because the born alive rule is inapplicable. Thus, according to Justice Zarella, under New York's homicide laws, a defendant who *recklessly* kills a fetus that dies after being born alive is guilty of manslaughter, whereas a defendant who *intentionally* kills a fetus that dies after being born alive cannot be prosecuted for murder. We can conceive of no reason why the New York legislature would have intended such an untenable result. For

or [the passage of] a separate feticide statute . . . no court of last resort in this country [had] held [prior to the enactment of our Penal Code] that the killing of a fetus is murder unless the fetus is born alive and then expires."[43] (Citations omitted.) *People* v. *Greer*, 79 Ill. 2d 103, 111, 402 N.E.2d 203 (1980). Accordingly, we recognize the rule in the absence of a persuasive reason to the contrary.[44]

As the defendant correctly notes, recent advances in medical science have prompted a number of state courts to depart from the born alive rule in favor of a rule of viability, under which "a *viable* fetus can be the victim of a homicide," regardless of whether it is born alive. (Emphasis added.) *Commonwealth* v. *Morris*, 142

all these reasons, we reject Justice Zarella's argument that recognition of the born alive rule conflicts with, and therefore is barred by, the language of § 53a-54a.

[43] Of course, "[a] judicial construction of a statute is an authoritative statement of what the statute meant *before, as well as after*, the decision of the case giving rise to that construction." (Emphasis added.) *Rivers* v. *Roadway Express, Inc.*, 511 U.S. 298, 312–13, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994); accord *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 810, 950 A.2d 1220 (2008). Moreover, "when [a] court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." *Rivers* v. *Roadway Express, Inc.*, supra, 313 n.12; accord *Washington* v. *Commissioner of Correction*, supra, 811.

[44] Justice Zarella contends that, in recognizing the born alive rule, we have created "a new substantive offense not contained in our Penal Code . . . ." We have done nothing of the kind. In adopting the rule, we simply have construed the term "human being," for purposes of our murder statute, in accordance with the long-standing common-law principle that the term includes a fetus that has been born alive.

Justice Zarella also asserts that our recognition of the born alive rule establishes, "for the first time in any jurisdiction [of which Justice Zarella is] aware . . . that the criminal act of murder does not require that the intent to murder be present either before or during the commission of the crime." This assertion also is meritless. The defendant does not dispute that the evidence establishes that he had the intent to murder at the time of the conduct at issue, and, under the born alive rule, if the perpetrator had the requisite intent to murder the fetus in utero, the subsequent death of the fetus after birth renders the perpetrator culpable of murder in every state in which the born alive rule has been adopted.

S.W.3d 654, 660 (Ky. 2004); see also, e.g., *Hughes* v. *State*, 868 P.2d 730, 731 (Okla. Crim. App. 1994) (viable fetus is "human being" under statute defining homicide as intentional killing of "human being"); *Commonwealth* v. *Cass*, 392 Mass. 799, 807, 467 N.E.2d 1324 (1984) (viable fetus is "person" under vehicular homicide statute barring certain conduct that causes death of "another person"); *State* v. *Horne*, 282 S.C. 444, 446–47, 319 S.E.2d 703 (1984) (viable fetus is "person" within meaning of statute defining murder as killing of "any person"). These courts generally have concluded that "the rationale for the 'born alive' rule no longer exists" because "[m]edical science has now advanced to the stage that the viability, health, and cause of a [fetus'] death can be determined."[45] *Commonwealth* v. *Morris*, supra, 659; see also *Commonwealth* v. *Cass*, supra, 806 ("[m]edical science now may provide competent proof as to whether the fetus was alive at the time of a defendant's conduct and whether his conduct was the cause of death"). Furthermore, according to the National Conference of State Legislatures, thirty-eight states have abrogated the born alive rule legislatively by the enactment of laws that classify the killing of a viable fetus as a homicide.[46] See National Conference of State Legis-

---

[45] We note that the born alive rule affords greater protection to criminal defendants than a statute that makes it a homicide to kill a viable fetus because, under the former, a murder prosecution will lie only if the state can establish that the fetus survived the injuries that it suffered in utero. Of course, a viability rule requires no such proof because the fetus need not be born alive after having sustained injuries in utero for the defendant to be culpable of murder.

[46] "[As of March, 2010], at least [thirty-eight] states have fetal homicide laws. The states include: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia and Wisconsin." National Conference of State Legislatures, Fetal Homicide Laws (March, 2010), available at http://www.ncsl.org/programs/health/fethom.htm (last visited May 27, 2010).

latures, Fetal Homicide Laws (March, 2010), available at http://www.ncsl.org/programs/health/fethom.htm (last visited May 27, 2010).

Notwithstanding the recent trend in other jurisdictions toward recognizing a viable fetus as a person for purposes of the homicide statutes of those jurisdictions,[47] several states have elected to treat the killing of

Although many of these fetal homicide statutes protect only viable fetuses, some are not so limited in scope and apply to all fetuses regardless of viability. See, e.g., Ala. Code § 13A-6-1 (3) (Cum. Sup. 2009) ("[t]he term [person], when referring to the victim of a criminal homicide or assault, means a human being, including an unborn child in utero at any stage of development, regardless of viability"); Cal. Penal Code § 187 (a) (Deering 2008) ("[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought").

[47] We note that Justice Zarella accepts as uncontroverted the proposition articulated by Clarke D. Forsythe; see C. Forsythe, supra, 21 Val. U. L. Rev. 563; that "the born alive rule developed as a rule of causation and no longer is necessary due to advances in medical science . . . ." Specifically, Justice Zarella asserts that, "if medical technology had been capable of assessing the health of the fetus in times past, there would have been no reason for creating the born alive rule." Although some courts have abrogated the born alive rule on the basis that the rule is no longer needed for purely evidentiary purposes, a number of commentators have rejected Forsythe's theory as overly simplistic and ideologically driven, explaining that the born alive rule is a substantive rule for defining legal personhood. For example, one such commentator states: "Forsythe is wrong about the purely evidentiary nature of the [born alive rule]. It seems rather that there are three reasons why the common law insisted on live birth for a homicide conviction, only one of which is evidentiary. That is the reason Forsythe gives—namely, that in the past, it was not possible to be sure that a miscarriage or stillbirth was the result of the attack on the pregnant woman, or whether the fetus was dead before the attack. Indeed, in the past it was not always clear if the woman was even pregnant. However, in addition to this evidentiary reason, there are two other reasons why live birth traditionally has been considered significant. First, prior to live birth, the fetus was considered to be a part of the pregnant woman, and not a separate existence. In [the] words [of Oliver Wendell Holmes], it was not in esse [that is, in being] until it was born alive. Second, a fetus is not yet a fully developed human being, a person like the rest of us. This was expressed by the great common-law authority, Sir Edward Coke, who held that the killing of a fetus is a 'great misprision, and no murder.' But if the child is born alive and then dies from the attack on its mother, this is murder, 'for in law it is accounted a reasonable creature, in rerum natura, when it is born alive.' [Moreover, Sir William]

## a fetus, including a viable fetus, as a form of aggravated

Blackstone . . . closely followed Coke. '[T]he person killed must be a "reasonable creature in being and under the king's peace," at the time of the killing . . . .'

* * *

"Blackstone may have been influenced by evidentiary considerations. However, this [factor alone] does not cohere with the fact that the common law did not allow recovery for prenatally inflicted wounds by a child who survived live birth. The reason for refusing to allow such suits was not the evidentiary problem of proving that the plaintiff's injuries were caused by the defendant's negligence. Rather, it was universally held that the defendant owed no duty of care to a being that was not in esse at the time of the negligence.

"It seems, then, that neither the requirement of separate existence, nor that of being a reasonable creature, is based solely on the difficulties of proving that the attack on the pregnant woman killed the fetus. If the born alive rule is properly interpreted as a substantive definition of a legal person, and is not merely evidentiary, it is not made obsolete by advances in medical technology." B. Steinbock, Life Before Birth: The Moral and Legal Status of Embryos and Fetuses (Oxford University Press 1992) c. 3, pp. 105–107; see also K. Savell, "Is the 'Born Alive' Rule Outdated and Indefensible?," 28 Sydney L. Rev. 625, 633 (2006) ("[a]s Forsythe himself concedes, [his theory] stands in stark contradiction to a substantial body of modern authority in [favor] of the view that the [fetus] does not attain legal personality until it is born alive"); cf. *People* v. *Greer*, supra, 79 Ill. 2d 114 ("The extent to which the unborn child is to be accorded the legal status of one already born is one of the most debated questions of our time, and one to which we do not find any completely consistent response. . . . [O]pposing tendencies to protect the fetus in some instances and not in others have long coexisted."). Moreover, some state legislatures, such as that of North Carolina, have elected to retain the born alive rule and to treat the killing of a fetus in utero as a felony against the mother. N.C. Gen. Stat. § 14-18.2 (b) (2009) ("[a] person who in the commission of a felony causes injury to a woman, knowing the woman to be pregnant, which injury results in a miscarriage or stillbirth by the woman is guilty of a felony that is one class higher than the felony committed"); see *State* v. *Beale*, 324 N.C. 87, 93, 376 A.2d 1 (1989) (adopting born alive rule for purposes of state's homicide statute). Other states treat the killing of a fetus as the crime of feticide as distinguished from the crime of homicide. See, e.g., Ind. Code Ann. § 35-42-1-6 (LexisNexis 2009) ("A person who knowingly and intentionally terminates a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus commits feticide, a Class B felony. This section does not apply to an abortion performed in compliance with . . . [law]."). States that have adopted one of these two approaches have done so, at least in part, to avoid the concern, wholly unrelated to any evidentiary considerations, that treating a fetus as a person under the state's homicide statute could

assault inflicted on the mother rather than as a homicide.[48] Connecticut is one of those states. In 2003, the legislature enacted Public Acts 2003, No. 03-21 (P.A. 03-21), entitled "An Act Concerning Assault of a Pregnant Woman," which is codified as amended at General Statutes § 53a-59c. Public Act 03-21 provides in relevant part: "(a) A person is guilty of assault of a pregnant woman resulting in termination of pregnancy when such person commits assault in the first degree . . . and (1) the victim of such assault is pregnant, and (2) such assault results in the termination of pregnancy that does not result in a live birth. . . .

"(c) Assault of a pregnant woman resulting in termination of pregnancy is a class A felony."

Public Act 03-21, also known as "Jenny's Law," was enacted in response to the December 31, 2001 murder of Jenny McMechen, who was thirty-six weeks pregnant at the time she was shot to death by Michael Latour. See *State* v. *Latour*, 276 Conn. 399, 401, 886 A.2d 404 (2005). Because the fetus she was carrying died in utero, the born alive rule operated to bar the state from treating the death of the fetus as murder, and, presumably as a consequence, Latour was charged with only one count of murder, that is, the murder of McMechen. See id. Indeed, at the time McMechen was murdered, our Penal Code contained no provision pertaining to the

---

undermine the reproductive rights of women. See, e.g., D. Curran, note, "Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws," 58 Duke L.J. 1107, 1109–11 (2009).

[48] See Del. Code. Ann. tit. 11, § 606 (2007) (abuse of pregnant female in first degree resulting in termination of pregnancy is class B felony); N.H. Rev. Stat. Ann. § 631:1 (2007) (person is guilty of first degree assault, which is class A felony, if he "[p]urposely or knowingly causes injury to another resulting in miscarriage or stillbirth"); N.M. Stat. § 30-3-7 (2004) (injury to pregnant woman resulting in stillbirth or miscarriage is third degree felony); N.C. Gen. Stat. § 14-18.2 (2009) (injury to pregnant woman resulting in miscarriage or stillbirth in commission of felony is guilty of felony that is one class higher than felony committed).

killing of a fetus that dies in utero. McMechen's family petitioned state lawmakers to enact legislation recognizing an unborn fetus as a person for purposes of this state's homicide statutes. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2002 Sess., pp. 2797, 2806–2807. In response, Raised House Bill No. 5747 (2002), entitled "An Act Concerning the Definition of a Person in the Penal Code," was referred to the judiciary committee on March 13, 2002. Section 1 of the bill provided that the term " 'person', when used to describe the victim of [a homicide], includes a viable fetus." A public hearing on the bill was held on March 18, 2002, at which numerous people testified both for and against the bill. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2307–18, 2402–39. At the hearing, Representative Michael P. Lawlor, the judiciary committee cochairperson, explained that the state historically had used the word "person" in its criminal statutes and that had not changed since the "[s]tate was chartered" in the 1600s. Id., p. 2405. He indicated, moreover, that he opposed expanding the definition of "person" under the homicide statutes to include a fetus because, among other reasons, it would create another death penalty eligible offense. Id., p. 2429.

Clarke D. Forsythe, president of Americans United for Life and a leading opponent of the common-law born alive rule,[49] spoke in favor of the bill. Id., pp. 2402–17. Forsythe argued that, "[o]ver the past several years a number of criminal assaults in Connecticut resulting in the death of unborn human beings have demonstrated that no remedy exists in the criminal law and that legislation is needed.

"The lack of remedy in the law *is due to the outdated and obsolete common law born alive rule which pre-*

---

[49] See generally, e.g., C. Forsythe, supra, 21 Val. U. L. Rev. 563.

*vents a charge of homicide when a child is stillborn after an assault.* At common law, the killing of an unborn human was not treated as a homicide unless the child was born alive and died thereafter and born alive does not mean term birth, it doesn't mean [forty] weeks gestation. It simply means expulsion from the womb at any time of pregnancy.

"It is a rule of location, a rule of evidence . . . that has no gestation[al] time limitation and thus, a charge of homicide can be brought if a criminal assault results in miscarriage at any time [during] gestation, as long as the child dies after expulsion from the womb. . . .

"[W]hile [the rule] may have made medical sense four centuries ago when it was created in 1601 in English courts, it has been rendered obsolete by modern medical science. With modern medical science, the application of the born alive rule leads to absurd results. Here in Connecticut, a prenatal assault that results in a miscarriage and death after birth at one month gestation can be charged as a homicide even though the fetus is only a month old. While a prenatal assault, as in the case of . . . McMechen, at eight months or nine months that results in a stillbirth, can never result in a charge of homicide." (Emphasis added.) Id., pp. 2403–2404; see also id., pp. 2417–19, remarks of Bill O'Brien, legislative vice president of Connecticut Right to Life Corporation. Thus, those testifying in favor of the bill acknowledged that its passage would serve to abrogate the born alive rule, which, they also acknowledged, was embodied in the common law of this state. Members of the judiciary committee both for and against the bill questioned these witnesses at some length in an effort to understand the rationale underlying the bill, its ramifications, and the extent to which other states had enacted similar legislation.[50]

---

[50] For example, Forsythe testified that a significant number of states had enacted statutes that treat the killing of a fetus as some form of homicide. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess.,

Many abortion rights organizations testified against the bill. For example, Elaine C. Werner, executive director of the Connecticut affiliate of the National Abortion and Reproductive Rights Action League, argued that, "[b]y focusing on creating a separate legal status for fetuses, rather than whether the bill would actually deter criminal conduct, I fear the promotion of a political agenda—an agenda that has nothing to do with violence against pregnant women. . . . Although presented as crime fighting, it is actually aimed at eroding a woman's constitutional right under *Roe* v. *Wade*."[51] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2002 Sess., p. 2809. Lisa B. Winjum, director of public policy and communication for Connecticut Sexual Assault Crisis Services, Inc., stated that the "bill opens the door to numerous legal and public policy concerns in the areas of privacy and reproductive freedom." Id., p. 2783. Winjum stated further: "We strongly oppose the bill because it will not do anything to prevent violence against women. Nor will it save a single life. Those who seek to undermine a woman's right to privacy and reproductive freedom continually try to separate the legal rights of the fetus from the legal rights of the mother."[52] Id. Jennifer C. Jaff, an attorney, argued

pp. 2404–10. Representative Gail K. Hamm asked Forsythe about the exact number of those states that had enacted such statutes, and Forsythe responded that approximately twenty-seven states had "changed their law by statute and, in effect, abolished the born alive rule." Id., p. 2412. Forsythe further responded that the courts of two states, including Massachusetts, "basically [held] that [they would not] apply the born alive rule in the case of a viable fetus." Id.

[51] *Roe* v. *Wade*, 410 U.S. 113, 153–54, 163–65, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) (recognizing and setting forth parameters of woman's constitutionally protected right to abortion).

[52] As the foregoing testimony illustrates, and as we discuss more fully hereinafter, a primary obstacle to the institution of fetal homicide laws nationwide has been "the political concern that treating [the killing of a fetus] as homicide would erode constitutionally protected reproductive freedoms . . . ." D. Curran, note, "Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws," 58 Duke L.J. 1107, 1111 (2009).

that the bill was "bad public policy" predicated on the false premise "that the interests of the woman and those of the fetus developing inside her body can be separated when, in fact, they are inextricably joined." Id., p. 2785. In light of the strong opposition to the bill, it was not reported out of the judiciary committee.

On March 25, 2002, Substitute House Bill No. 5747, entitled "An Act Concerning Assault of a Pregnant Woman," was reported favorably out of the judiciary committee. The bill was described by one senator as a "compromise" between the pro-life and pro-choice groups. See 46 S. Proc., Pt. 4, 2003 Sess., p. 1013, remarks of Senator Catherine W. Cook; see also id., p. 1010, remarks of Senator Donald E. Williams, Jr. (noting "broad support" for bill and describing "unique alliance" between pro-choice and pro-life groups in supporting proposed legislation). Although the House passed the substitute bill, the Senate never acted on it before the expiration of the 2002 legislative session.

The substitute bill was resurrected in the 2003 session as Senate Bill No. 355. A hearing on the bill was held on February 10, 2003. Susan Lloyd Yolen, chairperson of the Connecticut Coalition for Choice, testified that "the language contained in [the bill] is the positive result of compromise that took place last [s]ession. In the generally acrimonious battle over reproductive rights, which has often centered on the questions of what status and rights are accorded to the fetus, the wording of this bill stands as a rare example of accord. Sponsors of last year's bill assured the pro-choice community that it was not their intent to establish language that would erode abortion rights . . . [but that] would help mitigate the injustice done when a woman, pregnant with a wanted child, is harmed or killed by an assailant, and her pregnancy is ended. The resulting language was the result of a good faith effort to reach agreement on

an approach that would suitably punish the perpetrator by making such an assault a class A felony." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2003 Sess., p. 521.

Although many of those who had testified the previous year in support of the 2002 bill also testified in support of the 2003 bill, some complained that the bill did not go far enough because it did not define the term "person" in our Penal Code to include a viable fetus and, thus, did not serve to abolish the born alive rule. For example, O'Brien testified that the bill "continues Connecticut's adherence to [the] medically obsolete . . . born alive rule which was [recognized] in 1601." Id., p. 424. O'Brien explained that "[a] child no longer needs to be born alive for science to prove whether or not the child was alive at a certain time in the womb" and implored the legislature to "move Connecticut's courts and the law out of the [1600s] and abandon the born alive rule to join other more technologically sophisticated states in the [twenty-first] century in using modern medical science to determine if an unborn child's injuries or death resulted from some natural cause or from an assault." Id.; see also id., pp. 668–69, 671, remarks of Clarke Forsythe (arguing that "the [l]egislature should abolish the obsolete and outdated born alive rule in Connecticut" and suggesting different language in 2003 bill that would serve to abolish rule while protecting reproductive freedoms of women). Thus, some continued to advocate for the abolition of the born alive rule, and members of the judiciary committee continued to be actively involved in that discussion.[53]

---

[53] For example, in one exchange between O'Brien and Representative Robert Farr, O'Brien expressed the view that "[t]he problem is not that we don't recognize the unborn child in Connecticut as a person. The problem is that we have the born alive rule . . . [that requires it] to take its first breath [before you can prove that it is a person]." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2003 Sess., p. 426. Representative Farr responded, "[b]ut the bill before us"—that is, the bill that ultimately became P.A. 03-21—"actually [covers a fetus] from conception, it [just] doesn't treat

Ultimately, the legislature opted to treat the assault of a pregnant woman that results in the termination of her pregnancy without a live birth as an aggravated assault on the pregnant woman, and not as a homicide of the fetus, irrespective of whether the fetus was viable when the pregnancy was terminated. See P.A. 03-21. By its express terms, P.A. 03-21 applies only to "the termination of [a] pregnancy that does not result in a live birth," language that clearly reflects the legislature's awareness that it was carving out an exception for an infant who is born alive but who thereafter dies from injuries sustained in utero. The reason for this exception could hardly be clearer in light of the legislative debate that preceded the enactment of P.A. 03-21, namely, the legislature's recognition that an infant who is born alive but subsequently dies from injuries sustained in utero *already* is protected by virtue of the operation of the born alive rule, pursuant to which the infant's death is treated as a homicide.[54]

---

it as a separate case of murder . . . ." Id. O'Brien thereafter acknowledged his agreement with Representative Farr's characterization of the 2003 bill. Id.

[54] The legislative history of P.A. 03-21 notwithstanding, there is only one possible reason why the legislature opted to include within the protection of that provision only those fetuses that are not born alive, namely, the born alive rule, of which the legislature was well aware and which operates to protect an infant who suffers injuries in utero but who is born alive and then dies from those injuries. Indeed, neither Justice Zarella nor the defendant posits any other conceivable reason why P.A. 03-21 excludes from its purview an infant who is born alive but who subsequently dies from injuries sustained in utero. Moreover, we do not share Justice Zarella's view that the legislature was oblivious to the consequences of its enactment of P.A. 03-21 with respect to the class of victims who die from prenatal injuries after being born alive because we are unwilling to assume that the legislature enacted P.A. 03-21 without any thought or regard for that class of victims, especially in view of the fact that the legislature was well aware of the born alive rule generally and the pendency of the present case specifically. Indeed, as we discuss more fully hereinafter, Justice Zarella's view cannot be squared with numerous fundamental principles of statutory construction, including the principle that the legislature is deemed to intend the consequences of its action or lack thereof on all existing statutes. See, e.g., *Civardi* v. *Norwich*, 231 Conn. 287, 298, 649 A.2d 523 (1994).

Justice Zarella nevertheless asserts that the sole purpose of the legislature in enacting P.A. 03-21 was "to achieve a compromise between pro-choice

As the foregoing statutory language and legislative history reveal, it is abundantly clear that, in enacting P.A. 03-21, the legislature fully considered and rejected the possibility of abolishing the born alive rule and adopting a viability rule instead. In fact, a report on P.A. 03-21 prepared by the legislature's office of legislative research indicates that the legislature, in making its determination, was well aware of the trial court's express reliance on the born alive rule in the present case, as well as the application of the rule by the court in *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 498.[55] See Office of Legislative Research, Research

and pro-life advocates" in the aftermath of McMechen's murder, without any concern for "the issue of whether to penalize a defendant for" the death of an infant who has been born alive but who subsequently dies from injuries sustained in utero. Footnote 33 of Justice Zarella's concurring and dissenting opinion. Justice Zarella's contention fails not only because it leads to a bizarre result, but also because the legislature would have achieved the very same compromise if it had not limited the reach of P.A. 03-21 to fetuses that die in utero. In other words, extending the same protections to an infant who dies *after* being born alive would have had no effect on the compromise that had been achieved between the pro-choice and pro-life constituencies. We can think of no reasonable explanation, therefore, why the legislature would have crafted P.A. 03-21 in such a manner as to create a wholly unnecessary—and wholly irrational—lacuna in our homicide law. As we previously discussed, the only logical explanation for the legislative decision to limit the scope of P.A. 03-21 to fetuses that are *not* born alive is that the legislature was well aware of the applicability of the born alive rule to infants who die after being born alive. As we also have discussed, this explanation is borne out by the relevant legislative history.

We note, finally, that, in Justice Zarella's view, the legislative history of P.A. 03-21 supports his conclusion that the statutory scheme, as he interprets it, that is, a person who intentionally kills a fetus in utero is guilty of a class A felony whereas a person who intentionally kills an infant who is born alive but who subsequently dies from injuries sustained in utero is guilty of no crime, does not represent a gap in our homicide statutes. Our view of that same legislative history leads us to the opposite conclusion and also to the related conclusion that the legislature did not opt, and rationally never would have opted, for such a scheme.

[55] We note, moreover, that, in 1999, the office of legislative research prepared another report on the trial court's ruling on the defendant's motion to dismiss in the present case. See Office of Legislative Research, Research Report No. 99-R-0772, "Murder Case Involving Death of a Baby Injured As a Fetus" (July 27, 1999). The report noted that, "[i]n a probable cause hearing, the court considered whether Antonia, who sustained her injuries as a fetus

Report No. 2003-R-0488, "Assault of a Pregnant Woman and Murder" (June 30, 2003) (discussing present case and *Anonymous,* and specifically referring to fact that born alive rule was "applied" by trial court in present case), available at http://www.cga.ct.gov/2003/olrdata/ jud/rpt/2003-R-0488.htm (last visited May 27, 2010). "Although the comments of the office of legislative research are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill." *Harpaz* v. *Laidlaw Transit, Inc.,* 286 Conn. 102, 124 n.15, 942 A.2d 396 (2008); cf. *State* v. *Tabone,* 279 Conn. 527, 542, 902 A.2d 1058 (2006) (consulting analysis of bill by office of legislative research to ascertain legislative intent). The report provides in relevant part: "[Public Act] 03-21 creates a new crime of assault of a pregnant woman. The act makes it a class A felony (punishable by [ten] to [twenty-five] years in prison) for anyone to assault a pregnant woman and cause her pregnancy to terminate without a live birth. . . .

*"This new crime does not affect the murder statutes. Under Connecticut case law, a person cannot be charged with murder of a baby unless the baby is born alive and lives for some period of time."* (Emphasis added.) Office of Legislative Research, Research Report No. 2003-R-0488, supra.

In light of the centuries old born alive rule—which, as we have explained, has been universally recognized by courts and commentators throughout the country as deeply rooted in the common law—and the passage of and legislative history surrounding P.A. 03-21, we conclude that the trial court properly determined that

and then died after birth, was a 'person' under the murder and capital felony statutes. The court relied on similar murder statutes and the common law to rule that Antonia qualified as a 'person' because she was born alive." Id.

an infant who is born alive and who subsequently dies of injuries that he or she had sustained in utero is a "person" within the meaning of this state's homicide statutes.[56] Although it is true, of course, that this court previously has had no occasion to consider the born alive rule, no less authoritative a commentator than former Chief Justice Swift expressly acknowledged the applicability and import of the rule more than 200 years ago.

We note, furthermore, that, under the position that the defendant advances, he would not be subject to *any* greater penalty because Rodgers was eight and one-half months pregnant with Antonia than he would have been if she had not been pregnant at the time of her death. This result is a necessary consequence of the defendant's contention that the born alive rule was not embodied in our statutory scheme when he attacked and killed Rodgers; the defendant would be subject to criminal liability for Rodgers' murder and nothing more. We are unwilling to presume that the legislature intended such a result, especially in light of the clear legislative history of P.A. 03-21.

Justice Zarella, like the defendant, contends that we should decline to recognize the born alive rule because it is obsolete. It is true that the rule gained widespread acceptance at a time when it was not possible to determine whether a fetus was alive in utero. In part for that reason, the law required the state to prove a live birth to guard against the possibility that the fetus was not alive when the defendant engaged in the prohibited conduct. Of course, advances in medical science have

---

[56] We recognize that P.A. 03-21 was enacted several years after the defendant committed the offenses of which he stands convicted. That fact does not alter our analysis, however, because the born alive rule was the common law of this state when the defendant committed those offenses. Public Act 03-21 merely reflects the decision of the legislature to reaffirm the applicability of the rule rather than to abrogate it.

now made it possible to determine whether a fetus was alive prior to that conduct, and, consequently, the born alive rule is not necessary for the purpose of proving that fact. With the removal of that evidentiary impediment, a majority of states have seen fit to abandon the rule, *but they have done so in favor of statutes that treat the killing of a fetus as a form of homicide.* See, e.g., A. Lotierzo, comment, "The Unborn Child, A Forgotten Interest: Reexamining *Roe* in Light of Increased Recognition of Fetal Rights," 79 Temp. L. Rev. 279, 284–85 n.52 (2006). Indeed, in a few states, courts have achieved the same result in the exercise of their common-law authority. See *Commonwealth* v. *Cass*, supra, 392 Mass. 807 (viable fetus); *State* v. *Horne*, supra, 282 S.C. 446–47 (viable fetus). Those jurisdictions, therefore, have repudiated the born alive rule for the purpose of *expanding* the protection afforded under their homicide statutes to include not only those victims who previously had been covered under the rule but, in addition, a considerably *broader* group of victims, that is, the class of victims comprised of viable, and in some states, previable,[57] fetuses who have suffered fatal injuries and died in utero. In other words, those states that have rejected the born alive rule, either legislatively or judicially, have done so in the interest of protecting *all* viable fetuses who suffer fatal injuries, including those that are not born alive, in addition to those that are born alive but subsequently die due to injuries sustained in utero. Thus, as the Arizona Court of Appeals aptly has explained, "[a]lthough some commentators argue

---

[57] See, e.g., Idaho Code Ann. § 18-4001 (2004) ("[m]urder is the unlawful killing of a human being, including, but not limited to, a human embryo or fetus"); Miss. Code Ann. § 97-3-37 (1) (2006) ("[f]or purposes of the offenses [of homicide, capital murder and assault], the term 'human being' includes an unborn child at every stage of gestation"); S.D. Codified Laws § 22-16-1 (2006) ("[h]omicide is the killing of one human being, including an unborn child, by another"). These states, however, carve out an exception for legal abortions performed by licensed medical professionals. See, e.g., Miss. Code Ann. § 97-3-37 (3) (2006).

that the born alive rule is an anachronism in light of advances in the areas of obstetrics and forensics . . . such criticism favors the applicability of homicide statutes to the deaths of unborn, but viable, children, *not the inapplicability of such statutes to babies . . . who are not only viable, but are in fact born alive.*" (Citation omitted; emphasis added.) *State* v. *Cotton*, supra, 197 Ariz. 588 n.5. In light of the reason why various states have abolished the born alive rule—that is, because it now is viewed by those states as unnecessarily *underinclusive* with respect to the category of victims that it protects—it would make no sense to reject the rule, as Justice Zarella contends that we should, without replacing it with a broader rule, namely, one that includes the killing of a fetus.

We are not at liberty to follow the lead of other states in adopting a broader construction of our murder statute to include the killing of a fetus, however, because, as we previously discussed, our legislature took a markedly different approach from the majority of states when, in 2003, it made it a crime under P.A. 03-21 to commit an assault against a pregnant woman that causes the termination of pregnancy that *does not result in a live birth.* For the reasons that follow, the enactment of P.A. 03-21 provides yet another convincing reason why recognition of the born alive rule is the only appropriate approach to take with respect to the construction of our murder statute, as that statute is applied to the factual scenario presented.[58]

---

[58] Justice Zarella devotes much of his opinion to attacking the born alive rule as an outmoded relic of the past—for that reason, Justice Zarella characterizes our recognition of the rule as " 'revolting' "—and to explaining that a majority of states now have rejected the rule. Only after his lengthy attack on the legitimacy of the rule does Justice Zarella concede that it has been repudiated in other jurisdictions because it has been deemed to be unnecessarily narrow or restrictive in scope, that is, because it does not extend to the murder of a fetus in utero. Thus, Justice Zarella recognizes, as he must, that those jurisdictions that have rejected the rule have done so because it is not inclusive enough and that they therefore have replaced the rule with a broader criminal scheme that includes the intentional killing of a fetus.

It is crystal clear from the legislative history of P.A. 03-21 that the legislature took this approach because of the concern that treating a fetus as a person for purposes of our murder statute might have significant implications in the area of abortion rights. Indeed, the very same debate that preceded the enactment of P.A. 03-21 has occurred in many other states throughout the country, prompting one commentator to explain: "Analytically, this topic is a difficult one—on one hand, it is hardly controversial to take the position that a fetus is a human organism (though the legal personhood of a fetus is hotly debated) and that, consequently, the killing of a fetus should not go entirely unpunished. But, on the other hand, those advocates of constitutionally protected reproductive rights balk at classifying all unborn children as 'human beings' for the purposes of

---

In the present case, however, it would be nonsensical to reject the rule as too narrow because, in doing so, we would be required to assume that the legislature intended to create an irrational statutory scheme, one pursuant to which it would be a class A felony to kill a fetus in the process of assaulting a pregnant woman and no crime at all to cause the death of a fetus that is born alive but that subsequently dies from injuries sustained in utero. Justice Zarella's only response to this untenable result is a non sequitur. He states that "[t]his court's failure to recognize the born alive rule . . . would not constitute a . . . 'repudiation' of the [born alive rule similar to that of other states] because [the rule] has not heretofore been recognized in this jurisdiction and thus cannot be abandoned." Our disagreement with Justice Zarella that the born alive rule previously has not been recognized in this state notwithstanding, his response is beside the point; the issue of whether a court or courts of this state have recognized the rule in the past is irrelevant to the issue of whether this court should now decline to adopt the rule for the reason that it has been criticized and rejected by other states, that is, because it is *too narrow*. Under no circumstances is *that* a reason for us to reject the rule in light of the fact that our legislature already has criminalized the killing of a fetus in utero. In other words, the *reason* that other jurisdictions have rejected the born alive rule as outmoded, namely, because it places an unnecessary limitation on the scope of the crime of homicide, has no applicability in this state, and, therefore, there is no basis for rejecting the rule. Thus, although the born alive rule reasonably has been repudiated in other jurisdictions, Justice Zarella sets up the proverbial straw man in attacking the born alive rule as outmoded, and, therefore, unnecessary, for purposes of this state's homicide statutes.

homicide statutes. The challenge, then, becomes appropriately protecting pregnant mothers and their unborn children while still maintaining reproductive freedoms. . . .

"[Consequently, before opting to recognize unborn children as potential homicide victims] the legislature must weigh very carefully a countervailing concern: the potential erosion of constitutionally protected reproductive freedoms. Many pro-choice advocates understandably worry that fetal homicide laws encroach on reproductive freedoms and could ultimately result in the outlawing of abortion altogether. Couched in these terms, it is unsurprising that many oppose passage of a fetal homicide law, not because they do not wish to protect the life of a fetus, but because the issue implicates the politics of reproductive rights." D. Curran, note, "Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws," 58 Duke L.J. 1107, 1109–10 (2009).

The legislative history and debate surrounding the enactment of P.A. 03-21[59] reveals that it was precisely this consideration that prompted the legislature to treat the killing of a fetus in utero as an aggravated assault on the mother, which the legislature accomplished by enacting P.A. 03-21, and to treat the killing of an infant who dies after being born alive from injuries sustained in utero as a murder, which the legislature accomplished by leaving the born alive rule in place. Indeed, as we noted previously, two speakers, both of whom represented pro-life groups, argued strenuously before

[59] Justice Zarella takes us to task for characterizing P.A. 03-21 as criminalizing the killing of a fetus because the statute classifies the prohibited conduct as an assault and not as a homicide. Justice Zarella's criticism is unwarranted because, although P.A. 03-21 does indeed criminalize an assault on a pregnant woman, it does so only when her pregnancy is terminated or, in other words, her fetus is killed. Consequently, it is inarguable that P.A. 03-21 makes it a crime to kill a fetus, albeit a crime classified as one against the mother.

the judiciary committee that the born alive rule was outmoded and obsolete and that it should be abolished in favor of the proposed legislation that they favored,[60] which would have treated a viable fetus as a person under our murder statute.[61] See Raised House Bill No. 5747 (2002). Those who spoke against the born alive rule lost the argument, however, and the legislature

---

[60] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2403–2404, remarks of Forsythe; see also id., pp. 2417–19, remarks of O'Brien.

[61] Indeed, it recently has been observed in a pro abortion rights publication that one of those who spoke in favor of the bill, namely, Forsythe, the president of Americans United for Life, is at the forefront of a movement to overturn the seminal abortion case of *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). "The Supreme Court's 1973 *Roe v. Wade* decision galvanized opponents of legal abortion and led socially conservative Protestants and Catholics to begin cooperating, albeit in limited ways, during the late 1970s and early 1980s. In the mid-1990s the alliance was formalized in a document entitled *Evangelicals and Catholics Together: The Christian Mission in the Third Millennium* that committed the two groups to working together on social and cultural issues, most notably abortion . . . .

"Although efforts to overturn *Roe* have been studied from many different perspectives, little attention has been paid to the activities of socially conservative lawyers who try to undermine abortion rights by devising legal rationales for defining the human organism in all stages of development as a person. Legal advocacy groups associated with socially conservative Christian groups have followed a two-pronged strategy: 1) crafting model fetal rights legislation and 2) developing legal arguments about why existing laws should be re-interpreted in ways that result in embryos and fetuses being legally defined as persons." (Citation omitted.) J. Schroedel, Religious Coalition for Reproductive Choice Research Report, "Law, Religion, and Fetal Personhood" p. 2, available at http://www.rcrc.org/pdf/ RCRC_EdSeries_LRFP.pdf (last visited May 27, 2010). According to Schroedel, "[t]he two Christian legal groups that have been in the forefront in crafting model fetal rights statutes and developing novel legal rationales for stretching existing statutory law to encompass fetal life are Americans United for Life . . . and the National Right to Life Committee . . . ." Id., p. 9 n.2. A second person who spoke in favor of Raised House Bill No. 5747 (2002), O'Brien, represented the National Right to Life Committee before the judiciary committee. In light of the strong feelings on both sides of the abortion issue, one would have to blink at reality to think that the debate engendered by the proposed legislation—and with it, the debate about the proposed abolition of the born alive rule—somehow was lost on the members of the legislature when they rejected that bill in favor of P.A. 03-21.

took no action to abolish or abrogate the rule. Several legislators, moreover, expressly acknowledged that they were voting for P.A. 03-21 as a compromise between the position advocated by the pro-life activists and the position advocated by those other persons—mainly pro-abortion rights activists—who initially had favored no statutory change at all. It is evident, therefore, that the legislature's enactment of P.A. 03-21 *"merely reflects a desire to afford greater protection to the unborn fetus than was available under common law, not less protection to a child who, despite the homicidal conduct of another, happens to survive past birth."* (Emphasis added.) *State* v. *Cotton,* supra, 197 Ariz. 588. Of course, as a consequence of the enactment of P.A. 03-21, this court lacks the authority to reject the born alive rule in favor of an expansion of our murder statute to include the killing of a viable fetus that dies in utero because the legislature already has determined that such conduct shall be treated as an aggravated assault against the mother under P.A. 03-21 and not as a homicide.[62]

Disregarding the unmistakable import of P.A. 03-21 and the legislative debate that preceded its enactment,[63]

---

[62] Justice Zarella asserts that the legislative history of Raised House Bill No. 5747 (2002) (fetal homicide bill), which included a viable fetus within the definition of "person" for purposes of our homicide statutes and which the legislature rejected due to concerns about its potential for undermining reproductive freedoms, and the legislative history of P.A. 03-21 suggest an unwillingness by the legislature to adopt the born alive rule because the rule "employs exactly the same solution as the fetal homicide bill, namely, granting the fetus independent legal rights by imposing a punishment expressly related to its death, a step the . . . legislature clearly was unwilling to take." This analysis is off the mark because, under the fetal homicide bill, a viable fetus is accorded the same treatment as any other person, whereas, under the born alive rule, the protection of the homicide statutes is extended only when the fetus is born alive and, consequently, is no longer a fetus but a child. Thus, contrary to Justice Zarella's assertion, there is absolutely nothing about treating the death of such a child as a homicide that implicates any of the same concerns that prompted the legislature to reject the fetal homicide bill.

[63] Justice Zarella also disregards the born alive rule itself, claiming that it never was the common law of this state. See footnote 39 of this opinion.

Justice Zarella would have us reject the born alive rule as outmoded even though, in contrast to those other states that have done so, we would be barred by P.A. 03-21 from replacing it with a broader and, it is claimed, more modern and enlightened rule that encompasses the killing of a fetus in utero. The approach that Justice Zarella urges, however, simply ignores the reason why the legislature opted to preserve the born alive rule, that is, to facilitate the compromise crafted in response to the competing positions advocated by pro-life and pro-choice supporters. Thus, although we agree that the born alive rule no longer is necessary to ensure that the fetus was alive and viable when the injuries that led to its demise were inflicted, our legislature has decided to retain the rule for an altogether different reason, namely, to accommodate the concerns of pro-choice supporters who opposed treating the killing of a fetus in utero as murder.

Moreover, in light of the policy decision of the legislature that led to the enactment of P.A. 03-21, judicial abrogation of the born alive rule would lead to a result that is both unprecedented and absurd; in that event, a person who fatally injures a fetus that dies in utero would be subject to severe criminal penalties under P.A. 03-21, whereas that same person would be subject to *no* criminal sanction for inflicting those same injuries if the fetus is born alive and subsequently dies from the injuries inflicted in utero. Of course, no state ever has approved—or ever would approve of—such a result, yet that is the result that Justice Zarella would have us achieve by rejecting the born alive rule. Justice Zarella nevertheless accuses us of "invad[ing] the legislative prerogative" and "violat[ing] the separation of powers" by declining to ascribe to the legislature such a bizarre and irrational intent. On the contrary, it is the

As we previously explained, Justice Zarella's contention flies in the face of overwhelming evidence to the contrary.

position that Justice Zarella advocates—a position that defies both common sense and the legislative history surrounding the enactment of P.A. 03-21—that would thwart the obvious intent of the legislature, that is, to classify as a homicide conduct that causes an infant to die after being born alive as a result of injuries that were inflicted in utero, on the one hand, and to classify as an aggravated assault on the mother conduct that causes a fetus to die in utero from the same injuries, on the other.

Not surprisingly, the interpretation that Justice Zarella advances violates several cardinal principles of statutory construction. For example, this court repeatedly has stated "that the legislature, in amending or enacting statutes, always [is] presumed to have created a harmonious and consistent body of law . . . ." (Internal quotation marks omitted.) *In re Judicial Inquiry No. 2005-02*, 293 Conn. 247, 262, 977 A.2d 166 (2009). Moreover, "[j]ust as the legislature is presumed to enact legislation that renders the body of the law coherent and consistent, rather than contradictory and inconsistent . . . courts must discharge their responsibility, in case by case adjudication, to [ensure] that the body of law—both common and statutory—remains coherent and consistent." (Internal quotation marks omitted.) *Loughlin* v. *Loughlin*, 280 Conn. 632, 644, 910 A.2d 963 (2006). Thus, "we are required to read statutes together when they related to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme *to ensure the coherency of our construction*." (Emphasis added; internal quotation marks omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 748, 865 A.2d 428 (2005). In other words, "[t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have [on] any one of them. *And it is always presumed*

*to have intended that effect which its action or non-action produces.*" (Emphasis added; internal quotation marks omitted.) *Martinez* v. *Dept. of Public Safety,* 263 Conn. 74, 84, 818 A.2d 758 (2003). Furthermore, it is axiomatic that "those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results." (Internal quotation marks omitted.) *Dias* v. *Grady,* 292 Conn. 350, 361, 972 A.2d 715 (2009). Consequently, "[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended"; (internal quotation marks omitted) *ATC Partnership* v. *Coats North America Consolidated, Inc.,* 284 Conn. 537, 545, 935 A.2d 115 (2007); and, further, "if there are two [asserted] interpretations of a statute, we will adopt the . . . reasonable construction over [the] one that is unreasonable." (Internal quotation marks omitted.) *Aspetuck Valley Country Club, Inc.* v. *Weston,* 292 Conn. 817, 829, 975 A.2d 1241 (2009).

The statutory interpretation that Justice Zarella urges is wholly incompatible with each and every one of these fundamental principles because that interpretation requires us to presume either that the legislature enacted P.A. 03-21 with the intent to achieve an absurd result or that the legislature was oblivious to the bizarre consequences of its action. For obvious reasons, neither presumption is tenable. Indeed, it is particularly indefensible to indulge in a presumption that achieves such a bizarre and irrational result when, as in the present case, an alternative interpretation—one that has deep roots in the common law and is firmly predicated on the pertinent legislative history and genealogy—leads to a perfectly reasonable and logical result.

Justice Zarella nevertheless seeks to justify his refusal to recognize the decision of the legislature to treat the killing of a fetus in utero as an aggravated assault on the mother and the killing of an infant who

is born alive but who subsequently dies from injuries suffered in utero as a murder on the ground that this distinction "makes no sense whatsoever." This assertion is suspect if for no other reason than the fact that seventeen of our sister states still "retain some form of the born alive rule." *State* v. *Lamy*, 158 N.H. 511, 517, 969 A.2d 451 (2009); see also id., 517 n.3 (listing states that currently retain some form of born alive rule). Justice Zarella also fails to account for his inability to identify even one case that, prior to 1998, had abolished the born alive rule to reach the result that Justice Zarella would reach in the present case, that is, to exonerate a defendant who inflicts injuries on an infant in utero who is born alive but who thereafter dies from those injuries. More importantly, however, in view of the competing public policy considerations outlined previously, there is absolutely nothing irrational or nonsensical about a statutory scheme such as ours, which classifies the killing of a fetus in utero as an aggravated assault on the mother—a crime punishable by a term of imprisonment of up to twenty-five years—and the killing of an infant who is born alive but who subsequently dies from injuries suffered in utero as murder. More importantly, this court is bound to honor that legislative distinction irrespective of whether we personally agree that it represents wise or sound public policy. See, e.g., *State* v. *Allen*, 289 Conn. 550, 585, 958 A.2d 1214 (2008) (classification of crime "is a public policy determination reserved to the legislative branch of government, except [when] constitutional principles apply"); *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976) ("[t]he [state] constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment").

Indeed, to whatever extent one reasonably might disagree with the distinction that the legislature has

adopted, the classification that would result from the statutory interpretation that Justice Zarella advocates—that is, one that distinguishes the intentional killing of a fetus that dies in utero from the intentional killing of an infant who is born alive but who subsequently dies from injuries inflicted in utero by treating the former as a class A felony and the latter as *no crime at all*—is utterly irrational. Notably, as we previously have observed, Justice Zarella has not identified any conceivable reason why the legislature would place its imprimatur on such a perverse scheme.[64] In fact, as we have explained, to conclude that the legislature has done so would require us both to disregard the manifest intent of the legislature and, in the process, to reach a truly absurd result, a course that we refuse to take.[65]

[64] Justice Zarella acknowledges that repudiating the born alive rule results in a statutory scheme pursuant to which it is a class A felony under P.A. 03-21 to assault a woman that results in the death of her fetus, but no crime at all to inflict injuries on a fetus in utero if that fetus is born alive and subsequently dies of those injuries. According to Justice Zarella, this result is a "matter of concern," but it "does not represent a gap in the law." We do not understand why, if there is no gap in the scheme, that scheme nevertheless is a cause for concern. More importantly, however, we strongly disagree with Justice Zarella that there would be no gap in the law under the statutory construction that he advocates; indeed, we believe it to be self-evident that the gap would be so great as to render the statutory scheme wholly irrational. Although we must interpret statutes so as to ensure consistency and to avoid bizarre results; see, e.g., *Dias* v. *Grady*, supra, 292 Conn. 361; construing the statute to accomplish the result that Justice Zarella endorses does precisely the opposite; that construction renders the statutory scheme completely inconsistent and achieves a truly bizarre result.

[65] Thus, contrary to the assertion of Justice Zarella, the rule of lenity is wholly inapplicable to our resolution of the issue of statutory interpretation presented by this appeal because "[t]he touchstone of [the] rule . . . is statutory ambiguity. . . . Thus . . . courts do not apply the rule of lenity unless a reasonable doubt persists about a statute's intended scope *even after resort to the language and structure, legislative history, and motivating policies of the statute.*" (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Lutters*, 270 Conn. 198, 219, 853 A.2d 434 (2004). For the reasons that we have articulated, we disagree with Justice Zarella that the relevant extratextual sources, including the pertinent legislative history, "do not . . . assist in clarifying the statutes at issue." Footnote 38 of Justice Zarella's concurring and dissenting opinion. We conclude,

We also find no merit to the defendant's claim that the born alive rule is inconsistent with and "thus abrogated by the Penal Code [because the code premises] criminal liability on attendant circumstances that must exist at the time the defendant [commits the criminal acts]." The defendant argues, essentially, that the legislature, in adopting the Penal Code, intended that any conduct proscribed thereunder must be perpetrated on a victim who has been born and is alive at the time of the conduct.

Under § 53a-54a (a), a person commits the crime of murder when, with the intent to cause the death of another person, he causes the death of that person *or* of a third person. Thus, "the statute on its face allows transferred intent for the crime of murder without limitation as to the number of people killed. The clear meaning of the statute leads to the result that, when a person engages in conduct with the intent to kill someone, *there can be a separate count of murder for every person actually killed by the conduct.*" (Emphasis added.) *State* v. *Hinton,* supra, 227 Conn. 309. Although § 53a-54a (a) requires that the murder victim be a "person," there is nothing in that provision requiring a temporal nexus between the victim's status as a person and the conduct that brings about the person's death.[66] Moreover, the defendant has cited no persuasive authority, and we are aware of none, in support of his claim that such a temporal nexus is required when, as in the present case, the defendant is charged with murder arising out of the death of an infant who is born alive but who later dies from injuries sustained in utero. Indeed, virtually every court that has considered a simi-

rather, that those sources clearly establish that the common-law born alive rule is embodied in our murder statute.

[66] Although Justice Zarella argues to the contrary; see footnote 42 of this opinion; that argument lacks merit for the reasons that we already have enumerated.

lar challenge to the applicability of the born alive rule
has rejected it.[67]

For example, in *Cuellar* v. *State*, supra, 957 S.W.2d
134, the defendant, Frank Flores Cuellar, was convicted

[67] The only case that Justice Zarella has found to support his contention
concerning the purported requirement of a temporal nexus between the
defendant's conduct and the victim's status is *State* v. *Aiwohi*, 109 Haw.
115, 123 P.3d 1210 (2005), in which an infant who was born alive died
thereafter from injuries suffered in utero as a result of his mother's ingestion
of crystal methamphetamine. Id., 115–16. In *Aiwohi*, the state charged the
mother with manslaughter in connection with her infant's death, and the
mother filed a motion to dismiss the indictment, claiming, inter alia, that
the born alive rule, which the state had intended to invoke, was not embodied
in Hawaii's homicide statutes. See id., 116–18. The mother entered a plea
of no contest, reserving the right to appeal the denial of her motion to
dismiss. Id., 116. On appeal, the Supreme Court of Hawaii declined to apply
the born alive rule, observing, first, that the "overwhelming majority of the
jurisdictions confronted with the prosecution of a mother for her own
prenatal conduct, causing harm to the subsequently born child, refuse to
permit such prosecutions." Id., 119. The court then concluded that the born
alive rule was inconsistent with the Hawaii Penal Code because a principle
underlying that code is "the concept that the [mother's] conduct must occur
at a time when the victim is within the class contemplated by the legislature."
Id., 126. In doing so, however, the court expressly acknowledged that "*an
overwhelming majority of the jurisdictions confronted with the prosecu-
tion of a third party for conduct perpetrated against a pregnant mother,
causing the death of the subsequently born child, uphold the convictions
of the third parties.*" (Emphasis added.) Id., 123; see also id., 125–26
(acknowledging "modern trend in other jurisdictions supporting the proposi-
tion that a third party may be prosecuted for conduct perpetrated against
a pregnant mother that causes the death of the child subsequently born
alive"). Indeed, we are aware of no other case, and Justice Zarella has cited
none, in which a court has construed its state's homicide statutes as the
court did in *Aiwohi*.

Justice Zarella also claims that the proliferation of state statutes abandon-
ing the born alive rule is due to the fact that, in those states that have enacted
such statutes, the legislature "wished to *restore* the temporal connection
between the criminal conduct and the status of the victim . . . ." (Emphasis
in original.) This is not true. As Justice Zarella acknowledges, these statutes
generally "defin[e] homicide to *include* the death of an unborn child or
fetus from injuries inflicted in utero"; (emphasis added); a classification
that does not *exclude* from its purview the infliction of injuries on a viable
fetus that is born alive and that subsequently dies from those injuries.
Thus, these new homicide statutes broaden the class of victims protected
thereunder by redefining that class, an innovation that bears no relevance

of manslaughter after the car that he was driving while intoxicated collided with a vehicle being driven by a woman who was seven and one-half months pregnant. Id., 136. Because of evidence of fetal distress, medical personnel performed an emergency cesarean section in an attempt to save the baby. Although the baby survived the delivery, she died approximately two days later of injuries sustained in the collision. Id. Cuellar was charged under Texas' intoxication manslaughter statute, which provided in relevant part: "A person commits an offense if the person . . . (1) operates a motor vehicle in a public place . . . and (2) is intoxicated and by reason of that intoxication causes the death of another by accident or mistake." (Internal quotation marks omitted.) Id., 137, quoting Texas Penal Code Ann. § 49.08 (Vernon 1994). Under the Texas Penal Code, " '[a]nother' is defined . . . to mean a 'person,' a 'person' is defined to include an 'individual,' and an 'individual' is defined as 'a human being who has been born and is alive.' " *Cuellar* v. *State*, supra, 137, quoting Texas Penal Code Ann. § 1.07 (5), (26) and (38) (Vernon 1994).

On appeal, Cuellar claimed, inter alia, that the trial court improperly had denied his motion to dismiss the manslaughter charge on the ground that "the victim of the offense was a fetus at the time of [Cuellar's] conduct and, therefore, was not an 'individual' within the legal meaning of that term." *Cuellar* v. *State*, supra, 957 S.W.2d 136. The court noted that the case presented "the question of whether the [Texas] Penal Code authorizes a conviction only when a victim meets the definition of an individual at the time of the alleged misconduct, or whether a conviction may also be authorized if a victim attains the status of an individual after the alleged misconduct." Id., 137. In concluding that the law authorized Cuellar's conviction, the court relied on the born alive

to the issue of whether our murder statute contains the kind of temporal requirement that Justice Zarella says it does.

rule and the fact that the courts of other states consistently have applied the rule in affirming convictions under similar statutes and factual scenarios. Id., 137–39. The court explained that, "[i]t is not necessary that all of the elements of a criminal offense be immediately satisfied at the time of the defendant's conduct. It is axiomatic that a homicide conviction, requiring the death of the victim as an element of the offense, may stand even though the victim's death is not instantaneous with the defendant's conduct but results from that conduct at a later time. . . . To limit our perspective to the moment of the accused's conduct, as [Cuellar] urges, would be contrary to this well-established doctrine." (Citation omitted.) Id., 139; see also *State* v. *Cotton*, supra, 197 Ariz. 588–89 ("That the shooting in this case occurred while the infant was in utero does not preclude her post-birth status as a 'person' for purposes of Arizona's homicide statutes. While the homicide statutes require that the victim be a 'person,' they do not limit the nature or timing of the injury that causes the death of the 'person.' Additionally, the statutes do not require that all the elements of the offenses be immediately satisfied at the time of the defendant's conduct."); *State* v. *Hammett*, 192 Ga. App. 224, 225, 384 S.E.2d 220 (1989) ("[A] person who injures a pregnant woman so that her fetus, though born alive, subsequently dies by reason of the injuries inflicted on it while still in its mother's uterus, can be convicted for the felony murder of the newborn child. . . . It is thus apparent that it is not the victim's status at the time the injuries are inflicted that determines the nature of the crime . . . but [rather] the victim's status at the time of death which is the determinative factor." [Citations omitted.]); *Jones* v. *Commonwealth*, supra, 830 S.W.2d 880 ("[m]urder and manslaughter are criminal acts that result in the death of a 'person' . . . and neither the common law nor our statutes [require] 'person'

status at the time the act occurred" [citations omitted]). We agree generally with the reasoning of the foregoing cases.

We note, finally, that, under the doctrine of legislative acquiescence, we may infer that the failure of the legislature to take corrective action within a reasonable period of time following a definitive judicial interpretation of a statute signals legislative agreement with that interpretation. See, e.g., *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 665–66, 935 A.2d 1004 (2007). "Although we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) Id., 665. Under this court's recent decision in *State* v. *Fernando A.*, 294 Conn. 1, 20 n.15, 981 A.2d 427 (2009), we also are free to apply the doctrine to officially published decisions of the Superior Court. *Fernando A.* is relevant to the present case because the born alive rule has been recognized in two published Superior Court decisions, namely, *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 498, which was decided more than twenty years ago, and *State* v. *Courchesne*, supra, 46 Conn. Sup. 63, which was decided more than ten years ago. Thus, under *Fernando A.*, we would be permitted to presume that the failure of the legislature to abrogate the born alive rule by amending our Penal Code constitutes legislative approval of the rule. We need not rely on the presumption available to us under *Fernando A.*, however, in light of the legislative history and genealogy of P.A. 03-21 because, as we previously explained, that history and genealogy demonstrates, first, that the legislature was aware of both *Anonymous* and *Courchesne* when it enacted P.A. 03-21, and, second, that it enacted P.A. 03-21 with a full appreciation that, although that

provision protects only those fetuses that are injured and die in utero, our murder statute, § 53a-54a, embodies the born alive rule and, therefore, protects those infants who are injured in utero but who nevertheless are born alive and do not die until after birth.[68]

In sum, the born alive rule is well established in the common law of this state, and P.A. 03-21 reflects the

[68] Contrary to the view expressed by Justice Zarella, our decision in *Valeriano* v. *Bronson*, 209 Conn. 75, 90, 546 A.2d 1380 (1988), in which we rejected a claim that the year and a day rule represented the common law of this state, has no applicability to the present case. The genesis of that rule, which bars a homicide conviction if the victim does not die within one year and one day of the criminal misconduct, was the concern that primitive medical science could not discern the cause of death with reasonable certainty. See, e.g., 40 Am. Jur. 2d 589, Homicide § 13 (2008). *Valeriano* is inapposite because whatever vitality the year and a day rule once might have had, the rule no longer is necessary due to medical and scientific advances. By contrast, the born alive rule, although no longer necessary as a rule of causation due to similar advances, continues to serve a vital function as a component of our Penal Code in light of the legislative policy decision not to treat the killing of a fetus as a form of homicide. Thus, rejection of the born alive rule, unlike rejection of the year and a day rule, would lead to a bizarre and untenable result: the killing of an infant who dies from injuries suffered in utero after being born alive would not be a crime, whereas the killing of a fetus who dies in utero would be a class A felony under P.A. 03-21. As we explained, the legislature could not possibly have intended such a result.

Justice Zarella also asserts that the failure of the legislature to renounce the born alive rule in light of the trial court's decision in the present case to recognize the rule more than eleven years ago; see generally *State* v. *Courchesne*, supra, 46 Conn. Sup. 63; is attributable to the fact that this case remains in litigation. See footnote 32 of Justice Zarella's concurring and dissenting opinion. We do not share Justice Zarella's view of the reason for the legislature's inaction. If, as Justice Zarella maintains, it were the position of the legislature that the born alive rule does not represent the law of this state, we cannot imagine that the legislature would sit back and permit the state, at great expense, to seek the death penalty against the defendant, as it has, only to repudiate the rule, if this court does not do so, after the defendant has been confined wrongfully on death row for years. We presume, rather, that, if the legislature disagreed with the trial court's recognition of the born alive rule, the legislature would have acted in the interests of all involved, including the judiciary, and effectively terminated the capital proceedings against the defendant by clarifying its position on the born alive rule.

legislature's express acceptance of the rule. Moreover, there is nothing in our homicide statutes or elsewhere in the Penal Code to suggest that application of the rule is barred by any requirement of a temporal nexus between the defendant's conduct and the status of the victim.

### III

### TRANSFERRED INTENT UNDER § 53a-54a (a)

We next address the defendant's related contention that the trial court misapplied the doctrine of transferred intent by permitting the state to rely on that legal principle in establishing that the defendant had murdered Antonia. Specifically, the defendant asserts that his intent to kill Rodgers could not be transferred to Antonia because, at the time he assaulted and killed Rodgers, Antonia was not yet a person within the meaning of § 53a-54a (a). According to the defendant, the transferred intent principle "has never been applied to situations in which the defendant's intent to kill a person is transferred to another entity that had not legally attained the status of a 'person' at the time the defendant acted." Our recognition of the applicability of the born alive rule to the law of homicide also is dispositive of the defendant's transferred intent claim.

The doctrine of transferred intent operates to render a defendant culpable of the murder of a third person when the defendant causes the death of that third person with the intent to cause the death of someone else. See, e.g., *State* v. *Higgins*, 265 Conn. 35, 51–52, 826 A.2d 1126 (2003); *State* v. *Henry*, supra, 253 Conn. 359. The principle, which is reflected in the express language of § 53a-54a (a), represents a policy determination by the legislature that a defendant who engages in such conduct is no less culpable than if he had killed his intended victim.

As we previously explained, under the born alive rule, a person who inflicts injuries on a fetus in utero with the intent to kill that fetus is guilty of murder if the fetus is born alive but subsequently dies as a result of the injuries suffered in utero. Consequently, the born alive rule operates to render the fetus a person for purposes of our homicide statutes if that fetus, having been injured in utero, nevertheless is born alive and then dies of the injuries sustained in utero. Put differently, in that particular factual scenario, the fetus is treated like any other person. Thus, a defendant who, intending to kill a pregnant woman, inflicts injuries on the fetus that prove to be fatal only after the fetus is born alive, that is, once the fetus has achieved the status of a person under the born alive rule, is guilty of murder by operation of the transferred intent doctrine embodied in § 53a-54a (a). In other words, because a fetus that is born alive is a person for purposes of our homicide statutes, the transferred intent provisions of § 53a-54a (a) are equally applicable to a fetus that is born alive as they are to any other person.

The defendant has provided no persuasive reason why these two principles, each of which represents the public policy of this state as determined by the legislature, should not be applied in tandem for purposes of interpreting our statutory scheme. In the absence of any such reason, we reject his claim that the transferred intent provisions of § 53a-54a (a) are inapplicable to the present case.[69]

---

[69] The defendant urges us to invoke our supervisory authority over the administration of justice; see, e.g., *State v. Padua*, 273 Conn. 138, 178, 869 A.2d 192 (2005); and hold that a defendant cannot be eligible for the death penalty predicated on the dual application of the born alive rule and the doctrine of transferred intent. We decline the defendant's invitation to do so for several reasons, primarily because the legislature has provided no indication that they should not be applied together when, as in the present case, they both have applicability. We therefore see no justification for invoking our supervisory authority to thwart the intent of the legislature in the manner that the defendant advocates.

## IV

## DUE PROCESS AND EX POST FACTO CLAIMS

The defendant next claims that the application of the born alive rule to his conduct, rather than prospective application only, violates his right to fair notice under the due process and ex post facto clauses of the United States constitution. See footnote 29 of this opinion. He further contends that the court's "novel integration" of the born alive rule and the doctrine of transferred intent "created an unconstitutionally vague theory of murder as applied to [his] conduct . . . ." In other words, the defendant contends that a reasonable person in his position, at the time he assaulted Rodgers, could not be presumed to have known that his actions violated the murder and capital felony statutes with respect to Antonia. We also disagree with these claims.

"The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by [the United States Supreme] Court." *Bouie* v. *Columbia*, 378 U.S. 347, 350–51, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 2d 989 (1954). "It is settled that the fair-warning requirement embodied in the [d]ue [p]rocess [c]lause prohibits the [s]tates from holding an individual criminally responsible for conduct which he could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *Rose* v. *Locke*, 423 U.S. 48, 49, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975).

"There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.[70] . . . Second . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.[71] . . . *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). Third, [t]here can be no doubt that a deprivation of the right of fair warning can result . . . also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. *Bouie* v. *Columbia*, supra, 378 U.S. 352. In each of these

---

[70] "[A] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, [and] every presumption in favor of its validity [is to be made]. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [the defendant, he must] . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 759, 988 A.2d 188 (2010); accord *State* v. *Scruggs*, 279 Conn. 698, 709–10, 905 A.2d 24 (2006).

[71] "The rule of lenity concerns situations in which a legislature fails to give notice of the scope of punishment by leaving 'a grievous ambiguity or uncertainty in the language and structure of the [statute], such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute,' *Chapman* v. *United States*, 500 U.S. 453, 463, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991), in which case the rule of lenity tips the scales in favor of the defendant by requiring the court 'to impose the lesser of two penalties.' *United States* v. *Venturella*, 391 F.3d 120, 132 (2d Cir. 2004) . . . ." (Citation omitted.) *Sash* v. *Zenk*, 439 F.3d 61, 64 (2d Cir. 2005).

guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal. *United States* v. *Lanier,* supra, 267." (Internal quotation marks omitted.) *State* v. *Miranda,* supra, 260 Conn. 103.

The defendant invokes what is best described as a combination of the first and third of these manifestations of the fair warning doctrine in challenging the constitutionality of the born alive rule as applied to the present case.[72] In *Rogers* v. *Tennessee,* supra, 532 U.S. 451, the United States Supreme Court addressed those aspects of the fair warning requirement and, in so doing, reaffirmed the approach that it previously had articulated in *Bouie* v. *Columbia,* supra, 378 U.S. 347, explaining: "Reviewing decisions in which we had held criminal statutes void for vagueness under the [d]ue [p]rocess [c]lause, we noted [in *Bouie*] that this [c]ourt has often recognized the basic principle that a criminal

[72] The defendant contends that his "motion to dismiss should have been granted because the [panel's] novel integration of the born alive rule and the doctrine of transferred intent created an unconstitutionally vague theory of murder as applied to [his] conduct . . . and . . . under . . . the due process [clause] . . . of the United States . . . [constitution] should be applied prospectively only." In support of this broad contention, the defendant claims, more specifically, that "[a] reasonable person in the defendant's position at the time he acted would not have understood that his actions violated the murder and capital felony statutes as to the future Antonia . . . . Because [the defendant's] convictions necessitated a strained and unprecedented interpretation and application of the 'born alive' rule and the transferred intent doctrine, the application of this new rule of law to him retroactively violates his . . . constitutional right to due process of law." In essence, therefore, the defendant claims that our recognition of the born alive rule and its application to him is fundamentally unfair because he reasonably could not have anticipated that statutory interpretation. As we explain hereinafter, the defendant's due process claim fails because, as we previously discussed, the born alive rule was an established common-law principle when our Penal Code was enacted; the rule, therefore, has been embodied in our homicide statutes since that time, and, accordingly, the defendant, as with the public generally, is deemed to be on notice of the applicability of the rule.

statute must give fair warning of the conduct that it makes a crime. . . . Deprivation of the right to fair warning . . . can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face. . . . For that reason . . . [i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, [the construction] must not be given retroactive effect."[73] (Citations omitted; internal quotation marks omitted.) *Rogers* v. *Tennessee*, supra, 457.

In essence, therefore, the due process clause "requires only that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." (Internal quotation marks omitted.) *Rubin* v. *Garvin*, 544 F.3d 461, 469 (2d Cir. 2008). "Furthermore, the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement: 'The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into

---

[73] The court in *Rogers* further explained why reaffirmation of the *Bouie* standard was appropriate: "We believe [that] this [restriction on the due process limitations on the retroactive application of judicial interpretations of criminal statutes to those that are unexpected and indefensible by reference to the law that had been expressed prior to the conduct in issue] adequately serves the common law context . . . . It accords common law courts the substantial leeway they must enjoy as they engage in the daily task of formulating and passing [on] criminal defenses and interpreting such doctrines as causation and intent, reevaluating and refining them as may be necessary to bring the common law into conformity with logic and common sense. It also adequately respects the due process concern with fundamental fairness and protects against vindictive or arbitrary judicial lawmaking by safeguarding defendants against unjustified and unpredictable breaks with prior law." *Rogers* v. *Tennessee*, supra, 532 U.S. 461–62.

a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.' *Colten* v. *Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972) . . . ." (Citations omitted.) *Ortiz* v. *N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009). In other words, "[d]ue process does not require statutes to provide a laundry list of prohibited conduct. [L]aws may be general in nature so as to include a wide range of prohibited conduct. The constitution requires no more than a reasonable degree of certainty." (Internal quotation marks omitted.) *State* v. *Wilchinski*, 242 Conn. 211, 224, 700 A.2d 1 (1997). Moreover, "[d]ue process is not . . . violated simply because the issue is a matter of first impression." (Internal quotation marks omitted.) *Ortiz* v. *N.Y.S. Parole in Bronx, N.Y.*, supra, 159. Thus, the retroactive application of a judicial decision will be deemed to represent "an exercise of the sort of unfair and arbitrary judicial action against which the [d]ue [p]rocess [c]lause aims to protect" only if that decision constitutes "a marked and unpredictable departure from prior precedent . . . ." *Rogers* v. *Tennessee*, supra, 532 U.S. 467.

Subsequent to *Rogers*, this court, in *State* v. *Miranda*, supra, 260 Conn. 93, observed that the fair warning principles articulated in *Rogers* and *Bouie* are "in accordance with our fair warning jurisprudence. We consistently have held that [w]hile we also recognize that criminal statutes are to be construed strictly, the language in a criminal statute need not be given its narrowest possible construction. . . . A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions. . . . In addition, [r]eferences to judicial opinions involving the statute, the common law, legal dictionaries, or treatises

may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . . We [also] can use as a guide judicial opinions that, [although] not binding on this court, refer to the statute in question or to a statute that uses similar language." (Citations omitted; internal quotation marks omitted.) Id., 105–106; see also *Rose* v. *Locke*, supra, 423 U.S. 50, 52 (court considered judicial interpretations of similar state statutes in rejecting claim that Tennessee sodomy statute prohibiting " 'crimes against nature' " was unconstitutionally vague).

Furthermore, because this court routinely relies on settled principles of statutory interpretation to ascertain the meaning of an ambiguous statute, our reasoned application of those ordinary tools of construction no doubt will result in an interpretation of the statute at issue that is both foreseeable and defensible for purposes of due process. See *State* v. *Miranda*, supra, 260 Conn. 109 ("To reach the conclusion that we did, we relied on ordinary tools of statutory construction. Those tools of statutory construction demonstrated that by reference to the law as it then existed, it was neither unexpected nor indefensible to [interpret the statute in the manner that we did]."). This same standard applies to the defendant's closely related vagueness claim. In view of the fact that a statute is not unconstitutional merely because it is ambiguous or requires further investigation, the defendant can prevail on his claim under the vagueness doctrine only if he can demonstrate that the statutory meaning cannot be fairly ascertained upon application of established principles of statutory interpretation. See, e.g., *State* v. *Ehlers*, 252 Conn. 579, 591, 750 A.2d 1079 (2000) ("[i]f the meaning of a statute can fairly be ascertained through judicial construction . . . it need not be stricken for vagueness" [internal quotation marks omitted]). In other words, a statute that is not clear on its face will

survive a vagueness challenge if its meaning can be discerned by use of ordinary tools of statutory construction. See id. Finally, as we previously have noted, "to prevail on [a vagueness] claim, [a] defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed . . . ." (Internal quotation marks omitted.) *State* v. *Knybel*, 281 Conn. 707, 714, 916 A.2d 816 (2007).

Our inquiry under the ex post facto clause proceeds along similar lines. "The ex post facto prohibition forbids . . . the [s]tates [from] enact[ing] any law [that] imposes a punishment for an act [that] was not punishable at the time it was committed . . . or imposes additional punishment to that then prescribed. . . . Through this prohibition, the [f]ramers sought to assure that legislative [a]cts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. . . . *Weaver* v. *Graham*, 450 U.S. 24, 28–29, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981). [T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. Id., 29." (Internal quotation marks omitted.) *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 805, 950 A.2d 1220 (2008).

We have recognized that the judicial construction of a statute can operate like an ex post facto law and thus violate a criminal defendant's right to fair warning as to what conduct is prohibited. See, e.g., *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 58–59 n.4, 951 A.2d 520 (2008). "The United States Supreme Court has observed, [a]s the text of the [ex post facto] [c]lause makes clear, it is a limitation [on] the powers of the [l]egislature, and does not of its own force apply to the [j]udicial [b]ranch of government. . . . *Rogers* v.

*Tennessee,* [supra, 532 U.S. 456]. Nevertheless, limitations on ex post facto judicial decisionmaking are inherent in the notion of due process. Id. In *Bouie* v. *Columbia,* [supra, 378 U.S. 347], the United States Supreme Court observed: If a state legislature is barred by the [e]x [p]ost [f]acto [c]lause from passing such a law, it must follow that a [s]tate Supreme Court is barred by the [d]ue [p]rocess [c]lause from achieving precisely the same result by judicial construction. . . . If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect. . . . Id., 353–54; see also *State* v. *Hart,* 221 Conn. 595, 612–13 n.15, 605 A.2d 1366 (1992)." (Internal quotation marks omitted.) *Washington* v. *Commissioner of Correction,* supra, 287 Conn. 805–806.

"[A] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction. . . . *Rivers* v. *Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994). [Thus], when [a] court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law. Id., 313 n.12." *Washington* v. *Commissioner of Correction,* supra, 287 Conn. 810–11. In determining whether a judicial construction of a statute effectively operates as a prohibited ex post facto law, "[t]he question . . . is whether [the] decision was so unforeseeable that [the defendant] had no fair warning that it might come out the way it did." (Internal quotation marks omitted.) Id., 809. Put differently, "[t]he key test in determining whether the due process clause precludes the retrospective application of a judicial decision . . . is whether the decision was sufficiently foreseeable so that the defendant had fair warning that the interpreta-

tion given the relevant statute by the court would be applied in his case." *Aue* v. *Diesslin*, 798 P.2d 436, 441 (Colo. 1990).

Applying these principles to the present case, we find no merit to the defendant's first contention that he lacked fair notice that his actions violated the murder and capital felony statutes with respect to Antonia. Our previous analysis leading to the rejection of the defendant's claim concerning the inapplicability of the born alive rule and, in particular, our reasons for concluding that the term "person," as used in this state's murder statute, includes an infant who suffers injuries in utero, is born alive and subsequently dies from those injuries, necessarily are fatal to the defendant's due process and ex post facto claims. See *State* v. *Winot*, 294 Conn. 753, 759, 988 A.2d 188 (2010) (criminal statute not void for vagueness if its meaning can be discerned by resort to extratextual sources and tools of construction); *Washington* v. *Commissioner of Correction*, supra, 287 Conn. 803–804, 810–11 (retroactive application of judicial interpretation of statute did not operate as functional equivalent of ex post facto law and violate due process when interpretation was based on reasoned application of tools of construction and thus could not be considered unforeseeable and indefensible); *State* v. *Miranda*, supra, 260 Conn. 109–10 (in concluding that fair notice component of due process was not violated by retroactive application of judicial construction of criminal statute, court observed that construction had been reached by resort to ordinary tools of statutory construction). In light of the fact that the born alive rule has been embodied in our Penal Code since the code's adoption nearly four decades ago, our recognition of the rule reasonably cannot be characterized as a departure from settled law, let alone a radical and unforeseeable change in the law.

In his concurring and dissenting opinion, Justice Schaller nevertheless asserts that our recognition of the born alive rule violates due process, apparently because, in his view, doing so represents an unexpected and indefensible interpretation of the law as it existed when the defendant killed Rodgers and Antonia.[74] Justice Schaller's assertions notwithstanding, our analytical approach and conclusion is entirely consistent with, and is dictated by, the analysis and holdings of two seminal and controlling cases in this area, namely, *Rogers* v. *Tennessee*, supra, 532 U.S. 451, and *State* v. *Miranda*, supra, 260 Conn. 93.[75] In these cases, the

[74] Although Justice Schaller never expressly states that our interpretation of § 53a-54a as embodying the born alive rule is both unexpected and indefensible in light of the state of our law in 1998, he necessarily reaches that conclusion because, as he acknowledges, that is the showing that a defendant must make to establish a violation of the fair notice requirement. See, e.g., *Rogers* v. *Tennessee*, supra, 532 U.S. 462. We note, furthermore, that, to the extent that Justice Schaller relies on a separate void for vagueness analysis to support his conclusion of a due process violation, as we have explained, that analysis fails for the same reason that the defendant's retroactivity claim fails, that is, because our interpretation of our murder statute as embodying the born alive rule is predicated on the application of well established principles of statutory construction.

[75] By contrast, the constitutional analysis that Justice Schaller employs would lead to an unprecedented result. Neither the defendant nor Justice Schaller has identified a case from any jurisdiction in which even a single judge has determined that applying the born alive rule is unconstitutional, either as a violation of due process or for any other reason. We also have been unable to find such a case. Thus, even though the born alive rule first was recognized several centuries ago, and even though the rule has been applied by many courts in many different jurisdictions over those many years, to the best of our knowledge, this case represents the very first time that a judge ever has concluded that the application of the rule runs afoul of the constitution. Notwithstanding the unprecedented nature of his conclusion, Justice Schaller nevertheless is persuaded that our application of the born alive rule "is clearly and unequivocally unconstitutional"; (internal quotation marks omitted) *State* v. *Winot*, supra, 294 Conn. 759; and, further, that the defendant has proven "beyond a reasonable doubt that [he] had inadequate notice of what was prohibited . . . ." (Internal quotation marks omitted.) Id. For the reasons set forth in this opinion, neither the defendant nor Justice Schaller has raised any doubt concerning the constitutionality of the born alive rule, let alone a doubt so great as to satisfy the beyond a reasonable doubt standard.

United States Supreme Court and this court, respectively, rejected the same essential due process claim that the defendant raises in the present case, but in both *Rogers* and *Miranda*, the statutory construction that each court upheld as consistent with the fair notice requirement was *far* less predictable and foreseeable than our construction of § 53a-54a as incorporating the born alive rule. We therefore reject as contrary to settled law—and to the commonsense principles that underlie that law—Justice Schaller's assertion that only if the defendant was "clairvoyan[t]" when he launched his vicious and lethal attack on Rodgers and Antonia could he have been expected to understand the criminal consequences of his conduct.

In *Rogers*, the petitioner, Wilbert K. Rogers, was convicted of second degree murder in Tennessee state court for the stabbing death of the victim. *Rogers* v. *Tennessee*, supra, 532 U.S. 454. The victim, who had suffered life threatening injuries to his heart, survived for approximately fifteen months, after which he died from those injuries. Id. On appeal to the Supreme Court of Tennessee, Rogers claimed that Tennessee's common-law year and a day rule, pursuant to which a defendant cannot be convicted of murder unless the victim has died as a result of the defendant's conduct within one year and one day of that conduct, precluded his conviction for the murder of the victim. *State* v. *Rogers*, 992 S.W.2d 393, 394 (Tenn. 1999). Although the Tennessee statutes did not expressly refer to the year and a day rule, the Supreme Court of Tennessee acknowledged that it had recognized the viability of the rule in 1907, and both parties agreed that the rule was part of the state's common law. See id., 396, 399. After observing that the rule had been legislatively or judicially abolished in most jurisdictions and that the original justifications for the rule no longer existed, the court abolished the rule. Id., 398, 401. The court affirmed

Rogers' conviction, concluding that it did not offend principles of due process to apply its holding abolishing the year and a day rule to Rogers' case. Id., 401–403.

The United States Supreme Court affirmed the judgment of the Supreme Court of Tennessee; *Rogers* v. *Tennessee*, supra, 532 U.S. 467; stating that "[t]here is . . . nothing to indicate that the Tennessee's court abolition of the rule in [Rogers'] case represented an exercise of the sort of unfair and arbitrary judicial action against which the [d]ue [p]rocess [c]lause aims to protect. Far from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense. It did so by laying to rest the archaic and outdated rule that had never been relied [on] as a ground of decision in any reported Tennessee case." Id., 466–67. The court in *Rogers* reiterated that *Bouie* "restricted due process limitations on the retroactive application of judicial interpretations of criminal statutes to those that are 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue.'" Id., 461, quoting *Bouie* v. *Columbia*, supra, 378 U.S. 354.

In *Miranda*, the defendant, Santos Miranda, who was twenty-one years old, resided with his sixteen year old girlfriend and her two year old son and four month old daughter. *State* v. *Miranda*, supra, 260 Conn. 97. Although Miranda was not the biological father of either child, he took care of them and considered himself to be their stepfather. Id. Several months after Miranda had started living with his girlfriend, her four month old daughter was taken to the hospital, where it was determined that she previously had sustained a number of serious and apparently unrelated injuries, including multiple rib fractures that were approximately two to three weeks old, two skull fractures that were approxi-

mately seven to ten days old, an injury to her left arm, a rectal tear that was bleeding, and nasal hemorrhages. Id. Even though the state did not contend that Miranda himself had caused the injuries to the four month old child, he was arrested and charged with risk of injury to a child and multiple counts of assault in the first degree. Id., 96–97, 99 and n.4. Following a court trial, the "court concluded that [Miranda] had a legal duty to protect the health and well-being of the child based on the undisputed facts that he had established a familial relationship with the child's mother and her two children, that he had voluntarily assumed responsibility for the care and welfare of both children, and that he considered himself [to be] the [child's] stepfather." Id., 99. The trial court also found that, in light of the nature and extent of the child's injuries and in view of the fact that the child resided with Miranda, he necessarily was aware that there existed a substantial and unjustifiable risk that the child would be exposed to conduct that created a risk of death, and that, despite this knowledge, he had failed to help the child. Id., 98. On the basis of these circumstances, the trial court found Miranda guilty of one count of risk of injury to a child and six counts of assault in the first degree. Id., 99.

On appeal, the Appellate Court affirmed Miranda's conviction for risk of injury to a child but reversed his assault convictions, concluding that he had no legal duty to act under the circumstances. *State* v. *Miranda*, 41 Conn. App. 333, 341, 675 A.2d 925 (1996). We granted the state's petition for certification to appeal and "concluded that, [on the basis of] the trial court's findings that [Miranda] had established a familial relationship with the [child's] mother and [the] two children, had assumed responsibility for the welfare of the children, and had taken care of them as though he were their father, [Miranda] had assumed a legal duty to protect the [child] from abuse." *State* v. *Miranda*, supra, 260

Conn. 99; see *State* v. *Miranda,* supra, 245 Conn. 226, 230. We therefore reversed the judgment of the Appellate Court in part and remanded the case to that court for consideration of Miranda's evidentiary insufficiency claims and any constitutional claims of due process and double jeopardy arising as a result of this court's decision. *State* v. *Miranda,* supra, 260 Conn. 100; see *State* v. *Miranda,* supra, 245 Conn. 231.

On remand, the Appellate Court affirmed Miranda's conviction for risk of injury to a child. See *State* v. *Miranda,* 56 Conn. App. 298, 313, 742 A.2d 1276 (2000). With respect to Miranda's assault convictions, however, the Appellate Court concluded that convicting him of assault in the first degree would be a violation of due process because a person of ordinary intelligence in his circumstances would not have known that he had a duty to protect the child. Id., 305–306, 308. The Appellate Court therefore reversed the judgment of conviction with respect to the assault counts and remanded the case with direction to render judgment of not guilty with respect to those counts. Id., 313–14.

Following our granting of certification, and in reliance on the then recent opinion of the United States Supreme Court in *Rogers,* we concluded that the Appellate Court improperly had determined that Miranda's assault convictions deprived him of due process of law.[76] *State* v. *Miranda,* supra, 260 Conn. 100–101, 109–10. In particular, we concluded that our determination that the first degree assault statute applied to the facts of Miranda's case was reasonably foreseeable, such that

---

[76] We note that the state had conceded that Miranda's assault convictions "were premised on two separate acts of omission, which led to two, rather than six, discrete injuries." *State* v. *Miranda,* supra, 260 Conn. 96 n.1. Accordingly, we remanded the case to the Appellate Court with direction to affirm the trial court's judgment with respect to the risk of injury count and with respect to two of the six counts of assault in the first degree. Id., 127; see id., 132.

a person of ordinary intelligence in Miranda's position should have anticipated that this court would find that he had a common-law duty to help the child in this case and that his violation of that duty subjected him to conviction under the first degree assault statute. Id., 109–10. In reaching this conclusion, we explained that, in recognizing the common-law duty to act under the facts of the case and in construing our assault statute to encompass Miranda's failure to act, we had employed ordinary tools of statutory construction, which included an examination of the plain language of our first degree assault statute, the language of other Connecticut statutes governing similar conduct, the common law of this state and other jurisdictions, and treatises addressing the issue.[77] Id., 106–109.

As we have indicated, it is readily apparent that the holdings in *Rogers* and *Miranda* represented a relatively broad and sweeping modification of then existing law, whereas our holding in the present case merely reflects our recognition and application of a well established common-law doctrine in accordance with settled principles of statutory construction. Indeed, in *Rogers*, the United States Supreme Court concluded that the Tennessee Supreme Court's abolition of the common-law year and a day rule could be applied retroactively to a defendant whose conduct occurred *before* the court's repudiation of that common-law rule. Under *Rogers*, therefore, the fair notice requirement is not necessarily violated even when a state's highest court reverses course completely with respect to an existing rule or interpretation and applies that change in the law retroactively to conduct that occurred prior thereto. In con-

---

[77] This court ultimately concluded, in a subsequent decision, that Miranda's assault convictions could not stand because we incorrectly had construed our assault statute as encompassing the conduct at issue. See *State* v. *Miranda*, supra, 274 Conn. 734. Our determination in that regard, however, has no bearing on our prior conclusion that applying the assault statute to Miranda's conduct did not violate due process principles of fair notice.

trast to *Rogers*, the present case "does not involve any expansion of the scope of criminal liability beyond that indicated by previous decisional law." *Ortiz* v. *N.Y.S. Parole in Bronx, N.Y.*, supra, 586 F.3d 158. In other words, unlike in *Rogers*, we have not reversed prior precedent resulting in criminal liability where none previously had existed. In fact, no court of this state has ever even suggested that the born alive rule is inapplicable to our murder statute; on the contrary, as we have explained, the common-law roots of the rule, both in this state and elsewhere, are well established.

Moreover, in light of the holding of the United States Supreme Court in *Rogers*, even if the born alive rule previously had *not* been recognized in this state, our decision to do so today would constitute nothing more than a clarification or illumination of our murder statute as applied to the facts of this case, based on our considered view of what the legislature likely intended. In such circumstances, the conclusion of the court in *Rogers* concerning the Tennessee Supreme Court's repudiation of the year and a day rule would be equally applicable to our recognition of the born alive rule: "Far from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense." *Rogers* v. *Tennessee*, supra, 532 U.S. 467. Thus, even in the absence of evidence of the born alive rule in this state's common-law history, our decision to adopt the rule could not possibly be characterized as "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (Internal quotation marks omitted.) Id., 462.

Our holding in *Miranda* also represents a significantly less foreseeable or predictable application of the common law to a statutory provision than our application of the born alive rule in the present case. In fact,

the Appellate Court originally concluded in *Miranda* that applying the assault statute to Miranda's passive conduct was unjustifiable because Miranda had no legal duty to act under the circumstances. See *State* v. *Miranda*, supra, 41 Conn. App. 339–40. Moreover, when we concluded otherwise; *State* v. *Miranda*, supra, 245 Conn. 230; the Appellate Court, on remand, determined that our decision was so unexpected and unforeseeable that it violated Miranda's right to fair notice to apply the decision to his case. See *State* v. *Miranda*, supra, 56 Conn. App. 305–308. Notwithstanding this court's subsequent contrary determination; *State* v. *Miranda*, supra, 260 Conn. 109–10; we thereafter concluded that our original interpretation of the assault statute as encompassing a nonparent's failure to come to the aid of a child with whom he has a parent-like relationship was "clearly wrong"; *State* v. *Miranda*, supra, 274 Conn. 734; because it represented an unwarranted expansion of the assault statute. See id., 733–34; see also id., 749 (*Borden, J.*, concurring) (rejecting this court's previous interpretation of assault statute as representing "unwise . . . extension" of that statute resulting in provision with unacceptably "amorphous" boundaries); id., 762 (*Vertefeuille, J.*, concurring) (concluding that assault statute "should not be extended by implication to encompass [Miranda's] failure to act"). Nevertheless, as we explained, this court previously had determined that our use of ordinary tools of statutory construction had led to a foreseeable interpretation of the assault statute, such that Miranda had fair notice that even his failure to act could constitute an assault. *State* v. *Miranda*, supra, 260 Conn. 109–10.

Simply put, it is not possible to abide by the fair notice principles articulated and applied by the United States Supreme Court in *Rogers* and by this court in *Miranda*—cases that represent binding precedent— and also to conclude that our recognition of the born

alive rule in the present case violates those principles. Because neither *Rogers* nor *Miranda* represented a marked or unforeseeable departure from then applicable law, the present case, which represents a considerably more conventional and foreseeable example of common-law adjudication, certainly cannot be deemed to run afoul of due process requirements. For this reason, the due process analysis in Justice Schaller's concurring and dissenting opinion is flawed.[78]

Justice Schaller's analysis suffers from another fatal infirmity, namely, his assertion that the trial court incorrectly concluded that *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 498, placed the defendant on notice of the born alive rule because the court's discussion of the rule in *Anonymous* was merely dictum.[79] Contrary

---

[78] Justice Schaller asserts that we have misconstrued the defendant's due process claim, apparently because, in his view, we "[do] not address the [defendant's] vagueness claim directly but, instead, [characterize] the defendant's due process argument as invoking only the retroactivity doctrine." Footnote 13 of Justice Schaller's concurring and dissenting opinion. Justice Schaller's criticism is misplaced. Both aspects of the defendant's due process claim are founded on the contention that the defendant did not have fair notice of the applicability of the born alive rule, a contention that, as we have explained, is defeated by the fact that application of settled principles of statutory construction leads to the conclusion that the rule is embodied in our murder statute and has been embodied in that statute since the adoption of the Penal Code. In other words, to the extent that the defendant's claim is predicated both on the vagueness doctrine and on the constitutional bar against the retroactive application of an allegedly unforeseeable statutory interpretation, his claim founders on our determination that the murder statute, fairly construed, prohibits the killing of a fetus that is born alive and that subsequently dies from injuries sustained in utero.

[79] As this court previously has observed, dictum is "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination . . . [or] any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion. Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case . . . are obiter dicta, and lack the force of an adjudication." (Internal quotation marks omitted.) *DeSena* v. *Waterbury*, 249 Conn. 63, 78 n.16, 731 A.2d 733 (1999), quoting Black's Law Dictionary (6th Ed. 1990).

to Justice Schaller's contention, the court in *Anony-mous* relied expressly on the born alive rule in conclud-ing that a fetus killed in utero is not a person for purposes of our homicide statutes.[80]

In *Anonymous*, the state had sought an arrest warrant in contemplation of charging the accused with the mur-der of a viable fetus in utero. Id. As the court in *Anony-mous* stated, "[t]hat application require[d] [the] court to decide whether an unborn but viable fetus is a 'human being' within the meaning of the Connecticut statutes defining murder." Id. In concluding that it did not, the court observed, first, "that the codes from which our Connecticut law was drawn [namely, the New York Penal Law and the Model Penal Code] limit the words 'human being' to those who have been born alive . . . ." Id., 501. The court further observed that the fact that these two bodies of law have adopted the born alive standard "supports the position that Connecticut's legislature did not intend to define a 'human being' as an unborn but viable fetus." Id.

The court thereafter turned to the common law and, after noting that "[our] legislature, in enacting the mur-der statute, [presumably] was familiar with the general rules of common law on [the] subject when it enacted . . . [our] [P]enal [C]ode"; id., 502; explained that, as a principle of statutory construction, "[a] statute should not be construed as altering the common law rule, far-ther than the words of the statute import, and should not be construed as making any innovation [on] the common law which the statute does not fairly express." (Internal quotation marks omitted.) Id., quoting *State v. Kish*, 186 Conn. 757, 764, 443 A.2d 1274 (1982). The court, citing to Sir Edward Coke, explained that "it is

---

[80] We note that Justice Zarella also seeks to minimize the precedential import and value of *Anonymous*. For the reasons that follow, we also reject Justice Zarella's assessment of that case.

well settled that the common law, as far back as 1648 . . . held that an unborn fetus, viable or otherwise, could not be the subject of [a] homicide." (Citation omitted.) *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 502. The court then cited nine cases in support of its assertion that "almost every state court that has had a homicide statute, similar to Connecticut's, that did not define 'human being' explicitly to include a fetus [has] held [that] the words 'person' or 'human being' would not include the unborn child or fetus." Id., 503. The courts in *each and every one* of the cases cited by the court in *Anonymous expressly relied* on the born alive rule in rejecting a claim that a homicide prosecution could lie for the killing of a fetus that died in utero.[81] The court also acknowledged that two other sister state courts, each operating in a jurisdiction with common-law crimes, that is, "the legislature in [those] states merely codified existing criminal common law by prescribing penalties for existing common law crime," had "recognized that the preexisting common law did not recognize the killing of an unborn child as 'homicide,' but felt that they had the authority to change the law prospectively" and to treat an unborn child as a person. Id., citing *Commonwealth* v. *Cass*, supra, 392 Mass. 799, and *State* v. *Horne*, supra, 282 S.C. 444. These two courts, which then represented the distinct minority view, *expressly had abrogated* the born alive rule in favor of including a fetus within the class of potential

[81] These cases are: *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 625–31, 470 P.2d 617, 87 Cal. Rptr. 481 (1970); *State* v. *Gonzalez*, 467 So. 2d 723, 725–26 (Fla. App.), review denied, 476 So. 2d 675 (Fla. 1985); *People* v. *Greer*, supra, 79 Ill. 2d 111–16; *Hollis* v. *Commonwealth*, 652 S.W.2d 61, 62–65 (Ky. 1983), overruled by *Commonwealth* v. *Morris*, supra, 142 S.W.3d 654; *State* v. *Brown*, 378 So. 2d 916, 917–18 (La. 1979); *People* v. *Guthrie*, 97 Mich. App. 226, 229–30, 237–38, 293 N.W.2d 775 (1980), appeal denied, 417 Mich. 1006, 334 N.W.2d 616 (1983); *State ex rel. A. W. S.*, 182 N.J. Super. 278, 279–81, 440 A.2d 1144 (App. Div. 1981); *State* v. *Larsen*, 578 P.2d 1280, 1281–82 (Utah 1978); *State ex rel. Atkinson* v. *Wilson*, 175 W. Va. 352, 353–54 and n.3, 356–57, 332 S.E.2d 807 (1984).

victims protected under the homicide statutes of those states. See *Commonwealth* v. *Cass*, supra, 807; *State* v. *Horne*, supra, 447.

The court in *Anonymous* then considered the possible due process consequences of applying retroactively "a new interpretation" of our murder statute that would include within its purview a viable fetus. *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 503–504. Turning to *Cass* and *Horne*, the court explained that even those courts "have agreed with majority jurisdictions that to apply a new interpretation of the words 'human being' retroactively to include a viable but unborn fetus would violate constitutional principles that prohibit retroactive criminal laws." Id.; see *Commonwealth* v. *Cass*, supra, 392 Mass. 807–808; *State* v. *Horne*, supra, 282 S.C. 447. After quoting with approval from a third case, namely, *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 470 P.2d 617, 87 Cal. Rptr. 481 (1970), in which the Supreme Court of California had rejected the state's request to abolish the born alive rule and to expand the definition of "person" in the California homicide statutes to include a viable fetus; id., 631; the court in *Anonymous* stated that, "to charge the accused with the murder of the unborn but viable fetus would violate the accused's due process rights." *State* v. *Anonymous (1986-1)*, supra, 504.

Finally, the court in *Anonymous* observed that its decision to invoke the born alive rule applied "only to the crime of murder and not to tort law." Id., 505. The court explained: "American courts [that] have extended the benefits of tort law to fetuses have also, in the absence of specifically inclusive language, *uniformly refused to change the born-alive rule in criminal cases* . . . . The rationale is that [d]iffering objectives and considerations in tort and criminal law foster the development of different principles governing the same factual situation." (Citation omitted; emphasis added;

internal quotation marks omitted.) Id. Thus, the court clarified that its rationale for applying the born alive rule for purposes of the criminal law was not applicable to tort law. The court thereafter denied the application for an arrest warrant. Id.

As the foregoing discussion clearly demonstrates, the court in *Anonymous* declined to expand the definition of the term "person" under our murder statute to include an unborn but viable fetus because of its predicate determination that the born alive rule had been incorporated into the statute, and that to abolish the rule in favor of a broader definition of "person" would be incompatible with an accused's due process right to fair notice. See id., 503–504. Consequently, the court's recognition of the born alive rule in *Anonymous* was necessary to its conclusion and, therefore, part of its holding rather than dictum. See footnote 79 of this opinion. That the court's recognition of the born alive rule in *Anonymous* was a critical aspect of its holding is reflected by the fact that a multitude of courts and commentators have identified *Anonymous* as a case in which the court recognized and applied the born alive rule. See, e.g., *Vo* v. *Superior Court*, 172 Ariz. 195, 203, 836 P.2d 408 (App. 1992); *State* v. *Courchesne*, supra, 46 Conn. Sup. 72; *State* v. *Lamy*, supra, 158 N.H. 517 and n.3; *State* v. *Beale*, 324 N.C. 87, 92, 376 S.E.2d 1 (1989); *Commonwealth* v. *Booth*, supra, 564 Pa. 238 n.7; J. Brobst, "The Prospect of Enacting an Unborn Victims of Violence Act in North Carolina," 28 N.C. Cent. L.J. 127, 135 (2006); M. Fleming, "Feticide Laws: Contemporary Legal Applications and Constitutional Inquiries," 29 Pace L. Rev. 43, 48 n.27 (2008); T. Hartsoe, "Person or Thing—In Search of the Legal Status of a Fetus: A Survey of North Carolina Law," 17 Campbell L. Rev. 169, 212 and n.233 (1995); C. Ramsey, "Restructuring the Debate over Fetal Homicide Laws," 67 Ohio St. L.J. 721, 739 n.84 (2006); M. Kime, note, "*Hughes* v. *State*:

The 'Born Alive' Rule Dies a Timely Death," 30 Tulsa L.J. 539, 543 and n.39 (1995); C. Leventhal, comment, "The Crimes Against the Unborn Child Act: Recognizing Potential Human Life in Pennsylvania Criminal Law," 103 Dick. L. Rev. 173, 176 and n.27 (1998); S. Locke, note, "Abortion Revived: Is the Fetus a Person? Can the Present Law Remain in Light of State v. Courchesne?," 23 T. Jefferson L. Rev. 291, 304 (2001).

Thus, as the court stated in State v. Courchesne, supra, 46 Conn. Sup. 63, because Anonymous "expressly follow[ed] the common-law [born alive] rule"; id., 71; the published decision in that case "can be considered to have actually given notice that the defendant's actions concerning Antonia constituted murder separate from that of her mother [Rodgers]."[82] Id., 72. This is especially true in light of our recent decision in State v. Fernando A., supra, 294 Conn. 20 n.15, which permits us to presume, first, that the legislature is aware of officially published decisions of the Superior Court and, second, that the legislature's failure to respond to such a decision reflects the legislature's acquiescence in it. If an officially published decision of the Superior Court is sufficiently important to give rise to an inference that the legislature will take action if it disagrees with that decision, then such a decision certainly is sufficient to place the public on notice, for

---

[82] Of course, notwithstanding Justice Schaller's contrary suggestion, no such *actual* notice is necessary to satisfy the fair notice component of due process. As we have explained, unless a judicial decision is "unexpected and indefensible by reference to the law as it then existed"; *Rogers* v. *Tennessee*, supra, 532 U.S. 464; or, in other words, represents "a marked and unpredictable departure from prior precedent"; id., 467; the decision will be deemed to comport with due process requirements even if it is one of first impression in a particular jurisdiction. See id., 464–67; see also *State* v. *Miranda*, supra, 260 Conn. 109–10. For the reasons that we previously have set forth, our recognition of the born alive rule hardly constitutes the kind of unforeseeable and unpredictable departure from prior precedent that due process prohibits.

due process purposes, of the legal principles articulated therein.[83]

We also reject the defendant's claim that applying the born alive rule in combination with the doctrine of transferred intent violated his rights under the due process and ex post facto clauses. The born alive rule and the doctrine of transferred intent are well established. The born alive rule has deep roots in our common law, as we have explained, and our murder statute, namely, § 53a-54a (a), expressly incorporates the transferred intent principle. We can think of no reason why the application of these two doctrines renders the defendant's conviction constitutionally infirm merely because the defendant's conduct implicated both doctrines and, consequently, together formed the basis of the defendant's culpability for the murder of Antonia. The application of these doctrines to the defendant was not unforeseeable, novel or otherwise unfair.

---

[83] We also note that Justice Schaller, like Justice Zarella, dismisses Swift's commentary explaining that the born alive rule was a part of our common law, and had been incorporated into this state's murder statute, as early as the late eighteenth century. 2 Z. Swift, A System of the Laws of the State of Connecticut, supra, pp. 298–99; see part II of this opinion. Although Justice Schaller apparently does not dispute the fact that the born alive rule "was firmly entrenched in the common law generally"; footnote 33 of Justice Schaller's concurring and dissenting opinion; Justice Schaller asserts that the rule never represented the common law of this state because it was never "explicit[ly] adopt[ed] by the legislature or the courts of this state." Id. In fact, as Swift explained, the language of the murder statute in effect at the time of his commentary in 1796 indicates that the statute had been drafted "in affirmance of the common law," which Swift explained incorporated the "born alive" rule. 2 Z. Swift, A System of the Laws of the State of Connecticut, supra, pp. 298–99. Moreover, Justice Schaller's assertion that a rule or principle is not to be considered a part of our common law until it has been recognized explicitly by this state's legislature or courts reflects the same fundamental misunderstanding of the common law as that demonstrated by Justice Zarella in his concurring and dissenting opinion. See footnote 39 of this opinion. Indeed, as we have explained, the position espoused by Justices Zarella and Schaller cannot be squared with the principle that due process is not violated simply because the issue presented represents a matter of first impression.

On the contrary, as one court has stated in addressing a similar contention: "[I]t is impossible to perceive how an individual of even less than ordinary intelligence can fail to be aware that [stabbing a pregnant woman repeatedly in the chest and back] is not lawful conduct, and, in fact, [the perpetrator's] behavior after the [stabbing] in immediately [fleeing and] divesting himself of the [knife] . . . clearly indicates that he recognized the criminality involved in his actions. . . .

"[I]t is simply ludicrous to suppose that a particular statute fails to provide fair notice of forbidden conduct if it does not expressly anticipate every possible criminal contingency. . . . [I]t is fatuous for [the perpetrator] to complain that he did not receive fair notice that he was acting in a criminal manner [and could be held criminally liable if the pregnant woman's baby was born alive but subsequently died]." (Citation omitted.) *People* v. *Hall*, supra, 158 App. Div. 2d 79–80; see also *United States* v. *Spencer*, supra, 839 F.2d 1342–44 (rejecting claim that defendant could not have foreseen that kicking and stabbing pregnant woman in stomach could result in murder conviction for death of baby ten minutes after birth); *State* v. *Cotton*, supra, 197 Ariz. 589–90 (application of homicide statutes to conduct that resulted in postpartum death of baby did not violate defendant's due process rights).

We acknowledge that, under our interpretation of the relevant statutory scheme, a person who assaults a pregnant woman and causes the death of the fetus in utero will be subject to a lesser sanction than a person who commits the same assault when the fetus is born alive and subsequently dies of injuries resulting from that assault.[84] The defendant contends that such

---

[84] As we previously explained, the assault of a pregnant woman that results in the termination of her pregnancy is a class A felony punishable by not less than ten years and not more than twenty-five years imprisonment; P.A. 03-21; see General Statutes § 53a-35a (4); whereas murder, although also a class A felony, is punishable by a term of imprisonment of not less than

a result is arbitrary and unfair and creates a perverse incentive for criminals not to render aid to their dying victims, or to secrete their bodies to ensure that medical aid cannot be rendered to the fetus. In *State* v. *Cotton*, supra, 197 Ariz. 590–91, the Court of Appeals of Arizona addressed and rejected this very argument, and we agree with that court's analysis and conclusion.

In *Cotton*, the defendant, Lawrence Cotton, was charged with two counts of second degree reckless murder after he accidentally shot and killed his girlfriend, who was eight and one-half months pregnant. Id., 586. The baby was born alive but died one day after being born. Id. Cotton urged the Arizona Court of Appeals to extend its reasoning in *Vo* v. *Superior Court*, supra, 172 Ariz. 195, in which the court had concluded that the definition of "person" under the Arizona first degree murder statute did not include a fetus. Id.; see *State* v. *Cotton*, supra, 197 Ariz. 587. In *Vo*, the court "held that the trial court should have dismissed murder charges against the defendants for the death of a fetus that occurred after one of the defendants shot the pregnant mother"; *State* v. *Cotton*, supra, 587; reasoning that, "in enacting the statute, the legislature had not expressed an intent to deviate from the common law principle that only persons 'born alive' could be the victims of homicide." Id., citing *Vo* v. *Superior Court*, supra, 200, 206. The court in *Vo* had "found support for [its] conclusion . . . in the fetal manslaughter statute . . . which, by defining the killing of an unborn child as a separate offense from the killing of a 'person,'

twenty-five years and not more than life imprisonment. See General Statutes § 53a-35a (2); see also General Statutes § 53a-35b ("[a] sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release . . . in which case the sentence shall be imprisonment for the remainder of the defendant's natural life"). Furthermore, under our capital scheme, murder is a death penalty eligible crime; an assault of a pregnant woman that results in the termination of her pregnancy is not.

evidenced a legislative determination that a fetus was not to be considered a person within the meaning of the murder statute." (Citation omitted.) *State* v. *Cotton*, supra, 587, citing *Vo* v. *Superior Court*, supra, 201.

Cotton nevertheless maintained that his case presented a scenario that was legally indistinguishable from *Vo*, and "that, if it was not murder for the . . . defendants [in *Vo*] to cause the death of an unborn child, it similarly should not be murder or manslaughter for [Cotton] to have harmed a fetus who later died of her injuries after birth." *State* v. *Cotton*, supra, 197 Ariz. 587. The court disagreed, noting that Cotton had "caused the death not of a fetus, but of a child who had been born." Id. The court also rejected Cotton's contention that Arizona's fetal manslaughter statute "reflect[ed] a legislative determination that the [s]tate's other homicide statutes should not apply to situations in which fatal injuries are inflicted on a fetus, even if death does not result until after the child is born." Id., 588. The court explained: "By its terms, the fetal manslaughter statute applies only to the killing of an unborn child. It reflects a legislative decision to afford protection to unborn children that was not available under traditional homicide statutes because of the common law born alive rule. . . . Absent any legislative history to the contrary, we presume that the legislature's adoption of [the fetal manslaughter statute] merely reflects a desire to afford greater protection to the unborn fetus than was available under common law, not less protection to a child who, despite the homicidal conduct of another, happens to survive past birth." Id.

Finally, Cotton asserted that it was fundamentally unfair and against public policy "to permit a [murder] conviction . . . for inflicting prenatal injuries if the child survives, but to allow a conviction only for fetal manslaughter if the child dies before birth." Id., 590. Cotton maintained "that such an interpretation would

discourage a perpetrator from attempting to save the life of an injured fetus." Id., 590–91. Although the court acknowledged the "irony" inherent in the existing statutory scheme, it expressed doubt that "persons who have engaged in homicidal conduct will render aid to their victims, fetal or otherwise. Rarer still would be the killer who would refrain from attempting to save the life of the fetus solely based [on] the knowledge that allowing the child to die might reduce the perpetrator's culpability from murder to manslaughter." Id., 591. The court concluded that, "[e]ven [if its interpretation of Arizona's] homicide statutes [as applying] when the injured fetus dies after birth would have the effect Cotton claims, a contrary interpretation would result in even greater injustice. One who recklessly kills a fetus before birth under circumstances that would constitute murder of the mother could be convicted of fetal manslaughter. . . . However, under Cotton's interpretation, one who premeditatedly injures a child in utero could not be prosecuted for the later death, [as] long as the child lived long enough to be born: the fetal manslaughter statute would not apply once the child was born and the murder statute would not apply because no injury was inflicted on a 'person.' Thus, Cotton's interpretation would spawn the irony that the more serious criminal act of intentionally harming the fetus would carry no sanction if the child died after birth, while recklessly engaging in the same conduct would carry the possible sentence of ten and one-half years [imprisonment] if the fetus died before birth. . . .

"It is inconceivable that [the Arizona] legislature would have intended that the perpetrator escape responsibility for the child's death in the former scenario, but not the latter. To the extent that Cotton is correct in arguing that the interplay between the fetal manslaughter statute and the murder statutes has created a perverse incentive not to render aid to a dying

fetus, his policy arguments are best addressed to the legislature, which is the appropriate forum for determining what, if any, reform is appropriate." (Citations omitted.) Id.

We agree with the reasoning of the court in *Cotton*. If we were to determine, consistent with the defendant's contention in the present case, that the definition of "person" under our murder and capital felony statutes does not include an infant who is born alive and later dies from injuries inflicted in utero, we also would be required to conclude that the legislature, through its enactment of P.A. 03-21, intended to punish an assault on a pregnant woman that causes the termination of her pregnancy that does not result in a live birth, on the one hand, but intended no punishment for the same conduct if the fetus happens to be born alive but dies shortly thereafter from its injuries, on the other hand. We will not assume that the legislature intended such an irrational and bizarre result, especially because the legislative history surrounding P.A. 03-21 definitively establishes a contrary legislative intent.[85]

---

[85] Justice Schaller suggests that it is unfair and, indeed, bizarre, to treat a defendant more harshly because an injured fetus responds to "eleventh hour" medical care and is born alive, only to succumb thereafter to its prenatal injuries. Part I A and footnote 3 of Justice Schaller's concurring and dissenting opinion. We strongly disagree. When, as in the present case, a defendant brutally and repeatedly stabs a woman who is eight and one-half months pregnant in the chest and abdomen and then leaves her to die, it is readily foreseeable both that she and her unborn child will be seriously, if not fatally, injured, and that every possible effort will be made to save the mother and her unborn child when medical help becomes available. Fundamental fairness is readily satisfied by the foreseeability of medical intervention, and it therefore is perfectly reasonable for the defendant, who sets this horrific chain of events in motion, to assume the risk that his conduct will be punished more or less severely depending on the extent to which any medical intervention is successful.

Justice Schaller also asserts that it violates principles of due process to apply the born alive rule in the present case, and thereby to hold the defendant criminally responsible for Antonia's death because, in 1998, it was not a crime at all to kill a fetus in utero. Specifically, Justice Schaller argues that due process bars the retroactive application of the doctrine of transferred intent in a situation in which, as in the present case, "criminal intent

Moreover, it is not fundamentally unfair for the legislature to treat the killing of a fetus in one manner and the killing of an infant who is born alive and subsequently dies of prenatal injuries in another manner. We are aware, of course, that the legislature's decision to

is transferred toward an entity that has yet to achieve personhood status . . . ." This argument also lacks merit. As Justice Schaller acknowledges, this court, in *State* v. *Higgins*, supra, 265 Conn. 50, expressly held that the doctrine of transferred intent may provide the predicate for a conviction under our capital felony statute, namely, § 53a-54b. Indeed, in *Higgins*, we concluded that the defendant in that case properly had been convicted of the capital felony of killing a person under the age of sixteen even though the defendant had intended to kill a person over that age. Id., 42, 59. In reaching our conclusion, we explained that the "doctrine of transferred intent may be applied when the defendant's actual mental state and wrongful conduct are equivalent to the mental state and wrongful conduct that must be proved under the offense with which he is charged, even if that offense is more serious than the contemplated offense." Id., 59. According to Justice Schaller, however, we are barred from applying the doctrine of transferred intent in the present case because here, "we are not concerned with the transfer of the intent to kill an adult to a child, but . . . with the transfer of the intent to kill from an adult to what, at the time of the defendant's act, was an unborn fetus, in other words, to an entity that was not considered a 'person' under our law. Accordingly, the equivalence of mental state and wrongful conduct is lacking. . . . [A]t the time of the conduct underlying the defendant's convictions, causing the death of a fetus in utero was *not a criminal act*." (Emphasis in original.) We do not agree with Justice Schaller's conclusion because we do not agree with his premise, that is, that injuring a fetus that is born alive and that subsequently dies of those prenatal injuries is not the equivalent of fatally injuring any other person. Although it is true that, in 1998, killing a fetus in utero was not a crime—the legislature did not fill that gap in the statutory scheme until 2003 with its enactment of P.A. 03-21—under the born alive rule, it was murder if that same fetus was born alive and subsequently died of injuries sustained in utero. Because, as we have explained, it is readily foreseeable that a fetus may be born alive and then die from prenatal injuries, there is nothing unreasonable or unfair about treating that death as the death of a person. Indeed, it is treated as such because of the policy underlying the born alive rule, that is, a fetus that is born alive but later dies of prenatal injuries is entitled to precisely the same consideration and protection as any other person. Because the born alive rule reflects society's reasonable determination that there exists no moral distinction between the killing of a child predicated on conduct after the child was born, on the one hand, and the killing of a child predicated on conduct that occurred before that child was born, on the other—in both cases, of course, the defendant also must have had the intent to kill—there exists no due process impediment to prosecuting either under the transferred intent doctrine.

treat a fetus that dies in utero differently from an infant who is born alive produces a particularly unfortunate result for the defendant in the present case because, under the applicable statutory scheme, if he were not criminally liable for the murder of Antonia, he would not be eligible to receive the death penalty. To adopt the contention of the defendant, however, that an infant who is born alive but later dies of injuries sustained in utero is not a person "would usurp the legislature's role and require this court to vitiate what is an inherently legislative determination . . . . The categorization of offenses is a legislative judgment, and, generally speaking, it is not the prerogative of courts in this area lightly to launch an inquiry to resolve a debate [that] has already been settled in the legislative forum. . . . We defer to the broad authority that legislatures possess in determining the types and limits of punishment for crimes. Indeed, [i]n examining the rationality of a legislative classification, we are bound to defer to the judgment of the legislature unless the classification is clearly irrational and unreasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Heinemann*, 282 Conn. 281, 310–11, 920 A.2d 278 (2007). Because it is not irrational for the legislature to treat a fetus that is injured and dies in utero differently from an infant who is born alive but who subsequently dies from injuries sustained in utero, and in view of the fact that the competing policy concerns were raised and fully debated at the legislative hearings on the bill that would have redefined the term "person" in the Penal Code to include a viable fetus, it would be improper for us to modify our statutory scheme in the manner that the defendant advocates.[86]

---

[86] Contrary to Justice Schaller's assertion, we do not rely on the legislative history of P.A. 03-21 for the purpose of resolving the defendant's due process claim. We consider that legislative history only insofar as it evinces the intent of the legislature to recognize the born alive rule. The defendant's due process claim fails because our recognition of the rule—an action that we take because it is apparent that it reflects the intent of the legislature—

V

## EVIDENTIARY SUFFICIENCY AND THE CORRECT LEGAL STANDARD FOR DETERMINING WHETHER ANTONIA WAS BORN ALIVE

The defendant next claims that, even if the panel properly concluded that the born alive rule is applicable to the present case, he nevertheless is entitled to a judgment of acquittal with respect to the murder and capital felony charges pertaining to the death of Antonia because the evidence was insufficient to establish beyond a reasonable doubt that Antonia was born alive under "prevailing Connecticut law defining what it means to be alive."[87] (Internal quotation marks omitted.) Specifically, the defendant contends that the panel failed to apply the principles articulated by this court in *State* v. *Guess*, supra, 244 Conn. 761. We agree with the defendant's contention that the panel improperly failed to apply the principles articulated in *Guess* because, at the time of trial, neither the parties nor the panel appreciated the relevance of those principles to the present case. Because the evidence was sufficient to support the defendant's conviction under the standard that the panel did apply, however, the defendant is not entitled to an acquittal, as he claims; rather, he

---

is in no sense unforeseeable or indefensible with reference to the law as it existed in 1998.

[87] It is well established that a live birth is an essential element that the state must prove beyond a reasonable doubt. E.g., *People* v. *Bolar*, supra, 109 Ill. App. 3d 389; *People* v. *Selwa*, 214 Mich. App. 451, 469, 543 N.W.2d 321 (1995), appeal denied, 453 Mich. 934, 557 N.W.2d 307 (1996); *State* v. *Elliott*, 308 Mont. 227, 240, 43 P.3d 279 (2002); *Bennett* v. *State*, 377 P.2d 634, 635 (Wyo. 1963). "When the evidence that the child was born alive is susceptible of doubt, a conviction can not be sustained." (Internal quotation marks omitted.) *Commonwealth* v. *Morris*, supra, 142 S.W.3d 657. Whether a fetus has been born alive is an issue to be decided by the finder of fact. See, e.g., *Duncan* v. *Flynn*, 342 So. 2d 123, 124 (Fla. App. 1977), aff'd, 358 So. 2d 178 (Fla. 1978); *State* v. *Elliott*, supra, 234; *Bennett* v. *State*, supra, 636.

is entitled to a new trial. Cf. *State* v. *DeJesus*, 288 Conn. 418, 434, 438–39, 953 A.2d 45 (2008) (state entitled to retry defendant when trial court instructed jury using incorrect legal standard based on subsequent clarification in law, and evidence adduced at original trial was sufficient to meet that standard).

We commence our review of the defendant's claim with a summary of our analysis and holding in *Guess*. In *Guess*, the defendant, Barry Guess, repeatedly shot the victim, Melvin McCoy, who, after being transported to the hospital, was placed on life-support systems. See *State* v. *Guess*, supra, 244 Conn. 764–66. A short time later, it was determined that McCoy could not sustain either circulatory or respiratory function on his own. Id., 766. It also was determined that McCoy was "brain dead" because he exhibited no sign of any brain activity. Id. After McCoy's parents authorized the hospital to remove him from life support, he was pronounced dead. Id.

A jury found Guess guilty of McCoy's murder. Id., 763. Following his conviction, Guess appealed to the Appellate Court, claiming that the evidence was insufficient to support a finding of probable cause that he had killed McCoy because, Guess maintained, the legal cause of McCoy's death was his removal from life-support systems rather than Guess' shooting of McCoy. See id. In particular, Guess contended that, "because the legislature had not adopted the Uniform Determination of Death Act,[88] and because the legislature did not define death in the Penal Code to include brain death,

---

[88] Section 1 of the Uniform Determination of Death Act of 1980 provides: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." Unif. Determination of Death Act § 1, 12A U.L.A. 781 (2008). Thus, under the act, death can be established in one of two ways.

the court, in determining who or what caused [McCoy's] death, must use a common-law definition of death, which does not include brain death . . . but rather depends solely [on] the cessation of circulatory and respiratory functions of the body." Id., 766–67. The Appellate Court rejected Guess' claim, "concluding that the proximate cause of [McCoy's] death was the bullet wound he had sustained, and the act of disconnecting the life support systems after [McCoy] had been declared brain dead was a medically reasonable act that neither caused [McCoy's] death nor constituted a sufficient intervening cause so as to negate [Guess'] acts as the cause of death." Id., 763–64, citing *State* v. *Guess*, 44 Conn. App. 790, 800, 692 A.2d 849 (1997).

Upon our granting of Guess' petition for certification to appeal, we concluded that, even if the legislature had not adopted the Uniform Determination of Death Act as the operative definition of death under the Penal Code, we could, "as a matter of common-law adjudication, define [the] term [death] in tandem with medical science and technology as they [had] evolved in recent years." *State* v. *Guess*, supra, 244 Conn. 771. After noting the developments that had led to an expanded definition of death in the medical and legal fields; see id., 772–78; we "construe[d] the meaning of 'death' as that term is used in the Penal Code to include a brain-based definition of death"; id., 780; thus placing the common-law definition of death in conformance with the definition of that term under the Uniform Determination of Death Act. See footnote 88 of this opinion. We therefore determined, for purposes of our common law, that an individual is deemed to be dead if that person has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem. See *State* v. *Guess*, supra, 780.

In reaching our conclusion, we emphasized that "our recognition of brain-based criteria for determining death [was] not unfaithful to any prior judicial determinations. Death remains the single phenomenon identified at common law; the supplemental criteria are merely adapted to account for the changed conditions that a dead body may be attached to a machine so as to exhibit demonstrably false indicia of life. It reflects an improved understanding that in the complete and irreversible absence of a functioning brain, the traditional loci of life—the heart and the lungs—function only as a result of stimuli originating from outside of the body and will never again function as part of an integrated organism." (Internal quotation marks omitted.) Id., 780–81.

In light of our determination in *Guess* concerning the applicability of the brain death standard, we concluded that the trial court in that case properly had found probable cause to charge Guess with the crime of murder. Id., 781. Specifically, we stated: "Because the trial court at the hearing in probable cause reasonably found that [Guess'] act of shooting [McCoy] caused extensive brain damage, leaving [McCoy] with no evidence of brain function, the court properly found that the state had established probable cause to charge [Guess] with the crime of murder." Id.

On appeal to this court, the defendant in the present case concedes that the brain death standard that we adopted in *Guess* was not intended to supplant the traditional common-law definition but, rather, merely to supplement it as an alternative basis for establishing when death has occurred. He contends, nevertheless, that, because the court in *Guess* recognized that a person who is being sustained on life support may have died, that is, the person may be brain dead, even though that person continues to exhibit traditional signs of life, namely, circulatory and respiratory functions, the

state's burden of proving that Antonia was born alive required the state "to disprove any reasonable hypothesis arising from the evidence that [Antonia] actually died *before* she was extracted from the womb . . . *and placed on life support.*" (Emphasis added.) The defendant maintains, moreover, that the state's evidence failed to meet this standard because the testimony of Palmer, the emergency department physician who delivered Antonia, was based solely on the fact that Antonia had a heartbeat and was breathing *after* she had been placed on a ventilator. The defendant further claims that, in light of the testimony of Harold Wayne Carver II, the state's chief medical examiner, that Antonia's brain was "badly damaged" and "contained areas of atrophy or wasting away of the tissues" as a result of prenatal oxygen deprivation, there is a very real possibility, which the state was required to disprove, that Antonia was brain dead at the time of her birth and, therefore, was not a "person" within the meaning of the state's murder statute.

In response, the state contends that evidence of brain function never has been required to prove a live birth. The state therefore asserts that the defendant's reliance on *Guess* is misplaced and that *Guess* merely stands for the proposition that removing a person from life support does not bar a defendant's conviction for murder when the evidence establishes that the defendant's actions caused an irreversible cessation of that person's brain function before the removal of life support. In the state's view, *Guess* neither directly addressed nor implicitly resolved the issue raised by the present case, that is, whether an infant who, following her delivery, is placed on life support and sustained for forty-two days before being removed from life support, qualifies as a "person" within the meaning of our murder statute.[89]

---

[89] The state further maintains that, "from both a medical and legal standpoint, the question of when life begins is not the same as the question of when life ends. . . .

Before turning to the merits of the defendant's contention, we note that, at trial, the defendant never raised the evidentiary insufficiency claim that he now raises on appeal. Although defense counsel moved for a judgment of acquittal at the close of the state's case-in-chief on the ground of insufficiency of the evidence, his claim was based primarily on the contention that the state had failed to prove that the defendant had the intent necessary to support his conviction for the murder of Antonia because she was a fetus when he engaged in the conduct that caused her death. Thus, the claim of evidentiary insufficiency that defense counsel raised at trial differs markedly from the claim the defendant raises on appeal. Furthermore, the defendant, like the state, does not contend that the panel actually applied a brain function standard in determining that Antonia was born alive.

We agree with the state that *Guess* does not directly address the issue of what type of proof or evidence is required to establish that an infant who is delivered by cesarean section after suffering prolonged oxygen deprivation in utero and is immediately placed on life support is a "person" within the meaning of our murder statute. Indeed, *Guess* did not present a factual scenario that required us to consider that question. More importantly, it is clear that the panel in the present case did not apply *Guess* or otherwise consider what relevance,

"For purposes of the criminal law, 'brain death' provides a workable standard for establishing causation—i.e., to prove that the victim of an assault has in fact died—thereby ensuring (1) that the [perpetrator] will not escape punishment for homicide, and (2) that the medical professional who [withdraws] life support will not be subject to criminal liability. Conversely, requiring the state to prove that a baby such as Antonia was not 'brain dead' at the moment of birth would be unworkable because such a requirement would make it far more difficult to establish homicide and, consequently, far more likely that the person who injured the baby could not be held accountable for causing her death."

if any, that case might have with respect to the issue of Antonia's status at the time of her birth. It is apparent, rather, that the panel, in determining her status, applied the traditional common-law test pursuant to which an infant is born alive if she has circulatory and respiratory functions that are independent of her mother. Indeed, our review of the record indicates that *Guess* was mentioned only once in the entire course of the trial. That occurred when defense counsel, at the close of the state's case-in-chief, moved for a judgment of acquittal on the ground of evidentiary insufficiency. At that time, defense counsel primarily argued that the state had failed to prove that the defendant possessed the requisite intent to murder Antonia because she was still a fetus, and not a person, when the defendant inflicted the injuries on Rodgers that ultimately caused Antonia's death; defense counsel also asserted, however, that the state had failed to prove that the defendant's conduct, and not the actions of medical personnel in removing Antonia from life support, was the proximate cause of Antonia's death. In support of this latter contention, defense counsel relied on *Guess*, explaining that, in contrast to the proof that had been adduced by the state in *Guess*, there was no evidence tending to establish that Antonia was brain dead when she was removed from life support.[90] Thus, at trial, defense counsel contended that the evidence established that Antonia could have been *alive* when life support was removed, and that removing her from life support—not the defendant's conduct—had caused her death. In light of the foregoing argument, it is apparent that the defendant, like the state, viewed *Guess* merely as a causation case.[91]

---

[90] In response to defense counsel's argument, the state's attorney asserted that the evidence established that Antonia had lived for four to five hours following her removal from life support and that Carver, the medical examiner who performed Antonia's autopsy, ruled that her death was a homicide.

[91] The panel denied the motion for a judgment of acquittal but did not elaborate on its reasons for doing so. Presumably, however, the panel relied

At no time, moreover, did the defendant seek to establish, through Palmer or any other witness, that Antonia was brain dead at the time of her birth. To the contrary, consistent with the aforementioned theory of defense, defense counsel apparently elicited testimony from Palmer that Antonia was alive when she was born and up until six weeks after being delivered, at which time she was removed from life support. The state, moreover, presented no evidence, through Palmer or otherwise, as to whether Antonia had demonstrated brain function at the time of her birth or thereafter. The state's failure to adduce any evidence of brain function as part of its case and its argument on appeal that *Guess* is inapplicable to the issue of whether Antonia was born alive compel the conclusion that the state did not believe that it was required to establish brain function and therefore never sought to demonstrate any such function with respect to the born alive issue. In light of defense counsel's contention at trial concerning the import of *Guess*, it is equally evident that the defense also did not believe that the state had any obligation to satisfy a brain function standard. Finally, and significantly, there is nothing in the record to suggest that either the court, *Damiani, J.*, or the panel applied the standard set forth in *Guess* in determining whether Antonia had been born alive.

Thus, although the claim of evidentiary insufficiency that the defendant raises in this court is predicated on the application of a test for determining whether a person is alive that requires due consideration of the principles articulated in *Guess*, it is apparent that, in the trial court, neither the parties nor the court had any such test in mind. For the reasons set forth in part V

on the reasoning and holding of the Appellate Court in *Guess*, which had concluded that, when a defendant inflicts injuries on a victim who, upon being removed from life support, dies as a result of those injuries, the defendant proximately causes the victim's death. *State v. Guess*, supra, 44 Conn. App. 798–800.

B of this opinion, we conclude that the panel improperly failed to apply the *Guess* standard for purposes of determining whether Antonia was born alive. More specifically, we conclude that, in light of the fact that, as in *Guess*, a person whose circulatory and respiratory functions are sustained by life support nevertheless may have suffered brain death, it necessarily follows that, to prove beyond a reasonable doubt that Antonia was *alive* at birth, the state must *disprove* that she was brain dead at birth. The proper remedy for the panel's use of the wrong legal standard is a new trial, however, not a judgment of acquittal.[92] Cf. *State* v. *DeJesus*, supra, 288 Conn. 434 ("[i]t is well established that instructional impropriety constitutes 'trial error' for which the appropriate remedy is a new trial, rather than a judgment of acquittal").

A

Standard Utilized by the Trial Court and the
Sufficiency of the Evidence
Under That Standard

Before addressing the defendant's claim under *Guess*, we first address his claim that the evidence was insuffi-

---

[92] In the present case, the fact finder was a three judge panel. This case is no different, however, from a case in which the fact finder is a jury; in the former case, the panel applies the law that it deems applicable, whereas, in the latter, the jury applies the law as instructed by the court. The remedy for the legal impropriety, however, is the same in either case, namely, a new trial. See *State* v. *DeJesus*, supra, 288 Conn. 434. "As the United States Supreme Court observed in *Burks* v. *United States*, 437 U.S. 1, 15, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process [that] is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the [defendant] has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 434–35.

cient to prove beyond a reasonable doubt that Antonia was born alive under the standard that the panel applied. Although this claim, like the defendant's claim under *Guess*, was not preserved at trial, we nevertheless review it "because any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right . . . and would therefore necessarily meet the four prongs of [*State* v.] *Golding* [213 Conn. 233, 239–40, 567 A.2d 823 (1989)]."[93] (Internal

[93] In *State* v. *Padua*, 273 Conn. 138, 177, 869 A.2d 192 (2005), one of the defendants, Miranda Virgilia Calvente, claimed that the double jeopardy clause of the United States constitution required the Appellate Court to consider her claim of evidentiary insufficiency before remanding the case to the trial court after reversing the trial court's judgment on the ground of instructional error. We elected not to address Calvente's constitutional claim and, instead, imposed the same requirement, for prudential reasons, pursuant to our inherent supervisory authority over the administration of justice. Id., 178. We stated that "[i]nterests of judicial efficiency, sound appellate policy and fundamental fairness require a reviewing court to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error." Id. We note that, although the United States Supreme Court has not yet addressed this precise issue, most federal courts that have considered this issue have concluded that the double jeopardy clause is not implicated when a reviewing court fails to consider a defendant's claim of evidentiary insufficiency prior to reversing the trial court's judgment on the ground of trial error and remanding the case for a new trial. See, e.g., *Foxworth* v. *Maloney*, 515 F.3d 1, 4 (1st Cir. 2008) ("we do not hold that the [d]ouble [j]eopardy [c]lause *compels* the review of a properly preserved insufficiency claim before the petitioner is retried" [emphasis in original]); *United States* v. *Adkinson*, 135 F.3d 1363, 1379 n.48 (11th Cir. 1998) (consideration of insufficiency claim before remand for trial error "not mandated by the double jeopardy clause"); *United States* v. *Miller*, 952 F.2d 866, 874 (5th Cir.) (same), cert. denied sub nom. *Huls* v. *United States*, 505 U.S. 1220, 112 S. Ct. 3029, 120 L. Ed. 2d 900 (1992); *United States* v. *Douglas*, 874 F.2d 1145, 1150 (7th Cir.) ("we are not convinced . . . that the [d]ouble [j]eopardy [c]lause compels an appellate court to review the sufficiency of the evidence offered at trial anytime a defendant raises the question"), cert. denied sub nom. *Pruitt* v. *United States*, 493 U.S. 841, 110 S. Ct. 126, 107 L. Ed. 2d 87 (1989). But see *United States* v. *Bibbero*, 749 F.2d 581, 585 (9th Cir. 1984) ("[e]ven though we reverse on procedural grounds, double jeopardy principles require us to consider" defendant's insufficiency claim), cert. denied, 471 U.S. 1103, 105 S. Ct. 2330, 85 L. Ed. 2d 847 (1985). Nevertheless, in accordance with *Padua*, we address the defendant's unpreserved claim of evidentiary insufficiency before consider-

quotation marks omitted.) *State* v. *King*, 289 Conn. 496, 519, 958 A.2d 731 (2008). We conclude that the evidence adduced at trial was sufficient to satisfy the born alive standard that the panel had applied.

The following additional facts and procedural history are relevant to our analysis of this issue. In finding that Antonia was born alive, the panel made no specific factual findings of its own. Rather, the panel relied on the law of the case and, in particular, on the pretrial ruling of the court, *Damiani, J.*, on the motion to dismiss that the defendant filed immediately prior to the probable cause hearing. The only witness to testify at the probable cause hearing regarding Antonia's condition at birth was Palmer, the emergency department physician who delivered her. According to Palmer, after it was determined that Rodgers could not be resuscitated, he delivered Antonia by emergency cesarean section. After cutting and clamping the umbilical cord, he immediately handed Antonia to a physician's assistant, who was a member of the pediatric staff standing by to take Antonia to the pediatric intensive care unit for resuscitation. Because Palmer transferred Antonia to the physician's assistant so quickly, his observations of her were extremely limited. He did observe, however, that she was not breathing or making sounds. Approximately thirty minutes after the delivery, Palmer went to the pediatric intensive care unit to treat a laceration that Antonia had suffered during the cesarean section. At that time, her vital signs were stable and she was breathing with the assistance of a ventilator. Palmer thereafter completed the appropriate paperwork for the issuance of Antonia's birth certificate, signifying that she had been born alive. Over the next several weeks, Palmer often checked on Antonia, who continued to exhibit stable vital signs with the assistance of the venti-

---

ing the propriety of the standard that the panel applied in determining that Antonia was born alive.

lator until she died six weeks after being delivered. On the basis of these facts, Palmer concluded that Antonia "was born, she was alive, and she died . . . ." The state adduced no other testimony to establish that Antonia was born alive.

On cross-examination, defense counsel asked Palmer how much time had elapsed between Rodgers' arrival at the hospital and Antonia's birth. When the state's attorney objected to the question on relevancy grounds, defense counsel explained that he was "trying to determine whether the child was born alive or dead. And the time between when the mother came into the hospital and when the baby was delivered is very significant. The time clearly was of the essence because [Palmer] has already testified to the fact that [medical personnel] didn't do any monitoring of the fetus in utero because of the situation." The court then asked defense counsel why the question was relevant in view of the fact that Palmer already had testified "that the baby was born alive." Defense counsel responded: "He testified to that, but whether he had the basic facts to give that opinion, we don't know. I'm just testing whether he has the evidence to support [it]." The state's attorney interjected that "you don't . . . have to be a doctor to know whether a baby is born alive or dead . . . . The baby lived for [six] weeks." The court overruled the state's attorney's objection but observed that Palmer had delivered Antonia and testified that she "was born alive. [Palmer is] a human being. He has an infant or a baby in his hands or arms that he passes off, and he can tell if the baby is born alive or not." The court further observed that, in light of Palmer's testimony, it did not view the amount of time that had elapsed between Rodgers' arrival at the hospital and Antonia's birth as "relevant, but . . . we'll see where you are going."

Thereafter, defense counsel showed Palmer a copy of Antonia's birth certificate, which indicated that she

had been born at 12:16 a.m., shortly after Rodgers had been brought to the emergency department. He then asked Palmer whether he was "aware of what constitutes a fetal death in the state of Connecticut . . . ." The state's attorney objected, and the court inquired of defense counsel as to the relevancy of the question. Defense counsel responded: "Again, the issue is whether the child was born alive or not. I understand what the doctor's opinion was, but I think this is relevant to his knowledge of Connecticut law, which is what we are dealing with here." The state's attorney responded: "[T]he doctor has said that the baby was born alive. I know doctors are great, but I don't think when somebody is born dead, they can bring them back to life for [six] weeks . . . . This is ridiculous. It's ludicrous, these questions." The court overruled the state's attorney's objection, and Palmer then stated that he did not know "[t]he specifics of Connecticut law . . . ." Defense counsel asked Palmer whether, when he delivered Antonia, he had examined her to determine whether she had a heartbeat and was breathing. Palmer responded that he had done nothing except cut and clamp the umbilical cord, and hand Antonia over to the physician's assistant who was waiting to take her to the pediatric intensive care unit. Specifically, Palmer stated that he personally had observed "[n]o sounds," "[n]o crying," and "no breathing."

After defense counsel had finished questioning Palmer, the court indicated that it had a few questions. The court then asked Palmer what, in his medical opinion, constitutes a "fetal death . . . ." Palmer responded, "[t]hat's when the heart stops and the baby's no longer viable." The trial court also asked Palmer whether Antonia was breathing and had a heartbeat when he visited her thirty minutes after her birth. Palmer responded that, at that time, Antonia's heart was beating and she "was breathing on a ventilator."

In its decision finding that the state had established probable cause to conclude that Antonia was born alive and, therefore, that she was a person for purposes of our Penal Code, the court stated in relevant part: "[The] court finds that the definition of a 'person' in Connecticut criminal law includes those who are born and are alive. This definition does not exclude Antonia. . . . Palmer . . . testified at the probable cause hearing that Antonia was born and remained alive for forty-two days before she succumbed to her injuries.

"This interpretation of the statute's applicability to the facts of the present case finds support in the [common-law] 'born alive' rule." *State* v. *Courchesne*, supra, 46 Conn. Sup. 67–68. The only other portion of the decision that is relevant to the court's finding that Antonia was born alive is the following explanation by the court as to why the doctrine of transferred intent applied in the born alive context: "Obviously, there are many instances [in which] an adult victim has died some considerable time after the infliction of the fatal blow or wound. If the victim recovers and survives, whether by reason of medical or surgical treatment, or otherwise, there is no homicide; yet, if the victim dies from such wounds, it is murder. While such medical or surgical treatment may be a so-called intervening factor between the point of infliction of injury and [the] resultant survival or death, nevertheless, the issue of homicide is resolved by the initial circumstances that caused the death.

"There is no logical reason why any different rule should apply to an unborn fetus who is successfully delivered alive and lives independent[ly] of his mother for a reasonable time; at least for [a] sufficient time so as not to be 'stillborn,' as that term is accepted by the medical profession and our society."[94] Id., 75. A stillborn

---

[94] We note that the foregoing passage from the court's decision was taken almost verbatim from *State* v. *Anderson*, supra, 135 N.J. Super. 428–29.

baby is a baby that is dead at birth or that has died before birth. See Stedman's Medical Dictionary (28th Ed. 2006) p. 1838 (defining "stillborn" as "[b]orn dead; denoting an infant dead at birth," and defining "still-birth" as "[t]he birth of an infant who has died before delivery").

On the basis of the foregoing, it is evident that the court determined that Antonia had been "born and remained alive for forty-two days"; State v. Courchesne, supra, 46 Conn. Sup. 67; merely because she had demonstrated vital signs while being sustained on life support for that extended period of time. This is so because the state presented no other evidence at the probable cause hearing with respect to the born alive issue. That the court relied solely on the fact that Antonia had been sustained on a ventilator for forty-two days in concluding that she had been born alive also is evidenced by virtue of its questioning of Palmer regarding the meaning of "fetal death . . . ." Palmer responded that fetal death occurs "when the heart stops and the baby's no longer viable." The court then asked Palmer whether Antonia's heart was beating and whether she was breathing when he examined her approximately thirty minutes after birth. Palmer responded in the affirmative but noted that she was breathing with the assistance of a ventilator. Thus, under the test that the court applied, an infant is born alive, even if she is not breathing at birth, as long as her circulatory and respiratory functions are maintained by life-support systems for a period of time.

Following the trial court's finding of probable cause, the guilt phase of the trial ensued before the panel. During the guilt phase, the state's attorney presented essentially the same evidence that he had adduced at the probable cause hearing. In addition, the state adduced testimony from Carver, the state's chief medical examiner, who had performed an autopsy on Antonia. Carver

classified Antonia's death as a homicide and described Antonia as a "normal appearing infant" who weighed approximately ten pounds at the time of death, that is, several hours after ventilation support had been withdrawn. According to Carver, Antonia's size and development were consistent with that of a six week old baby.[95]

The panel thereafter found the defendant guilty as charged. In doing so, the panel adopted the born alive test that the court, *Damiani, J.*, had applied. Specifically, in its memorandum of decision on the defendant's motion for articulation, the panel stated in relevant part: "Judge Damiani issued a . . . comprehensive opinion resolving the issue of the 'born alive' rule as it applies to murder and capital felony in the state of Connecticut. . . . [The panel] has adopted that ruling and utilized Judge Damiani's analysis in concluding as it did that the defendant is guilty of murder and capital felony as charged . . . ."[96] (Citation omitted.)

In light of the nature of the test that the panel applied, it is apparent that the evidence adduced by the state at trial was sufficient to meet that test. As we previously explained, the traditional common-law definition of death was satisfied by evidence establishing the irreversible cessation of circulatory and respiratory functions. Conversely, proof of "life" merely required evidence of circulatory and respiratory functions. See, e.g., *People* v. *Selwa*, 214 Mich. App. 451, 463–64, 543 N.W.2d 321 (1995) ("the definition of 'life' logically

[95] The state also elicited testimony from Antonio Joseph, Antonia's father. Joseph testified that he and other members of his family had held Antonia after she was removed from life support and that she did not die until four to five hours thereafter. Joseph, however, did not explain the basis for his conclusion that Antonia was alive for that four or five hour period.

[96] It is important to underscore that, at trial, the defendant never claimed that Antonia was not born alive. His only claim relative to the issue of whether Antonia had been born alive was that the born alive rule was not applicable, both because it was not embodied in our law and that, even if it was, applying it in the present case violated his right to fair notice.

flow[s] from the . . . definition of 'death,' " and, "[a]ccordingly, a child is 'born alive' and thus a 'person' . . . if, following expulsion or extraction from the mother, there is lacking an irreversible cessation of respiratory and circulatory functions"), appeal denied, 453 Mich. 934, 557 N.W.2d 307 (1996); see also *State* v. *Cornelius*, supra, 152 Wis. 2d 277 ("[w]e accept as axiomatic the legal, if not medical, proposition that if one is not dead, he is indeed alive").

In the present case, the uncontroverted evidence established that Antonia was delivered in the emergency department at the hospital and subsequently placed on a ventilator that maintained her lung function, which, in turn, assisted her heart function. While on life support, Antonia grew at about the same rate as any other infant would have in the course of six weeks. Antonia remained on life support for forty-two days until it was withdrawn, after which she died. Because Antonia's bodily functions, including her circulatory and respiratory functions, continued, independently of her mother, for six weeks following her delivery, the state's evidence was sufficient to satisfy the standard that the panel applied during the guilt phase of the defendant's trial.

In connection with his claim that he is entitled to a judgment of acquittal on the ground of evidentiary insufficiency, the defendant appears to presume that the panel applied a test pursuant to which the state was required to prove that Antonia lived or was able to live independently of her mother *and* independently of life support. This presumption is manifested by the defendant's reliance on several cases that, he asserts, stand for that general proposition.[97] It is true that a few

---

[97] The defendant cites *Keeler* v. *Superior Court*, supra, 2 Cal. 3d 619, *Commonwealth* v. *Booth*, supra, 564 Pa. 228, *State* v. *Horne*, supra, 282 S.C. 444, and *Morgan* v. *State*, 148 Tenn. 417, 256 S.W. 433 (1923). *Keeler*, *Booth* and *Horne* did not involve the question of what evidence is required to prove a live birth because, in each of those cases, it was undisputed that

courts, in refining the traditional common-law test for purposes of applying that test when an infant has been placed on life support immediately after delivery, have held that the infant will be deemed to have been born alive only if the evidence establishes that he or she had an existence independent of artificial support. See, e.g., *State* v. *Lamy*, supra, 158 N.H. 517–18; *State* v. *Dellatore*, 761 A.2d 226, 230–31 (R.I. 2000). The law in this area, however, is neither uniform nor well developed, and some courts have failed to articulate any such additional requirement. See *Regina* v. *Iby*, supra, 63 N.S.W.L.R. 285–87 (surveying case law of Australia, United States, England and Ireland and concluding that there is "[no] support [for] the . . . contention that unassisted breathing must exist before a baby can be said to have been born alive").

For purposes of our analysis, however, the decisive consideration is the fact that the defendant never claimed that such a test applied, that neither the court,

the fetus died in utero. See *Keeler* v. *Superior Court*, supra, 623–24; *Commonwealth* v. *Booth*, supra, 230; *State* v. *Horne*, supra, 446. The issue in all three cases, rather, was whether the court should recognize a viable fetus as a person in contravention of the born alive rule. See *Keeler* v. *Superior Court*, supra, 631; *Commonwealth* v. *Booth*, supra, 229; *State* v. *Horne*, supra, 446. In *Morgan*, although the issue was whether a baby found floating in a creek had been born alive and therefore was a person for purposes of the state murder statute; see *Morgan* v. *State*, supra, 419–21; there is nothing in that case to suggest that an existence independent of life support was required to establish that the baby was born alive. Rather, the Tennessee Supreme Court articulated a standard consistent with the standard applied by the trial court in the present case: "In order to become a 'reasonable creature in being,' a child must be born alive. It cannot be the subject of a homicide until it has an existence independent of its mother. It is usually said that the umbilical cord must have been severed, and an independent circulation established. Ordinarily, if the child has breathed, this would show independent life. But this test is not infallible. Sometimes infants breathe before they are fully delivered, and sometimes they do not breathe for quite a perceptible period after they are delivered. Generally, however, if respiration is established, that also establishes an independent circulation and independent existence." Id., 420–21.

*Damiani, J.*, nor the panel ever mentioned or otherwise adverted to a standard requiring evidence that Antonia was capable of living independently of life support, and that no evidence relative to any such standard was adduced by either party. It therefore is clear that both the court, *Damiani, J.*, and the panel used a test pursuant to which Antonia was deemed to have been born alive merely because, as the court stated, she was "successfully delivered . . . and live[d] independent[ly] of [her] mother for a reasonable time; at least for [a] sufficient time so as not to be 'stillborn,' as that term is accepted by the medical profession and our society." *State* v. *Courchesne*, supra, 46 Conn. Sup. 75. Thus, to the extent that some courts have adopted a born alive standard that requires proof that the baby lived independently of life support, that was not the standard that the court, *Damiani, J.*, or the panel applied. For the reasons set forth hereinafter, we conclude that the *proper* test requires proof that the baby was not brain dead at the time of birth, and, therefore, the defendant is entitled to a new trial at which the state will be required to meet that standard.

### B

### The Applicable Standard Under *Guess*

We turn, therefore, to the defendant's claim that the state was required but failed to prove that Antonia was not brain dead for purposes of establishing that she was born alive. We begin our analysis by noting our disagreement with the state's contention that the issue that we decided in *Guess*, namely, when life ends for purposes of proving causation in a homicide case, has no bearing on the question of when life begins for purposes of determining whether an infant has been born alive under the born alive rule. Although its relevance may not be readily apparent, our determination in *Guess* that a person may be dead even though he or she exhib-

its traditional indicia of life, that is, a heartbeat and respiration, is highly relevant to the issue of whether Antonia was alive at birth. We incorporated brain death into our common-law definition of death in *Guess* precisely because a person in extremis can be kept alive with the aid of life support even though that person already may have suffered an irreversible cessation of brain function. See *State* v. *Guess*, supra, 244 Conn. 780. We explained in *Guess* that, under the common law, a person was not considered dead unless he or she had suffered an irreversible cessation of the circulatory and respiratory systems; id., 772; and that would seem to hold true even if those systems were functioning only with the aid of life support. See *People* v. *Mitchell*, 132 Cal. App. 3d 389, 396, 183 Cal. Rptr. 166 (1982) ("In many cases . . . life support equipment can maintain an expired person's circulation and respiration artificially. A respirator can maintain physical breathing, as well as balance oxygen and carbon dioxide levels. However, if the victim has been without respiration long enough to have caused permanent and irreversible brain damage, the victim will forever remain in a vegetative state, a mere repository for organs capable of surviving if transplanted elsewhere, but incapable of regenerating the brain of the corpse in which they are contained. Under the common law definition of death, the patient is alive."); see also *Law* v. *Camp*, 116 F. Sup. 2d 295, 304 (D. Conn. 2000) ("[b]ecause advances in medical technology [have] made it possible for . . . bodily functions to continue in the absence of any brain function, a person on a mechanical ventilator would not be legally dead under the *common law definition of death*") aff'd, 15 Fed. Appx. 24 (2d Cir. 2001), cert. denied, 534 U.S. 1162, 122 S. Ct. 1172, 152 L. Ed. 2d 116 (2002); cf. *Strachan* v. *John F. Kennedy Memorial Hospital*, 109 N.J. 523, 532, 538 A.2d 346 (1988) ("For organs to be preserved for transplant, the donor's car-

diopulmonary system must continue functioning until the organs can be removed. Under the traditional definition of death, [however] such a donor would be considered as still alive because the heart continues to beat and the lungs continue to perform the respiratory function."). In view of the fact that such a person is not truly alive in the way that we have come to understand or appreciate what it means to be alive, we deemed it appropriate to expand the common-law definition of death to include brain death. See *State* v. *Guess*, supra, 780–81. As we stated in *Guess*, "it has become clear in medical practice that the traditional vital signs—breathing and heartbeat—are not independent indicia of life . . . but are, instead, part of an integration of functions in which the brain is dominant . . . . [Therefore] our focus must shift from those traditional vital signs to recognize cessation of brain functions as [a criterion] for death following this medical trend." (Citation omitted; internal quotation marks omitted.) Id., 776. In *Guess*, however, we had no reason to address the question of how the brain function standard would operate, if at all, in the context of a case that, like the present one, implicates the born alive rule.

It is apparent, however, that application of the traditional common-law test to determine whether Antonia was born alive, as the court, *Damiani*, *J.*, and the panel did in this case, does not account for the possibility that Antonia could have been brain dead at birth even though her respiratory and circulatory functions were sustained for forty-two days with the assistance of life support.[98] If, in fact, that was the case, the defendant could not be held criminally responsible for her death

---

[98] There is no evidence in the record that Antonia breathed or had a heartbeat prior to being placed on life support. To the contrary, Palmer, the only person to testify with respect to this time frame, explained that Antonia was not breathing and that he did not know whether her heart was beating when he transferred her to the pediatric staff immediately after he delivered her.

under our murder statute because, in such circumstances, she would have died in utero, and, consequently, she would not be a "person" within the meaning of our murder statute.

In *Guess*, this court expanded the definition of death for purposes of the Penal Code to include brain death as well as the traditional test that requires proof of the irreversible cessation of circulatory and respiratory functions. See id., 780. We did so both because the medical and scientific communities have long accepted the brain based standard for defining death; id., 777; and in recognition of the fact that "medical science and technology [have] evolved to the point where a person's heartbeat and respiration may be sustained mechanically even in the face of an irreversible loss of all brain functions, and where machines that artificially maintain cardio[pulmonary] [function] have come into widespread use." Id., 772; see also *State* v. *Lamy*, supra, 158 N.H. 518 ("As medical technology has advanced . . . so too has the born alive rule. Through the efforts of doctors and technology, a fetus can now be delivered with no heartbeat, no breathing, and no brain function, yet have [certain of] those functions artificially resuscitated and maintained some time later. Because of these advances, states employing the born alive doctrine have required that the child show some spontaneous sign of life, as well as the ability to exist independent[ly] of artificial support at some point in the future."), citing Alaska Stat. § 11.41.140 (2008) (providing that "[a] person is 'alive' if there is spontaneous respiratory or cardiac function or, when respiratory and cardiac functions are maintained by artificial means, there is spontaneous brain function"). In such circumstances, when an individual is maintained on life support despite the complete absence of brain function, death has occurred under the brain death standard that we adopted in *Guess* even though, due to mechanical inter-

vention, there has been no irreversible cessation of circulatory and respiratory functions. In that case, therefore, the fact that there has been no irreversible cessation of circulation and respiration functions does not signify life. Similarly, when, as in the present case, an infant's circulatory and respiratory functions have been maintained artificially since immediately after her birth, the state must establish that she was not brain dead at the time of birth in order to satisfy the requirement that she had been born alive.[99]

The state contends that this evidentiary standard is unworkable in light of the medical exigencies that frequently exist at the time of birth. According to the state, requiring proof of brain function to establish that a baby had been born alive "would make it far more difficult to establish homicide and, consequently, far more likely that the person who injured the baby could not be held accountable for causing her death." Although we acknowledge that, depending on the circumstances, satisfying a brain death standard may require greater proof than would be necessary under the traditional born alive rule, that fact alone does not dictate the test to be adopted because "brain death became the medically accepted standard for determining death some time ago." *State* v. *Guess*, supra, 244 Conn. 777. Moreover, in the present case, if Antonia was, in fact, born alive, there is every likelihood that the state will be able to prove it. Indeed, the hospital may have performed one or more tests over the forty-two days when Antonia was on life support that would establish the existence of brain function. Alternatively,, there may be evidence indicating that, at some point prior to the time that

---

[99] We do not purport to create a standard for determining brain death; rather, such a standard should be established, for purposes of the present case, at the defendant's new trial by appropriate expert testimony and be in accordance with the standards generally accepted by the medical profession. See *State* v. *Guess*, supra, 244 Conn. 774–75, 778.

Antonia was pronounced dead following her removal
from life support, she reacted to certain stimuli or other-
wise engaged in activity or spontaneous movements
that are incompatible with brain death. Cf. id., 773
("[t]he criteria by which the medical community deter-
mines brain death . . . include: [1] a total lack of
responsivity to externally applied stimuli; [2] no sponta-
neous muscular movements or respiration; and [3] no
reflexes, as measured by fixed, dilated pupils and lack
of ocular, pharyngeal and muscle-tendon reflexes"). In
such circumstances, the state presumably could estab-
lish that Antonia was not brain dead at birth by showing,
for example, that she breathed on her own or that she
coughed or cried or otherwise exhibited some sponta-
neous sign of life after birth.[100]

We recognize that other courts have declined to adopt
a brain death standard for purposes of the born alive
rule. See *People* v. *Bolar*, supra, 109 Ill. App. 3d 391
("[The] contention that brain activity [is] required for
a finding of live birth is a luxury that is impossible to
afford. Testimony at trial indicated that this could only
be conclusively established through use of an electroen-
cephalogram. [Although] no testimony was adduced we
believe that constraints of time, availability of equip-
ment, and incompatibility with life-saving measures
[render] this requirement totally impractical."); see also
*Regina* v. *Iby*, supra, 63 N.S.W.L.R. 289–90 (rejecting
claim that common law should be adapted so that defini-
tion of life coincides with statutory definition of death,
which includes brain death); cf. *People* v. *Hall*, supra,
158 App. Div. 2d 74 (looking at respiratory and circula-
tory functions, as well as voluntary movement of mus-
cles, as signs that infant has been born alive). We are
not persuaded, however, by the analysis and conclusion

---

[100] Of course, the state would be required to prove, through expert medical
testimony, that, because of the nature and duration of any such activity,
that activity was, indeed, inconsistent with brain death.

of those cases, which, in our view, give insufficient consideration to the fact that a baby can be maintained by artificial means even though she has no brain function. Indeed, the holdings of those cases are inconsistent with our holding in *Guess*, which we expressly reaffirm. We therefore conclude that, on retrial, the state will be required to establish that Antonia was not brain dead at the time of her birth.[101]

## VI

## PENALTY PHASE CLAIMS

The defendant also challenges the sufficiency of the evidence presented by the state at the penalty phase hearing. Specifically, the defendant first contends that

---

[101] We note that Justice Schaller, in his concurring and dissenting opinion, asserts that the defendant is entitled to a judgment of acquittal due to evidentiary insufficiency. In support of this claim, Justice Schaller contends that, if the defendant should have known, for due process purposes, that he could be prosecuted for killing Antonia, as we have concluded, then it is only fair to bar the state, which, according to Justice Schaller, should have known of the applicability of *Guess* to the present case, from retrying the defendant for Antonia's death because the state did not adduce evidence sufficient to satisfy that test. Justice Schaller further asserts that a contrary conclusion would violate the defendant's double jeopardy rights.

Justice Schaller provides no legal support for either contention because his argument, which appears to seek a sort of rough justice, is truly unprecedented. It is perfectly clear that the issue of whether the defendant had fair notice of the born alive rule has nothing to do with the issue of whether the state should be barred from retrying the defendant for Antonia's murder on the ground of evidentiary insufficiency; thus, Justice Schaller's assertion that "constitutionally required fundamental fairness" somehow justifies their linkage lacks any basis in law or logic. As we explained, the evidence that the state adduced was sufficient under the test that the panel actually did apply; that is all that is necessary to permit the retrial of the defendant. Moreover, although we disagree with Justice Schaller's assertion that *Guess* is so clearly relevant to the present case, even if we agreed with Justice Schaller on that point, the state was not alone in failing to recognize the relevance of *Guess*; neither the defendant nor the panel recognized it either. It therefore would be manifestly unreasonable and unfair to penalize the state for the reason and in the manner advocated by Justice Schaller. In short, the approach that Justice Schaller urges has no foundation in the law and no place in this case.

the evidence was insufficient to prove beyond a reasonable doubt that the defendant had committed the capital felony "in an especially heinous, cruel or depraved manner" as § 53a-46a (i) (4) requires. Second, the defendant contends that the state failed to prove that he had intended to murder Rodgers in such a manner. Third, the defendant contends that the jury reasonably could not have found that the aggravating factor outweighed any mitigating factor or factors in accordance with § 53a-46a (f). We reject the defendant's claims.[102]

"[W]e have interpreted the aggravating factor set forth in § 53a-46a (i) (4) to require proof that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, and that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim. . . .

"In reviewing a claim that the evidence fail[ed] to support the finding of an aggravating factor specified in [§ 53a-46a (i)] . . . we subject that finding to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession . . . or the seizure of a defendant. . . . In such circumstances, we are required to determine whether the factual findings are supported by substantial evidence. . . .

---

[102] Although we have concluded that the defendant is entitled to a new trial on the capital felony charges, we address the defendant's claim of evidentiary insufficiency with respect to the penalty phase hearing because a finding that the evidence was insufficient to impose a sentence of death would preclude the imposition of the death penalty on retrial. See footnote 93 of this opinion.

"Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, [first] by considering the evidence presented at the defendant's penalty [phase] hearing in the light most favorable to sustaining the facts impliedly found by the jury. . . . Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established [the existence of the aggravating factor] beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"Furthermore, [i]n viewing evidence [that] could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"[Finally], [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes [the existence of an aggravating factor] in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the defendant's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; inter-

nal quotation marks omitted.) *State* v. *Colon*, supra, 272 Conn. 335–37.

The evidence that the state presented at the penalty phase hearing established that the defendant had caused the death of Rodgers, who was eight and one-half months pregnant, by stabbing her multiple times with a kitchen knife while the two were seated in the defendant's car. The defendant's statement to the police indicates that, on the night of the murder, he spoke with Rodgers on the telephone and told her that he had the $365 that he owed her boyfriend for drugs. The defendant told Rodgers that he would pick her up and take her to an automated bank teller machine at his bank, where he would withdraw the money. In his statement, the defendant explained that he "really had no intention of paying [Rodgers] because [he] did not have any money, [and he] was trying to fool her."

When they arrived at the bank, the defendant told Rodgers that he had forgotten his bank card. Rodgers became upset with the defendant, and, at that point, the defendant "just lost it . . . grabbed a kitchen knife [that he kept] in the driver's door compartment and . . . started to stab [Rodgers] with [it]." Although she tried to get away, he "just kept stabbing her." At some point, Rodgers escaped from the car and ran a short distance before she collapsed. The defendant then exited the car, intending "to chase her down." When he saw that there were several other cars in the vicinity, however, he became scared, got back into his car and drove away. As he was fleeing, he thought it was possible that he had run Rodgers over with his car. All he could think about at the time, however, was not getting caught.

The state also presented expert testimony regarding the nature of the wounds that the defendant inflicted on Rodgers. One of the state's associate medical exam-

iners, Malka Shah, testified that Rodgers had sustained several injuries in a number of different places on her body, including a stab wound to her chest and seven stab wounds to her back. The chest wound measured five and one-half inches deep, and penetrated the right border of Rodgers' sternum and her heart. The most serious stab wound to Rodgers' back measured five inches deep and penetrated the abdominal cavity. According to Shah, the stab wounds to Rodgers' chest and abdomen had caused her death. In addition to these wounds, Rodgers also sustained a three inch wound to her face and another wound to her chin, both of which were caused by a sharp object. Rodgers also had cuts and bruising around her mouth, which were caused by premortem, blunt force trauma that was unlikely to have been caused by a fall. The evidence further established that Rodgers remained conscious for up to seven minutes after suffering the fatal chest wound and that she lived for up to fifteen minutes before finally succumbing to her injuries.

Having carefully considered the evidence adduced by the state, we conclude that it supported the jury's finding that the defendant killed Rodgers in an especially heinous, cruel or depraved manner. The jury reasonably could have found that the eight stab wounds, as well as the multiple wounds and blunt force trauma to Rodgers' face, caused her to experience extreme physical and psychological pain and suffering above and beyond that which was necessary to accomplish the killing, and that she experienced such suffering for up to seven minutes. The jury also reasonably could have found that Rodgers' psychological pain and suffering were compounded by the terror of being subjected to such a vicious, spontaneous attack while pregnant, and that her pregnancy caused her to suffer additional psychological pain out of extreme concern for her nearly full-term child. See *State* v. *Medrano*, 173 Ariz.

393, 397, 844 P.2d 560 (1992) (victim's knowledge of her pregnancy "would likely have contributed significantly to her mental suffering").

We also conclude that the evidence supports the jury's finding that the defendant possessed the requisite intent to satisfy the aggravating factor. "It is axiomatic that the fact finder may infer intent from the natural consequences of one's voluntary conduct." (Internal quotation marks omitted.) *State* v. *Colon*, supra, 272 Conn. 338. In light of the nature and number of wounds that the defendant inflicted on Rodgers with the knowledge that she was pregnant, the jury reasonably could have found that the defendant intended to inflict extreme physical and psychological pain and suffering on her. The jury also could have found that the defendant exhibited extreme indifference to the mental suffering that Rodgers no doubt experienced from being repeatedly stabbed in the abdomen while eight and one-half months pregnant. The jury also could have inferred extreme indifference toward Rodgers' suffering predicated on the defendant's statement to police that, when fleeing the scene, he did not "even know if [he] ran her over. [He] just didn't want to get caught." Accordingly, we conclude that there was sufficient evidence to support the jury's finding that the defendant murdered Rodgers with the intent to inflict extreme physical or psychological pain, suffering or torture on her above and beyond that necessary to accomplish the killing or that he was indifferent to the extreme pain, suffering or torture that he intentionally inflicted on her.

The defendant finally claims that, even if the evidence supports the finding of the jury that he murdered Rodgers in an especially heinous, cruel or depraved manner, the jury reasonably could not have found that that aggravating factor outweighed one or more mitigating factors. The state contends that, under our case law, the jury's determination as to the weight to be accorded

the mitigating and aggravating factors is not reviewable on appeal. The state further maintains that, to the extent that such a determination is reviewable, the evidence presented at the penalty phase hearing permitted the jury rationally to conclude that the aggravating factor outweighed any asserted mitigating factors. Assuming without deciding that the defendant's claim is reviewable, we agree with the state that the evidence is sufficient to support the jury's determination that the aggravating factor outweighed any mitigating factor or factors.

The following additional facts and procedural history are relevant to our resolution of this claim. The defendant raised eighteen claims of mitigation, including two statutory mitigating factors under § 53a-46a (h).[103] The sixteen, nonstatutory mitigating factors were: (1) "[The defendant] was found guilty of the murder of Antonia . . . under the doctrine of transferred intent"; (2) "[p]rior to his convictions for the murders in this case, [the defendant] had no record of criminal convictions"; (3) "[the defendant] developed a dependence on cocaine and crack cocaine that negatively affected him in his personal and work life"; (4) "[h]is cocaine and crack cocaine dependency led directly to his relationship with . . . Rodgers"; (5) "[h]is thinking was

---

[103] The two statutory mitigating factors were, first, that the defendant's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution; see General Statutes (Rev. to 1997) § 53a-46a (h) (2); and second, that he could not reasonably have foreseen that his conduct in the course of the commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person, that is, Antonia. See General Statutes (Rev. to 1997) § 53a-46a (h) (4). The jury concluded that the defendant did not prove either of the two statutory mitigating factors by a preponderance of the evidence. Of course, if the jury had concluded that the defendant had proved either statutory mitigating factor, the defendant would have been ineligible to receive a death sentence. See General Statutes (Rev. to 1997) § 53a-46a (h). The defendant, however, raises no express claim that the jury reasonably could not have rejected his two alleged statutory mitigating factors.

impaired by the crack cocaine he ingested prior to stabbing . . . Rodgers"; (6) "[h]e worked constantly and productively from the age of sixteen until . . . he was arrested and incarcerated in September, 1998"; (7) "[h]e is a caring person who has been empathetic to other persons, particularly those with disabilities"; (8) "[h]e has been generous to others"; (9) "[h]e has and will continue to be a well behaved and productive prison inmate"; (10) "[h]e has volunteered his time, both when employed and while incarcerated, to work above and beyond what is required of him to the benefit of other persons and institutions"; (11) "[w]ith the exception of the murders that he has been convicted of, [the defendant] is a nonviolent person, and it is unlikely that he will behave violently in the future"; (12) "[h]e voluntarily gave written statements to Waterbury police"; (13) "[h]e is remorseful"; (14) "[d]eath is not the appropriate penalty for [the defendant]"; (15) "[a]ny other factor concerning [the defendant's] character, background and history, or the nature and circumstances of the crime, that has not been specifically suggested, which [a] juror or the jury may, in fairness and mercy, find is mitigating in nature and constitutes a basis for a sentence of life imprisonment without the possibility of release"; and (16) "[t]he cumulative or combined effect of all [of] the evidence concerning [the defendant's] character, background or history, or the nature or circumstances of the crime, which a juror or the jury may, in fairness and mercy, find mitigating in nature and constitutes a basis for a sentence of life imprisonment without the possibility of release." The jury concluded that the defendant had proved by a preponderance of the evidence one or more of the foregoing nonstatutory, mitigating factors, but it did not specify which factor or factors it found had been proven.

We begin our analysis with the standard of review. This court previously has indicated that appellate

review of a jury's determination with respect to the weighing of aggravating and mitigating factors in a specific case could be impossible in the practical sense. In *State* v. *Rizzo*, 266 Conn. 171, 833 A.2d 363 (2003), we interpreted § 53a-46a, our capital felony weighing statute, to require a jury to be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. Id., 224–25. In so concluding, we recognized "that there is not a risk of error in such a decision in the usual sense of that term, namely, the risk of being wrong in determining the historical facts, such as who did what to whom." Id., 237. We noted, however, that "there [can] be a risk of error in a more practical sense, namely, the risk that, in making the determination that the aggravating factors outweigh the mitigating factors and that the defendant shall therefore die, the jury may weigh the factors improperly . . . and may arrive at a decision of death that is simply wrong." Id. With that possibility in mind, we further observed that, "once the jury has arrived at such a decision pursuant to proper instructions, that decision would be, for all practical purposes, unreviewable on appeal save for evidentiary insufficiency of the aggravating factor"; id.; an observation that led us to impose on the state a heightened burden of persuasion under § 53a-46a.

The state contends that, under *Rizzo*, the weighing process in which the jury engages is effectively unreviewable and that, consequently, we should decline to consider the defendant's challenge to that process in the present case. We need not address the state's threshold reviewability claim because we conclude that, in the present case, the jury reasonably could have found beyond a reasonable doubt that the aggravating factor that the state had proven outweighed the mitigating factors alleged by the defendant.[104]

---

[104] There are a number of states that engage in appellate review of the jury's decision with respect to the weighing of aggravating and mitigating

As we previously explained, the jury concluded that the defendant had proved by a preponderance of the evidence the existence of one or more mitigating factors, but it did not specify which factor or factors the defendant had proven. We conclude that, even if the jury had credited all of the mitigating factors advanced by the defendant, they were not so compelling that the jury was required to find that one or more of those mitigating factors outweighed the cruel, heinous or depraved manner in which the defendant had murdered Rodgers.

The evidence presented at the penalty phase hearing established that the defendant had induced Rodgers to get into his car under false pretenses and, thereafter, repeatedly had stabbed her in the chest and back as she fought for her life and the life of her unborn child. When Rodgers finally escaped from the car, the defendant got out of the car, knife in hand, intending to chase her down to make sure that she was dead. Only when he saw other cars in the vicinity and feared that he might be seen did he stop his vicious assault of Rodgers. In light of this undisputed evidence, in particular, the extensive nature of Rodgers' injuries, which, in addition to the numerous stab wounds, included blunt force trauma wounds to the face, we cannot say that the jury reasonably could not have found beyond a reasonable

factors in a capital case, and these states are guided by a variety of standards in performing that review. See, e.g., *Williams* v. *State*, 338 Ark. 97, 108, 991 S.W.2d 565 (1999) (conclusion must be supported by substantial evidence); *People* v. *Hooper*, 172 Ill. 2d 64, 77, 665 N.E.2d 1190 (conclusion must be "amply supported by the record"), cert. denied, 519 U.S. 969, 117 S. Ct. 396, 136 L. Ed. 2d 311 (1996); *State* v. *Cole*, 155 S.W.3d 885, 906 (Tenn.) ("whether . . . a rational trier of fact could have" reached conclusion), cert. denied, 546 U.S. 829, 126 S. Ct. 47, 163 L. Ed. 2d 79 (2005). For purposes of this appeal, we adopt the same standard that we generally use in evaluating claims of evidentiary insufficiency, namely, whether the trier of fact reasonably could have concluded that the aggravating factor or factors proven by the state outweighed any claimed mitigating factor or factors. See, e.g., *State* v. *Reynolds*, supra, 264 Conn. 92–93.

doubt that the aggravating factor outweighed the mitigating factors that the defendant had alleged.[105]

The judgment is reversed with respect to the defendant's conviction of both counts of capital felony and the count with respect to the murder of Antonia Rodgers and the case is remanded for a new trial on those counts; the judgment is affirmed with respect to the defendant's conviction of the murder of Demetris Rodgers.

In this opinion ROGERS, C. J., and KATZ and VERTE-FEUILLE, Js., concurred.

KATZ, J., concurring. Although many of the considerations and principles on which Justice Zarella relies in his concurring and dissenting opinion have strong appeal, both on their merits and because he reaches a result that would not expose the defendant to the death penalty, ultimately, I cannot overcome the anomalous result that his and Justice Schaller's concurring and dissenting opinions yield—a statutory scheme that makes an assault on a woman that results in the death of a fetus a class A felony under General Statutes § 53a-59c, but imposes no enhanced penalty when the assault on the pregnant woman results in a live birth and the fetus subsequently dies as a result of the assault. Therefore, I join the majority opinion in its recognition of the born alive rule as a part of our common law.

Although I agree with the majority opinion insofar as the resolution of the issues it does decide, I disagree with its decision not to address additional claims related to the penalty phase of the proceedings that are likely to arise again at a subsequent penalty phase proceeding

---

[105] The defendant also contends that the imposition of the death penalty in the present case was, inter alia, arbitrary and disproportionate. We reject this claim for the same essential reasons that we conclude that the evidence was sufficient to support the imposition of the death penalty under our capital sentencing scheme.

should the defendant, Robert Courchesne, be convicted of capital felony at the guilt phase because the majority's failure to consider those claims is contrary to the interests of every participant in the trial proceedings. Many of these claims pertain to matters on which the parties and the trial court undoubtedly will need guidance should a penalty phase proceeding transpire.[1] Indeed, some of the claims would preclude the imposition of the death penalty.[2] The parties and the trial court should not have to guess at how this court would decide these issues, risk making the same mistakes if indeed the defendant's claims have merit, and go through what could turn out to be a needless, costly and time-consuming exercise. We also may unnecessarily be exposing both the victim's family to the heartbreak of reliving their tragedy in another penalty phase proceeding and the defendant to the anxiety of defending against another sentence of death. I acknowledge that the state may not convict the defendant of capital felony and

---

[1] Such claims include whether: (1) the trial court improperly excluded certain of the defendant's mitigation evidence, including a statement by the defendant expressing remorse for the offense, evidence regarding the reasons for the Waterbury police department's policy against electronically recording confessions, and evidence related to "the insidious allure and unyielding grasp of crack cocaine"; (2) this court should conclude, either under the state constitution or pursuant to the exercise of our supervisory authority, that law enforcement officials may not testify at a penalty phase hearing in a capital case that the defendant did not show remorse when confessing to the offense if those officials failed to record by videotape or audiotape the confession; (3) defense counsel should be permitted to review a sealed record to determine if that record contains exculpatory material, or in the alternative, whether this court should perform such a review; and (4) the defendant was entitled to a pretrial hearing to determine whether the state's allegation that the murder was committed in an especially heinous, cruel, or depraved manner was supported by probable cause.

[2] For example, the defendant claims that the trial court improperly denied his motion to bar the imposition of the death penalty because the decision by the state's attorney to seek the death penalty was based on the race of the victims in violation of the defendant's state and federal constitutional rights as evidenced by statements allegedly made by the state's attorney to defense counsel.

caution that, by articulating the need to address these other issues, I do not mean to intimate that the defendant would be so convicted. In light of that caveat, I am less persuaded by a concern that we would be issuing an advisory opinion than I am compelled by the potential harm to the parties to the case, the victim's family and the interests of judicial economy that the majority risks by declining to address these claims.

Accordingly, I respectfully concur.

ZARELLA, J., with whom NORCOTT, J., joins, concurring in part and dissenting in part. Today, the majority subjects the defendant to another trial for capital felony and murder by adopting, for the first time in the state of Connecticut, the born alive rule. In so doing, the majority, in an opinion of more than 160 pages, fails to demonstrate that the murder statute encompasses the acts alleged to have been committed, adds a substantive element of proof that does not appear in the statutes governing murder, thus making the killing of a fetus that dies after birth a new substantive offense not contained in our Penal Code, fails to establish that the born alive rule was ever adopted by the legislature, provides no convincing support for its view that the rule was a part of the common law of Connecticut and resorts to the legislative history of an act enhancing the penalty for an assault on a pregnant woman to conclude that the legislature has accepted the rule under our murder and capital felony statutes. In addition, the majority ignores the plain language of the murder statute, ignores or fails to address our precedent in the area of what constitutes the common law of Connecticut, disregards the due process rights of the defendant by relying on the legislature's purported acceptance of the rule more than four years *after* the crime was committed, fails to employ the rule of lenity to resolve the ambiguities in our murder and capital felony statutes as applied to

the facts of this case,[1] and, for the first time in *any* jurisdiction that I am aware of, establishes the proposition that the criminal act of murder does not require that the intent to murder be present either before or during the commission of the crime.

I cannot agree with this deeply flawed approach because, no matter how horrific or despicable the crime, it does not justify ignoring our precedent and the constitutional protections guaranteed to all defendants. Accordingly, I concur in part I of the majority opinion, in which the majority concludes that the trial court properly denied the defendant's motion to suppress his written confessions and other evidence tying him to the murder of Demetris Rodgers, but respectfully dissent with respect to parts II through V,[2] in which the majority adopts the born alive rule, devises a legal standard for its implementation and remands the case for a new trial that will require the state to prove that the baby was alive at birth by disproving the irreversible cessation of all brain function. I also generally agree with Justice Schaller's concurring and dissenting opinion because the majority's retroactive application of the born alive rule clearly deprives the defendant of his due process right to fair notice.

## I

Justice Oliver Wendell Holmes once observed in a similar context: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since,

---

[1] See *State* v. *Courchesne*, 262 Conn. 537, 555–56 and n.15, 816 A.2d 562 (2003) (declining to apply rule of lenity to interpretation of capital felony statutes).

[2] Because I would not address any of the defendant's penalty phase claims on the basis of my disagreement with parts II through V of the majority opinion, I decline to take any position with respect to part VI, in which the majority addresses certain of the defendant's penalty phase claims.

and the rule simply persists from blind imitation of the past." O. Holmes, "The Path of the Law," Address at Boston University School of Law (January 8, 1897), in 10 Harv. L. Rev. 457, 469 (1897); cf. *State* v. *Muolo*, 118 Conn. 373, 378–79, 172 A. 875 (1934).[3] Justice Holmes' observation is particularly apt in the present case because the dearth of medical knowledge that prompted articulation of the born alive rule in the early 1300s no longer exists, and, therefore, the grounds for its adoption have vanished.[4]

It is well documented that the born alive rule evolved during a time of limited medical knowledge, when it was necessary to establish that a fetus was alive at the time of the criminal act. See, e.g., C. Forsythe, "Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms," 21 Val. U. L. Rev. 563, 575

---

[3] "It is a well settled rule that the law varies with the varying reasons on which it is founded. This is expressed by the maxim, cessante ratione, cesset ipsa lex. This means that no law can survive the reasons on which it is founded. It needs no statute to change it; it abrogates itself. If the reasons on which a law rests are overborne by opposing reasons, which in the progress of society gain a controlling force, the old law . . . must cease to apply as a controlling principle to the new circumstances." (Internal quotation marks omitted.) *State* v. *Muolo*, supra, 118 Conn. 378–79.

[4] In *State* v. *Lamy*, 158 N.H. 511, 969 A.2d 451 (2009), a case on which the majority relies, the New Hampshire Supreme Court acknowledged that the born alive rule is obsolete, stating, "[w]e recognize, as have many other courts, that the born alive doctrine may be an outdated anachronism often producing anomalous results. . . . However, because the legislature explicitly chose to adopt the rule as statutory law, we cannot mold, change, [or] reverse the doctrine as we could were it still common law. . . . In cases of criminal law, [i]t is the province of the legislature to enact laws defining crimes and to fix the degree, extent and method for punishment. . . . Should the legislature find the result in this case as unfortunate as we do, it should follow the lead of many other states and revisit the homicide statutes as they pertain to a fetus." (Citations omitted; internal quotation marks omitted.) Id., 521. This court, unlike the New Hampshire court, is not bound by legislative acceptance of the born alive rule. The majority nonetheless embraces it in "blind imitation of the past"; O. Holmes, supra, 10 Harv. L. Rev. 469; even though the rule has been abandoned by the majority of our sister states as "an outdated anachronism often producing anomalous results." *State* v. *Lamy*, supra, 521.

(1987) ("As a result of . . . primitive knowledge of human life in utero, the health of the child in utero could not be established unless and until the child was observed outside the womb. . . . [L]ive birth was required to prove that the unborn child was alive and that the material acts were the proximate cause of death, because it could not otherwise be established if the child was alive in the womb at the time of the material acts."); see also *Commonwealth* v. *Cass*, 392 Mass. 799, 806, 467 N.E.2d 1324 (1984) (rationale offered for born alive rule since 1348, namely, that "it [was] difficult to know whether [the defendant] killed the child," no longer exists because "[m]edical science now may provide competent proof as to whether the fetus was alive at the time of a defendant's conduct and whether his conduct was the cause of death" [internal quotation marks omitted]). The born alive rule thus was used as an evidentiary tool to confirm that the fetus had died due to the perpetrator's actions rather than to natural causes or other reasons that could not be identified by then existing diagnostic techniques. See *State* v. *Lamy*, 158 N.H. 511, 516, 969 A.2d 451 (2009) ("born alive rule emerged in fourteenth century England as an evidentiary standard requiring observation of the child to prove the corpus delecti[5] in the killing of an infant"). As one nineteenth century expert on medical jurisprudence more fully explained: "It is well known that, in the course of nature, many children come into the world dead, and that others die from various causes soon after birth. In the latter, the signs of their having lived are frequently indistinct. Hence to provide against the danger of erroneous accusations, the law humanely presumes that every new-born child has been born

---

[5] "[T]he expression corpus delicti, as understood in homicide cases, means the body of the crime, and consists of two component parts, the first of which is the death of the person alleged to have been killed, and the second that such death was produced through criminal agency." *State* v. *Sogge*, 36 N.D. 262, 271, 161 N.W. 1022 (1917).

dead, until the contrary appears from medical or other evidence. The onus of proof is thereby thrown on the prosecution; and no evidence imputing murder can be received, unless it be made certain, by medical or other facts, that the child survived its birth and was actually living *when the violence was offered to it.*" (Emphasis added.) A. Taylor, Medical Jurisprudence (5th Am. Ed. 1861) p. 317; see also J. Reese, Text-book of Medical Jurisprudence and Toxicology (7th Ed. 1907) p. 216.[6] Accordingly, prosecution for homicide under the born alive rule, as originally understood, did not depend on whether the fetus was born alive and thus became a "person" prior to its death but on whether the fetus was alive when the fatal injury was inflicted. See, e.g.,

---

[6] The majority assails the idea that the born alive rule evolved as a rule of evidence, quoting from the work of two modern commentators who believe that it is "a substantive rule for defining legal personhood." Footnote 47 of the majority opinion, citing B. Steinbock, Life Before Birth: The Moral and Legal Status of Embryos and Fetuses (Oxford University Press 1992) c. 3, pp. 105–107, and K. Savell, "Is the 'Born Alive' Rule Outdated and Indefensible?," 28 Sydney L. Rev. 625, 633 (2006). I am not surprised that a few commentators who support the rule would attempt to diminish the large body of nineteenth century law and analysis on which Forsythe, Taylor and other respected attorneys and experts on medical jurisprudence base their views. Once advanced medical technology has made the rule obsolete, there is no other way to defend or retain it except by transforming it into a substantive element of the crime of murder and severing the temporal connection between the criminal act and the legal status of the victim at the time of the fatal injury. In this regard, both Steinbock, a philosopher, and Savell express reluctance to accept the evidentiary nature of the born alive rule because each is advocating for its retention and advancing a theory that the unborn fetus has no legally protected interests. See K. Savell, supra, 627 (arguing that "a conception of personhood that pays due regard to the intrinsic and relational aspects of [fetal] being has greater potential both to explain the existing criminal law, and to guide future developments, than does a theory based solely on the intrinsic properties of the [fetus]," and acknowledging that her personal "theory" that personhood requires relationship to external world is "consistent with retaining the 'born alive' rule"); see also B. Steinbock, supra, c. 1, p. 41, and c. 3, p. 107. Accordingly, Steinbock and Savell have no interest in acknowledging the evidentiary basis of the born alive rule because doing so would make their respective philosophical theories, neither of which, to my knowledge, appears to have been accepted by any court of law, more difficult to defend.

C. Forsythe, supra, 571 ("[m]edical treatises and writings on medical jurisprudence during the [sixteenth] through [nineteenth] centuries testify to the primitive state of medical technology and the resulting evidentiary limitations which gave rise to . . . the born alive rule"); see also *Commonwealth* v. *Cass*, supra, 806. In other words, if medical technology had been capable of assessing the health of the fetus in times past, there would have been no reason for creating the born alive rule. The perpetrator very likely would have been prosecuted for homicide regardless of whether the fetus had died before or after its birth. See C. Forsythe, supra, 589 ("[i]n practice, the born alive rule was applied to proscribe as homicide the killing of a child even if the mortal injuries were inflicted while the child was still in utero").

Recognizing the evidentiary basis for the born alive rule and the advances in medical science that have made the rule obsolete,[7] the overwhelming majority of our sister states have rejected it in favor of legislation defining homicide to include the death of an unborn child or fetus from injuries inflicted in utero. See Ala. Code § 13A-6-1 (a) (3) (Cum. Sup. 2009) (defining "person," in referring to victim of homicide, as "a human being, including an unborn child in utero at any stage of development, regardless of viability"); Alaska Stat. §§ 11.41.150, 11.41.160 and 11.41.170 (2008) (proscribing murder, manslaughter and criminally negligent homicide with respect to unborn child); Ariz. Rev. Stat. Ann. §§ 13-1102, 13-1103, 13-1104 and 13-1105 (Cum. Sup. 2008) (for purposes of negligent homicide, manslaughter and first and second degree murder statutes, victim can include unborn child in mother's womb at any stage of development); Ark. Code Ann. § 5-1-102

---

[7] These advances include amniocentesis, ultrasonography and fetal heart rate monitoring. See J. Williams, Obstetrics (22d Ed. 2005) pp. 328, 390, 464–65.

(13) (B) (i) (a) (Sup. 2009) (for purposes of Arkansas homicide statutes, term "person" includes "an unborn child in utero at any stage of development"); Cal. Penal Code § 187 (a) (Deering 2008) ("[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought"); Fla. Stat. Ann. § 782.09 (West 2007) ("[t]he unlawful killing of an unborn quick child, by any injury to the mother of such child which would be murder if it resulted in the death of such mother, shall be deemed murder in the same degree as that which would have been committed against the mother"); Idaho Code Ann. §§ 18-4001 and 18-4006 (Cum. Sup. 2009) (including within definition of "human being," for purposes of murder and manslaughter statutes, "a human embryo or fetus"); 720 Ill. Comp. Stat. Ann. 5/9-1.2, 5/9-2.1 and 5/9-3.2 (West 2002) (proscribing homicide of unborn child from fertilization to birth); Ind. Code Ann. §§ 35-42-1-1 (4), 35-42-1-3 (a) (2) and 35-42-1-4 (d) (LexisNexis 2009) (proscribing murder and manslaughter of viable fetus); Kan. Stat. Ann. § 21-3452 (d) (2007) (extending definition of "person" in Kansas' murder, manslaughter and vehicular homicide statutes to include "an unborn child," regardless of viability); Ky. Rev. Stat. Ann. §§ 507A.010 (1) (c) and 507A.020 through 507A.050 (LexisNexis 2008) (proscribing "fetal homicide," which includes intentional or reckless killing of unborn child from conception); Md. Code Ann., Crim. Law § 2-103 (LexisNexis Sup. 2009) (proscribing murder or manslaughter with respect to viable fetus); Mich. Comp. Laws Serv. § 750.322 (LexisNexis 2003) (designating as manslaughter wilful killing of "an unborn quick child"); Minn. Stat. Ann. §§ 609.266 (a) and 609.2661 through 609.2665 (West 2009) (proscribing murder and manslaughter with respect to unborn child, which is defined as "the unborn offspring of a human being conceived, but not yet born"); Miss. Code Ann. § 97-3-37 (1) (2006) (for purposes of Mississippi's homi-

cide statutes, "the term 'human being' includes an unborn child at every stage of gestation from conception until live birth"); Neb. Rev. Stat. §§ 28-389 (2) and 28-391 through 28-394 (Cum. Sup. 2006) (delineating various degrees of homicide with respect to killing of unborn child at any stage of development in utero); Nev. Rev. Stat. § 200.210 (2007) (designating wilful killing of "unborn quick child" by any injury committed against child's mother as manslaughter); N.D. Cent. Code §§ 12.1-17.1-01 through 12.1-17.1-04 (1997) (proscribing murder, manslaughter and negligent homicide with respect to unborn child, which is defined as child conceived but not yet born); Ohio Rev. Code Ann. §§ 2903.01 through 2903.06 (West 2006 and Sup. 2009) (classifying unlawful termination of pregnancy as homicide); Okla. Stat. Ann. tit. 21, § 691 (A) and (B) (West Sup. 2010) (killing of unborn child constitutes homicide); 18 Pa. Cons. Stat. Ann. §§ 2603 through 2605 (West 1998) (proscribing murder and manslaughter with respect to unborn child); R.I. Gen. Laws § 11-23-5 (2002) (proscribing wilful killing of "an unborn quick child" by any injury to mother that would be murder if it resulted in death of mother); S.C. Code Ann. § 16-3-1083 (c) (Cum. Sup. 2009) (intentional killing of unborn child "punished [as] murder"); S.D. Codified Laws § 22-16-1 (2006) ("[h]omicide is the killing of one human being, including an unborn child, by another"); Tenn. Code Ann. § 39-13-214 (2006) (viable fetus included in term "person" for purposes of Tennessee homicide statutes); Tex. Penal Code Ann. § 1.07 (49) (Vernon Cum. Sup. 2009) (term "death," with respect to unborn child, includes "the failure to be born alive" for purposes of Texas Penal Code and its homicide provisions); Utah Code Ann. § 76-5-201 (1) (a) (2003) (person commits criminal homicide when he causes death of another human being, including unborn child at any stage of development); Va. Code Ann. § 18.2-32.2 (2009) (pro-

scribing killing of fetus); Wash. Rev. Code Ann. § 9A.32.060 (1) (b) (West 2009) (designating as first degree manslaughter unlawful and intentional killing of unborn quick child by infliction of injury on mother of such child); W. Va. Code Ann. § 61-2-30 (LexisNexis 2005) (recognizing embryo or fetus as distinct victim for purposes of West Virginia's homicide statutes); cf. Ga. Code Ann. § 16-5-80 (2007) (treating killing of unborn fetus as "feticide"); La. Rev. Stat. Ann. §§ 14:32.5 through 14:32.8 (2007 and Sup. 2010) (designating killing of unborn child as feticide); Wis. Stat. Ann. § 940.04 (West 2005) (proscribing intentional destruction of life of unborn child but not classifying such crime as homicide). The Supreme Judicial Court of Massachusetts also implicitly rejected the born alive rule when it determined that a defendant may be charged with homicide for causing the death of a viable fetus in utero. *Commonwealth* v. *Cass*, supra, 392 Mass. 807; see also id., 799 (ruling that viable fetus is within ambit of term "person" in vehicular homicide statute).[8] The legislatures in Alabama, Arkansas, Idaho, Kansas, Mississippi, Oklahoma, South Dakota and Utah also have amended their penal codes to include an unborn child or fetus in the definition of a "person" or "human being," thus emphasizing that the critical focus of the fetal homicide statutes is on life rather than birth. This is consistent with the rationale for creating the born alive rule in the first instance, because the rule always presumed that a viable fetus was a person. The requirement of a live birth was merely a mechanism to prove that the death of the fetus was caused by the defendant's act and not by some other cause.

The majority's adoption of the born alive rule has at least three deleterious consequences. First and fore-

---

[8] In *Commonwealth* v. *Lawrence*, 404 Mass. 378, 383–84, 397, 536 N.E.2d 571 (1989), the court reaffirmed its earlier decision in *Cass* and upheld the defendant's conviction of involuntary manslaughter for causing the death of a twenty-seven week old fetus in the course of murdering the mother.

most is that the court invades the legislative prerogative to define what is, and what is not, a crime, because the rule, as understood and applied by the majority, has the effect of amending the definition of a "person" under our murder statutes; see General Statutes § 53a-3 (1) (defining "person" as "a human being"); to include a fetus that is born alive but subsequently dies from injuries inflicted in utero, thus making the killing of such a fetus a new substantive offense. This court has acknowledged that, "in light of established doctrines implicit in the separation of powers, the primary responsibility for enacting the laws that define and classify crimes is vested in the legislature . . . ." (Citations omitted.) *State* v. *Joyner*, 225 Conn. 450, 460, 625 A.2d 791 (1993); see also *State* v. *Hanson*, 210 Conn. 519, 529, 556 A.2d 1007 (1989) ("Where statutory language is clearly expressed . . . courts must apply the legislative enactment according to the plain terms and cannot read into the terms of a statute something which manifestly is not there in order to reach what the court thinks would be a just result. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." [Citation omitted; internal quotation marks omitted.]); Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-4 (West 2007), comment, p. 324 (court not "free to fashion additional substantive offenses" not included in Penal Code). Accordingly, in adopting the born alive rule and, in effect, amending the statutory definition of "person," the court exceeds its jurisdiction.

Second, the born alive rule, stripped of its relevance as an evidentiary tool, is logically incoherent and thus introduces a significant incongruity into our criminal law. As interpreted by the majority, the rule contains the inherent contradiction that a viable fetus that is fatally injured but subsequently born alive is considered

a person under our murder and capital felony statutes but is not considered a person if it is not born alive. Thus, a viable fetus that is fatally injured in utero may or may not be a person for purposes of prosecuting an accused for murder or capital felony depending on the entirely random fact of its status at the time of its death, which may depend on such unforeseen factors as how soon the injured mother receives medical attention, how quickly the medical staff is able to perform the delivery, and the accuracy of the observations and tests administered by the delivery team to determine if the baby is born alive. This makes no sense whatsoever. Moreover, the majority's focus on the status of the fetus at the time of its death is completely at odds with the underlying rationale of the born alive rule, which considered whether the fetus was alive at birth only to establish its condition *in utero* at the time of the fatal injury. The majority thus severs the temporal connection between the criminal conduct and the status of the victim when the fatal injury was inflicted and allows pure happenstance to determine whether a perpetrator may be prosecuted for murder and subjected to the death penalty.

This, in turn, raises serious due process concerns regarding the right to fair notice because whether criminal liability will attach for the death of a fetus in any particular case will not be evident to the perpetrator at the time the crime is committed. See *State* v. *Aiwohi*, 109 Haw. 115, 136, 123 P.3d 1210 (2005) (Acoba, J., concurring). The defendant in the present case also will have been denied his due process rights because the majority's retroactive application of its newly adopted construction of our murder statute will have deprived him of notice and fair warning regarding the consequences of his actions.

In summary, because the born alive rule developed as a rule of causation and is no longer necessary due

to advances in medical science that now permit a determination to be made regarding the health of a fetus, there is no evidentiary justification for its perpetuation. Accordingly, adoption of the rule will have the effect of amending the definition of "person" under our Penal Code to include a fetus that is fatally injured but subsequently born alive. Amending our criminal statutes violates the separation of powers because it is well established that the legislature, not the court, has the undisputed authority to define crimes. In addition, the rule engenders confusion and threatens due process because it lacks logical consistency and deprives potential defendants of fair warning as to the consequences of their actions. The defendant in this particular case also will be deprived of fair notice because of the majority's decision to apply the rule retroactively. In my view, these reasons strongly militate against the rule's adoption.

## II

The majority nonetheless embraces the born alive rule, concluding that, as long as the fetus that is fatally injured is subsequently born alive, the perpetrator can be charged with the murder of a person. Recognizing that this appears to be problematic, however, the majority states that Connecticut's murder statute does not require that the fetus be a person at the time of the criminal conduct but only that it *become* a person before it dies by being born alive. This interpretation of the murder statute is not only in direct conflict with the rule's original purpose of establishing that the fetus was alive when the fatal injury was inflicted, but requires a major rewriting of General Statutes § 53a-54a.

The majority claims that there is nothing in our Penal Code or § 53a-54a (a) suggesting that application of the born alive rule is barred by the requirement of a temporal nexus between the defendant's criminal conduct

and the victim's status as a person, and that it is unaware of any other authority that requires one. I find this reasoning unpersuasive because an examination of the language of the murder statute, its relationship to other statutes, the authorities on which the majority relies and other authorities unequivocally demonstrate otherwise.[9] See *State* v. *Gibbs*, 254 Conn. 578, 601–606, 758 A.2d 327 (2000) (applying well settled principles of statutory interpretation to determine if temporal nexus between multiple murders is absolute prerequisite to proving that murders took place in course of single transaction for purposes of General Statutes [Rev. to 1991] § 53a-54b [8]). In addition, all four cases from other jurisdictions cited by the majority[10] for the principle that no temporal nexus is required involved statutes that, unlike our murder statute, contained no element of intent and have been superseded by fetal homicide statutes, which eliminated the born alive rule and effectively repudiated the legal rationale for its adoption in those jurisdictions.

---

[9] "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181–82, 914 A.2d 533 (2007). "Because statutory interpretation is a question of law, our review is de novo." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 650, 969 A.2d 750 (2009).

[10] *State* v. *Cotton*, 197 Ariz. 584, 5 P.3d 918 (App. 2000); *State* v. *Hammett*, 192 Ga. App. 224, 384 S.E.2d 220 (1989); *Jones* v. *Commonwealth*, 830 S.W.2d 877 (Ky. 1992); *Cuellar* v. *State*, 957 S.W.2d 134 (Tex. App. 1997).

General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." There can be no clearer expression of a temporal nexus between the intent necessary to commit the crime and the act of committing the crime than this language. The use of the term "when" *mandates* that the defendant must have the intent to cause the death of a person prior to, or contemporaneously with, the act that is the cause of death.

The statute's reference to the death "of such person or of a third person" further suggests that the unintended victim, as well as the intended victim, must be a person when the fatal injury is inflicted because the term "such person" relates back to the time of the criminal act and is linked with the term "third person" by the word "or." This court previously has stated that, "[a]mong the definitions of the word 'or' is 'the synonymous, equivalent, or substitutive character of two words or phrases . . . .' Webster's Third New International Dictionary." *Seymour* v. *Seymour*, 262 Conn. 107, 112, 809 A.2d 1114 (2002). It is thus very clear that the intended and unintended victims of the defendant's criminal conduct must occupy an equivalent status as persons at the time the injury is inflicted. Indeed, if the victim is not a person when the injury is inflicted, it is hard to understand, without engaging in logical and linguistic acrobatics, how the defendant's conduct can cause the victim's subsequent death. Furthermore, the majority cites no other statute in our Penal Code that lacks the requirement of a temporal nexus between the criminal conduct in question and the status of the victim as a person. Accordingly, the language in the statute clearly instructs that a defendant cannot be found guilty of murder unless the intended and unintended victims are persons when the injuries are inflicted.

The majority's attempt to parse the statutory language by turning to the dictionary definition of the word "when" in support of its assertion that no temporal nexus is required is unavailing. Webster's Third New International Dictionary defines "when" in relevant part as "at or during the time that," which unquestionably establishes that a temporal nexus must exist because the link created between the element of intent and the criminal act by the use of the word "when" necessarily requires that the victim be a person at the time the act is committed, it being self-evident that there can be no intent to kill a person if the law does not recognize that the victim is a person.

The majority also relies on four cases from other jurisdictions. These include *Cuellar* v. *State*, 957 S.W.2d 134 (Tex. App. 1997), in which the court stated that "[i]t is not necessary that all of the elements of a criminal offense be immediately satisfied at the time of the defendant's conduct"; id., 139; and *State* v. *Cotton*, 197 Ariz. 584, 588–89, 5 P.3d 918 (App. 2000), *State* v. *Hammett*, 192 Ga. App. 224, 225, 384 S.E.2d 220 (1989), and *Jones* v. *Commonwealth*, 830 S.W.2d 877, 880 (Ky. 1992), all of which concluded that it is not the status of the victim at the time of the injury that determines the nature of the crime but the victim's status at the time of death. *In all four jurisdictions*, however, the statutes in question lacked the element of intent that supplies the requisite temporal link between the criminal conduct and the status of the victim as a person in Connecticut's murder statute. See *State* v. *Cotton*, supra, 586 (defendant charged under Arizona's second degree murder statute, which provides in relevant part that offense is committed when person "without premeditation . . . [and] [u]nder circumstances manifesting extreme indifference to human life . . . recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another person," but

convicted under Arizona's manslaughter statute, which provides in relevant part that offense is committed by "[r]ecklessly causing the death of another person" [internal quotation marks omitted]), quoting Ariz. Rev. Stat. Ann. §§ 13-1104 (A) (3) and 13-1103 (a) (1) (Cum. Sup. 1999); *State* v. *Hammett,* supra, 224 (defendant charged under Georgia's second degree homicide by vehicle statute, which provides in relevant part that "[a]ny person who causes the death of another person, without an intention to do so, by violating [certain] provision[s] of [the Georgia motor vehicle and traffic laws] commits the offense of homicide by vehicle in the second degree when such violation is the cause of said death" [internal quotation marks omitted]),[11] quoting Ga. Code Ann. § 40-6-393 (b) (1989); *Jones* v. *Commonwealth,* supra, 877 (defendant charged under Kentucky's second degree manslaughter statute, which provides in relevant part that offense is committed when one "wantonly causes the death of another person" [internal quotation marks omitted]), quoting Ky. Rev. Stat. Ann. § 507.040 (Michie 1985); *Cuellar* v. *State,* supra, 136–37 (defendant charged under Texas' intoxication manslaughter statute, which provides in relevant part that offense is committed when person "[1] operates a motor vehicle in a public place, an aircraft, or a watercraft; and [2] is intoxicated and by reason of that intoxication causes the death of another by accident or mistake" [internal quotation marks omitted]), quoting Tex. Penal Code Ann. § 49.08 (a) (Vernon 1994).

The significance of the element of intent in Connecticut's murder statute, and what distinguishes it from the foregoing statutes, is that it is specific and must exist

---

[11] The Georgia court acknowledged the more expansive nature of the statute in that state when it observed that "[n]othing in [the statute] limits consideration of the status of the victim to the moment at which the injury is inflicted, since the statute explicitly states that second degree vehicular homicide is committed when a person *'causes the death* of another person.' " (Emphasis in original.) *State* v. *Hammett,* supra, 192 Ga. App. 225.

*contemporaneously* with the act that causes the victim's death. In other words, the intent to cause the victim's death must exist in the mind of the perpetrator at the moment the fatal injury is inflicted, which cannot occur when the victim is a fetus because a fetus is not a person under Connecticut law. Indeed, I can think of no case in which this or any other court has determined that the specific intent to kill a person can be found to exist *after* the act is completed. The language of the statutes in the cases on which the majority relies thus does not support the conclusion that a temporal nexus must exist between the criminal conduct and the status of the victims as persons, as the language of the murder statute in the present case does, because the element of intent is lacking and there is no other requirement of a contemporaneous relationship among the elements of each of the crimes enumerated in those statutes.

Furthermore, all four jurisdictions have since enacted fetal homicide or feticide statutes and thus have repudiated the rationale of the born alive rule in order to avoid the legal inconsistencies that inevitably arise when the criminal conduct is severed from the status of the victim as a person at the time of the fatal injury.[12] See Ariz. Rev. Stat. Ann. §§ 13-1102, 13-1103, 13-1104 and 13-1105 (Cum. Sup. 2008); Ga. Code Ann. § 16-5-80 (2007); Ky. Rev. Stat. Ann. §§ 507A.010 (c) and 507A.020 through 507A.050 (LexisNexis 2008); Tex. Penal Code Ann. § 1.07 (49) (Vernon Cum. Sup. 2009).

The majority also declares that it is "perfectly clear" that no temporal nexus is required because New York's "homicide statutes . . . are materially identical to our homicide statutes"; footnote 42 of the majority opinion; and a New York appellate court applied the born alive

---

[12] The majority also relies substantially on the outmoded rationale of *State* v. *Cotton,* supra, 197 Ariz. 584, in part IV of its opinion, in which it considers the due process issues raised by the present case.

rule in affirming a conviction under New York's second degree manslaughter statute.[13] See *People* v. *Hall*, 158 App. Div. 2d 69, 76, 557 N.Y.S.2d 879, appeal denied, 76 N.Y.2d 940, 564 N.E.2d 679, 563 N.Y.S.2d 69 (1990). I disagree. Although our Penal Code is modeled in part after the New York Penal Law, the New York statute at issue in *Hall* pertained to second degree reckless manslaughter, not murder, and, therefore, like the statutes at issue in the Arizona, Georgia, Kentucky and Texas cases that involved reckless conduct, the New York statute is distinguishable from Connecticut's murder statute because it lacks the element of intent that must exist when the fatal injury is inflicted. Accordingly, it is not "materially identical" to our murder statute, and *Hall* cannot assist this court in interpreting § 53a-54a.

The majority asserts that it is unaware of any authority in support of the view that a temporal nexus is required between the criminal conduct and the victim's status as a person. I find this assertion surprising when there is so much authority to be found. The reason why the overwhelming majority of states have abandoned the born alive rule and adopted fetal homicide laws, and why two other states have enacted laws expressly limiting the definition of a "person" to one who has been born and is *alive at the time of the criminal act*; see Colo. Rev. Stat. § 18-3-101 (2) (2009) (" '[p]erson,' when referring to the victim of a homicide, means a human being who had been born and was alive at the time of the homicidal act"); Or. Rev. Stat. § 163.005 (3) (2009) (" '[h]uman being' means a person who has been born and was alive at the time of the criminal act"); is that they wished to *restore* the temporal connection between the criminal conduct and the status of the

[13] That statute provides in relevant part: "A person is guilty of manslaughter in the second degree when:

"1. He recklessly causes the death of another person . . . ." N.Y. Penal Law § 125.15 (McKinney 2009).

victim as a person that is necessarily broken when the born alive rule no longer functions as a rule of causation. Indeed, the Supreme Court of Hawaii in *State v. Aiwohi,* supra, 109 Haw. 115, after considering the benefits and flaws of the born alive rule as applied to the prosecution of mothers and third parties who inflict fatal injuries on a fetus, expressly concluded that the more cogent rule is that "the defendant's conduct must occur at a time when the victim is within the class contemplated by the legislature." Id., 126. The majority's assertion as to the lack of other authority regarding the requirement of a temporal nexus is, therefore, without foundation.[14]

The majority claims that the enactment by other states of fetal homicide statutes that amend the definition of "person" to include an unborn child or fetus "does not *exclude* from its purview the infliction of injuries on a viable fetus that is born alive and that

---

[14] The majority criticizes *Aiwohi,* describing it as the only case cited in this opinion for the proposition that a temporal nexus is required between the criminal conduct and the victim's status. See footnote 67 of the majority opinion. The majority is mistaken. I also rely on *State* v. *Hammett,* supra, 192 Ga. App. 225, in which the court determined that the vehicular homicide statute at issue contained no language that required a temporal nexus, and, therefore, the defendant in that case was subject to prosecution. See footnote 11 of this opinion. I also cite statutes from Colorado and Oregon that require a temporal nexus. See Colo. Rev. Stat. § 18-3-101 (2) (2009); Or. Rev. Stat. § 163.005 (3) (2009). The principal reason why there are so few contemporary cases that discuss the issue is because the legislatures in the majority of our sister states have enacted fetal homicide statutes, thus making further judicial construction of the relevant murder statutes under the born alive rule unnecessary. See footnote 15 of this opinion. To the extent that the court in *Aiwohi* noted that "an overwhelming majority of the jurisdictions confronted with the prosecution of a third party for conduct perpetrated against a pregnant mother, causing the death of the subsequently born child, uphold the convictions of the third parties"; *State* v. *Aiwohi,* supra, 109 Haw. 123; *every one* of the cases that the court in *Aiwohi* cited were from jurisdictions that have rejected the born alive rule by adopting a fetal homicide statute, or involved a manslaughter or reckless homicide statute that did not require proof of intent, unlike the murder statute in this case. Accordingly, the majority's comments are unpersuasive.

subsequently dies from those injuries." (Emphasis in original.) Footnote 67 of the majority opinion. The majority thus reasons that "[fetal] homicide statutes *broaden* the class of victims protected thereunder by redefining that class, an innovation that bears no relevance to the issue of whether our murder statute contains the kind of temporal requirement that [this concurring and dissenting opinion] says it does." (Emphasis added.) Id. The majority then concludes that, "because [the born alive rule] now is viewed by those states [that have abolished it] as unnecessarily *underinclusive* with respect to the category of victims that it protects . . . it would make no sense to reject the rule . . . without replacing it with a broader rule, namely, one that includes the killing of a fetus." (Emphasis in original.) I agree that, insofar as the born alive rule previously has been recognized in *other* states, the adoption of fetal homicide statutes in those states constitutes a repudiation, or abandonment, of the rule. Such statutes not only criminalize conduct that causes the death of a fetus, regardless of whether it is born alive, but, to the extent that the rule has lost its meaning as a rule of causation, they also restore the temporal connection between the element of intent and the status of the fetus at the time of the criminal act.[15] See, e.g.,

[15] The majority misrepresents my views when it claims that (1) I "concede" that the born alive rule has been "repudiated" in other jurisdictions as unnecessarily narrow or restrictive because it does not extend to the killing of a fetus that dies in utero, and (2) my purported belief that the rule also should be repudiated in Connecticut as too narrow is "nonsensical" because it requires an assumption that the legislature intended to create an irrational statutory scheme under which it would be a class A felony to kill a fetus that dies in utero and no crime at all to kill a fetus that is born alive and that subsequently dies from injuries sustained in utero. Footnote 58 of the majority opinion. The majority completely misunderstands my discussion of this matter, and, consequently, it is the majority, not this opinion, that "sets up the proverbial straw man" to attack the opposition. Id.

As previously stated, I believe jurisdictions that have recognized and subsequently abandoned or repudiated the born alive rule in favor of fetal homicide statutes have done so not merely to expand the class of victims injured in utero, but to restore the temporal connection between the element

*People* v. *Ford,* 221 Ill. App. 3d 354, 367, 581 N.E.2d 1189 (1991) (expressly acknowledging legislature's rejection of born alive rule in criminalizing acts directed against unborn child), appeal denied, 143 Ill. 2d 642, 587 N.E.2d 1019 (1992). This court's failure to recognize the born alive rule, however, would not constitute a similar "repudiation" of the rule because it has not heretofore been recognized in this jurisdiction and thus cannot be abandoned.[16]

The majority claims, to the contrary, that the born alive rule is "well established in the common law of this state . . . ." This claim is without merit. The majority ignores the fact that, even if the born alive rule had been accepted as part of the common law of this state prior to 1969, which I submit it had not, "*[a]doption of the [P]enal [C]ode [in 1969]*[17] *abrogated our common law of crimes.*" (Emphasis added.) *State* v. *Ross,* 230 Conn. 183, 197, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); accord *Valeriano* v. *Bronson,* 209 Conn. 75, 92, 546 A.2d 1380 (1988); see also *State* v. *DeJesus,* 288 Conn. 418, 515, 953 A.2d 45 (2008) (*Katz, J.,* dissenting) (relying on *Valeriano* for proposition that Penal Code abro-

of intent and the status of the victim at the time of the criminal act. My view that Connecticut should not adopt the born alive rule is based on the fact that the Penal Code precludes it, and, even if this was not the case, the rule has become, over time, a substantive element of the crime in which the temporal connection between criminal intent and the criminal act has been severed. I thus believe that, because the born alive rule never has been adopted in Connecticut, a decision by this court to refrain from adopting the rule in the present case neither expands nor narrows the class of criminals currently subject to prosecution for the killing of a fetus in this state.

[16] The majority's repeated assertions that I believe this court should "reject" the born alive rule incorrectly perpetuate the idea that the rule presently exists in Connecticut, a proposition with which I disagree.

[17] The legislature adopted the Penal Code in 1969, and it became effective on October 1, 1971. See, e.g., *State* v. *Skakel,* 276 Conn. 633, 776, 888 A.2d 985 (*Katz, J.,* concurring), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

gated common-law rules, and savings clause of code precludes court from readopting them); Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2007) § 53a-4, p. 324 (court not "free to fashion substantive offenses" formerly considered common-law crimes but not included in Penal Code because *the [c]ode precludes . . . the notion of common law crimes*" [emphasis added]). Accordingly, no matter how many pages or how much passion the majority devotes to its common-law analysis, it cannot overcome the very conspicuous and simple fact that such an analysis is irrelevant following this state's adoption of the Penal Code. Nevertheless, because the majority places so much emphasis on the common-law roots of the born alive rule, including a lengthy discussion of legislative history in an attempt to show that the legislature expressly accepted the rule when it enacted Public Acts 2003, No. 03-21 (P.A. 03-21), entitled "An Act Concerning Assault of a Pregnant Woman," approximately five years *after* the crime in this case was committed, I am compelled to respond because I believe that much of the majority's analysis is either misleading or legally incorrect.

The common law, as distinguished from statutory law, "comprises the body of those principles and rules of action, relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming, and enforcing such usages and customs . . . ." Black's Law Dictionary (6th Ed. 1990). This means that, in order to demonstrate that the born alive rule is "well established in the common law of this state," there must be evidence that the rule was a well known usage or custom in the colony or the state of Connecticut, or that reviewing courts have issued judgments and decrees enforcing the rule over the past

200 years. Even giving the majority the benefit of the doubt, I submit that no such evidence exists.

The majority relies on a single treatise, written in 1796 by a former Chief Justice of the Connecticut Supreme Court, Zephaniah Swift,[18] that explains the born alive rule in the context of the common-law definition of murder, and on three trial court decisions, a single Appellate Court decision, the Model Penal Code and the common-law principles that govern criminal matters in this state. Swift, however, authored the treatise several years before he became a judge of the Superior Court in 1801, and nearly twenty years before he became Chief Justice of this court in 1814. See 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823), memoir of the author. Swift's treatise thus does not represent his understanding of the decisional law rendered by Connecticut courts during his time on the bench. In addition, others have observed that Swift's treatise "not only covered Connecticut law but encompassed the law 'generally.' " *Valeriano* v. *Bronson*, supra, 209 Conn. 91 n.10, citing P. O'Sullivan, "Biographies of Connecticut Judges," 19 Conn. B.J. 181, 192 (1945). Notwithstanding this limitation, the revised version of Swift's treatise, which was published in 1823 before advanced medical technology permitted a determination to be made as to whether a fetus was alive in utero, explains that the reason why the killing of a fetus that dies in utero is not considered murder is because "the circumstance[s] of its death cannot be ascertained with sufficient precision," not because the fetus does not satisfy the definition of a "person."[19] 2 Z. Swift, supra, p. 267.

---

[18] See 2 Z. Swift, A System of the Laws of the State of Connecticut (1796).

[19] The fact that this court sometimes has relied on Swift's treatise in other contexts is irrelevant. Even if the treatise is consulted, it explains that the purpose of the born alive rule was to determine whether the fetus was alive at the time of the criminal act, and not, as the majority insists, to impose a penalty for the killing of a fetus merely because it was born alive and thus became a person before it died. See 2 Z. Swift, supra, p. 267.

With respect to the three trial court decisions that allegedly recognize the born alive rule, the issues raised in two of those decisions, one of which was published in 1955 before the availability of advanced medical technology, did not involve criminal conduct but, rather, required the court to determine whether a cause of action could be brought against a *negligent* wrongdoer for injuries inflicted in utero to a viable fetus and a nonviable[20] fetus. See *Simon* v. *Mullin*, 34 Conn. Sup. 139, 147, 380 A.2d 1353 (1977) (nonviable fetus); *Tursi* v. *New England Windsor Co.*, 19 Conn. Sup. 242, 248, 111 A.2d 14 (1955) (viable fetus). Consequently, neither decision supports the majority's view that the born alive rule is well established in the common law of this state because "[d]iffering objectives and considerations in tort and criminal law foster the development of different principles . . . ." *People* v. *Greer*, 79 Ill. 2d 103, 115, 402 N.E.2d 203 (1980); see W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 2, pp. 7–9.

This leaves *State* v. *Anonymous (1986-1)*, 40 Conn. Sup. 498, 516 A.2d 156 (1986) (*Anonymous*), in which the issue before the court was "whether an unborn but viable fetus is a 'human being' *within the meaning of the Connecticut statutes defining murder.*" (Emphasis added.) Id., 499. In concluding that such a fetus is not a "human being," the court first examined the legislative history of Connecticut's Penal Code and noted that the murder section was based in part on the revised New York Penal Law and in part on the Model Penal Code; id., 500; which define the terms "person" and "human being," respectively, as one "who has been born and is alive." N.Y. Penal Law § 125.05 (1) (McKinney 2009); accord Model Penal Code § 210.0 (1) (1980). The court thus concluded that "[i]t is obvious that neither the

---

[20] I use the term "nonviable" fetus throughout this opinion to refer to a previable fetus, or a fetus that has not yet reached the stage in its development that it would be capable of living outside the mother's womb.

word 'person' nor the words 'human being' would include an *unborn fetus* under the [revised] New York Penal [Law] or the Model Penal Code." (Emphasis added.) *State* v. *Anonymous (1986-1)*, supra, 501. The court then examined this state's homicide statutes and determined that the Connecticut legislature "did not intend to define a 'human being' as an unborn but viable fetus." Id. The court finally observed that, under common-law principles dating back to seventeenth century England, "an unborn fetus," regardless of viability, cannot be the subject of a homicide. Id., 502. The court cited nine cases from other jurisdictions in support of this principle, all of which concluded that the killing of a fetus in utero is not a homicide because, under the born alive rule, a fetus is not considered a person. Id., 503. In closing, the court noted that "any redefining of the word 'person' must be left to the legislature, which has the primary authority to define crimes." Id., 505. The court also observed that its decision related only to the crime of murder, and not to tort law, because American courts that have afforded to fetuses "the benefits of tort law" in the civil context have declined to treat the killing of a fetus in utero as a homicide and thus have refused to change the born alive rule in criminal cases, relying on the "[d]iffering objectives and considerations in tort and criminal law . . . ." (Internal quotation marks omitted.) Id., quoting *People* v. *Greer*, supra, 79 Ill. 2d 115.

*Anonymous* has little, if any, precedential value in the present context because the issue before the trial court was whether an *unborn* fetus, rather than a fetus that is fatally injured but is subsequently born alive, is a "human being" under Connecticut's murder statute, and the court specifically stated that any redefinition of the term "person" must be left to the legislature because *that body alone* has the authority to define crimes. *State* v. *Anonymous (1986-1)*, supra, 40 Conn.

Sup. 505. Moreover, eight of the nine jurisdictions cited by the court that did not consider the killing of an unborn fetus a homicide have since enacted fetal homicide or feticide statutes and discarded the born alive rule.[21] Insofar as the court stated that "the codes from which our Connecticut law was drawn limit the words 'human being' to those who have been born alive"; id., 501; the statement suggests nothing with respect to whether the infliction of a fatal injury on a fetus that is subsequently born alive constitutes murder; rather, it simply means that a human being is one who is born and is alive. Indeed, it is absolutely clear from the discussion that precedes and follows this quoted language that the court was referring *only* to the killing of an unborn fetus because "Connecticut's legislature did not intend to define a 'human being' as an unborn but viable fetus." Id. Although the court also stated in dictum that, under the born alive rule, an unborn fetus is not considered a person; see id., 503; its passing reference to the born alive rule incorrectly describes the rule, which did not reject the idea that the killer of an unborn fetus could be prosecuted for murder but merely required evidence that the fetus had been born alive to prove that it was alive when the criminal act was committed. Lastly, the trial court's conclusion that the killing of an unborn fetus is not a homicide did not require the court to adopt the born alive rule because the issue in that case was whether an *unborn fetus* was a human being under Connecticut's murder statute. Id., 499. Thus, the trial court's reasoning in *Anonymous* hardly supports the majority's assertion that the born alive rule was adopted in that case or that the rule "is well established in the common law of this state," and the majority's attempt to suggest otherwise by also cit-

[21] The court in *Anonymous* cited cases from California, Florida, Illinois, Kentucky, Louisiana, Michigan, New Jersey, Utah and West Virginia. See *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 503. All but New Jersey have enacted fetal homicide or feticide statutes.

ing to *In re Valerie D.*, 25 Conn. App. 586, 591, 595 A.2d 922 (1991), rev'd on other grounds, 223 Conn. 492, 613 A.2d 748 (1992), which involved the termination of parental rights and quoted certain language from *Anonymous*, is misguided, at best.[22]

The majority also seeks support for its view in the Model Penal Code, but its reasoning is internally inconsistent and reflects a misunderstanding of the code. On the one hand, the majority concedes that "it is not entirely clear" whether the Model Penal Code intended the definition of "human being" to apply to a fetus that is born alive but later dies from injuries inflicted in utero. Footnote 35 of the majority opinion. The majority further concedes that "it [is] more likely that the [related] commentary to the Model Penal Code was intended to clarify that the killing of a fetus in utero does not constitute the crime of homicide, and that [the Model Penal Code] definition [of 'human being'] does not expressly address the more specific issue of whether it is a homicide when an infant, having been injured in utero, is born alive and then dies of his or her injuries." Id. On the other hand, the majority asserts that, "[b]ecause our statutory scheme is patterned after the Model Penal Code," we must presume that our legislature would have "expressly repudiat[ed]" the born alive rule if it had not intended it to apply.[23] Id. The

[22] The majority finds fault with my failure to explain why this state would not have recognized the born alive rule under the common law. Such speculation on my part is beside the point. The issue before this court never has been raised under our homicide statutes, and, consequently, the born alive rule never has been judicially recognized or rejected in Connecticut. Consequently, the only relevant question is whether *this* court should adopt the rule in the present case.

[23] The majority reaches this conclusion on the basis of the following commentary in the Model Penal Code: "Section 210.0 (1) defines the term 'human being' to mean a person 'who has been born and is alive.' The effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive. Several modern statutes follow the Model Code in making this limitation explicit. Others are silent on the point, but absent express statement to the contrary, they too may be expected to carry forward the common-law approach.

majority thus cites the Model Penal Code as authority for adopting the born alive rule in Connecticut after explicitly *rejecting* the notion that the code was intended to incorporate the rule in defining the term "human being."

Even if the Model Penal Code's definition of "human being" could be construed as an implicit adoption of the born alive rule, which I believe it cannot, the Connecticut legislature declined to embrace that definition or the definition of "person" in the New York Penal Law when it adopted this state's Penal Code in 1969. See General Statutes § 53a-3 (1) (defining "person" for purposes of Penal Code as "a human being, and, where appropriate, a public or private corporation, a limited liability company, an unincorporated association, a partnership, a government or a governmental instrumentality"). Accordingly, even though portions of our Penal Code may be patterned after the Model Penal Code and the legislature may have been familiar with the Model Penal Code commentary, the legislature's decision to reject the definitions of "person" and "human being" in the New York Penal Law and Model Penal Code, respectively, necessarily constitutes a rejection of any affirmative implications regarding the born alive rule purportedly arising therefrom.

*"The significance of this definition of 'human being' is that it excludes from criminal homicide the killing of a fetus.* This exclusion is warranted in order to avoid entanglement of abortion in the law of homicide. . . .

"Thus, defining 'human being' to exclude a fetus serves the valuable function of maintaining abortion as an area of distinct criminological concern not covered by the law of homicide." (Emphasis added.) Model Penal Code § 210.1, comment 4 (c) (1980).

On the basis of this commentary, the majority concludes that, because the Connecticut legislature has made no explicit statement regarding the born alive rule, it may be presumed that the rule has been adopted in this state. I disagree for all of the reasons discussed in this opinion, including that the legislature did not employ the definition of "human being" on which this portion of the Model Penal Code commentary is based and, additionally, that the focus of the commentary is on the killing of a fetus, not on the killing of a fetus that is fatally injured but subsequently born alive.

816

The majority next claims that "[t]he born alive rule has deep roots in our common law" and that it knows of "no reason . . . why the . . . rule would not have been accepted as the law of this state . . . just as [it] was accepted by virtually every other jurisdiction that had considered it." I agree that the born alive rule is derived from the common law of England and that *some* of our sister states have accepted the rule in the past. See, e.g., *State* v. *Cotton*, 197 Ariz. 584, 589, 5 P.3d 918 (App. 2000); *Ranger* v. *State*, 249 Ga. 315, 317, 290 S.E.2d 63 (1982); *People* v. *Bolar*, 109 Ill. App. 3d 384, 389, 440 N.E.2d 639 (1982); *Jones* v. *Commonwealth*, 830 S.W.2d 877, 880 (Ky. 1992); *Williams* v. *State*, 316 Md. 677, 682–83, 561 A.2d 216 (1989); *State* v. *Cornelius*, 152 Wis. 2d 272, 280–82, 448 N.W.2d 434 (App. 1989). The majority provides no citations or support, however, for its far broader assertion, presented as established fact, that the rule "has been *universally* recognized by courts and commentators throughout the country as deeply rooted in the common law"; (emphasis added); thus implying that the born alive rule has been accepted as part of the common law in all other jurisdictions. Indeed, most, if not all, jurisdictions that have rejected the born alive rule appear to have done so statutorily only following the rule's express acceptance by the courts in those jurisdictions, not because the rule inhabited the common law in some ethereal sense without judicial recognition and approval.

In addition, the majority ignores the crucial fact that the precise issue before this court never has been litigated in Connecticut, and, therefore, the rule never has been recognized and adopted in this state, a conclusion absolutely required by the cases on which the majority itself relies.[24] In fact, in one such case, this court noted

[24] See *State* v. *Muolo*, supra, 118 Conn. 378 (defining our common law as "the prevailing sense of the more enlightened members of a particular community, *expressed through the instrumentality of the courts*" [emphasis added]); *Brown's Appeal from Probate*, 72 Conn. 148, 151, 44 A. 22 (1899) ("[a]s our jurisprudence developed, *the courts* applied the principles of the

in a passage from which the majority selectively quotes that the English common law has *not* been transplanted automatically into Connecticut's legal soil but, rather, "[h]istorically, our view of the relationship of the common law of England to the law of Connecticut has been conspicuous by its *ambivalence.* During the greater part of the colonial era, the common law of England was not deemed to form a part of the jurisprudence of Connecticut, except so far as any part of it might have been accepted and introduced by her own authority. . . . Later this court accepted the doctrine that the English common law was brought here by the first settlers, and became the common law of Connecticut so far as it was not unadapted to the local circumstances of this country. . . . In more recent years we seemed to have reverted to our earlier colonial thinking by asserting that the common law of England prior to 1776 *does not necessarily represent the common law of this state*; *State* v. *Muolo,* [supra, 118 Conn. 378]; *even mutatis mutandis.* We further defined our common law in our own terms as the prevailing sense of the more enlightened members of a particular community, *expressed through the instrumentality of the courts,* as to those rules of conduct which should be definitely affirmed and given effect under the sanction of organized society, in view of the particular circumstances of the time, but with due regard to the necessity that the law should be reasonably certain and hence that its principles have permanency and its development be by an orderly process. Such a definition necessarily implies that the common law must change as circumstances change." (Citations omitted; emphasis added; internal quotation marks omitted.) *Dacey* v. *Connecticut Bar Assn.,* 184 Conn. 21, 25–26, 441 A.2d 49 (1981).

[English] common law to the decision of causes, *so far as they seemed applicable to our social conditions*" [emphasis added]).

The majority responds to this clear and unambiguous statement of how Connecticut courts have incorporated the common law of England into this state's legal framework by declaring that I have a "fundamental misapprehension of the manner in which the common law is identified and applied. Even if no court of this state previously had recognized the existence of the born alive rule, we would be required to determine its existence on the basis of the case law of England, the decisions of courts of other jurisdictions, and the works of common-law scholars." Footnote 39 of the majority opinion. The majority thus appears to subscribe to the view that all of the English common law has been assimilated into the common law of this state, regardless of whether it has been recognized either statutorily or by the courts. I emphatically disagree.

In clear disregard of our precedent, the majority ignores significant portions of our analysis in *Dacey* and relies on the case law of several foreign jurisdictions, including Arkansas, Maryland, Minnesota and North Dakota to guide its common-law analysis. See id. To the extent that the majority acknowledges *Dacey*, it takes a small passage from *Graham* v. *Walker*, 78 Conn. 130, 133, 61 A. 98 (1905), which also is quoted in *Dacey*, that the English common law " 'was brought here by the first settlers, and became the common law of Connecticut so far as it was not unadapted to the local circumstances of this country.' " The majority also quotes selectively from *Dacey* for the proposition that, at times, our view of the common law of England has been ambivalent and that the common law does not necessarily represent the common law of our state. The majority then concludes that Connecticut has demonstrated no ambivalence with respect to the common-law born alive rule. The majority, however, omits all of the surrounding language in *Dacey*, in which the court explains that the common law of England "was

not deemed to form a part of" Connecticut law during the greater part of our colonial history *unless specifically introduced by our state's own authority* and that, in recent years, we have "reverted to our earlier colonial thinking by asserting that the common law of England prior to 1776 does not necessarily represent the common law of this state . . . ." (Citations omitted; internal quotation marks omitted.) *Dacey* v. *Connecticut Bar Assn.*, supra, 184 Conn. 25. In other words, the majority distorts the historical analysis in *Dacey* by quoting out of context language that it deems favorable to its view and by ignoring those portions of *Dacey*, and the Connecticut cases cited therein, that do not support its view, even though none of the cited cases has been overruled or qualified in the nearly thirty years since *Dacey* was decided. As a result, the majority's conclusion that the born alive rule is well established in the common law of this state lacks *any* convincing support because Connecticut courts never have acknowledged and applied it in the criminal context. Consequently, there can be no presumption that they would have done so had the issue been presented. Moreover, even if the born alive rule had been established in the common law of this state, it would have been superseded by our Penal Code, which, as previously discussed, requires that the victim of a murder be a person at the time of the criminal act. In fact, that is exactly what we concluded in *Valeriano* v. *Bronson*, supra, 209 Conn. 90–96, a case directly on point, in which we rejected the petitioner's argument that the English common-law year and a day rule,[25] another rule of causation that applied to prosecutions for homicide, existed in the common law of Connecticut.

In *Valeriano*, we determined that the common-law year and a day rule had never been adopted in this state and that, even if it had, it had been abrogated by

---

[25] See footnote 37 of this opinion.

enactment of the comprehensive Penal Code in 1969. Id., 95–96. Relying on reasoning similar to that which I have articulated in this opinion, we stated that (1) passing references to the rule in two prior cases were merely "part of a larger [passage] that addressed the dispositive issue in [those cases]," which had nothing to do with the year and a day rule; id., 91; (2) "discussion in a judicial opinion that goes beyond the facts involved in the issues is mere dictum and does not have the force of precedent"; id.; (3) no other Connecticut decision had expressly "adopted and applied" the year and a day rule; id.; (4) even if the rule had existed in the common law of Connecticut prior to 1969, "adoption of the comprehensive [P]enal [C]ode in 1969 abrogated the common law and set out substantive crimes and defenses in great detail," and, there having been no mention of the year and a day rule in the Penal Code, it had not been adopted; id., 92; (5) the language of the savings clause in General Statutes § 53a-4[26] and related commentary by the commission to revise the criminal statutes indicated that the savings clause was intended to apply *only* to those statutes in the chapter in which § 53a-4 appears, namely, chapter 951 on statutory construction and principles of criminal liability, and not to the homicide statutes in chapter 952; id., 93–94; (6) the year and a day rule would be "inconsistent" with the

---

[26] General Statutes § 53a-4 provides: "The provisions *of this chapter* shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." (Emphasis added.) The commission's comment further explains: "The purpose of this saving clause is to make clear that *the provisions of sections 53a-5 to 53a-23*, which define the principles of criminal liability and defenses, *are not necessarily exclusive*. A court is not precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith. *This does not mean, however, that the court is free to fashion additional substantive offenses, for the* [c]*ode precludes, by repealing section 54-117, the notion of common law crimes*." (Emphasis added.) Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-4 (West 2007), comment, p. 324.

homicide statutes because the rule "prevents conviction for a homicide [when] the victim does not die within a year and a day of the defendant's conduct causing the death," and, "given the sweeping overhaul of the criminal law wrought by the [P]enal [C]ode in 1969, it is wholly illogical that such a defense in bar not be specifically included in the code or . . . chapter [951] which is rife with 'defenses' . . . [p]articularly . . . where the crime of homicide is involved"; id., 94; (7) the "original reason for the year and a day rule developed hundreds of years ago when medical science was hardly as advanced as it [was in the 1980s]," and that reason no longer exists because it is now possible to diagnose with far greater precision the cause of the victim's death, and, therefore, "the policy behind the rule is dubious . . . in the twentieth century"; (internal quotation marks omitted) id., 94–95; (8) the rule was "in decline throughout the United States" and numerous jurisdictions already had abolished it; id., 95; and (9) although Swift's Digest of the Laws of the State of Connecticut specifically refers to the year and a day rule, Swift did not state that the rule was part of Connecticut's common law as opposed to the English common law in general, and "[i]t must be remembered that Swift's Digest not only covered Connecticut law but encompassed the law 'generally,'" and, "[u]nder the circumstances, any reliance on Swift would have been a weak position."[27] Id., 91–92 n.10.

[27] For several reasons, I disagree with the majority's assertion that this court, in *Ullmann* v. *State*, 230 Conn. 698, 647 A.2d 324 (1994), "expressly disavowed [*Valeriano*'s] narrow reading . . . of the applicability of Swift's Digest to Connecticut law . . . ." Footnote 41 of the majority opinion. First, this court did not conclude in *Valeriano* that Swift was never applicable or relevant in construing Connecticut law, but stated that, "[u]nder the circumstances," which required the court to interpret the concept of proximate cause under Connecticut's felony murder statute, reliance on Swift's Digest was "a weak position." *Valeriano* v. *Bronson*, supra, 209 Conn. 91–92 n.10. Second, the issue in *Ullmann* involved the interpretation of a contempt statute, not a provision from the Penal Code. See *Ullmann* v. *State*, supra, 699. Thus, the court in *Ullmann* could not have disavowed our conclusion

I submit that *Valeriano* *must* serve as precedent in determining whether the born alive rule is embedded in the common law of this state because the born alive rule, like the year and a day rule, was a common-law rule of causation applied by English courts to determine liability in homicide cases. Accordingly, all of the reasons on which this court relied in rejecting the argument that the year and a day rule existed in Connecticut apply with equal force to the born alive rule. These include that (1) no Connecticut court expressly has

in *Valeriano* regarding the applicability of Swift's Digest to the interpretation of the Penal Code in that case. Third, although the court in *Ullmann* noted that Swift had stated in the preface to the first volume of his Digest that his "plan [was] to select from the English authorities, the rules in force here, and to combine them with our own, in a systematic view, so as to exhibit one complete code"; (internal quotation marks omitted) id., 707 n.7; the reason why the court found Swift persuasive in resolving the contempt issue was because Swift had cited English common law as authority for the Connecticut contempt statute in existence in the early nineteenth century, which was similar to the contempt statute at issue in *Ullmann*. See id., citing 2 Z. Swift, supra, pp. 359–60. In contrast, Swift's Digest did not refer to the year and a day rule or the born alive rule as authority for any Connecticut statute or court decision pertaining to those rules. In both the Digest and its predecessor, "A System of the Laws of the State of Connecticut"; see footnote 18 of this opinion; Swift's reference to the born alive rule was followed by a footnote to the work of the renowned English commentator, Sir Edward Coke, in which Coke described the English common-law born alive rule. Furthermore, as the court indicated in *Valeriano*, a former Connecticut judge who studied the legal significance of Swift's Digest and wrote a biographical article about Swift observed that the Digest "covered the law generally and was almost as applicable to the other states as it was to his own. Undoubtedly this was the reason why the Digest was used to a considerable extent throughout the [s]tates, mainly for legal instruction but occasionally as an authority cited to and by the courts." P. O'Sullivan, supra, 19 Conn. B.J. 192. In light of the scholarly character of this biographical piece and the fact that Swift cited no Connecticut statutes or cases pertaining to the born alive rule, I do not believe that the court in *Valeriano* was mistaken in concluding that reliance on Swift was misplaced in that context or that Swift was largely a compendium of "not only . . . Connecticut law but . . . the law generally." (Internal quotation marks omitted.) *Valeriano* v. *Bronson*, supra, 91–92 n.10. Finally, even if it is presumed that Swift's Digest once was regarded as common-law authority for the existence of the born alive rule in Connecticut, such authority clearly was extinguished when the legislature adopted the Penal Code in 1969.

concluded that the infliction of injuries to a fetus that is born alive but that subsequently dies from those injuries constitutes murder, (2) to the extent that the Superior Court and the Appellate Court referred to the rule in *Anonymous* and *In re Valerie D.*, respectively, it was mentioned only in passing as part of a larger discussion of the dispositive issues in those cases, none of which had anything to do with the infliction of fatal injuries on a fetus that is subsequently born alive, and, thus, those references were merely dicta with no precedential value, (3) there is no support for the rule in Swift's Digest because Swift never suggested that the rule had been adopted in Connecticut, (4) even if it is assumed that the born alive rule existed in our common law, enactment of our Penal Code abrogated the rule, and it is not preserved by the savings clause, which does not apply to chapter 952 of the General Statutes, in which the murder and capital felony statutes appear, (5) the rule is inconsistent with our homicide statutes because the legislature specifically rejected any modification of the term "person" to include a viable fetus when it rejected the proposed fetal homicide bill; see Raised House Bill No. 5747 (2002); and (6) advanced medical technology has rendered the original reason for the born alive rule, as in the case of the year and a day rule, obsolete.

The majority nonetheless claims that "[c]ourts in other jurisdictions have . . . consistently concluded that the death of an infant who is born alive from injuries inflicted in utero constitutes homicide." (Internal quotation marks omitted.) Such a comparison, which might have been compelling forty or fifty years ago, is now passé. See *State* v. *Lamy*, supra, 158 N.H. 521 (describing born alive rule as "outdated anachronism often producing anomalous results"). Most other jurisdictions that have adopted the born alive rule did so at a time in our nation's history when the health of the fetus

could not be monitored in utero, which is no longer the case. Although the majority concedes that "recent advances in medical science have prompted a number of state courts to depart from the born alive rule" in favor of a rule recognizing that a fetus can be the victim of a homicide, it fails to acknowledge that the "recent trend" to which it refers is more akin to a landslide, with approximately 70 percent of our sister states now rejecting the born alive rule in favor of fetal homicide laws. Indeed, many, if not most, of the cases from other jurisdictions that had adopted the born alive rule and on which the majority relies have been superseded by the fetal homicide laws enacted in those jurisdictions.[28] See, e.g., *State* v. *Cotton*, supra, 197 Ariz. 589 (born alive rule superseded by Ariz. Rev. Stat. Ann. §§ 13-1102, 13-1103, 13-1104 and 13-1105 [Cum. Sup. 2008]); *Ranger* v. *State*, supra, 249 Ga. 317 (born alive rule superseded by Ga. Code Ann. § 16-5-80 [2007]); *People* v. *Bolar*, supra, 109 Ill. App. 3d 389 (born alive rule superseded by 720 Ill. Comp. Stat. Ann. 5/9-1.2, 5/9-2.1 and 5/9-3.2 [West 2002]); *Jones* v. *Commonwealth*, supra, 830 S.W.2d 880 (born alive rule superseded by Ky. Rev. Stat. Ann. §§ 507A.010 [1] [c] and 507A.020 through 507A.050 [LexisNexis 2008]); *Williams* v. *State*,

---

[28] The majority attacks my purported assertion that the born alive rule is not deeply rooted in the common law. As a fair reading of this opinion demonstrates, however, I make no such assertion but merely state that the born alive rule is not deeply rooted in *Connecticut* law. As previously explained, our legal precedent has established that "the common law of England . . . is not necessarily the common law of Connecticut"; *State* v. *Muolo*, supra, 118 Conn. 378; and that Connecticut has defined the common law in its own terms as "the prevailing sense of the more enlightened members of a particular community, *expressed through the instrumentality of the courts*, as to those rules of conduct which should be definitely affirmed and given effect under the sanction of organized society, in view of the particular circumstances of the time . . . ." (Emphasis added; internal quotation marks omitted.) *Dacey* v. *Connecticut Bar Assn.*, supra, 184 Conn. 25–26. Consequently, the majority misrepresents my views, and its conclusions reflect a basic misunderstanding of the legal precedent on which they are based.

supra, 316 Md. 682–83 (born alive rule superseded by Md. Code Ann., Crim. Law § 2-103 [LexisNexis Sup. 2009]); *State* v. *Cornelius,* supra, 152 Wis. 2d 280–82 (born alive rule superseded by Wis. Stat. Ann. § 940.04 [West 2005]). In short, there is no evidence that the born alive rule is "well established in the common law of this state," and the overwhelming majority of our sister states do not continue to follow the rule. Consequently, the majority's conclusion to the contrary lacks any solid basis in fact and is inconsistent with *Valeriano.*

The majority further justifies its decision on the ground that the legislative history of P.A. 03-21 (aggravated assault statute)[29] "reflects the legislature's express acceptance of the [born alive] rule" because the legislature rejected a bill[30] that would have defined "person," for purposes of the Penal Code, to include a viable fetus and enacted the aggravated assault statute in its place. This conclusion is both logically flawed and completely unsupported by the legislative history. There is no reflection in the legislative history of the legislature's express acceptance of the born alive rule, and nowhere in the legislative history does any legislator suggest that the rule is part of the common law of this state. Moreover, it is wholly irrelevant what

[29] Public Act 03-21, which is codified as amended at General Statutes § 53a-59c, provides: "(a) A person is guilty of assault of a pregnant woman resulting in termination of pregnancy when such person commits assault in the first degree as provided under subdivision (1) of subsection (a) of section 53a-59 of the general statutes and (1) the victim of such assault is pregnant, and (2) such assault results in the termination of pregnancy that does not result in a live birth.

"(b) In any prosecution for an offense under this section, it shall be an affirmative defense that the actor, at the time such actor engaged in the conduct constituting the offense, did not know that the victim was pregnant.

"(c) Assault of a pregnant woman resulting in termination of pregnancy is a class A felony."

[30] Raised House Bill No. 5747 (2002). Hereinafter, all references to the fetal homicide bill are to Raised House Bill No. 5747.

assumptions the legislature made regarding the born alive rule because the statute was enacted nearly five years after the crime in this case was committed, and, in any event, the common law is not determined by legislative assumptions as to what the common law may be.

The majority states,[31] and I agree, that enactment of the fetal homicide bill would have constituted legislative rejection of the born alive rule, if it had been part of the common law, because treating the killing of a fetus in utero as a homicide *without evidence* that the fetus was alive at the time of the criminal act plainly conflicts with the rule's requirement that such evidence be provided in order for such a killing to constitute a homicide. The legislature's decision to treat the assault of a pregnant woman that results in the termination of her pregnancy as an *aggravated* assault, however, is not synonymous with acceptance of the born alive rule. To the contrary, the legislature consciously declined to address statutorily the controversial issue of the status of the fetus by omitting any reference to the unborn child in the aggravated assault statute and by making the offense a crime against the pregnant *woman* rather than against the fetus. The reason why the legislature took this approach was that it wanted to punish conduct resulting in the termination of a pregnancy without becoming embroiled in an abortion rights debate and without granting the fetus independent legal recognition, which would have been granted under the fetal homicide bill. In other words, the aggravated assault statute was not intended to punish the perpetrator for a crime against the fetus but to provide pregnant women with additional protections by increasing the existing penalty for the assault of a pregnant woman if the assault results in the termination of her pregnancy.

---

[31] As I previously discussed, the majority makes conflicting assertions with respect to this issue.

Compare P.A. 03-21 (designating assault of pregnant woman that results in termination of her pregnancy as class A felony) with General Statutes § 53a-59a (designating assault of pregnant woman in first degree as class B felony). Although this may appear to be a distinction without a difference, it was crucial to the enactment of the aggravated assault statute. The point is that, because the aggravated assault statute did not grant the fetus legal recognition, the statute is inconsistent with the presumption of the born alive rule that a fetus is a person as long as there is evidence that it was born alive. Accordingly, the majority's attempt to treat the legislature's refusal to expand the definition of "person" to include a fatally injured fetus as an affirmation of the born alive rule must collapse under the weight of its own faulty logic.

The majority further declares that "it is abundantly clear that . . . the legislature fully considered and rejected the possibility of abolishing the born alive rule and adopting a viability rule instead." This assertion is wrong in at least two respects. First, it implies that the born alive rule is presently followed in Connecticut because "the legislature . . . rejected the possibility of abolishing" it. As previously stated, I disagree that such a conclusion can be drawn from an objective examination of this state's common law or the legislative history of the aggravated assault statute. Second, it suggests that the legislature expressly considered the possibility of eliminating the born alive rule when it enacted the aggravated assault statute, when in fact it did not.

The only references to the born alive rule during the legislative proceedings on the fetal homicide and aggravated assault bills were made by Clarke D. Forsythe, president of Americans United for Life, and Bill O'Brien, legislative vice president of Connecticut Right to Life Corporation. Both Forsythe and O'Brien

remarked in passing that the definition of "person" in the Penal Code should be expanded to include an unborn fetus because the born alive rule had become outmoded and should be abolished in Connecticut. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2003 Sess., p. 424, remarks of O'Brien; id., pp. 663–66, written testimony of Forsythe; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2403–2404, remarks of Forsythe. Forsythe admitted, however, that he was a resident of Illinois and twice explained that he was "not familiar with" or "aware of the intricacies of Connecticut law . . . ." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2406, 2407. Moreover, no member of the committee or General Assembly referred to the born alive rule during the public hearings or legislative debates on the matter. The legislature understandably was concerned with the much narrower question of whether and how to penalize a perpetrator for causing the death of an *unborn* fetus. Furthermore, any positive discussion of the born alive rule would have been inconsistent with the legislature's express unwillingness to create a new capital offense. See id., pp. 2429–30, remarks of Representative Michael P. Lawlor (stating that creation of "new capital offense" was "real issue" and that he was "extremely reluctant" to expose potential defendants to capital punishment for killing unborn fetus). Accordingly, because the record demonstrates that the legislature did not discuss, or take any action that could be construed as recognizing, the born alive rule at any time during the proceedings, it cannot be said that the legislature "fully considered and rejected" abolishing the born alive rule in Connecticut.[32]

---

[32] The majority's assertion that the legislature rejected the possibility of "abolishing the born alive rule and adopting a viability rule instead" because a report on the aggravated assault statute prepared by the office of legislative research "indicates that the legislature, in making its determination, was well aware of the trial court's express reliance on the born alive rule in the present case, as well as the application of the rule by the court in *State* v.

In reaching the opposite conclusion, the majority takes what can only be described as extreme liberties in interpreting the legislative history. For example, the majority unequivocally declares, in sometimes overblown language, that "the legislature opted to preserve the born alive rule," "our legislature has decided to retain the rule," "judicial abrogation of the born alive rule would lead to a result that is both unprecedented and absurd," "the obvious intent of the legislature [in enacting the aggravated assault statute was] to classify as a homicide conduct that causes an infant to die after being born alive as a result of injuries that were inflicted in utero," failing to apply the born alive rule in this case would amount to a "perverse scheme" to decriminalize the infliction of fatal injuries on a fetus that is subsequently born alive, the legislature was "carving out an

*Anonymous (1986-1)*, supra, 40 Conn. Sup. 498," is inaccurate. As I previously discussed, the legislature did not reject the possibility of abolishing the born alive rule when it considered the fetal homicide and aggravated assault bills, and the court did not apply the rule in *Anonymous*. The majority quotes a passage in the report stating that the aggravated assault statute "does not affect the murder statutes. Under Connecticut case law, a person cannot be charged with murder of a baby unless the baby is born alive and lives for some period of time." Office of Legislative Research, Research Report No. 2003-R-0488, "Assault of a Pregnant Woman and Murder" (June 30, 2003), available at http://www.cga.ct.gov/2003/olrdata/jud/rpt/2003-R-0488.htm (last visited May 27, 2010). The quoted passage, however, incorrectly represents that the born alive rule has been adopted by courts of this state. I agree with the majority that legislative reports do not constitute evidence of legislative intent. I also agree with the majority that legislative inaction does not necessarily constitute affirmation of a judicial decision. Accordingly, I do not understand why the majority states that it is reasonable to conclude that the legislature's inaction "may be understood as a validation" that the born alive rule is part of Connecticut law, especially in light of the fact that this case continues to be litigated and is currently under appeal. Finally, the majority's assertion that the legislature did not take action following *Anonymous* and the trial court's ruling in the present case is not necessarily true. The legislature's refusal to enact the fetal homicide bill because it would have created a new capital offense could well be construed as a rejection of the trial court's ruling in the present case, issued approximately three years earlier, which had the practical effect of creating a new capital offense for the murder of a fetus.

exception" to the born alive rule when it enacted the aggravated assault statute, and the legislature recognized that "an infant who is born alive but subsequently dies from injuries sustained in utero already is protected by virtue of the operation of the born alive rule, pursuant to which the infant's death is treated as a homicide." Even more misleading is the majority's statement that, "as a consequence of the enactment of [the aggravated assault statute], this court *lacks the authority* to reject the born alive rule . . . ." (Emphasis added.) To those who have not read the legislative history, these assertions convey the impression that the legislature expressly recognized that the infliction of fatal injuries on a fetus that is subsequently born alive is presently considered murder in Connecticut and that the aggravated assault statute was enacted to complement the rule by providing a remedy for the death of a fetus that dies in utero. The majority appears to base its assertions on the limiting language of the aggravated assault statute, the testimony of pro-life and pro-choice witnesses during the judiciary committee hearings on the fetal homicide and aggravated assault bills and the passing references to the born alive rule by Forsythe and O'Brien, who testified as pro-life advocates before the committee. *Nothing* in the legislative history, however, demonstrates that the legislature expressly, or even implicitly, recognized the born alive rule when it considered either bill. In fact, exactly the opposite is true.

With respect to language in the aggravated assault statute limiting its application to "the termination of pregnancy that does not result in a live birth"; P.A. 03-21; the language implies nothing more than it says. The statute was enacted in direct response to the sensational killing of a pregnant woman and the acute public concern that followed regarding the lack of a penalty for the death of her unborn fetus. See 46 S. Proc., Pt. 4, 2003 Sess., p. 1009, remarks of Senator Andrew J.

McDonald ("this bill arises out of, has generally become known as Jenny's bill and it deals with the situation where a woman is assaulted while pregnant and the assault causes her pregnancy to terminate without a live birth"); id., p. 1010, remarks of Senator Donald E. Williams, Jr. ("Jenny's law . . . refers to a specific case [involving] a young woman . . . [who] was pregnant at [the] time [she was shot and murdered]"). Consequently, the bills and those who testified at the committee hearings focused exclusively on a remedy for the killing of an unborn fetus. In restricting application of the statute to the death of such a fetus, the legislature was *not* acknowledging that a penalty presently exists for the killing of a fetus that is born alive and subsequently dies but, rather, was directing its attention to the specific issue at hand and expressing its intention *not* to address circumstances beyond those giving rise to the statute ultimately enacted. The majority's declaration that the existence of the born alive rule was the "only . . . possible reason why the legislature opted to include within the protection of [the aggravated assault statute] only those fetuses that are not born alive"; footnote 54 of the majority opinion; thus misses the mark completely and raises questions as to the majority's knowledge and understanding of the legislative history of the fetal homicide and aggravated assault bills.

Insofar as the majority relies on the testimony at the legislative hearings to conclude that the enactment of the aggravated assault statute also represented legislative affirmation of the born alive rule, it misunderstands the compromise ultimately forged to bridge the stark differences expressed by pro-choice and pro-life advocates who spoke before the judiciary committee. In often eloquent language, pro-life advocates argued that an unborn fetus should be recognized as an independent entity deserving of legal protection and, therefore, that the fetal homicide bill should be passed. See, e.g., Conn.

Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2425–26, 2428, remarks of Sister Suzanne Gross, on behalf of the Pro-Life Ministry of the Franciscan Life Center. In equally eloquent language, pro-choice advocates, fearing an erosion of existing abortion rights, argued that an unborn fetus should not be granted independent legal status and that restraining orders and other laws then in place to curb domestic violence were sufficient, if properly enforced, to protect pregnant women. See, e.g., id., p. 2309, remarks of Jennifer C. Jaff, on behalf of Connecticut Coalition for Choice. Pro-choice advocates thus contended that the real issue at stake was the protection of a woman's right to carry her pregnancy to term, and that it was not necessary to enact additional laws that would create new penalties for the killing of an unborn fetus. See, e.g., id., p. 2227, remarks of Jeri Reutenaur, on behalf of the Connecticut Civil Liberties Union; id., p. 2311, remarks of Jaff. Significantly, no witnesses, other than Forsythe and O'Brien, referred to the born alive rule, presumably because the rule never had been publicly recognized in this state and thus was generally unknown.

After considering the foregoing arguments, the legislature was unwilling to choose sides. It thus crafted a solution in which each side got some, but not all, of what it sought in order to garner broad public support. See, e.g., 46 S. Proc., Pt. 4, 2003 Sess., p. 1010, remarks of Senator Williams ("[T]here's broad support for this bill. The National Organization of Women and the Connecticut Coalition [for] Choice are joined by the Conference of Catholic Clergy in a unique alliance in support of this legislation."); id., p. 1013, remarks of Senator Catherine W. Cook (praising "extraordinary work" of former state Representative Peter Nystrom in preceding year "in crafting that very unusual compromise between the pro-life folks and the pro-abortion folks"); id., p.

1014, remarks of Senator Toni Nathaniel Harp ("this bill goes a long way in reconciling some of the contradictions that may appear in the minds of those around women's right to choose"); 46 H.R. Proc., Pt. 7, 2003 Sess., p. 1982, remarks of Representative Jefferson B. Davis (stating that bill was "reasonable compromise"). To placate pro-life advocates, a new offense was created in the aggravated assault statute that increased the penalty for the assault of a pregnant woman by elevating the crime from a class B to a class A felony if it results in the termination of her pregnancy. To mollify pro-choice advocates, the legislature declined to make the new offense a crime against the unborn fetus because this would have granted the fetus legal rights independent of the mother. Thus, the essence of the compromise was to increase the penalty for an assault on a pregnant woman that results in the termination of her pregnancy *without* recognizing the fetus as a separate legal entity. The legislature accomplished this delicate balance by omitting any reference to the fetus in the statute, by using language emphasizing that the crime is against the woman and by naming it, "An Act Concerning Assault of a Pregnant Woman."[33]

[33] In light of this legislative history, the majority's claim that "there is only one possible reason why the legislature opted to include within the protection of [the aggravated assault statute] only those fetuses that are not born alive, namely, the born alive rule . . . which operates to protect an infant who suffers injuries in utero but who is born alive and then dies from those injuries," and its corresponding claim that I "[do not posit] any other conceivable reason why [the statute] excludes from its purview an infant who is born alive but who subsequently dies from injuries sustained in utero," misrepresent the record as well as my opinion. Footnote 54 of the majority opinion. The majority also goes on to assert that it is "unwilling to assume" that the legislature could have enacted the statute in response to the specific event in question, namely, the killing of a fetus in utero, without considering the born alive rule, thus ignoring the fact that the rule is inapplicable in that context and that the statute not only was enacted in response to a very specific crime, but ultimately became known as Jenny's Law in honor of the victim. Id. I also disagree with the majority's statement that the legislature would not have enacted the statute if it had not intended to recognize implicitly the born alive rule. Such comments are completely

The majority fails to appreciate this fact, consistently describing the aggravated assault statute as imposing a penalty for the killing of a fetus. If this had been the legislature's intention, however, the act never would have passed. As the demise of the fetal homicide bill demonstrates, the legislature was *unwilling* to recognize independent fetal rights in light of the strong opposition of pro-choice advocates. The born alive rule, under which the killing of a fetus is considered as murder as long as there is evidence to prove that the fetus was alive when the criminal act was committed, employs exactly the same solution as the fetal homicide bill, namely, granting the fetus independent legal rights by imposing a punishment expressly related to its death, a step that the Connecticut legislature clearly was unwilling to take.[34]

As previously stated, no member of the judiciary committee engaged in a discussion of the born alive rule, even when Forsythe and O'Brien mentioned the rule during the committee hearings. In the exchange to which the majority refers involving O'Brien and Representative Farr, Farr did not affirm the existence of the rule but merely asked O'Brien to clarify his comments

unsupported by the legislative history, which demonstrates, without question, that the legislature was attempting to achieve a compromise between pro-choice and pro-life advocates in the context of that unique situation and was not concerned with the issue of whether to penalize a defendant for inflicting fatal injuries on a fetus that is subsequently born alive.

[34] The majority reasons that the born alive rule does not have the same effect as the fetal homicide bill that the legislature rejected because, under the fetal homicide bill, a fetus would have been accorded the same treatment as a person, whereas, under the born alive rule, "the protection of the homicide statutes is extended only when the fetus is born alive and, consequently, is no longer a fetus but a child." Footnote 62 of the majority opinion. This analysis, however, is logically incoherent because, as previously noted, it requires severance of the temporal connection between the criminal act and the status of the victim, and transforms the rule into a substantive element of the crime, neither of which was contemplated under the traditional born alive rule.

distinguishing the born alive rule from penalties imposed for the death of a viable or nonviable fetus by asking whether "the bill . . . is actually going from conception, but it doesn't treat it as a separate case of murder *is that what you're saying.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2003 Sess., p. 426. O'Brien responded: "That's right. It's simply talking about the woman and her pregnancy, a pregnant woman." Id. The discussion thus concerned details relating to the aggravated assault statute, not the born alive rule.[35]

---

[35] The majority grossly inflates and, in my view, misrepresents, the remarks by Forsythe and O'Brien at the judiciary committee hearings. The hearing on the fetal homicide bill generated approximately 110 pages of transcribed testimony by approximately thirty witnesses. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2002 Sess., pp. 2224–28, 2308–18, 2331–33, 2335–36, 2338–62, 2382–89, 2402–39, 2448–65. Only two witnesses, Forsythe and O'Brien, mentioned the born alive rule in discussing the bill. Forsythe testified in his initial presentation that he had authored professional articles addressing issues involving the born alive rule and fetal homicide; id., p. 2402; and that the "lack of [a] remedy" in Connecticut for the killing of a fetus in utero was "due to the outdated and obsolete common law born alive rule." Id., p. 2403; see also id., p. 2404 (referring to "the outdated born alive rule"). Forsythe described the rule as "a rule of location, a rule of evidence"; id., p. 2403; and, in light of modern medical knowledge, as a rule that leads to "absurd results." Id., p. 2404. Forsythe also indicated that several other states had abolished the born alive rule by adopting fetal homicide laws. See id., pp. 2412, 2414. Together, these few remarks represented less than one out of fifteen pages of his transcribed testimony and constituted nothing more than his personal opinion that the born alive rule was part of the common law of this state. Significantly, committee members asked *no* questions and made *no* comments in response to Forsythe's references to the born alive rule, which were buried in his discussion of the fetal homicide bill. Those few questions that were directed to Forsythe concerned his knowledge of fetal homicide laws in other jurisdictions, which purport to treat the death of a fetus in the same manner as the death of a person, prosecutions for the death of a fetus in other jurisdictions, differences among the states regarding fetal viability limitations under their respective homicide laws, and the applicability of constitutional law relating to abortion. Id., pp. 2404–2409. O'Brien provided only three pages of transcribed testimony in which he never discussed the born alive rule. See id., pp. 2417–20. O'Brien *was asked only one question about whether he believed the fetal homicide bill should contain a provision on viability,* to which he responded in the negative. Id., p. 2420.

Finally, with respect to the majority's focus on legislative history, it is more than ironic that the majority finds the enactment of the aggravated assault statute equivalent to legislative affirmation of the born alive rule when it also declares that the statutory provisions pertaining to murder and the definition of "person," the only relevant statutes in the present case, are unclear and that the pertinent legislative history of *those* provisions "offers no guidance with respect to the issue [of] . . . whether a person who murders a pregnant woman also may be found guilty of the murder of the baby if the baby is born alive and later dies from the injuries

The hearing on the aggravated assault bill produced approximately eleven pages of transcribed testimony from six witnesses. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2003 Sess., pp. 424–26, 461–66, 477. The *only* witness referring to the born alive rule was O'Brien, who stated in his initial presentation that the proposed legislation continued "Connecticut's adherence to [the] medically obsolete . . . born alive rule," which had been created "as a rule of evidence." Id., p. 424. O'Brien later suggested several changes to the proposed legislation. See id., p. 425. Following these remarks, and in response to a question regarding whether there should be any limitation on the age of the fetus at the time of the assault on the pregnant woman, O'Brien replied that the law should "apply at any stage of gestation. Essentially, that's what Connecticut has on the books, or at least by common law today. The problem is not that we don't recognize the unborn child in Connecticut as a person. The problem is that we have the born alive rule to prove that it's a person. It's got to take its first breath." Id., p. 426. Representative Robert Farr then asked: "But the [proposed legislation] . . . is actually going from conception, but it doesn't treat it as a separate case of murder is that what you're saying." Id., remarks of Representative Robert Farr. O'Brien responded: "That's right. It's simply talking about the woman and her pregnancy, a pregnant woman." Id. Representative Farr made one other minor comment, also unrelated to the born alive rule, before the next witness testified. Id. On the basis of this testimony, it is abundantly clear that there was no discussion of the born alive rule during the two judiciary committee hearings, as no committee member directed a single question to any witness regarding the meaning or relevance of the born alive rule under Connecticut law. Similarly, there was no discussion of, or reference to, the born alive rule during subsequent debate on the aggravated assault bill in the House and Senate chambers. Thus, the majority's repeated and unsupported assertions that the legislature considered the born alive rule because of the few *unsolicited* comments made by Forsythe and O'Brien at the hearings can be described only as a misrepresentation of the record.

inflicted while the baby is in utero," a conclusion shared by the trial court in this case.

In addition to its common-law analysis, which is entirely irrelevant in light of the fact that adoption of the Penal Code in 1969 abrogated our common law of crimes; see, e.g., *State* v. *Ross*, supra, 230 Conn. 197; the majority maintains that the born alive rule fills a "gap" in the law; footnote 54 of the majority opinion; because, but for the existence of that rule, there would be no penalty for the infliction of fatal injuries on a fetus that is subsequently born alive. I agree that the aggravated assault statute was not intended to address situations in which an assault causes the death of a fetus after it is born alive. I also believe, however, that the current lack of a penalty in Connecticut for causing such a death does not represent a gap in the law. The legislature merely has determined that an assault of a pregnant woman that results in the termination of her pregnancy is a class A felony. As the legislative history of the aggravated assault statute demonstrates, the legislature declined to grant the fetus independent legal rights in the face of strong opposition by pro-choice advocates, and, therefore, it never has enacted a law directly imposing any type of penalty for causing the death of a fetus, either before or after it is born. The majority's mischaracterization of the statute as imposing such a penalty in support of its assertion that a gap in the law exists reflects, at best, a serious misunderstanding of the legislative history and, at worst, a misguided attempt to create a theoretical justification for adopting the born alive rule.[36] I agree with the majority

---

[36] To the extent that the majority relies on the concept of a "gap" to justify the imposition of a penalty for the infliction of fatal injuries on a fetus that is subsequently born alive, its reasoning is flawed. Footnote 54 of the majority opinion. Any new law may be viewed as filling a "gap" because a new law, by definition, is intended to resolve an issue that never has been addressed. Thus, recognition of the fact that every new law is intended to fill a gap renders the concept of a gap to justify adoption of the born alive rule in the present case essentially meaningless.

that the lack of such a penalty is a matter of concern. The imposition of a penalty by judicial fiat in the absence of clear legislative guidance, however, defies legal and common sense, and interferes with the prerogatives of another branch of government. See *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 505 ("For this court to explore new fields of crime is foreign to modern concepts of justice and raises serious questions of separation of powers between it and the legislature. Therefore, any redefining of the word 'person' must be left to the legislature, which has the primary authority to define crimes."); see also *State* v. *Gray*, 62 Ohio St. 3d 514, 518, 584 N.E.2d 710 (1992) ("[a] court should not place a tenuous construction on [a] statute to address a problem to which the legislative attention is readily directed and which it can readily resolve if in its judgment it is an appropriate subject of legislation" [internal quotation marks omitted]). Furthermore, the majority's adoption of the born alive rule means that the penalty for causing the death of a fetus that is fatally injured but subsequently born alive will be far greater than the penalty established by the legislature for the assault of a pregnant woman that results in the termination of her pregnancy. Accordingly, although there is presently no punishment for causing the death of a fetus who dies after birth from prenatal injuries, adoption of the

---

With respect to *State* v. *Lamy*, supra, 158 N.H. 517 and n.3, on which the majority relies in claiming that my view that the legislature imposed a penalty for the termination of a pregnancy under the aggravated assault statute without implicitly recognizing the born alive rule is "suspect" because "seventeen of our sister states [and Connecticut] still retain some form of the . . . rule"; (internal quotation marks omitted); the New Hampshire court is incorrect with respect to at least nine of those states. Seven of the seventeen states cited in *Lamy*, namely, Alaska, Colorado, Maryland, Nebraska, Oregon, Virginia and West Virginia, have statutorily rejected the born alive rule, this court never has considered whether to adopt the rule, and the Supreme Court of Hawaii has stated in dictum that the more cogent rule is that "the defendant's conduct must occur at a time when the victim is within the class contemplated by the legislature." *State* v. *Aiwohi*, supra, 109 Haw. 126.

born alive rule will create a new legal conundrum because perpetrators now will be exposed to two different consequences for essentially the same conduct, merely on the basis of whether the fetus dies before or after it is born. Subjecting the perpetrator to two different penalties depending on how long it takes the victim to die is, to my knowledge, unheard of in any other criminal context,[37] finds no support in the legislative history of the fetal homicide bill and, as previously noted, raises serious due process concerns. Creating a second penalty with vastly different consequences for the death of a fetus that dies from prenatal injuries after birth also will have the reprehensible effect of providing an incentive for the perpetrator to conduct an even more brutal and vicious attack on a pregnant woman to ensure that the fetus dies in utero and thus escape the more serious punishment of death that will very likely follow if the fetus dies after birth. Such an absurd and bizarre result could not have been intended by the legislature.

Contrary to the majority's claim, it is the majority's adoption of the born alive rule, not my interpretation of the relevant statutes and legislative history, that will "[violate] several cardinal principles of statutory construction." These include the well established canon

---

[37] I distinguish the majority's interpretation of the born alive rule, which no longer functions as a rule of causation, from the common-law year and a day rule, a rule of causation that "bars a conviction for homicide if the victim does not die within one year and one day of the conduct that caused the death." *Valeriano* v. *Bronson*, supra, 209 Conn. 77. "The year and a day rule can be traced to [a thirteenth century English statute]. The reason assigned for that rule was that if the person alleged to have been murdered die[d] after that time, it [could not] be discerned, as the law presumes, whether he died of the stroke or poison, etc., or a natural death; and in case of life, rule of law ought to be certain. *Louisville, E. & St. Louis R. Co.* v. *Clarke*, 152 U.S. 230, 239, 14 S. Ct. 579, 38 L. Ed. 422 (1894), quoting 3 E. Coke, Institutes (2d Ed. 1648) p. 53." (Internal quotation marks omitted.) *Valeriano* v. *Bronson*, supra, 77–78 n.3. As I noted previously, Connecticut never has recognized this common-law rule.

that "[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 542–43 n.28, 949 A.2d 1092 (2008). Statutes also must be interpreted so as to ensure consistency and to avoid bizarre results. See, e.g., *Dias* v. *Grady*, 292 Conn. 350, 361, 972 A.2d 715 (2009) ("those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results" [internal quotation marks omitted]). The majority's construction of our murder statute violates these principles because the statute does not plainly apply to the killing of a fetus that is fatally injured but is subsequently born alive. The majority thus fails to construe the statute strictly against the state.

To the extent that any lingering doubt remains as to how the murder statute should be construed, I believe that the court must rely on the well established rule of lenity, which directs that any ambiguity in a capital felony statute must be interpreted in favor of the defendant; see *State* v. *Harrell*, 238 Conn. 828, 832–33, 838, 681 A.2d 944 (1996); a point I also made in my dissenting opinion in *State* v. *Courchesne*, 262 Conn. 537, 597–99, 609–13, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting). In *Courchesne*, the question before the court was whether, when a defendant has been convicted of capital felony for the "murder of two or more persons at the same time or in the course of a single transaction" under General Statutes (Rev. to 1997) § 53a-54b (8), and the state seeks a death sentence, the state is required to prove the existence of the aggravating factor enumerated in General Statutes § 53a-46a (i) (4), namely, that

the defendant committed the killing in "an especially heinous, cruel or depraved manner," as to both of the victims or only one of the victims. Id., 542. The majority in *Courchesne* conceded that the text of the statutes favored the defendant's interpretation that the state must prove that both of the victims had been murdered in an especially heinous, cruel or depraved manner; see id., 546–47; but declined to apply the rule of lenity to resolve ambiguities in the statute's language. See id., 555–56; see also id., 597–98 (*Zarella, J.*, dissenting). I disagreed with the majority for its failure to follow the rule's clear command, especially in the context of a capital felony. See id., 597–99, 609–13. We are now presented with a similar question involving a related statute, and, once again, I disagree with the majority's decision in the present case to ignore this venerable rule.

As I stated in *Courchesne*, "[t]he rule of lenity, which embodies the fundamental constitutional principles of due process and the separation of powers; see, e.g., *United States* v. *Bass*, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971); provides that our death penalty statute should not be applied unless the legislature '*expressly* so intend[s].' " (Emphasis in original.) *State* v. *Courchesne*, supra, 262 Conn. 598 (*Zarella, J.*, dissenting), quoting *State* v. *Harrell*, supra, 238 Conn. 832. The reason why the rule of lenity has become an important due process consideration in this and other jurisdictions is that, "when choice has to be made between two readings of what conduct [the legislature] has made a crime, it is appropriate, before we choose the harsher alternative, to require that [the legislature] should have spoken in language that is clear and definite. . . . This principle is founded on two policies that have long been part of our tradition. First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to

do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. . . . Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should. . . . Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." (Citations omitted; internal quotation marks omitted.) *United States* v. *Bass*, supra, 347–48. The rule of lenity carries added significance in death penalty cases, in which the ultimate punishment may be imposed.

The provision now before the court is General Statutes § 53a-54a (a), which provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person . . . he causes the death of such person or of a third person . . . ." General Statutes § 53a-3 (1) defines "person" as "a human being . . . ." The majority states that the statutory provisions are unclear and that the pertinent legislative history "offers no guidance with respect to the issue [of] . . . whether a person who murders a pregnant woman also may be found guilty of the murder of the baby if the baby is born alive and later dies from the injuries inflicted while the baby is in utero, in the course of the intentional killing of the mother." The trial court, *Damiani, J.*, likewise indicated in its memorandum of decision on the defendant's motion to dismiss for lack of probable cause that there is no express statutory authority in Connecticut for the proposition that the definition of "person" under the murder statute includes a fetus that is born alive and later succumbs to injuries inflicted in utero. See *State* v. *Courchesne*, supra, 46 Conn. Sup. 66–67. Consequently, the majority and the

trial court both have concluded that there is no express intention in the statutory scheme to impose the death penalty when the second of two deaths occurring in the course of the same transaction involves a fetus that is fatally injured but is subsequently born alive. In these circumstances, the rule of lenity not only should, but must, be applied to resolve the lack of an express intention in the statutory scheme;[38] see, e.g., *United States* v. *R. L. C.*, 503 U.S. 291, 305, 112 S. Ct. 1329, 117 L. Ed. 2d 559 (1992) (rule of lenity reserved for "those situations in which a reasonable doubt persists about a statute's intended scope" [internal quotation marks omitted]); and the majority's failure to do so constitutes a fatal flaw in its analysis.

In closing, I return to the words of Justice Holmes, who offered the following additional thoughts when reflecting on the question of whether well established rules of law should be perpetuated: "[I]f we want to know why a rule of law has taken its particular shape, and more or less if we want to know why it exists at all, we go to tradition. . . . [W]e find out the practical motive for what now best is justified by the mere fact of its acceptance and that men are accustomed to it. The rational study of law is still to a large extent the study of history. History must be a part of the study, because without it we cannot know the precise scope of rules which it is our business to know. It is a part of the rational study, because it is the first step toward an enlightened [skep]ticism, that is, toward a deliberate reconsideration of the worth of those rules. When you get the dragon out of his cave on to the plain and in the daylight, you can count his teeth and claws, and

---

[38] Just as I stated in *State* v. *Courchesne*, supra, 262 Conn. 611–12 n.8 (*Zarella, J.*, dissenting), I do not take up, in the present case, the question of whether the rule of lenity should be applied before or after resorting to other sources of statutory interpretation because I do not believe such sources assist in clarifying the statutes at issue.

see just what is his strength. But to get him out is only the first step. The next is either to kill him, or to tame him and make him a useful animal." O. Holmes, supra, 10 Harv. L. Rev. 469. Having gotten the dragon out of his cave and examined the roots of the born alive rule, and having come to understand its creation as an evidentiary tool that was used to determine whether the fetus was alive at the time of the criminal conduct, I believe that it is clear that advances in medical science have rendered the rule obsolete, a conclusion now shared by the vast majority of other jurisdictions. It is time to slay the dragon for the purpose of creating a more useful rule that will establish criminal responsibility for the killing of a fetus, regardless of when it dies. This is a task for the legislature, not the courts, because it requires the kind of open and vigorous public debate that is unique to the exercise of legislative discretion. Until that time, the court must rely on the rule of lenity, which mandates that any ambiguity in a capital felony statute be construed in favor of the defendant absent an express intention in the statutory scheme. *State* v. *Harrell*, supra, 238 Conn. 832–33. Accordingly, I respectfully dissent with respect to parts II through V of the majority opinion.

SCHALLER, J., concurring in part and dissenting in part. I agree with the majority's decision in part I of its opinion that the trial court properly denied the motion of the defendant, Robert Courchesne, to suppress his written confessions and other evidence connecting him with the murder of Demetris Rodgers (Rodgers). I disagree, however, with respect to the majority's conclusions in parts II through V of its opinion concluding that the born alive rule is embodied in our Penal Code and that the defendant had fair notice that the rule would apply to his conduct, construing the doctrine of transferred intent in novel fashion, and remanding the case for a new trial, at which the state will have another

opportunity to prove that Antonia Rodgers (Antonia) was alive at birth. With respect to these conclusions, I generally agree with and, in that regard, join in Justice Zarella's concurring and dissenting opinion concluding that the born alive rule is antiquated, illogical and incoherent, that Connecticut's murder statute requires that a victim be a "person" at the time of the criminal act and that the rule of lenity counsels us to resolve any ambiguity in our murder and capital felony statutes in favor of the defendant. I write separately to emphasize that, by virtue of the majority's conclusions, the defendant has been denied the due process required by the fourteenth amendment to the United States constitution, and further, will be subject to double jeopardy upon retrial.

I emphasize at the outset that in 1998, at the time of the events underlying the defendant's convictions, the termination of a pregnancy in utero resulting from an assault was not an independent criminal act, as to either the fetus or the mother.[1] The primary issue on appeal is whether *Connecticut's law, in 1998,* provided sufficient notice and fair warning to the defendant that, by stabbing Rodgers, he would be subject to the death penalty pursuant to General Statutes (Rev. to 1997) § 53a-54b (8) and (9)[2] for an assault upon a fetus—a noncriminal

---

[1] The act against a fetus is to be distinguished from the underlying assault on its mother that results in the termination of a pregnancy. In 2003, five years after the underlying events in the present case, the legislature enacted General Statutes § 53a-59c, which criminalized as a class A felony the assault of a pregnant woman when the "assault results in the termination of pregnancy that does not result in a live birth." General Statutes § 53a-59c (a) (2). To date, the legislature has yet to adopt a statute recognizing a fetus itself as a potential "victim" of assault.

[2] Pursuant to General Statutes (Rev. to 1997) § 53a-54b, "[a] person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age." Pursuant to General Statutes § 53a-54a (a), "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

act—because an emergency cesarean section delivery by medical professionals approximately one hour later[3] would result in the "birth" and subsequent "death"[4] of a second, juvenile victim, Antonia.[5] In concluding that the defendant's due process rights to notice and fair

[3] I recognize that medical intervention generally may be expected to follow an assault and that, in certain instances, such intervention can affect the degree of criminality of particular conduct. For example, a defendant may be charged with attempted murder instead of murder only because of the fortuity of timely and successful medical intervention. In the present case, however, successful medical intervention resulted in the defendant being subject to *harsher*, rather than lesser, criminal penalties. Such a result is, in my opinion, thoroughly bizarre and, accordingly, could not reasonably have been expected by the defendant or any other resident of Connecticut.

[4] Because, in light of the resolution of this appeal, the issue of whether Antonia ever was "alive" remains open, I place the terms "birth" and "death" in quotation marks.

[5] Simply put, the combined effect of unforeseeable events and a novel interpretation of our murder statutes as applied to those events has transformed the death of a fetus in utero, which at the time of the defendant's assault of Rodgers was a noncriminal act, into an offense eligible for the death penalty. Compare *Chapman* v. *United States*, 500 U.S. 453, 467–68, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (noting, in rejecting due process claim, that "whatever debate there is [over meaning of statute] would center around the appropriate sentence, and not the criminality of the conduct"), reh. denied, 501 U.S. 1270, 112 S. Ct. 17, 115 L. Ed. 2d 1101 (1991), superseded by statute on other grounds as stated in *United States* v. *Clark*, 110 F.3d 15 (6th Cir. 1997); *Knutson* v. *Brewer*, 619 F.2d 747, 750 (8th Cir. 1980) (rejecting argument that defendant had due process right to expect to be convicted of lesser crime only, finding it "significant that the issue of construction involved here is not the drawing of a line between legal conduct and illegal conduct"); *State* v. *Payne*, 240 Conn. 766, 779, 695 A.2d 525 (1997) (rejecting due process claim when "defendant has made no plausible argument, nor can we conceive of one, that he acted in reliance on the belief that his conduct was lawful, or that a person of ordinary intelligence would have no reason to know that he was engaging in prohibited conduct"), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 490, 849 A.2d 760 (2004); J. Jeffries, "Legality, Vagueness, and the Construction of Penal Statutes," 71 Va. L. Rev. 189, 196 (1985) (among "factors considered in the vagueness inquiry . . . [is] whether the uncertainty affects the fact or merely the grade of criminal liability").

In rejecting the defendant's due process claim, the majority, employing inflammatory language designed to evoke sympathy, twice confuses the analysis by conflating the question of whether the defendant knew that killing Rodgers was a criminal act with the question of whether he had

warning were not violated and, therefore, upholding the applicability of our death penalty statute in this instance, the majority has relied on, not one, but two, highly questionable legal fictions. The first is the common-law born alive rule; the second is the doctrine of transferred intent. Because neither the statutes defining murder, nor their legislative history or any prior, authoritative judicial construction of those statutes gave any indication that the born alive rule had been incorporated as part of our criminal code, the defendant cannot, consistent with federal due process principles, be charged constructively with having had knowledge and fair warning that the rule would apply to him and render him eligible for the penalty of death. Furthermore, the legislature did not provide sufficient guidance to prosecutors, judges and juries as to whether it intended the conduct at issue to be proscribed, leading to the arbitrary result of the defendant facing execution while another equally culpable individual has escaped punishment entirely for committing essentially the same act and achieving the same result. See *State* v. *Lanier*, 276 Conn. 399, 401, 886 A.2d 404 (2005). Alternatively, even if this court's adoption and retroactive application of the born alive rule in the present case somehow were constitutionally proper, because the state at trial failed to disprove that Antonia had suffered an irreversible cessation of brain activity prior to her "birth," the evidence was insufficient to establish that she was born "alive." Accordingly, it is clear that a judgment of acquittal, rather than a new trial, should be ordered with respect to the charges arising from the death of Antonia.[6] For the foregoing reasons, I respectfully dissent.

notice that the death of her fetus would result in an additional charge of murder. Obviously, those issues are entirely distinct, and the defendant raises no claim that prosecuting him for the murder of Rodgers offends due process.

[6] Because the evidence was insufficient to convict and, therefore, the proper remedy is a judgment of acquittal, the majority's remand of the case

I

A

As the majority observes, to be eligible for the death penalty pursuant to § 53a-54b (8) and (9), the defendant must have been responsible for the death of two or more "persons" or the death of a "person" under sixteen years of age, respectively. See footnote 2 of this concurring and dissenting opinion. The issue of whether the defendant had notice and fair warning that the eleventh hour, emergency cesarean section delivery resulting in the "birth" and subsequent "death" of Antonia would transform the noncriminal act of an assault upon a fetus in utero into a second act of murder rendering him eligible for the death penalty, therefore, turns primarily on whether the legislature's use of the word "person" in our criminal statutes made it sufficiently clear to the defendant that his actions could lead to an additional criminal prosecution, i.e., prosecution beyond that for the murder of Rodgers.[7] With respect to the clarity required for statutes proscribing particular conduct, Justice Oliver Wendell Holmes explained that "fair

for a new trial violates the defendant's rights against double jeopardy. "The [d]ouble [j]eopardy [c]lause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Burks v. United States, 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). "The [c]lause does not allow the [s]tate . . . to make repeated attempts to convict an individual for an alleged offense, since [t]he constitutional prohibition against double jeopardy was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." (Internal quotation marks omitted.) Id. Because "the [d]ouble [j]eopardy [c]lause precludes a second trial once [a] reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." Id., 18.

[7] If the "death" of Antonia qualifies as the "murder of a person under sixteen years of age" pursuant to subdivision (9) of General Statutes (Rev. to 1997) § 53a-54b, it necessarily follows that it also qualifies as a second murder pursuant to subdivision (8). I review the law, therefore, with an eye toward determining whether the defendant's conviction for the alleged murder of Antonia could stand on its own pursuant to subdivision (9).

warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle* v. *United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931). Simply stated, "[t]he . . . principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *Bouie* v. *Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964), quoting *United States* v. *Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954).

"There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). "[T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning."[8] (Internal quotation marks omit-

---

[8] Although I acknowledge that some degree of reliance on secondary legal resources as interpretive aids may be appropriate when determining whether a statute is unconstitutionally vague, I disagree with *the extent* of the majority's use of such materials in this death penalty case, particularly in light of the complete dearth of support for the majority's conclusion in the most relevant places, i.e., the statutory language, legislative history, other Connecticut statutes or authoritative Connecticut jurisprudence existing in 1998. It is not so much the majority's methodology of using the ordinary tools of

ted.) *State* v. *Winot*, 294 Conn. 753, 759, 988 A.2d 188 (2010). "The general rule is that the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 192, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

"Second, as a sort of 'junior version of the vagueness doctrine,' H. Packer, The Limits of the Criminal Sanction [(1968) p. 95], the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States* v. *Lanier*, supra, 520 U.S. 266. "Courts must avoid imposing criminal liability where the legislature has not *expressly* so intended." (Emphasis added.) *State* v. *Breton*, 212 Conn. 258, 268–69, 562 A.2d 1060 (1989). Accordingly, "[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." (Internal quotation marks omitted.) *State* v. *Jones*, 234 Conn. 324, 340, 662 A.2d 1199 (1995); see also *State* v. *Brown*, 235 Conn. 502, 517, 668 A.2d 1288 (1995); *State* v. *Hinton*, 227 Conn. 301, 317, 630 A.2d 593 (1993). Strict construction of criminal statutes is particularly apt within the context of a capital felony case in light of the unparalleled severity and irreversible nature of the penalty.[9] "It is axiomatic that any statutory construction implicating the death penalty must be

statutory construction with which I take issue, but the fact that the most powerful of those tools either reveal nothing as to what our legislature intended or, worse, suggest a conclusion contrary to the majority's conclusion.

[9] Indeed, the rule of strict construction of criminal statutes originated within the context of capital punishment, in recognition of the severity of that punishment. See 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 2.2 (d), pp. 123–24.

based on a conclusion that the legislature has *clearly and unambiguously* made its intention known. . . . The rules of strict construction and lenity applicable to penal statutes generally are 'especially pertinent to a death penalty statute such as § 53a-54b.' "[10] (Citations omitted; emphasis added.) *State* v. *Harrell*, 238 Conn. 828, 833, 681 A.2d 944 (1996); see also *State* v. *McGann*, 199 Conn. 163, 177–78, 506 A.2d 109 (1986) (overturning trial court's novel construction of murder for hire portion of murder statute which had led to capital felony conviction).

"Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope . . . ." (Citations omitted.) *United States* v. *Lanier*, supra, 520 U.S. 266. "If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect."[11] (Internal quotation

---

[10] "No doubt some criminal statutes deserve a stricter construction than others. Other things being equal, felony statutes should be construed more strictly than misdemeanor statutes; those with severe punishments more than those with lighter penalties; those involving morally bad conduct more than those involving conduct not so bad; those involving conduct with drastic public consequences more than those whose consequences to the public are less terrible; those carelessly drafted more than those done carefully." 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 2.2 (d), p. 126. This case presents most, if not all, of the foregoing hallmarks counseling stricter construction in favor of the defendant.

[11] This is because "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as [a]rt. I, § 10, of the [c]onstitution forbids. An ex post facto law has been defined by [the United States Supreme Court] as one that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action, or that aggravates a crime, or makes it greater than it was, when committed. . . . If a state legislature is barred by the [e]x [p]ost [f]acto [c]lause from passing such a law, it must follow that a [s]tate Supreme Court is barred by the [d]ue [p]rocess [c]lause

marks omitted.) *Bouie* v. *Columbia*, supra, 378 U.S. 354; see also *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 806, 950 A.2d 1220 (2008). Similarly, "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect . . . where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (Internal quotation marks omitted.) *Rogers* v. *Tennessee*, 532 U.S. 451, 462, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001).

No concrete guidelines are prescribed for courts seeking to make a substantive determination about whether a statute is vague, or whether a new interpretation of a statute is unexpected or indefensible with reference to previously stated law. See *Ortiz* v. *N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 157 (2d Cir. 2009) ("[t]he due process right to fair notice is a . . . general rule of law that demand[s] a substantial element of judgment . . . and can hardly be implemented . . . mechanically" [internal quotation marks omitted]); see also 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 2.3 (a), p. 146 ("[t]here is no simple litmus-paper test for determining whether a criminal statute is void for vagueness"). In either due process guise, however, "the touchstone is whether the statute, either standing alone or as construed, made it *reasonably clear at the relevant time* that the defendant's conduct was criminal." (Emphasis added.) *United States* v. *Lanier*, supra, 520 U.S. 267.

In his motion to dismiss the charge of murder as to Antonia, the defendant argued both that Antonia was "not a person, as defined by . . . [General Statutes]

from achieving precisely the same result by judicial construction." (Citation omitted; internal quotation marks omitted.) *Bouie* v. *Columbia*, supra, 378 U.S. 353–54.

§ 53a-3 (1)" and that, should the trial court determine
to the contrary, such a novel interpretation could not
apply retroactively to the defendant without violating
his constitutional rights to notice and fair warning. In
denying the defendant's motion to dismiss, the trial
court, *Damiani, J.*, concluded "that the murder and
capital felony statutes as applied to the facts of [this]
case are not ambiguous" such that the rule of lenity
would apply. *State* v. *Courchesne*, 46 Conn. Sup. 63, 70,
757 A.2d 699 (1999). According to the trial court, the
Superior Court opinion in *State* v. *Anonymous (1986-
1)*, 40 Conn. Sup. 498, 516 A.2d 156 (1986) (*Anony-
mous*), "can be considered to have actually given notice
that the defendant's actions concerning Antonia consti-
tuted a murder separate from that of [Rodgers]." *State*
v. *Courchesne*, supra, 72. In other words, the trial court
held that the statutes, along with the judicial gloss pro-
vided by *Anonymous*, clearly applied to the defendant
and were not unconstitutionally vague.[12] Id. The trial
court, recognizing that nothing in the statutory language
or legislative history of the murder statutes addressed
the issue at hand, also relied on related provisions from
the Model Penal Code and New York Penal Code and
two criminal law treatises to interpret the statutes. I
disagree with the trial court that the statutes defining
murder, even with the assistance of these interpretative
aids, are not unconstitutionally vague as applied to the
defendant's conduct.[13]

Beginning with the statutory language, the most obvi-
ous source of fair warning as to what conduct is pro-
scribed within a jurisdiction, § 53a-3 (1) defines a
" '[p]erson,' " in relevant part, as "a human being

---

[12] In analyzing the claim, the trial court cited to state and federal
vagueness jurisprudence.

[13] The trial court also rejected the defendant's retroactivity claim. Specifi-
cally, the court disagreed that prosecution of the defendant for the murder
of Antonia in reliance on the born alive rule was an impermissible retroactive
application of a *novel* judicial construction because "the rule [that] applies
to establish the defendant's liability was not created after he acted. That

rule existed before the murder and capital felony statutes were enacted and continues to be in effect after their enactment." *State* v. *Courchesne,* supra, 46 Conn. Sup. 72.

On appeal, although the defendant continues to press both vagueness and retroactivity claims, the majority opinion, while at times reciting vagueness principles, does not address the vagueness claim directly but, instead, characterizes the defendant's due process argument as invoking only the retroactivity doctrine. The majority proceeds to rely heavily on cases that involved that doctrine, i.e., cases in which the court openly acknowledged that the decision involved *a change* in the law. It is, therefore, unclear whether the majority: (1) agrees with the trial court that the statutes, as previously construed in *Anonymous,* are not vague and that they clearly incorporate the born alive rule, but that this court nevertheless is changing the law by adopting a novel construction of the statutory language for the first time today; (2) concludes, contrary to the trial court, that the statutes are vague as to whether the born alive rule was incorporated, but that any vagueness may be cured by retroactive judicial construction that is neither unexpected or indefensible with reference to the same preexisting law that was insufficient to defeat the vagueness claim; or (3) concludes, contrary to the trial court, that the statutes are not vague and do *not* incorporate the born alive rule, but that this court retroactively may enlarge the scope of the statutory definition of "person" to include the rule because such construction is not unexpected or indefensible with reference to previously stated law. In light of the fundamental confusion that confounds the majority's position, evidenced by the amalgamation of vagueness and retroactivity principles that permeates its due process analysis, it is ironic that the majority criticizes my understanding of well established due process jurisprudence.

The majority's approach is problematic, regardless of which of the foregoing paths it has chosen. As to the first option, if, as the trial court found, the statutes are unambiguous and clearly incorporated the born alive rule, there simply is no occasion for this court to decide whether it improperly is applying retroactively a novel construction of those statutes. See *Ortiz* v. *N.Y.S. Parole in Bronx, N.Y.,* supra, 586 F.3d 158 (because "case does not involve any expansion in the scope of criminal liability beyond that indicated by previous decisional law," federal court "need not consider whether the New York courts have worked an impermissible retroactive *change* in the law, violating due process by adopting a new judicial interpretation that was 'unexpected and indefensible' by reference to what courts had said before," but need only determine whether, as state court held, statute itself provided fair warning [emphasis in original]); *Dale* v. *Haeberlin,* 878 F.2d 930, 932 (6th Cir. 1989) ("[b]efore determining whether the Kentucky Supreme Court violated the [c]onstitution by retroactively applying an unanticipated change in state law, we must be certain that the opinion . . . actually changed existing Kentucky law"), cert. denied, 494 U.S. 1058, 110 S. Ct. 1528, 108 L. Ed. 2d 767 (1990); compare *Rogers* v. *Tennessee,* supra, 532 U.S. 455 (acknowledging that Tennessee Supreme Court's abolition of year and a day rule represented change from previously articulated law before concluding that change was neither unexpected nor indefensible);

. . . ." Because "human being" is not further defined

*Marks* v. *United States*, 430 U.S. 188, 194, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (noting that United States Supreme Court had announced new standards that significantly extended reach of federal obscenity statutes before deciding whether standards could be applied retroactively); *Bouie* v. *Columbia*, supra, 378 U.S. 351–52 (concluding that statute was narrow, precise and clearly did not encompass conduct at issue before deciding whether judicial enlargement of statute could be applied retroactively); *State* v. *Miranda*, 260 Conn. 93, 106–10, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (this court's determination that assault statute had been violated based on failure to act, when all previous case law had been based on affirmative conduct, was reasonably foreseeable change).

As to the second option, I question whether a statute, once having been found unconstitutionally vague after reference to appropriate interpretative aids, may then be rehabilitated by a retroactive judicial construction that purports to be expected and defensible by reference to those same interpretative aids. "[W]here vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot be cured in a given case by a construction in that very case placing valid limits on the statute, for the objection of vagueness is twofold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. *The former objection could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured for the future by an authoritative judicial gloss.*" (Emphasis added; internal quotation marks omitted.) *Bouie* v. *Columbia*, supra, 378 U.S. 352–53.

As to the third option, I disagree that this court, if it were to conclude that the murder statutes were unambiguous and did not incorporate the born alive rule, nevertheless could read the rule into the statutes and then apply that construction retroactively. Connecticut is a "code" state that has relegated the defining of crimes exclusively to the legislature. See Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-4 (West 2007), commission comment; see also *Vo* v. *Superior Court*, 172 Ariz. 195, 204, 836 P.2d 408 (App. 1992) (noting "[critical] distinction between 'code states,' which have abolished common law crimes and provide that no crime can be defined other than by the legislature, and 'common law states,' which recognize common law crimes and allow judicial decisions to fashion expanded definitions of crimes"). Although this court may consider the common law for purposes of discerning legislative intent; see *Vo* v. *Superior Court*, supra, 204; see also *State* v. *Soto*, 378 N.W.2d 625, 627 (Minn. 1985); its authority *to adopt or to recognize itself common-law doctrine* is limited by the plain language of the code's savings clause, which is included at the outset of chapter 951 of the General Statutes and provides: "The provisions of *this chapter* shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with *such provisions*." (Emphasis added.) General Statutes § 53a-4. Clearly, in light of the savings clause, we are limited to recognizing basic common-law principles of and defenses to criminal liability not incon-

sistent with those set out in chapter 951 of the Penal Code. Contrary to the majority's suggestion, we are not authorized to adopt *any* common-law principles, so long as they are not inconsistent with *any other* part of the Penal Code. Chapter 951 comprises General Statutes §§ 53a-4 through 53a-23, which "set out the basic principles of and defenses to criminal liability." Commission to Revise the Criminal Statutes, Penal Code Comments, supra, commission comment, p. 323. Section 53a-3, which includes the definition of " '[p]erson,' " falls within chapter 950, enumerating "general provisions" of the Penal Code, and § 53a-54a, which proscribes murder, falls within chapter 952, enumerating substantive offenses of the Penal Code. See *State* v. *Miranda*, 245 Conn. 209, 220, 715 A.2d 680 (1988) ("[t]he definition of proscribed results constitutes the substantive crime" [internal quotation marks omitted]). The savings clause simply does not permit this court to supplement provisions of chapters 950 and 952 with common-law doctrine, and, therefore, we cannot supplement §§ 53a-3 and 53a-54a with common-law rules unexpressed by the legislature. As explained by the accompanying commission comment, the inclusion of the savings clause "does not mean . . . that the court is free to fashion additional substantive offenses, for the [Penal] Code precludes, by repealing section 54-117, the notion of common law crimes." Commission to Revise the Criminal Statutes, Penal Code Comments, supra, commission comment, p. 323. If this court today, as a matter of common-law adjudication, were to adopt the born alive rule, it effectively would be defining an element of a substantive offense in direct contravention to the foregoing stricture. See *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 631–32, 470 P.2d 617, 87 Cal. Rptr. 481 (1970) (declining to change statutory definition of human being because "the power to define crimes and fix penalties is vested exclusively in the legislative branch" and explaining that "we would undoubtedly act in excess of the judicial power if we were to adopt the . . . proposed construction"), superseded by statute as stated in *Wilson* v. *Kaiser Foundation Hospitals*, 141 Cal. App. 3d 891, 190 Cal. Rptr. 649 (1983); compare *Commonwealth* v. *Cass*, 392 Mass. 799, 803, 467 N.E.2d 1324 (1984) (disagreeing that changing statutory definition of person required legislative action because, "[*w*]*hile this may be true in code jurisdictions*, it is not true in [Massachusetts], where our criminal law is largely common law" [emphasis added]).

In sum, I analyze the defendant's due process claim within the void for vagueness rubric because the trial court disposed of the claim on that basis, the defendant continues to press a vagueness claim on appeal that cannot simply be bypassed, and the issue presented, at root, is whether *the legislature*, when promulgating the criminal code, intended to incorporate the born alive rule into the definition of person and made that clearly known, and *not*, as the majority's choice of analytical frameworks suggests, whether *this court* may newly recognize that rule today and apply it retroactively without offending due process. Accordingly, I disagree with the majority that the present case is a "conventional and foreseeable example of common-law adjudication" to which the holdings of *Rogers* v. *Tennessee*, supra, 532 U.S. 451, and *State* v. *Miranda*, supra, 260 Conn. 93, are directly applicable. I nevertheless will address those holdings hereinafter because of the majori-

in our statutes, the trial court relied on the Model Penal Code and the New York Revised Penal Law, both of which served as bases for our Penal Code,[14] as grounds for concluding that "the definition of a 'person' in Connecticut criminal law includes those who are born and are alive." *State* v. *Courchesne*, supra, 46 Conn. Sup. 67. The parallel definitions in those codes, however, differ significantly from the definition of " '[p]erson' " in our code. Specifically, both the Model Penal Code and the New York Revised Penal Law include express language mirroring that of the born alive rule. See 2 American Law Institute, Model Penal Code and Commentaries (1980) § 210.0 (1), p. 532 (Model Penal Code) (defining " 'human being' " as "a person *who has been born and is alive*" [emphasis added]); New York Penal Law § 125.05 (1) (McKinney 1975) (defining " 'person' " as "a human being *who has been born and is alive*" [emphasis added]). Additionally, the commentary to the Model Penal Code explains that "[t]he effect of this language is to continue the common-law rule limiting

ty's extensive reliance on them and, furthermore, because I believe the majority's characterization of them and the results they purportedly dictate are inaccurate.

[14] Although the murder section of our Penal Code was based in part on the New York Revised Penal Law and the Model Penal Code; see Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-54a (West 1971), commission comment; we do not inevitably rely upon provisions of those codes to construe related Connecticut provisions identically. In *State* v. *Ross*, 230 Conn. 183, 197–99, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), for example, this court declined to adopt wholesale the Model Penal Code's principles of extraterritorial jurisdiction where those principles had not been incorporated explicitly into Connecticut's code. Moreover, "[a]s this court has noted, [even where there is] similarity of language existing between the New York and Connecticut Penal Codes, [such] does not compel a like construction." *State* v. *Mastropetre*, 175 Conn. 512, 522, 400 A.2d 276 (1978). Here, however, despite the varying approaches, the defendant was effectively charged with predicting that, as to defining who may be the victim of a homicide, the trial court would conclude that the legislature, although it declined to adopt the Model Penal Code approach explicitly, nevertheless intended to adopt it.

criminal homicide to the killing of one who has been born alive."[15] 2 Model Penal Code, supra, § 210.1, comment 4 (c), p. 11. Because of this *explicit, unambiguous* language, a defendant within a jurisdiction governed by either code clearly would be on notice that that jurisdiction had adopted the born alive rule.

By contrast, our General Assembly's conspicuous omission of the phrase, "who has been born and is alive," from Connecticut's statutory definition of "person" strongly suggests a conscious legislative choice *not* to adopt the born alive rule. *State* v. *Miranda,* 274 Conn. 727, 761–62, 878 A.2d 1118 (2005) (*Vertefeuille, J.,* concurring) (interpreting legislature's failure to adopt Model Penal Code definition of "conduct" as rejection of notion, included in that code, that conduct encompasses both positive acts and failures to act); see also *Commonwealth* v. *Chretien,* 383 Mass. 123, 132–33, 417 N.E.2d 1203 (1981) (interpreting omission of term "unlawful" from statutory definition as abandonment of common-law spousal exception to sexual assault). At the very least, with respect to notice and fair warning concerns, if a defendant were inclined to engage in a statutory comparison, it would be wholly reasonable for him to conclude, on the basis of the legislature's decision not to incorporate the language of the born alive rule when defining "person," that the legislature in fact had not intended to adopt that rule. "The underlying principle [of fair notice] is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harriss,* supra, 347 U.S. 617.[16]

---

[15] Following this language is a citation to a footnote in a criminal law treatise "and the authorities cited therein." 2 Model Penal Code, supra, § 210.1, comment 4 (c), p. 11 n.22. That treatise, in turn, cites to the portion of Blackstone's Commentaries discussing the born alive rule. See R. Perkins, Criminal Law (2d Ed. 1969) p. 29 n.10.

[16] The majority recites often quoted language from decisions of the United States Supreme Court explaining that the vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into

The majority does not explain adequately this important distinction[17] but, instead, merely asserts that

account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited," that "[d]ue process does not require statutes to provide a laundry list of prohibited conduct . . . [and that laws] may be general in nature so as to include a wide range of prohibited conduct." (Internal quotation marks omitted.) I acknowledge that, in many instances, "[u]ncertain statutory language has been upheld when the subject matter would not allow more exactness and when greater specificity in language would interfere with practical administration." 1 W. LaFave, supra, § 2.3 (c), p. 151. The inability to be precise and the desire to avoid extensive, limiting descriptions that may reduce flexibility in the application of a statute, however, simply are not real concerns in the drafting of a provision that defines who will be considered a person for purposes of the law of homicide. In short, if the legislature had intended to incorporate the born alive rule into Connecticut's statutory definition of person, it *easily* could have done so, like the drafters of the Modal Penal Code and the New York Revised Penal Law, by the addition of a mere seven words: "who has been born and is alive." The only murder prosecutions that possibly could be precluded by the addition of those words are the prosecutions that the majority has determined the legislature unequivocally intended to foreclose, that is, prosecutions for the deaths of unborn fetuses. Because our code was modeled after the Model Penal Code and the New York Revised Penal Law, our legislators most certainly were aware of the option of using the more precise language. The majority offers no persuasive reason why the legislature would decline to do so while simultaneously intending to incorporate the rule that the omitted language so clearly would have conveyed.

[17] The majority's answer to this point is weak, almost to the point of warranting no response. Essentially, the majority asserts that, although the Model Penal Code definition mirrors the born alive rule and the accompanying commentary, which cites to material discussing the born alive rule, explains that "[t]he effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive," it nevertheless is not clear whether the drafters of the Model Penal Code intended to incorporate the born alive rule, although a number of courts, including the trial court, have concluded precisely the opposite. In any event, according to the majority, the differences between the relevant provisions are unimportant because our legislature's intent is clearly evidenced by the opinion of the Model Penal Code drafters that our statute, although silent on the point, "may be expected to carry forward the common-law approach"; 2 Model Penal Code, supra, § 210.1, comment 4 (c), p. 11; or, alternatively, by a treatise author's general musings as to what "courts" usually do. See 1 W. LaFave, supra, § 14.1 (c), pp. 419–20 n.13. Thus, the majority argues, instead of simply saying what it meant, our legislature expected the general public to discern and infer its hidden intent from its failure to repudiate expressly speculative commentary appearing in the code of other jurisdictions, or in footnoted treatise predictions. I cannot agree with this strained reasoning.

"the born alive rule has been embodied in our Penal Code since its adoption nearly a quarter of a century ago . . . ." (Citation omitted.) Precisely how the born alive rule became embodied in our Penal Code, despite the legislature's omission of the relevant statutory language, the majority does not explain.[18] Moreover, the majority declines to explain why the legislature's failure to designate clearly and precisely the point at which criminal liability attaches has not led to arbitrary enforcement. Compare *State* v. *Alfieri*, 132 Ohio App. 3d 69, 78, 724 N.E.2d 477 (1998) (statutes clearly stating that unborn protected from fertilization to birth guarded against arbitrary enforcement and did not violate due process), appeal denied, 85 Ohio St. 3d 1477, 709 N.E.2d 849 (1999).[19] Finally, at best, the legislature's definition

---

[18] In fact, this court's holding in *Valeriano* v. *Bronson*, 209 Conn. 75, 546 A.2d 1380 (1988), strongly suggests the opposite conclusion. In that case, we rejected a habeas petitioner's claim that his counsel had been ineffective for failing to raise, as a bar to prosecution, the common law "year and a day" rule because it was "very doubtful if the rule ever existed in Connecticut." Id., 90. We noted that the rule had been mentioned in Connecticut case law only twice, in dicta, in 1877 and 1984; id., 90–91; and that "the adoption of the comprehensive Penal Code in 1969 abrogated the common law and set out substantive crimes and defenses in great detail." Id., 92. We then rejected the petitioner's argument that the savings clause of § 53a-4 had resulted in an incorporation of the "year and a day" rule into the Penal Code because "[g]enerally speaking, [a] 'savings clause' . . . saves something . . . that would otherwise have been lost. . . . The usual function of a saving clause is to preserve something from immediate interference . . . ." (Citations omitted; internal quotation marks omitted.) Id. The flaw in the defendant's argument, we reasoned, was that it assumed "that [the 'year and a day'] rule had been adopted in Connecticut and remained legally viable at the time the Penal Code was enacted into law in 1969," an argument that, in light of the absence of pre-1969 case law adopting the rule, already had been resolved against the petitioner. Id. The same circumstances are present here: Indisputably, prior to the adoption of the criminal code in 1969, no Connecticut case had adopted the born alive rule. Accordingly, the legislature could not have intended, sub silentio, to retain it.

[19] In contrast, in Connecticut, the defendant has been prosecuted for capital murder for killing a pregnant woman and, consequently, her full term fetus, while another individual who accomplished precisely the same result a few years later was charged with only one count of murder, simply because the fetus in that case was not delivered prior to expiring. See *State*

of the term "person" is ambiguous. The majority fails to explain, however, why the rule of lenity does not require that we resolve this statutory ambiguity in favor of the defendant.[20] See *Rewis* v. *United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971); *State* v. *Jones*, supra, 234 Conn. 340.

I acknowledge that a comment to the Model Penal Code suggests that a jurisdiction need not expressly incorporate the born alive rule into its statutes for the

v. *Latour*, 276 Conn. 399, 401, 886 A.2d 404 (2005). I am hard pressed to suggest a better example of arbitrariness. Such disparity in treatment is a prime demonstration of how "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The United States Supreme Court has cautioned that "[l]egislatures may not so abdicate their responsibilities for setting the standards of the criminal law." *Smith* v. *Goguen*, 415 U.S. 566, 575, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974).

[20] I recognize that, pursuant to United States Supreme Court precedent, courts should not apply the rule of lenity unless a statute remains ambiguous after consulting its language, structure and legislative history and the policies motivating its passage. See, e.g., *Moskal* v. *United States*, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990). That approach has been criticized heavily, however, by members of both that court and this one, in light of *the rule's* motivating concerns, namely, the provision of notice and fair warning to criminal defendants as to what conduct is prohibited. See *State* v. *Lutters*, 270 Conn. 198, 222–23, 853 A.2d 434 (2004) (*Zarella, J.*, concurring); see also *United States* v. *Hayes*, 555 U.S. 415, 129 S. Ct. 1079, 1093, 172 L. Ed. 2d 816 (2009) (Roberts, C. J., dissenting) ("[i]f the rule of lenity means anything, it is that an individual should not go to jail for failing to conduct a [fifty state] survey or comb through obscure legislative history"). In light of those concerns, I am hard pressed to conclude that the United States Supreme Court's sanction of the use of legislative history in this context extends to the use of legislative history underlying *different* statutory provisions enacted *after* the criminal conduct in question, as the majority has done in this case. Moreover, for reasons discussed hereinafter, I believe the majority's complete reliance on extrajurisdictional precedent and secondary sources to uphold *this defendant's* conviction, rather than for future application of our murder statutes in similar circumstances, also offends due process. Without this disproportionate level of assistance from secondary interpretory aids, Connecticut's statutory definition remains ambiguous such that the rule of lenity properly is applicable.

rule to retain viability. That comment states: "The effect of [the Model Penal Code's definition of human being] is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive. Several modern statutes follow the Model [Penal] Code in making this limitation explicit. *Others are silent on the point, but absent express statement to the contrary, they too may be expected to carry forward the common-law approach.*" (Emphasis added.) 2 Model Penal Code, supra, § 210.1, comment 4 (c), p. 11. I find the notion that a jurisdiction that has omitted from its statutes a common-law definition, nonetheless can be deemed to have "adopted" such definition, deeply troubling in light of due process concerns. Moreover, the commentators' position flies in the face of the principle that "any statutory construction implicating the death penalty must be based on a conclusion that the legislature has *clearly and unambiguously* made its intention known." (Emphasis added.) *State* v. *Harrell*, supra, 238 Conn. 833.

In addition to the fact that our legislature, in promulgating the Penal Code, did not expressly adopt the born alive rule and, therefore, did not provide notice of that rule to the defendant, the history of our jurisprudence similarly fails to demonstrate that this archaic rule ever entered *Connecticut's* common law. In fact, the majority opinion has the distinction of being the first appellate court decision in Connecticut ever to rely on the born alive rule.[21] Moreover, in the years preceding the defen-

---

[21] In *In re Valerie D.*, 25 Conn. App. 586, 591–92, 595 A.2d 922 (1991), rev'd, 223 Conn. 492, 499, 613 A.2d 748 (1992), the Appellate Court alluded vaguely to the born alive rule in recounting the holding of *Anonymous*, when determining that, pursuant to governing statutes, a mother's prenatal conduct toward her fetus could be taken into account during proceedings for neglect and termination of parental rights brought subsequent to the child's birth. The Appellate Court then rejected the applicability of the rule's underlying rationale in that context in favor of the reasoning of cases allowing tort claims for injuries inflicted in utero. Id. In reversing the Appellate Court's ultimate determination, this court did not mention either *Anonymous* or the born alive rule. See *In re Valerie D.*, supra, 223 Conn. 492.

dant's act, Connecticut appellate courts on four separate occasions decided cases involving the murders of pregnant victims that did not include charges for the deaths of the fetuses. In terms of notice to future defendants, those opinions indicated that Connecticut regarded the murder of a pregnant victim as one murder only, i.e., the murder of the mother. See *State* v. *Roman*, 224 Conn. 63, 64, 616 A.2d 266 (1992) (death of pregnant victim, one murder charge), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993); *Boles* v. *Commissioner of Correction*, 89 Conn. App. 596, 601, 874 A.2d 820 (2005) (victim eighteen weeks pregnant, one murder charge), cert. denied, 275 Conn. 901, 884 A.2d 1024 (2005); *State* v. *Sherman*, 38 Conn. App. 371, 375, 662 A.2d 767 (death of pregnant victim, one murder charge), cert. denied, 235 Conn. 905, 665 A.2d 905 (1995); *State* v. *Booker*, 28 Conn. App. 34, 37 n.3, 611 A.2d 878 (although state originally charged defendant for three murders, death of "unborn child" not pursued at trial), cert. denied, 223 Conn. 919, 614 A.2d 826 (1992), cert. denied, 507 U.S. 916, 113 S. Ct. 1271, 122 L. Ed. 2d 666 (1993); see also *State* v. *Yochelman*, 107 Conn. 148, 149, 139 A. 632 (1927) (prosecuting defendant for one count of manslaughter for death of woman following attempted abortion).[22]

---

[22] There were additional indications, at the time of the defendant's acts, that Connecticut was not inclined to afford much legal protection to fetuses. As I mentioned previously in this opinion, there was no statute, as there is now; see General Statutes § 53a-59c; imposing additional penalties for an assault of a pregnant woman that results in the death of her fetus in utero. Furthermore, this court had held that a mother's detrimental actions toward her child, occurring prior to the child's birth, could not form the basis of a petition to terminate the mother's parental rights. *In re Valerie D.*, 223 Conn. 492, 505, 613 A.2d 748 (1992). Finally, consistent with the United States Supreme Court's decision in *Roe* v. *Wade*, 410 U.S. 113, 157–59, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), which rejected the notion that a fetus is a person within the meaning of the fourteenth amendment, the right to an abortion was, and remains, statutorily protected with minimal restrictions. See General Statutes § 19a-602.

The only acknowledgment as to the existence of the born alive rule in the history of Connecticut criminal jurisprudence[23] occurred, in dicta, in a lone decision of our Superior Court. In *State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 498, the state applied for an arrest warrant charging the accused with the murder of an unborn—but viable—fetus. After a review of the legislative history of our Penal Code, the statutory scheme, the common law, due process jurisprudence, and the scope of judicial authority, the trial court concluded that an unborn, but viable, fetus did not qualify as a person within the meaning of § 53a-3 (1). Id., 500–505. In a closing aside, the court observed that its decision related to criminal law, and not to tort law, and cited to a decision of the Supreme Court of Illinois; *People* v. *Greer*, 79 Ill. 2d 103, 402 N.E.2d 203 (1980); for the proposition that "American courts which have extended the benefits of tort law to fetuses have also, in the absence of specifically inclusive language, uniformly

---

[23] Like Justice Zarella, I disagree with the majority's conclusion that it is appropriate to look to decisions of the Superior Court in civil cases that discuss a child's right to bring a tort action for injuries sustained in utero. See, e.g., *Simon* v. *Mullin*, 34 Conn. Sup. 139, 380 A.2d 1353 (1977); *Tursi* v. *New England Windsor Co.*, 19 Conn. Sup. 242, 111 A.2d 14 (1955). I acknowledge that judicial opinions, to provide the requisite notice and fair warning to a defendant that his conduct is criminal, need not involve precisely the same factual scenario as the defendant's case. See *Rose* v. *Locke*, 423 U.S. 48, 51, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975). Entirely different considerations apply, however, in the civil context than in the criminal context. See *State* v. *Amaro*, 448 A.2d 1257, 1259 (R.I. 1982) (wrongful death statutes are "remedial in nature, and . . . thus properly subject to a liberal application" while a "statute that is clearly penal in nature . . . must . . . be narrowly construed"); see also *Vo* v. *Superior Court*, 172 Ariz. 195, 205, 836 P.2d 408 (App. 1992) (same). Moreover, the United States Supreme Court has rejected the notion that civil case law suffices to provide notice to citizens as to the meaning of analogous criminal provisions. See *Bouie* v. *Columbia*, supra, 378 U.S. 357–58 (holding that South Carolina Supreme Court, in reaching novel construction of criminal trespass statute that deprived defendants of due process, improperly relied on "irrelevant" cases concerning law of civil trespass; because "[b]oth cases . . . turned wholly upon tort principles . . . they had no relevance whatever . . . to criminal trespass").

refused to change the born-alive rule in criminal cases
. . . ." (Internal quotation marks omitted.) *State* v.
*Anonymous (1986-1)*, supra, 505. The substance or
propriety of the born alive rule itself, however, was not
otherwise discussed, applied or even directly at issue
in *Anonymous*.[24]

---

[24] The majority's lengthy description of the content of the trial court's
opinion in *Anonymous* is notable for what it does *not* include, namely, a
clear statement explaining the operation of the born alive rule or an overt
acknowledgment that it is controlling law in Connecticut. Contrary to the
majority's initial characterization of *Anonymous*, the trial court in no way
"relied *expressly* on the born alive rule in concluding that a fetus killed in
utero is not a person for purposes of our murder statute"; (emphasis added)
*State* v. *Anonymous (1986-1)*, supra, 40 Conn. Sup. 505; nor was it necessary
for the court to do so. As I noted previously in this opinion, the trial court
in *Anonymous* explored many sources of legislative intent, none of which
indicated that the legislature intended for the protections of the criminal
code to apply to unborn, viable fetuses. Because the purported victim in
*Anonymous* had not been born alive, then expired from injuries inflicted
in utero, the court simply had no occasion to decide what rule the legislature
intended to control in that circumstance and, accordingly, the opinion does
not discuss it. Even if it had, "discussion in a judicial opinion that goes
beyond the facts involved in the issues is mere dictum and does not have
the force of precedent." *Valeriano* v. *Bronson*, supra, 209 Conn. 91.

Moreover, even if the trial court's imprecise and indirect statements in
*Anonymous*, as recited by the majority in the present case, can be said to be
an implicit acknowledgment of the born alive rule, such an acknowledgment
resembles an instance in which a court assumes, without actually deciding,
that a particular rule is in force, then disposes of the case by determining
that, given the facts of the case, the claim at issue nevertheless fails. Often-
times, the court later will have occasion to decide squarely whether it ought
to adopt the rule and, when it so decides, it is not to be bound by its
earlier assumption because the propriety of that assumption, having not
been directly at issue, was purely dictum. See, e.g., *Stuart* v. *Commissioner
of Correction*, 266 Conn. 596, 603 n.11, 834 A.2d 52 (2003) (concluding that
persons arrested and confined in other states are not similarly situated to
those arrested and confined in Connecticut, despite previous case assuming
that opposite was true, but disposing of case on rationale that no fundamental
right was at stake); *Ford* v. *Ford*, 68 Conn. App. 173, 177 and n.2, 789
A.2d 1104 (concluding that certain factors need not be considered in initial
custody determination despite previous case assuming that opposite was
true, but disposing of case on rationale that trial court did consider factors),
cert. denied, 260 Conn. 910, 796 A.2d 556 (2002).

The majority's desperation is evident from its suggestion that, consistent
with due process jurisprudence, the defendant should be constructively

In the present case, therefore, I disagree with the trial court that "[a]s far as it stands for the proposition that Connecticut follows the common law rule on this point, the court's decision in *Anonymous* can be considered to have actually given notice that the defendant's actions concerning Antonia . . . constituted a murder separate from that of her mother." *State* v. *Courchesne*, supra, 46 Conn. Sup. 72. Foremost, dicta from a lone decision of the Superior Court cannot be said to constitute an authoritative pronouncement as to whether Connecticut has adopted the born alive rule. Cf. *Rogers* v. *Tennessee*, supra, 532 U.S. 465 (rejecting that year and a day rule was firmly entrenched in common law of Tennessee when, although rule was briefly referenced in one early state Supreme Court case, "[t]he court made no mention of [it] in its legal analysis or, for that matter, anywhere else in its opinion"); *Valeriano* v. *Bronson*, 209 Conn. 75, 90–91, 546 A.2d 1380 (1988) (finding it "very doubtful" that year and a day rule "ever existed in Connecticut" where it only had been referred to in dicta in two decisions of this court). Indeed, that dicta does not even tether the born alive rule to any Connecticut case, but rather, refers only vaguely to unidentified "American courts." Moreover, nothing in *Anonymous* remotely indicates that Connecticut's legislature or courts ever agreed with those unidentified courts. Within the death penalty context, it is simply too far a stretch to regard the quoted dicta from *Anonymous* as having given notice to the defendant that, pursuant to the prevailing rule of law in Connecticut, the intervening circumstance of a fatally injured fetus' birth

---

charged not only with having read between the lines of a Superior Court decision to discern what rule would apply in a related, but distinct situation that was not before the court and that the decision never discussed, but also with the underlying rationale of the holdings of several extrajurisdictional cases cited within that Superior Court decision. It is hardly surprising that the majority cites no authority for this incredible proposition.

could convert an otherwise noncriminal act into an offense eligible for the death penalty.[25]

In fact, when considering whether prior judicial constructions of state statutes have provided sufficient clarification to save those statutes from vagueness challenges, the United States Supreme Court typically[26] looks to *appellate level* jurisprudence, and *only* decisions from the state whose statute is at issue.[27] See,

---

[25] Although the majority proceeds as if the born alive rule had been universally adopted in every state, it is unclear whether that, in fact, is the case. In any event, whatever historical foothold the rule had acquired largely has been abandoned, for the most part legislatively, in favor of less arbitrary rules affording greater protection to fetuses and treating equally culpable defendants with greater parity. See D. Curran, note, "Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws," 58 Duke L.J. 1107, 1109 (2009) (beginning in 1970s, American jurisdictions began moving away from born alive rule and, by 2009, thirty-six states had abandoned it).

[26] I use the word "typically" in acknowledgment of the point made earlier, that there are no hard and fast rules or set methodology for evaluating due process arguments. Due to the vast body of due process jurisprudence, I cannot say with certainty that there is no case in which a court's exclusive reliance on extrajurisdictional precedent and secondary sources to reject a vagueness claim has been upheld. I submit, however, that such a case would be more the exception than the norm, and that in a matter involving the penalty of death, this court should refrain from heavy reliance on questionable techniques when analyzing a due process claim.

[27] The United States Supreme Court has explained: "It would be a rare situation in which the meaning of a statute of another [s]tate [as interpreted by that state's courts] sufficed to afford a person 'fair warning' that his own [s]tate's statute meant something quite different from what its words said." *Bouie* v. *Columbia*, supra, 378 U.S. 359–60 (rejecting South Carolina's reliance on North Carolina decisions in evaluating due process challenge). This court previously has acknowledged this restriction. See *State* v. *DeFrancesco*, 235 Conn. 426, 444, 668 A.2d 348 (1995) ("[i]n determining whether a statute is unconstitutionally vague, we take into account any prior interpretations that this court, our Appellate Court and the Appellate Session of the Superior Court have placed on the statute" [internal quotation marks omitted]); *State* v. *Indrisano*, 228 Conn. 795, 805 n.6, 640 A.2d 986 (1994) ("[t]he rule of federal vagueness jurisprudence is that prior judicial decisions interpreting a state statute are authoritative if they are decisions of a court of statewide jurisdiction, the decisions of which are binding upon all trial courts in the absence of a conflicting decision of the [state] Supreme Court" [internal quotation marks omitted]). Clearly, the Superior Court's decision in *Anonymous* does not fall within the foregoing parameters.

Although additional language from *DeFrancesco* on its face suggests, contrary to *Bouie, Indrisano* and the several United States Supreme Court

e.g., *Bradshaw* v. *Richey*, 546 U.S. 74, 77, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (rejecting due process challenge to Ohio Supreme Court's application of transferred intent doctrine to aggravated felony murder stat-

decisions cited in the main text of this concurring and dissenting opinion, that our sister states' jurisprudence concerning their statutes is an appropriate source of fair warning as to the meaning of a Connecticut statute, closer examination of the source of that language clarifies that it should not be read so broadly. Citing to *State* v. *Proto*, 203 Conn. 682, 699–700, 526 A.2d 1297 (1987), we stated that, in determining whether a statute is unconstitutionally vague, "we can use as a guide judicial opinions that, while not binding on this court, refer to the statute in question or to a statute that uses similar language." *State* v. *DeFrancesco*, supra, 235 Conn. 444. In *Proto*, we concluded that the United States Supreme Court's decision in *Buckley* v. *Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), was "a *uniquely applicable* guide to the [Connecticut] statutes at issue" because those statutes were "similar in significant respects" to the federal statutes at issue in *Buckley* and, more importantly, "the legislative history of [the Connecticut statutes] clearly show[ed] that the General Assembly intended [Connecticut's statutory definitions] to incorporate the distinctions enumerated in *Buckley*." (Emphasis added.) *State* v. *Proto*, supra, 699–700. We reasoned that, "[s]ince our goal is to clarify statutory ambiguities in a manner consistent with legislative intent . . . we may appropriately refer to *Buckley* as a guide to resolving [the ambiguity at issue]." (Citations omitted.) Id., 700.

Needless to say, the "unique" circumstances of *Proto* are not present here. As the majority acknowledges, the legislative history of §§ 53a-3 (1) and 53a-54a (a) "offers no guidance with respect to the issue raised by the present case," let alone does it indicate that in promulgating those statutes, the General Assembly intended to incorporate doctrine enshrined in other jurisdictions' statutes or common-law jurisprudence, particularly where those jurisdictions' statutes are worded differently or where they have different common-law traditions or constitutional provisions adopting English common law. If that was the legislature's intent, it easily could have indicated that by including the words, "who has been born and is alive," to the definition of person, rather than expecting this court to discover it serendipitously in the course of a winding, extrajurisdictional journey, indeed, in the decisions of tribunals as distant as New South Wales, Australia.

As the foregoing explanation demonstrates, the quoted language in *DeFrancesco*, traced to its source, cannot reasonably be read to sanction heavy reliance on dicta from a single trial court opinion that postdated the legislature's enactment of the Penal Code by seventeen years and, consequently, could not have been intended by the legislature to be incorporated into the Penal Code. This is particularly so in light of the extensive federal authority counseling otherwise and which, in the event of a conflict with state jurisprudence on a federal due process question, obviously is controlling. See, e.g., *Hagan* v. *Caspari*, 50 F.3d 542, 544–45 (8th Cir. 1995); *Moore* v. *Wyrick*, 766 F.2d 1253, 1255 (8th Cir. 1985), cert. denied sub nom. *Armontrout* v. *Moore*, 475 U.S. 1032, 106 S. Ct. 1242, 89 L. Ed. 2d 350 (1986).

ute because "Ohio [Supreme Court decisions] at the time of respondent's offense provide fully adequate notice of the [doctrine's] applicability"), reh. denied, 546 U.S. 1146, 126 S. Ct. 1163, 163 L. Ed. 2d 1015 (2006); *Ward* v. *Illinois,* 431 U.S. 767, 771, 97 S. Ct. 2085, 52 L. Ed. 2d 738 (1977) (rejecting vagueness claim because "appellant had ample guidance from the Illinois Supreme Court that his conduct did not conform to the Illinois law"); *Smith* v. *Goguen,* 415 U.S. 566, 575, 582 n.31, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974) (finding vague broad statutory language that "was . . . devoid of a narrowing state court interpretation at the relevant time in this case," while also noting existence of, but not searching for guidance in, similar statutes of federal and state governments that had been "universal[ly] adopt[ed]"); *Wainwright* v. *Stone,* 414 U.S. 21, 22, 94 S. Ct. 190, 38 L. Ed. 2d 179 (1973) (looking to Florida cases in due process challenge to Florida statute and stating that "[t]he judgment of federal courts as to the vagueness or not of a state statute must be made in the light of prior *state constructions* of the statute" [emphasis added]); *Bouie* v. *Columbia,* supra, 378 U.S. 356 (finding due process violation where South Carolina Supreme Court's interpretation of trespassing statute "has not the slightest support in prior *South Carolina decisions*" [emphasis added]); *Musser* v. *Utah,* 333 U.S. 95, 97, 68 S. Ct. 397, 92 L. Ed. 562 (1948) (recognizing that, when evaluating vagueness challenge to Utah statute, statutory language "does not stand by itself as the law of Utah but is part of the whole body of common and statute law *of that [s]tate and is to be judged in that context*" [emphasis added]); see also *State* v. *Pickering,* 180 Conn. 54, 63–65, 428 A.2d 322 (1980) (rejecting vagueness challenge to risk of injury statute because several prior decisions of this court had delineated its reach and "serve[d] as an authoritative judicial gloss on the provision"); 3 R. Rotunda & J. Nowak, Treatise

on Constitutional Law (4th Ed. 2008) § 17.8 (h), p. 146 n.31 ("[i]f a law as written and construed *by appropriate courts within the jurisdiction* does not give reasonable notice to individuals that [their] conduct . . . has been made criminal, the statute could not be applied to them due to a lack of notice; such a statute should be considered 'void-for-vagueness' " [emphasis added]); 1 W. LaFave, supra, § 2.3 (a), p. 145 n.13 ("[a]ppropriate construction *by the state court* may remove the vagueness objection" [emphasis added]). Similarly, a state normally should look only to its own common law to determine whether a criminal defendant has received adequate notice of what state law proscribes. See *Rogers* v. *Tennessee,* supra, 532 U.S. 464. Thus, although authoritative pronouncements from a state's highest court interpreting its statutes and common law may provide the requisite notice and fair warning of what conduct is proscribed, the majority's complete reliance instead on dicta from one trial court decision, secondary sources and extrajurisdictional precedent, some involving differently worded statutory provisions,[28] is highly questionable in the due process context.[29]

[28] See, e.g., *People* v. *Hall,* 158 App. Div. 2d 69, 557 N.Y.S.2d 879 (1990) (applying statutory definition that explicitly incorporated born alive rule); *Cuellar* v. *State,* 957 S.W.2d 134 (Tex. App. 1997) (same); *State* v. *Cornelius,* 152 Wis. 2d 272, 448 N.W.2d 434 (App. 1989) (same). It should go without saying that, when the language of a Connecticut statute differs significantly from statutes of other states governing the same subject matter, judicial precedents from those states are of little utility for purposes of interpreting the Connecticut provision. See *Nickel Mine Brook Associates* v. *Joseph E. Sakal, P.C.,* 217 Conn. 361, 365, 585 A.2d 1210 (1991).

[29] The majority, in one instance of looking to extrajurisdictional jurisprudence for guidance, observes that "numerous other appellate courts have recognized the born alive rule and deemed it applicable to the then pending case solely on the basis of English common-law authority, other state cases, the writings of legal commentators or a combination thereof." What the majority declines to state, however, is that in three of the five cases cited, the rule was applied to *absolve* a defendant of criminal liability for the death of an *unborn* fetus by rejecting the state's contention that a viability standard ought to apply instead. See *People* v. *Greer,* 79 Ill. 2d 103, 402 N.E.2d 203 (1980); *People* v. *Guthrie,* 97 Mich. App. 226, 293 N.W.2d 775 (1980), cert. denied, 417 Mich. 1006, 334 N.W.2d 616 (1983); *State* v. *Beale,* 324 N.C. 87, 376 S.E.2d 1 (1989). Consequently, in the foregoing cases, no due process

In its attempt to overcome the undeniable fact that, prior to the acts in question, neither our legislature nor our courts ever had adopted expressly or even considered the born alive rule, the majority takes the highly unusual approach of relying on testimony from a public hearing related to the enactment of General Statutes § 53a-59c, which occurred *four years after* the conduct underlying the defendant's convictions, to support its argument that the born alive rule was in effect at the time of the defendant's actions.[30] This directly contradicts the rule that, when evaluating a due process claim, we look only to "the law which had been expressed *prior to the conduct* in issue . . . ." (Internal

concerns were implicated by the courts' adoption of the rule. Another of the cited cases is from Maryland, a jurisdiction that recognizes common-law crimes and has a constitutional provision directing the court to look to the common law of England as of July 4, 1776, to define the state's common law. See *Williams* v. *State*, 316 Md. 677, 679 n.1, 561 A.2d 216 (1989). Given that context, the defendant could not possibly claim a lack of fair warning as to the court's adoption of the rule.

Notably, several of the other contemporary cases relied upon by the majority in support of the notion that the born alive rule is firmly established by the common law, similar to *Greer, Guthrie* and *Beale*, cite the rule in the context of considering whether a charge of homicide may lie for the killing of an unborn fetus, and not to apply the rule directly to uphold a criminal conviction. See *Commonwealth* v. *Cass*, 392 Mass. 799, 467 N.W.2d 1324 (1984); *State* v. *Amaro*, 448 A.2d 1257, 1258 (R.I. 1982); *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 624, 470 P.2d 617, 87 Cal. Rptr. 481 (1970). This is because direct application of the rule was widespread only much further back in the historical record.

The majority is dismissive of this serious constitutional claim, reasoning, in part, that I have not identified any instance of a court holding application of the born alive rule to be unconstitutional. This circumstance likely is a function of both the rule's antiquity and its now widespread abandonment. In jurisdictions where the rule received early legislative or judicial recognition, predating robust due process jurisprudence, such recognition would preclude later vagueness challenges. Moreover, in the thirty-six states that have abandoned the rule during the last five decades or so, there clearly no longer is any occasion for a constitutional challenge.

[30] The majority's assertion that it has not relied on this material in resolving the defendant's due process argument, but only to determine that "it evinces the intent of the legislature to recognize the born alive rule," is difficult to comprehend. Simply put, the defendant's due process argument is inextricably intertwined with the questions of what the legislature intended and whether that intent was made clear, either by the statutory language, or other interpretative aids, at the time of the defendant's conduct.

quotation marks omitted.) *Washington* v. *Commissioner of Correction*, supra, 287 Conn. 806; see also *Bradshaw* v. *Richey*, supra, 546 U.S. 78 (case decided long after offense for which defendant was convicted "ha[d] no bearing on whether the law at the time of the charged conduct was clear enough to provide fair notice"); *Lanzetta* v. *New Jersey*, 306 U.S. 451, 456, 59 S. Ct. 618, 83 L. Ed. 888 (1939) (when "[a]ppellants were convicted before [a state court opinion construing a statute], [i]t would be hard to hold that . . . they were bound to understand the challenged provision according to the language later used by the court"); *Helton* v. *Fauver*, 930 F.2d 1040, 1047 (3d Cir. 1991) (case decided subsequent to underlying crimes in appellant's case "irrelevant" to due process inquiry, because "the [c]onstitution requires *prior* notice of an expansion in the degree of punishment" [emphasis in original]); *DiLeo* v. *Greenfield*, 541 F.2d 949, 953 (2d Cir. 1976) (disagreeing that "vagueness in the statute could be cured by *subsequent* explanation . . . [because] [d]ue process requires *prior* notice of what constitutes forbidden behavior" [emphasis in original]). Because the enactment of § 53a-59c postdates the commission of the charged conduct, its legislative history is wholly irrelevant to the questions of notice and fair warning.[31]

Nonetheless, the majority quotes, at length, various speakers who testified at the public hearings concerning § 53a-59c as if that testimony constituted binding authority regarding the state of the law in Connecticut in 1998. Reliance on this irrelevant source, however, leads the majority to make a series of forward looking, then backward applying arguments, all of which confuse the due process analysis. For example, the majority rejects the defendant's contention that he should not

---

[31] Because the reports of the office of legislative research, also relied upon by the majority, were drafted in 2003, they similarly are irrelevant to the question of whether the defendant received notice and fair warning.

be subjected to any greater penalty because Rodgers was eight and one-half months pregnant than if she had not been pregnant, because the majority is "unwilling to presume that the legislature intended such a result, especially in light of the clear legislative [intent of § 53a-59c]." The majority, in so doing, rejects an argument based on the state of the law in 1998, the year when the alleged conduct occurred, by reliance on purported legislative intent that was displayed more than *four years later*. Similarly, the majority further rejects the defendant's due process argument because it would require us to presume that, in enacting § 53a-59c, the legislature "intended to punish an assault on a pregnant woman that causes the termination of her pregnancy that does not result in a live birth, on the one hand, but intended no punishment for the same conduct if the fetus happens to be born alive but dies shortly thereafter from its injuries, on the other hand." According to the majority, the defendant's construction would lead to an "irrational and bizarre result" by creating a disparity, namely, that an assault on a pregnant woman that terminates her pregnancy without a live birth would be treated as criminal, while a similar assault resulting in a live birth would be treated as noncriminal. Again, the majority's analysis is based on the law as it existed five years after the events underlying the defendant's convictions.[32] Simply put, the enact-

[32] Putting aside the temporal difficulties with this argument, I fail to understand why the result imagined by the majority is any more or less "irrational and bizarre" than the necessary implication of the majority's conclusion today. Specifically, underlying that conclusion is a presumption that the legislature, in purportedly adopting the born alive rule when it promulgated the Penal Code in 1969, intended for identical conduct to be considered either murder, rendering the defendant potentially eligible for the death penalty, or a noncriminal act carrying no penalty, with the outcome of a particular case dependent not upon the precise character of the defendant's conduct and his relative culpability, but on such external factors as the availability, skill and timeliness of intervening medical professionals and the random circumstance of when the death of the fetus ultimately occurred. Compare *State* v. *Latour*, supra, 276 Conn. 399, with the present case.

ment of § 53a-59c, and the corresponding legislative history, have absolutely no bearing on the defendant's notice and fair warning claim. *Bradshaw* v. *Richey*, supra, 546 U.S. 78 (case decided several years after defendant's conduct in which application of doctrine of transferred intent was rejected "ha[d] no bearing on whether the law at the time of the charged conduct was clear enough to provide fair notice").

Pared to its core, the majority's conclusion that the defendant had notice and fair warning of the born alive rule as the established law *in Connecticut* which, in the present context, transformed noncriminal conduct into an offense eligible for the death penalty, is based on dicta from one Superior Court criminal decision, two Superior Court civil cases addressing tort law, a Connecticut treatise[33] originally written in 1796, and

[33] I disagree with the majority's reliance on Zephaniah Swift and William Blackstone for the proposition that, because the born alive rule was firmly entrenched in the common law generally, it automatically became part of the common law of Connecticut without any explicit adoption by the legislature or the courts of this state. "[A]s Blackstone wrote, the common law was a law for England, and did not automatically transfer to the American [c]olonies; rather, it had to be adopted. See 1 [W.] Blackstone [Commentaries on the Laws of England (1769)] *107–*108 (observing that the common law of England, as such, has no allowance or authority in [o]ur American plantations); see also 1 [Z.] Swift [A System of the Laws of the State of Connecticut (1795) p. 45] ([t]he English common law is not in itself binding in this state); id., [44–45] ([t]he English common law has never been considered to be more obligatory here, than the Roman law has been in England). In short, the colonial courts felt themselves perfectly free to pick and choose which parts of the English common law they would adopt." (Internal quotation marks omitted.) *Rogers* v. *Tennessee*, supra, 532 U.S. 475 (Scalia, J., dissenting).

Although the majority cites several cases in which this court has relied on the writings of Swift, it is worth emphasizing that we do not inevitably do so. We have declined to take that approach, for example, where the statute at issue "has been drastically changed since Swift's time"; *State* v. *Van Allen*, 140 Conn. 586, 589, 102 A.2d 526 (1954); see also *State* v. *Nixon*, 32 Conn. App. 224, 246, 630 A.2d 74 (1993) (refusing to engraft common-law definition of rioting requiring participation of at least three participants, as described in writings of Swift, onto modern rioting statute that, by express terms, was not so limited), aff'd, 231 Conn. 545, 651 A.2d 1264 (1995); or where Swift's writing reflected a view of the common law that had not been applied in any case and later was rejected. *State* v. *James*, 237 Conn. 390, 417–18, 678 A.2d 1338 (1996); see also *Valeriano* v. *Bronson*, supra, 209

testimony from citizens, some of whom did not even reside in Connecticut, at a public hearing related to legislation enacted over four years after the events underlying the defendant's convictions. Moreover, the majority reaches this conclusion *despite* the fact that § 53a-3 (1), unlike the New York Revised Penal Code and the Model Penal Code, omits the language of the born alive rule from its definition of "person" and, further, when no appellate court in our state—until today—ever has relied upon the born alive rule. Although the defendant's conduct in this case undoubtedly is reprehensible, "it cannot be denied that the guarantee of due process extends to violent as well as peaceful men." *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 635, 470 P.2d 617, 87 Cal. Rptr. 481 (1970). Because Connecticut's laws, as they were expressed *prior to the defendant's conduct*, did not provide the defendant with notice and fair warning that an intervening cesarean delivery and the resultant "birth" and "death" of the fetus carried by Rodgers could transform noncriminal conduct into an additional count of murder—thus rendering him eligible for the death penalty, society's harshest punishment—those laws were unconstitutionally vague. Accordingly, I conclude that the defendant has been deprived of due process of law.[34]

Conn. 91 n.10 (concluding that year and a day rule, having never been applied in any Connecticut decision, never had been adopted as part of common law in Connecticut, although Swift indicated that it had been part of common law generally). Here, the Swift treatise relied upon by the majority to prove the born alive rule is part of the common law of Connecticut; see 2 Z. Swift, A System of the Laws of the State of Connecticut (1796), pp. 298–99; indicates that the murder statute in force at that time differed vastly from today's statute and did not even purport to define either "murder" or "person." Id. Moreover, in the more than two hundred years since that treatise was published, the born alive rule never before has been adopted as authoritative Connecticut precedent and, elsewhere, has met with widespread rejection. Accordingly, I disagree with the majority that the rule's presence in the writings of Swift gave the defendant constructive notice that the rule would be applied to him and result in the penalty of death.

[34] My conclusion that there was insufficient notice of the born alive rule to apply that doctrine to *this defendant* would not impede future prosecutions under that doctrine as a result of the majority's conclusion and, therefore,

In apparent acknowledgment that the born alive rule is being *newly* recognized in Connecticut today by virtue of this court's decision in the present case, the majority disregards the defendant's vagueness argument, and all of the law that I have cited, and instead relies heavily on the United States Supreme Court's decision in *Rogers* v. *Tennessee*, supra, 532 U.S. 451, and this court's analogous opinion in *State* v. *Miranda*, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002), to reject the defendant's due process claim.[35] In *Rogers*, the Supreme Court reaffirmed its holding in *Bouie* v. *Columbia*, supra, 378 U.S. 354, that a court may not expand precise statutory language by judicial construction and apply the change retroactively to conduct that occurred prior to that construction if the new construction was "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." In *Rogers*, the Supreme Court considered the constitutionality of the Tennessee Supreme Court's retroactive application of its decision abolishing the common-law year and a day rule in prosecutions for homicide and held that, in the circumstances of that case, due process was not offended. Specifically, Tennessee's statute defining homicide made no mention of the rule. *Rogers* v. *Tennessee*, supra, 454. Moreover, explained the court, "[t]he year and a day rule is widely viewed as an outdated relic of the common law"; id., 462; that was "without question obsolete"; id., 463; and for that reason, had "been legislatively or judicially abolished in the vast majority of jurisdictions recently to have addressed the issue." Id. In fact, noted the court, the petitioner did "not even so much as hint that good reasons exist for retaining the rule . . . ." Id.

would not create a gap in the legislative scheme in the future. As to future defendants, the majority opinion clearly provides an authoritative judicial gloss.

[35] As earlier explained, I disagree with this approach. See footnote 13 of this concurring and dissenting opinion.

The United States Supreme Court next stated an unremarkable point, namely, that "[c]ommon law courts frequently look to the decisions of other jurisdictions in determining whether to alter or modify a common law rule in light of changed circumstances, increased knowledge, and general logic and experience." Id., 464. It nevertheless recognized, consistent with the vagueness jurisprudence that I have cited in this opinion, that *as a general rule*, for purposes of evaluating challenges to *retroactive* applications of those common-law courts' holdings in criminal cases, defendants should not be charged with predicting their home courts' future holdings on the basis of those courts' potential utilization of extrajurisdictional precedent. "Due process, *of course*, does not require a person to apprise himself of the common law of all [fifty] [s]tates in order to guarantee that his actions will not subject him to punishment in light of a developing trend in the law that has not yet made its way to his [s]tate." (Emphasis added.) Id. The court nevertheless allowed that an exception was appropriate in limited circumstances, that is, when there existed an overwhelming trend in the law of other jurisdictions toward an obviously more enlightened approach. In such circumstances, the court reasoned, that trend could be taken into account *as a factor* when determining whether a state court's decision to join that trend was predictable: "At the same time, however, the fact that a vast number of jurisdictions have abolished a rule that has so clearly outlived its purpose is surely relevant to whether the abolition of the rule in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed." Id.

"Finally, *and perhaps most importantly*," according to the United States Supreme Court, "at the time of [the defendant's] crime the year and a day rule had only the most tenuous foothold as part of the criminal law

of the [s]tate of Tennessee. The rule did not exist as part of Tennessee's statutory criminal code. And while the Supreme Court of Tennessee concluded that the rule persisted at common law, it also pointedly observed that the rule had never once served as a ground of decision in any prosecution for murder in the [s]tate. Indeed, in all the reported Tennessee cases, the rule has been mentioned only three times, and each time in dicta." (Emphasis added.) Id. According to the court, those "cases hardly suggest that the Tennessee [c]ourt's decision [abolishing the rule] was 'unexpected and indefensible' such that it offended the due process principle of fair warning articulated in *Bouie* and its progeny." Id., 466. Although the rule was "a 'substantive principle' of the common law of Tennessee . . . it was a principle in name only, having never once been enforced in the [s]tate." Id. Thus, "[f]ar from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense. It did so by laying to rest an archaic and outdated rule that had never been relied upon as a ground of decision in any reported Tennessee case."[36] Id., 467.

[36] According to the majority, this court's holding in *State* v. *Miranda*, supra, 260 Conn. 93 (*Miranda II*), which relied on *Rogers*, provides additional support for its conclusion that adoption of the born alive rule is not unexpected and indefensible with reference to previously stated law. At the outset, I disagree that the reliability of the holding of *Miranda II*, namely, that the retroactive application of *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda I*), did not offend due process, was not seriously undermined when this court subsequently reversed *Miranda I*. In *State* v. *Miranda*, supra, 274 Conn. 727 (*Miranda III*), three justices of this court opined that *Miranda I*, as a policy matter, was "clearly wrong"; id., 734; "unwise" and went "too far"; id., 749 (*Borden, J.*, concurring); and three other justices concluded that *Miranda I*, as a matter of law, had been wrongly decided, in part because the opinion had failed to consider the plain language and legislative history of the statute at issue, contrary to what had been stated in *Miranda II*, and instead had relied on local and extrajurisdictional precedent that largely was inapposite. Id., 758 n.4, 762–64 (*Vertefeuille, J.*, concurring). According to the majority, however, our conclusion in *Miranda II* that this deeply flawed decision was "reasonably foreseeable"; *Miranda II*, supra, 110; nevertheless remains inviolate.

Applying the foregoing holding to the present matter, the majority concludes that the defendant's due process claim fails because its recognition of the born alive rule was not unexpected and indefensible with reference to the law that had been expressed prior to the defendant's conduct.[37] I do not agree. Rather, I believe that applica-

Additionally, I disagree with this court's conclusion in *Miranda II* that retroactive application of *Miranda I* clearly was sanctioned by the then recent holding of *Rogers*. Specifically, the conclusion in *Miranda I* had no support in the relevant statutory language or legislative history, and the extrajurisdictional precedent relied upon, even if it was analogous, hardly represented an overwhelming trend. In short, I disagree with the conclusion in *Miranda II*, purportedly reached in reliance on *Rogers*, that retroactive application of any decision arrived at by "employ[ing] the ordinary tools of statutory construction"; id., 106; including reference to inapposite extrajurisdictional precedent at odds with the language of the statute at issue, necessarily comports with due process. I have searched *Rogers* in vain, and have found no language sanctioning such an unrestrained approach. As noted previously in this concurring and dissenting opinion, when state and federal jurisprudence on federal due process conflict, the federal jurisprudence controls.

[37] The majority applies the holding of *Rogers* expansively and mechanically, and at a highly general level. In short, according to the majority, because the United States Supreme Court in *Rogers* concluded that a retroactive overruling of precedent did not offend due process, any retroactive change in the law that falls short of a direct overruling of prior case law necessarily is constitutional. Moreover, the majority reasons, because the United States Supreme Court sanctioned consideration of extrajurisdictional precedent as a factor in certain circumstances, complete reliance on extrajurisdictional precedent, in the absence of any authoritative pronouncement from Connecticut's courts or legislature, is entirely appropriate.

I reject this approach as overly cynical and inconsistent with the individualized, case specific consideration that should be given to claims of inadequate notice. Furthermore, novel judicial interpretations of statutes that did not involve outright reversal of previous precedent have been held to be unexpected and indefensible with reference to the law as previously stated and, therefore, violative of due process. Typically, these cases involve the expansion of statutory language to cover conduct not obviously within a statute's reach or not previously held to be within its coverage. See, e.g., *Bouie* v. *Columbia*, supra, 378 U.S. 347 (finding due process violation where state court expanded reach of trespassing statute beyond plain language or scope previously indicated); 1 W. LaFave, supra, § 2-4 (c), p. 163 n.62 ("[a]n examination of the prior state decisions [in *Bouie*] shows that none were actually overruled by the case which held that the trespass statute also covered instances in which a person refuses to leave the land of another after being ordered to do so"); see also *Rabe* v. *Washington*, 405 U.S. 313, 315, 92 S. Ct. 993, 31 L. Ed. 2d 258 (holding due process violation where state court broadened reach of obscenity statute by finding dispositive

tion of the reasoning of *Rogers* leads clearly and unequivocally to the opposite result.

As was the case with the year and a day rule at issue in *Rogers*, the born alive rule appears nowhere in Connecticut's criminal statutes. Moreover, also similarly to the year and a day rule at issue in *Rogers*, in fact even more so, the born alive rule has virtually no presence in the entire history of reported Connecticut jurisprudence.[38] Even if, prior to this case, it was a substantive principle of the common law in Connecticut, "it was a principle in name only, *having never once been enforced in th[is] [s]tate.*" (Emphasis added.) Id., 466. As the United States Supreme Court emphasized in *Rogers*, the rule's lack of presence in our case law perhaps weighs "most importantly." Id., 464. Finally, just like the year and a day rule at issue in *Rogers*, the born alive rule is widely regarded as an obsolete, archaic and outmoded relic of the common law, and presently there is an overwhelming trend in the vast majority of jurisdictions toward abandoning it.[39] Given the foregoing circumstances, the United States Supreme Court concluded that the Tennessee Supreme Court's *abolition of the common-law rule* was not unexpected and indefensible.[40] The majority, however, turns

manner in which movie was displayed rather than its content), reh. denied, 406 U.S. 911, 92 S. Ct. 1604, 31 L. Ed. 2d 822 (1972). Each of these cases, like the present case, necessarily involved a matter of first impression.

[38] As the court explained in *Rogers*, the year and a day rule, prior to the conduct in question, had been mentioned in one decision of the Tennessee Supreme Court and one decision of the Tennessee Court of Appeals, both times in dicta.

[39] Apparently, the majority considers historic trends more compelling than contemporary ones. Astoundingly, according to the majority, "the reasons for recognizing the rule are compelling and . . . there is no persuasive reason for not doing so."

[40] Indeed, for very similar reasons, this court concluded that the year and a day rule never existed in Connecticut. See *Valeriano* v. *Bronson*, supra, 209 Conn. 90–95 (rejecting argument that rule was part of Connecticut common law where it had been mentioned rarely and only in dicta, did not appear in our Penal Code and had been abolished in numerous other jurisdictions in light of its dubious underpinnings and advent of modern medical technology). Today, however, the majority concludes that its

that holding on its head by concluding, under virtually identical circumstances, that its *adoption of the born alive rule* today is not only expected and defensible, but in fact, is a "conventional and foreseeable example of common-law adjudication" that has brought Connecticut's "law into conformity with reason and common sense." (Internal quotation marks omitted.) I emphatically disagree.

## B

I recognize that a conviction of murder on the basis of the doctrine of transferred intent may form the predicate for a conviction under our capital felony statute. *State* v. *Higgins*, 265 Conn. 35, 50, 826 A.2d 1126 (2003). In *Higgins*, we also stated, however, that "because this case does not involve the death penalty,[41] any constitutional limitations on the doctrine in that context are left for another day." Id., 60 n.25. Although I conclude that the majority's adoption and retroactive application of the born alive rule, standing alone, violates the defendant's due process rights to notice and fair warning, I also conclude that the majority's application of the doctrine of transferred intent, which, in conjunction with the born alive rule, serves as a predicate for the imposition of the death penalty on the defendant, similarly violates those rights. Because, at the time of the defendant's conduct, the intentional killing of an unborn fetus in utero was not an independent criminal act, the notion of moral equivalence between the intent to kill the mother and the constructive intent to cause the death of the fetus, which underpins the doctrine of transferred intent, is lacking. Accordingly, the majority's novel application of that doctrine, pursuant to which criminal intent is transferred toward an entity

employment of precisely the opposite reasoning is not unexpected and indefensible with reference to previously stated law.

[41] In *Higgins,* the defendant had been sentenced to life imprisonment. *State* v. *Higgins*, supra, 265 Conn. 42.

that has yet to achieve personhood status, cannot be applied retroactively to the defendant consistent with due process of law.[42]

In *State* v. *Higgins*, supra, 265 Conn. 59, we explained that "the weight of authority supports the proposition that the common-law doctrine of transferred intent may be applied when the defendant's actual mental state and wrongful conduct *are equivalent* to the mental state and wrongful conduct that must be proved under the offense with which he is charged . . . ." (Emphasis added.) In that case, the defendant had intended to kill an adult but, instead, had killed a thirteen year old child. Id., 40. Although the lone murder of an adult would not have implicated the death penalty, the resultant death of a person under sixteen years of age constituted a crime eligible for the death penalty. See id., 37 n.2; General Statutes (Rev. to 2003) § 53a-54b (8). We concluded that the doctrine of transferred intent could support the application of the death penalty because the mental state and wrongful conduct necessary to murder a child were equivalent to the defendant's actual intent and actions as directed toward the intended adult victim. See *State* v. *Higgins*, supra, 59–60.

In the present case, however, we are not concerned with the transfer of the intent to kill an adult to a child, but rather, with the transfer of the intent to kill an adult to what, at the time of the defendant's act, was an unborn fetus, in other words, to an entity that was not considered a "person" under our law. Accordingly, the equivalence of mental state and wrongful conduct is lacking. As I noted previously in this opinion, at the time of the conduct underlying the defendant's convictions,

[42] Furthermore, for the reasons expressed more fully by Justice Zarella, I agree that our murder statutes require that there must be a temporal nexus between a defendant's criminal conduct and the status of the victim when the fatal injury is inflicted.

causing the death of a fetus in utero was *not a criminal act.*

Indeed, even in cases in which courts have applied the doctrine of transferred intent to the death of a fetus, the defendant's underlying conduct carried with it criminally equivalent culpability. For example, in *State* v. *Merrill,* 450 N.W.2d 318, 323 (Minn.), cert. denied, 496 U.S. 931, 110 S. Ct. 2633, 110 L. Ed. 2d 653 (1990), the Minnesota Supreme Court held that the defendant's intent to kill a pregnant mother could be transferred to support a murder charge for the death of the fetus. In that case, however, the critical distinction was that, at the time of the defendant's conduct, Minnesota recognized that an independent act that resulted in the death of a fetus constituted either first or second degree murder.[43] Id. Consequently, both of the resultant crimes constituted independent *criminal* acts involving substantially similar criminal culpability, thereby justifying application of the doctrine of transferred intent.

As the majority has acknowledged, "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to *the law which had been expressed* prior to the conduct in issue, [the construction] must not be given retroactive effect." (Emphasis added; internal quotation marks omitted.) *Bouie* v. *Columbia,* supra, 378 U.S. 354. As I discussed in part I A of this concurring and dissenting opinion, on the basis of our law as it was expressed prior to the defendant's conduct, the defendant did not have notice and fair warning regarding the potential application of the born alive rule. The majority further compounds that problem of lack of notice through the application of a second legal fiction, the doctrine of transferred intent,

---

[43] The difference is that first degree murder requires premeditation. Compare Minn. Stat. § 609.2661 (1988) with Minn. Stat. § 609.2662 (1988).

which, prior to today, never had been employed in similar circumstances. Even assuming that the majority, as a legal matter, is correct in its determination that the two doctrines can be applied together in the present factual context, that conclusion is so novel to our jurisprudence that its retroactive application violates the defendant's due process rights to notice and fair warning. It is worth repeating that these concerns are particularly significant in the present case, because the consequence of the majority's construction unquestionably is an expanded application of our society's most severe form of punishment—the sentence of death. For the foregoing reasons, I disagree with the flawed conclusion of the majority with respect to this issue.

## II

Even assuming that retroactive application of the newly recognized born alive rule to this case is constitutionally proper, a conclusion with which I disagree, I nevertheless would reverse the trial court's judgment convicting the defendant of murder for the "death" of Antonia because the evidence presented at trial was insufficient to establish that she was born alive. In light of the majority's conclusion that the defendant had sufficient notice of the potential application of the born alive rule and its novel construction of the transferred intent doctrine despite the absence of any prior legislative adoption of the born alive rule and any prior Connecticut case applying either doctrine in such a fashion, it is ironic—and deeply troubling—that the majority also has decided that the state, on the other hand, *did not have sufficient notice* of the expansion of the common-law definition of death established in *State* v. *Guess*, 244 Conn. 761, 764, 772, 780, 715 A.2d 643 (1998). Based on this glaring inconsistent treatment in favor of the state, the majority has ordered a remand of the case for a new trial—essentially, to give the state a second opportunity to attempt to prove that Antonia

had brain function at the time of her birth, even though the state failed to prove that fact at the defendant's first trial and even though the state was on notice of such requirement.

It cannot be disputed that the requirement was reasonably foreseeable as a result of our expansion of the common-law definition of death in *Guess*, which was published several months *prior* to the defendant's trial. As a result of our decision in *Guess*, the state clearly was on notice that, pursuant to our expanded definition of death, to sustain a conviction under the born alive rule, the state would have to disprove beyond a reasonable doubt *both* that, at the time of her birth, Antonia had not suffered an irreversible cessation of her circulatory and respiratory systems *and* that she had not suffered an irreversible cessation of brain activity. See id. Because the state failed to disprove that Antonia did not suffer an irreversible cessation of brain activity, the evidence was insufficient for the fact finder to conclude that Antonia was "alive" at the time of her birth and, therefore, the evidence was insufficient to prove that Antonia was a "person" under the born alive rule. The majority's conclusion that the state is entitled to retry the defendant results in a denial of the defendant's right to be free from double jeopardy. See *Burks* v. *United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

It is beyond question that the state was fully on notice of the foreseeable impact of *Guess* on a death penalty prosecution involving the born alive rule. The opening paragraph in *Guess* leaves no doubt as to what that case was about: "The sole issue on appeal is whether the term 'death,' as used in the Penal Code, may be construed to embrace a determination, made according to accepted medical standards, that a person has suffered an irreversible cessation of all brain functions." *State* v. *Guess*, supra, 244 Conn. 762. As the majority points out, prior to *Guess*, the common law defined

death as occurring when a person had suffered an irreversible cessation of the circulatory and respiratory systems. In light of the state of current medical science, however, we acknowledged in *Guess* that "the traditional vital signs—breathing and heartbeat—are not independent indicia of life, but are, instead, part of an integration of functions in which the brain is dominant . . . . [Therefore] our focus must shift from those traditional vital signs to recognize cessation of brain functions as criteria for death following this medical trend." (Citation omitted; internal quotation marks omitted.) Id., 776. Because it is axiomatic that "life is the obverse of death"; *People* v. *Flores*, 3 Cal. App. 4th 200, 210, 4 Cal. Rptr. 2d 120 (1992); it already was clear that, to disprove that Antonia was not dead at the time of birth, and, therefore, to prove that she was a person under the born alive rule, the state had to establish both that she did not suffer an irreversible cessation of circulatory and respiratory systems and did not suffer an irreversible cessation of brain function.[44]

In a case in which the defendant has been sentenced to death, it is simply too much to bear to expect the defendant to be familiar with the eighteenth century works of Zephaniah Swift, extrajurisdictional precedent and the unexpressed intent of our legislature to adopt a common-law definition, yet, at the same time, to excuse the state's ignorance or disregard of a pertinent and contemporaneous state Supreme Court decision from this jurisdiction.

I disagree emphatically with the majority's characterization of my argument as advocating for unwarranted penalizing of the state, apparently aimed at evening some unexplained score. What the majority cursorily

---

[44] Indeed, as the majority itself acknowledges, the expanded two-prong definition of life, and conversely, death, already had been applied *in the born alive rule context* six years prior to the defendant's trial. See *People* v. *Flores*, supra, 3 Cal. App. 4th 210–11.

dismisses as seeking "a sort of rough justice" is nothing less than advancing the values of fundamental fairness. The majority purports to adhere to these values despite holding the defendant to a standard of, in essence, legal clairvoyance as to this court's recognition of the born alive rule some twelve years after the criminal conduct at issue, resulting in the upholding of a death penalty charge, while simultaneously excusing the state's failure to predict the direction of the law that clearly was signaled by *Guess.* If advocating for constitutionally required fundamental fairness in both instances amounts to rough justice, then I am in favor of it.[45]

In short, in a criminal prosecution, the burden is upon the state to present its case-in-chief and prove all the elements of the charged crimes. It is not incumbent upon the defendant, or upon the trial court, to instruct the state on how to try its case. By failing to prove definitively that Antonia had not suffered an irreversible cessation of brain function at the time of her "birth," the state ran the risk that its evidence would be insufficient to show that Antonia was a person for purposes of the born alive rule. The remedy for the failure to present sufficient evidence at trial is a judgment of acquittal on all related charges. *Burks* v. *United States*, supra, 437 U.S. 11, 18. In remanding the case for a new trial, the majority improperly provides the state with a second opportunity to prove its case, ostensibly to protect the defendant's rights. Instead, I would order a

---

[45] The majority's attempt to explain the due process violation by mischaracterizing my argument concerning the need for clairvoyance is unavailing under the circumstances of this case. My point, simply put, is that the majority has denied the defendant fundamental fairness in two separate respects—first, by charging him with knowledge that a wholly unarticulated and, therefore, novel interpretation of our murder statutes would apply to make his conduct as to Antonia criminal, and, second, by failing to require the state to appreciate that a general standard for determining death, intended to apply in a variety of contexts, would be pertinent to the life or death issue at the heart of this case. The majority, rather than refuting this argument, attempts to distract from it through mischaracterization.

judgment of acquittal with respect to the charges arising from the "death" of Antonia.

In sum, the majority's newfound recognition of the born alive rule, which is not clearly embodied in our murder statutes, and its application of the doctrine of transferred intent to the present circumstances are unexpected and indefensible by reference to Connecticut law as it existed at the time of the defendant's offenses. Accordingly, retroactive application of the majority's legal conclusions to uphold the defendant's convictions is a violation of due process. Furthermore, because the state failed to present sufficient evidence to prove that Antonia was born "alive" pursuant to the definition of that term established by *State* v. *Guess*, supra, 244 Conn. 764, the defendant's right to be free from double jeopardy also has been violated. On the basis of the foregoing, I respectfully dissent.